1

2

3

4                                                      **E-FILED on     2/28/06**

5

6

7

8                    IN THE UNITED STATES DISTRICT COURT

9                   FOR THE NORTHERN DISTRICT OF CALIFORNIA

10                            SAN JOSE DIVISION

11

12   COALITION FOR ICANN TRANSPARENCY          No. C-05-04826 RMW
     INC, a Delaware corporation,
13                                              ORDER DENYING VERISIGN'S MOTION
                   Plaintiff,                   TO DISMISS AND GRANTING
14                                              DEFENDANTS' MOTIONS FOR
            v.                                  JUDGMENT ON THE PLEADINGS
15
     VERISIGN, INC., a Delaware corporation;    **[Re Docket No. 63, 66, 74]**
16   INTERNET CORPORATION FOR
     ASSIGNED NAMES AND NUMBERS, a
17   California corporation,

18                 Defendants.

19

20         On November 28, 2005 the Coalition For ICANN Transparency, Inc. ("CFIT") sued

21   VeriSign, Inc. ("VeriSign") and the Internet Corporation for Assigned Names and Numbers

22   ("ICANN") (collectively "defendants") for antitrust violations, unfair competition, cybersquatting,

23   and intentional interference with prospective economic advantage.  CFIT filed a motion for a

24   Temporary Restraining Order ("TRO").  On November 30, 2005 this court denied CFIT's motion.

25   The court noted that it would construe the motion as a request for a preliminary injunction if CFIT

26   desired and set a briefing schedule.  On January 17, 2006 CFIT withdrew its motion.  VeriSign now

27   moves to dismiss CFIT's complaint for improper venue.  In addition, both defendants seek judgment

28

1   on the pleadings.  The court has read the moving and responding papers and considered counsels'

2   arguments.  For the reasons set forth below, the court denies VeriSign's motion to dismiss and grants

3   defendants' motions for judgment on the pleadings with leave to amend.

### I. BACKGROUND

5       CFIT is a nonprofit membership organization whose members "include certain Internet

6   domain registrars, registrants, back order service providers, and other Internet stakeholders."

7   Complaint ("Comp.") ¶ 7.  CFIT alleges that every computer connected to the Internet has a unique

8   Internet Protocol ("IP") address.  *Id*. at ¶ 15.  IP addresses are long strings of numbers, such as

9   64.233.161.147.  *Id*.  The Internet domain name system ("DNS") provides an alphanumeric

10   shorthand for IP addresses.  *Id*. at ¶ 16.  For example, the IP address 64.233.161.147 is commonly

11   known by its domain name: google.com.  *Id*.  The portion of the domain name to the right of the

12   period is the top-level domain ("TLD").  TLDs include .com, .gov, .net., and .biz.  *Id*. at ¶ 17.  The

13   .com and .net TLDs are "dominant" in the United States and of paramount importance for many

14   businesses.  *Id*. at ¶¶ 6, 20, 25.  Second-level domain names are to the left of the TLDs, such as

15   "google" in "google.com."  *Id*.  Each domain name is unique and thus can only be registered to one

16   entity.  *Id*. at ¶ 18.  Thus, recognizable domain names are a finite resource.  *Id*. at ¶ 25.  To ensure

17   that each domain name refers to the appropriate IP address, each TLD has a single "registry" that

18   links the two.  *Id*. at ¶ 19.

19       ICANN is a private not-for-profit corporation that coordinates the DNS on behalf of the

20   United States Department of Commerce ("DOC").  *Id*. at ¶¶ 1, 5, 27.  ICANN's bylaws provide that

21   it shall "[i]ntroduc[e] and promot[e] competition in the registration of domain names where

22   practicable and beneficial in the public interest."  *Id*. at ¶ 29.  ICANN operates under a

23   Memorandum of Understanding ("MOU") with the DOC.  *Id*. at ¶ 27.  The MOU "is effectively

24   ICANN's charter."  *Id*.  The MOU's purpose is to "promote[ ] the management of the DNS in a

25   manner that will permit market mechanisms to support competition and consumer choice in the

26   technical management of the DNS."  *Id*.  The MOU prohibits ICANN from "unjustifiably or

27   arbitrarily" injuring "particular persons or entities or particular categories of persons or entities."  *Id*.

28

1    It requires ICANN to "act in a non-arbitrary and reasonable manner with respect to . . . any . . .

2    activity related to a DNS project." *Id*. The original MOU was scheduled to expire in September

3    2000. *Id*. ICANN and the DOC have amended it six times. *Id*. The most recent amendment

4    reiterates the DOC's "policy goal of privatizing the technical management of the DNS in a manner

5    that promotes stability and security, competition, coordination, and representation." *Id*. In this

6    amendment, ICANN also reaffirms its "commitment to maintaining security and stability in the

7    technical management of DNS, and to perform as an organization founded on the principles of

8    competition, bottom up coordination, and representation." *Id*.

9         ICANN has contracted with VeriSign to serve as the registry for all .com and .net domain

10   names. Consumers, or "registrants," sign up for domain names, causing VeriSign's database to relate

11   the domain name with the specific IP address. *Id*. at ¶¶ 19, 21. Registrants do not have direct access

12   to this database. *Id*. at ¶ 21. Instead, prospective registrants use "registrars" to handle the technical

13   details. *Id*. This process is automated. *Id*. at ¶ 22. VeriSign grants a limited number of connections

14   to its registry computers. *Id*. A registrar sends an "add" command to the registry. *Id*. If the name is

15   available, the registrar acquires the name on behalf of the registrant. *Id*. When a popular domain

16   name expires, registrars send rapid-fire "add" commands to try to register the name. *Id*. at ¶ 23.

17   Because the system is based on chance, and because a registrar's odds of registering an expired

18   domain name increase with the number of "add" commands it sends, it "functions, in essence, like a

19   lottery." *Id*. "[J]ust as buying more tickets in a lottery increases the chance of winning, lining up

20   more registrars to participate in the domain name lottery on behalf of a registrant increases the

21   chance of success." *Id*. at ¶ 64.

22        Accordingly, this regime spawned a new business: "back order service providers." Back

23   order service providers are companies that combine forces with several registrars in order to increase

24   the odds of winning the domain name registration lottery. *Id*. at ¶ 24. A registrar receives an order

25   from a client and hires a back order service provider to pool the resources of several registrars. *Id*.

26   If the back order service provider is successful, it and its partner-registrars "all share appropriately in

27   the registration fee charged to the client." *Id*. The back order service business is "robust and

28

competitive," with hundreds of registrars generating millions of dollars in revenue. *Id*. at ¶ 26. Without back order service, the cost to register a new or previously-released name is between $6.95 and $7.50. *Id*. VeriSign and ICANN collect $6.25 ($6.00 to VeriSign and $0.25 to ICANN) for registration of each .com domain name and $4.25 ($3.50 to VeriSign and $0.75 to ICANN) for each .net domain name. *Id*. The registrar keeps the balance. *Id*. However, a valuable domain name is likely to be registered through a back order service provider. *Id*. The price of back order service is generally around $60. *Id*. Of this, VeriSign collects $6.00 for the registry fee for .com domain names and $4.25 for .net domain names. *Id*. The back order service provider generally retains about half of the remaining sum and splits the other half among its registrar partners. *Id*.

Two contracts govern ICANN and VeriSign's relationship: the .com Registry Agreement and the .net Registry Agreement. ICANN and VeriSign initially signed these agreements on May 25, 2001 ("the 2001 Agreements"). *Id*. at ¶ 31. Both 2001 Agreements require VeriSign to provide "Registry Services" to ICANN-accredited registrars "in a manner meeting certain performance and functional specifications." *Id*. at ¶ 34. "Registry Services" is a defined term. *Id*. VeriSign also must comply with "Consensus Policies": rules established by certain Internet stakeholders. *Id*. at ¶ 35. Appendix G to both Agreements caps the prices VeriSign can charge for its services. *Id*. at ¶ 36. Under Appendix G, VeriSign can charge no more than $6 per year for registration or renewal of a domain name. *Id*. In addition, it calls for a "registry-level transaction fee" payment of $0.25 to ICANN for each domain name registration. *Id*. Appendix I to both Agreements includes a Code of Conduct that tasks VeriSign with "at all times striv[ing] to operate as a trusted and neutral third-party provider of Registry Services." *Id*. The Code of Conduct also forbids VeriSign from "warehousing or registering domain names in its own right other than through an ICANN-accredited registrar." *Id*. Appendix W to both Agreements provides that VeriSign will spend $200,000,000 "for research, development, and infrastructure improvements to the .com, .net, and .org Registries" between 2001 and 2010. *Id*. at ¶ 38. Finally, both Agreements prohibit VeriSign from "unreasonably retrain[ing] competition." *Id*.

1    The 2001 .com Agreement is scheduled to expire on November 10, 2007, but allows

2    VeriSign to submit a written extension proposal between November 10, 2005 and May 10, 2006. *Id*.

3    at ¶ 32.  ICANN must consider this proposal for no more than six months "before deciding whether

4    to call for competing proposals . . . ." *Id*.  VeriSign "shall be awarded a four-year renewal term,"

5    expiring on November 10, 2011, unless ICANN determines that VeriSign has materially breached

6    the 2001 .com Agreement or the proposal's prices are too high.  *Id*.  According to CFIT, ICANN

7    believes that VeriSign has materially breached the 2001 .com Agreement.  In addition, VeriSign's

8    current proposal to renew the 2001 .com Agreement contains excessive prices.  *Id*.  Thus, if ICANN

9    wishes, it can "require competitive bidding for operation of the .com registry in 2007." *Id*.

10    Instead, however, defendants intend to replace the 2001 .com Agreement with the 2005 .com

11    Agreement.  *Id*. at ¶ 40.  On October 24, 2005 defendants agreed to submit the 2005 .com

12    Agreement for public comment and approval by ICANN's Board of Directors. *Id*. at ¶ 41.  The

13    Board was scheduled to vote at an ICANN meeting between November 30, 2005 and December 4,

14    2005.  *Id*.  The initial expiration of the 2005 .com Agreement is November 30, 2012. *Id*. at ¶ 42.  It

15    will be renewed thereafter unless an arbitrator or court has issued a final ruling stating that VeriSign

16    has materially breached its obligations under the contract.  *Id*.  It increases the maximum price for

17    domain name registration. *Id*. at ¶ 43.  Until December 31, 2006 the maximum price is $6.00. *Id*.

18    Beginning in 2007, it increases by seven percent each year.  *Id*.  In addition, the 2005 .com

19    Agreement defines maximum price so that it does not include "registry-level transaction fees." *Id*. at

20    ¶ 44.  Thus, a registrar would pay these fees in addition to VeriSign's fee.  *Id*.  The "registry-level

21    transactions fees" also increase over time, thus "allow[ing] ICANN to share in the monopoly profit

22    generated by . . . the 2005 .com Agreement." *Id*.

23    The 2005 .com Agreement allows VeriSign "to use commercially valuable traffic data for its

24    own commercial benefit, including promoting the sale of domain names." *Id*. at ¶ 45.  It defines

25    "Registry Services" in a manner that permits VeriSign to exclude certain tasks from the maximum

26    price provisions. *Id*. at ¶ 46.  Appendix 9 to the Agreement allows VeriSign "to offer many services

27    in markets that are downstream and adjacent to the [DNS] market." *Id*. at ¶ 48.  ICANN previously

28

ORDER DENYING VERISIGN'S MOTION TO DISMISS AND GRANTING DEFENDANTS' MOTIONS FOR JUDGMENT ON THE PLEADINGS
C-05-4826 RMW
DOH                                                                 5

1   opposed these services under the 2001 .com Agreement unless they were approved through the

2   Consensus Policy.  *Id.*  One such service is the "Wait List Service," which ICANN viewed as a

3   breach of the 2001 .com Agreement.  *Id.* at ¶ 49.  VeriSign intends to launch a modified version of

4   the Wait List Service, which it has renamed the Central Listing Service ("CLS").  *Id.*  The CLS

5   overhauls the domain name registration system.  *Id.*  Under the current regime, when a registrant

6   does not renew a domain name, VeriSign provides a forty-five day grace period before releasing the

7   name.  *Id.*  By contrast, under the CLS, VeriSign will immediately conduct an auction for expired

8   names among all registrars who have signed a CLS service agreement.  *Id.* at ¶ 50.  VeriSign will

9   receive ten percent of the auction price.  *Id.*  In addition, while the 2001 .com Agreement allows

10  registrants to "return" domain names within five days of acquiring them, the 2005 .com Agreement

11  provides no such guarantee.  *Id.*  The 2005 .com Agreement also defines Consensus Policies

12  differently and eliminates (1) the provision in the 2001 .com Agreement that requires VeriSign to

13  spend $200,000,000 for research and development and (2) the Code of Conduct.  *Id.* at ¶¶ 52-54.

14       ICANN and VeriSign signed the 2005 .net Agreement, on June 29, 2005.  *Id.* at ¶ 56.  The

15  2005 .net Agreement shares many provisions with the 2005 .com Agreement, including the

16  automatic renewal procedure.  *Id.* at ¶¶ 57, 58.  It also eliminates the 2001 .net Agreement's price

17  controls and raises the registry-level transaction fee."  *Id.* at ¶ 58.

18       CFIT contends that the 2005 Agreements will destroy the back order service provider

19  business by replacing the current lottery-like system with the CLS.  *Id.* at ¶¶ 65, 68.  Because

20  "nothing in the contracts or otherwise will prevent VeriSign from further increasing prices,"

21  consumers will pay more.  *Id.* at ¶¶ 66-67.  In addition, VeriSign intends to use its monopoly power

22  over the .com and .net domain names to lock up the market for Web address directory assistance

23  services.  Under the current system, if a user enters domain name that is not registered, he receives a

24  standard error page.  *Id.* at ¶ 70.  VeriSign's proposed SiteFinder service would "replace the standard

25  error page with a customized VeriSign page that states that the desired page could not be found and

26  offers some links to domain names with similar spellings."  *Id.* at ¶ 71.  For example, if a user types

27  www.bokkstore.com, which is not registered, "the user will be directed to a VeriSign SiteFinder

28

ORDER DENYING VERISIGN'S MOTION TO DISMISS AND GRANTING DEFENDANTS' MOTIONS FOR JUDGMENT ON THE
PLEADINGS
C-05-4826 RMW
DOH                                                        6

page at www.bokkstore.com featuring such links as www.bookstore.com or www.bkstore.com." *Id*. VeriSign may be able to collect a Pay Per Click fee from the owners of these web sites. *Id*. Some registrants already purchase domain names that are misspellings of common web sites for the sole purpose of generating Pay Per Click revenue. *Id*. Because of VeriSign's unique position as the depository of all unregistered .com and .net domain names, only it will be able to receive revenue from this service and will drive out "some of those who are currently active in the Pay Per Click market." *Id*. at ¶ 72. In addition, because VeriSign has eliminated the five-day grace period for "returning" registered domain names, only VeriSign will be able to "test .com and .net domain names to see if they are suitable for use in the Pay Per Click market without paying a registry fee." *Id*. at ¶ 73. No one will be able to compete with VeriSign in this market because every other registrant will have to pay the non-refundable $6 or $4.25 registry fee to test traffic on such a domain name. *Id*. VeriSign has employed the SiteFinder service before, on September 15, 2003. *Id*. at ¶ 74. An ICANN advisory board determined that it "considerably weakened the stability of the Internet." *Id*. VeriSign abandoned the system only after ICANN threatened to take legal action. *Id*. at ¶ 75. However, VeriSign "announced that it would reintroduce SiteFinder at its discretion, and made clear that it had no intention of turning SiteFinder off for good." *Id*. Now, ICANN has agreed to permit VeriSign to launch SiteFinder "subject only to perfunctory procedural requirements." *Id*. at ¶ 76.

CFIT alleges causes of action against (1) VeriSign in the .com and .net Registration Markets for monopolization under section 2 of the Sherman Act, (2) VeriSign in the .com and .net Registration Markets for attempted monopolization under section 2 of the Sherman Act, (3) VeriSign in the Expiring Names Registration Services and Directory Assistance Services Markets for attempted monopolization under section 2 of the Sherman Act, (4) VeriSign and ICANN in "all relevant markets" for conspiracy to monopolize under section 2 of the Sherman Act, (5) VeriSign and ICANN in "all relevant markets" for conspiracy in restraint of trade under section 1 of the Sherman Act, (6) VeriSign and ICANN in "all relevant markets" for conspiracy in restraint of trade under the Cartwright Act, (7) VeriSign and ICANN for unfair competition under California Business

and Professions Code section 17200, (8) VeriSign for cybersquatting under 15 U.S.C. section 1125(d), and (9) VeriSign and ICANN for intentional interference with prospective economic advantage. *Id*. at ¶¶ 79-147.  CFIT seeks (1) a declaration that the 2005 .com Agreement is unlawful, (2) a declaration that sections of the 2005 .net Agreement is unlawful, and (3) injunctive relief.

## II.  ANALYSIS

### A.    Motion to Dismiss

Federal Rule of Civil Procedure 12(b)(3) permits a defendant to move to dismiss for "improper venue."[1]  Each registrar in the .com and .net TLDs must sign a Registry-Registrar Agreement ("RRA") with VeriSign.  Dahlquist Decl. Supp. Mot. Dism. ("Dahlquist Decl.") Ex. A. The RRA states that "[a]ny legal action or other legal proceeding relating to this Agreement or the enforcement of any provision of this Agreement shall be brought or otherwise commenced in any state or federal court located in the eastern district of the Commonwealth of Virginia." *Id*. at § 6.7. VeriSign argues that because CFIT purports to sue on behalf of registrars — who are subject to the RRA — it is bound by this mandatory forum selection clause, making venue here improper.[2] VeriSign contends that "[a]ll of the purported claims in the Complaint necessarily relate to the RRA, because they are premised on alleged harm to CFIT's member registrars' ability to compete effectively in the domain name registration business."  Mot. Dism. at 5:22-24 (emphasis omitted). VeriSign cites *Hill v. Pac. Gas. & Elec. Co.*, 1995 WL 86567 (N.D. Cal. 1995), *Bense v. Interstate Battery Sys. of Am., Inc.*, 683 F.2d 718 (2d Cir. 1982), and *Rini Wine Co., Inc. v. Guild Wineries & Distilleries*, 604 F. Supp. 1055 (E.D. Ohio 1985) for the proposition that "forum selection clauses

---

[1]      VeriSign has answered CFIT's complaint.  Although defendants generally must bring Rule 12(b) motions before answering, VeriSign pled improper venue as an affirmative defense in its answer, thus preserving its right to bring a Rule 12(b)(3) motion. *See Hopkinson v. Lotus Development Corp.*, 1995 WL 381888, *5 (N.D. Cal. 1995) (rejecting argument that defendant waived right to contest venue because it "timely raised the defense of improper venue in its . . . Answer to Plaintiffs' Complaint").

[2]      Federal common law applies to the validity and interpretation of forum selection clauses. *See Manetti-Farrow, Inc. v. Gucci America, Inc.*, 858 F.2d 509, 513 (9th Cir. 1988).

1  apply to non-contractual claims, including antitrust, intellectual property, unfair competition, and

2  tortious interference[.]"  Mot. Dism. at 10:10-12.

3  　　　This argument is not convincing.  The forum selection applies only to "legal proceeding[s]

4  relating to this Agreement."  The plain meaning of this language is that a lawsuit must involve the

5  RRA itself to trigger the clause.  Although VeriSign would have no relationship with CFIT's

6  registrars absent the RRA, it is undisputed that CFIT's complaint and filings make no mention of the

7  RRA.  VeriSign's interpretation of "relating to" has no limiting principle: under it, all registrars must

8  bring all causes of action against VeriSign in Virginia, no matter how attenuated the relationship

9  between the claim and the RRA.  This is not the law.  *Cf. Gootnick v. Lighter*, 2005 WL 3079000 *7

10  (N.D. Cal. 2005) (denying motion to transfer venue based on forum selection clause in promissory

11  note because, *inter alia*, "[i]t is unlikely that many legal issues in the claims asserted here will turn

12  on legal interpretation of the note itself").  Indeed, each of VeriSign's authorities involved lawsuits

13  that, in one manner or another, flowed from the contract containing the clause.  *See Hill*, 1995 WL

14  86567 at *2 (applying forum selection clause to unfair competition and tort claims where plaintiff

15  alleged that defendants breached the contract that contained the clause "with the intention of causing

16  him emotional distress, and that their breaches were the result of fraud and unfair competition");

17  *Bense*, 683 F.2d at 719 (applying forum selection clause to antitrust allegation that defendant had

18  terminated the contract that contained the clause in retaliation for the plaintiff's refusal to participate

19  in a price-fixing scheme); *Rini Wine*, 604 F. Supp. 1058-59 (applying forum selection clause to

20  antitrust claims where "[t]he incident from which this dispute arises is indeed the termination of the

21

22

23

24

25

26

27

28

ORDER DENYING VERISIGN'S MOTION TO DISMISS AND GRANTING DEFENDANTS' MOTIONS FOR JUDGMENT ON THE PLEADINGS
C-05-4826 RMW
DOH

1  distributor agreement" that contained the clause).[3]  The court thus denies VeriSign's motion to

2  dismiss.[4]

3  **B.   Motions for Judgment on the Pleadings**

4  **1.   Legal Standard**

5  A motion for judgment on the pleadings under Federal Rule of Civil Procedure 12(c) is a

6  "means to challenge the sufficiency of the complaint after an answer has been filed."  *New.Net, Inc.*

7  *v. Lavasoft,* 356 F. Supp. 2d 1090, 1115 (C.D. Cal. 2004).  A motion for judgment on the pleadings

8  is similar to a motion to dismiss.  "For the purposes of the motion, the allegations of the non-moving

9  party must be accepted as true, while the allegations of the moving party which have been denied are

10  assumed to be false.  Judgment on the pleadings is proper when the moving party clearly establishes

11  on the face of the pleadings that no material issue of fact remains to be resolved and that it is entitled

12  to judgment as a matter of law."  *Hal Roach Studios, Inc. v. Richard Feiner and Co., Inc.*, 896 F.2d

13  1542, 1550 (9th Cir. 1990).

14  Federal Rule of Civil Procedure 8(a) requires complaints to contain "a short and plain

15  statement of the claim showing that the pleader is entitled to relief."  "[A]ntitrust pleadings need not

16  _____

17  [3]   VeriSign argues that "CFIT is clearly invoking the contract-based remedy of specific
18  performance" because it "seeks to 'preserve the status quo in markets related to Internet domain
   names' by 'requiring VeriSign and ICANN to abide by the terms of the current .com [A]greement . . .
   until it expires."  Rep. Supp. Mot. Dism. at 3:25-27 (emphasis omitted) (quoting Comp. ¶ 2).  There
19  are at least two problems with this contention.  First, even if CFIT does request specific
   performance, it does so with respect to the 2001 .com Agreement, not the RRA.  Second, the court
20  cannot construe CFIT as seeking specific performance of the 2001 .com Agreement because it is not
   a party to that contract.  *See Sheppard v. Banner Food Products*, 78 Cal. App. 2d 808, 812 (1947)
21  ("Plaintiff has no right to enforce performance of the Bortz-Banner contract.  He was not a party to it
   and it was not made specifically for his benefit.").

22
23  [4]   During oral argument, VeriSign asked the court to deny the motion without prejudice.
   VeriSign claimed that CFIT will not be able to prove a necessary element of its substantive claims
24  — antitrust injury — without implicating the RRA.  "Antitrust injury" refers to the fact that only
   certain types of alleged harm sound in antitrust.  *See, e.g., Glen Holly Entertainment, Inc. v.*
25  *Tektronix Inc.*, 343 F.3d 1000, 1008 (9th Cir. 2003) (opining that "the party alleging the injury must
   be either a consumer of the alleged violator's goods or services or a competitor of the alleged
26  violator in the restrained market") (internal quotation marks omitted).  Even if the issue of whether
   CFIT's members are "consumers" or "competitors" arises, the court fails to perceive how the RRA
27  will be relevant to this inquiry.  Because the court can imagine no scenario causing the parties to
   dispute their rights and obligations under the RRA, it declines to permit VeriSign to renew its
   motion later.

28

1  contain great factual specificity" than other complaints. *Portland Retail Druggists Ass'n v. Kaiser*

2  *Found. Health Plan*, 662 F.2d 641, 648 (9th Cir. 1981). "However, the court is not required to

3  accept legal conclusions cast in the form of factual allegations if those conclusions cannot

4  reasonably be drawn from the facts alleged." *Clegg v. Cult Awareness Network*, 18 F.3d 752,

5  754-55 (9th Cir. 1994). "Nor is the court required to accept as true allegations that are merely

6  conclusory, unwarranted deductions of fact, or unreasonable inferences." *Sprewell v. Golden State*

7  *Warriors*, 266 F.3d 979, 988 (9th Cir. 2001).

8               **2.       Standing**

9         VeriSign and ICANN argue that CFIT lacks standing. The standing requirement ensures that

10  federal courts hear only "cases" or "controversies" under Article III of the United States

11  Constitution. An association has "organizational standing" if it seeks to redress an injury that it

12  personally suffers. *See Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 299 n.11 (1979).

13  CFIT does not claim standing on this ground. An association may also invoke the doctrine of

14  "associational standing" to bring a complaint "on behalf of its members." *See New York State Club*

15  *Ass'n, Inc. v. City of New York*, 487 U.S. 1, 9 (1988). It may do if "(a) its members would otherwise

16  have standing to sue in their own right; (b) the interests it seeks to protect are germane to [its]

17  purpose; and (c) neither the claim asserted nor the relief requested requires the participation of

18  individual members in the lawsuit." *Hunt v. Wash. State Apple Adver. Com'n*, 432 U.S. 333, 343

19  (1977).[5] When a defendant moves to dismiss on standing grounds, the court must "accept as true all

20  material allegations of the complaint, and . . . construe [it] in favor of the complaining party."

21  *Pennell v. City of San Jose*, 485 U.S. 1, 7 (1988). At the same time, though, "[i]t is a long-settled

22  principle that standing cannot be inferred argumentatively from averments in the pleadings, but

23  rather must affirmatively appear in the record." *FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 231

24  (1990) (plurality opinion) (internal citations and quotation marks omitted). Therefore, "[i]t is within

25  the trial court's power to allow or to require the plaintiff to supply, by amendment to the complaint

26  _____

27      [5]       The requirement is not that all of the organization's members must have standing, but
    that "at least one of its members would have standing to sue in his own right." *GrassRoots*
    *Recycling Network, Inc. v. U.S. E.P.A.*, 429 F.3d 1109, 1111 (D.C. Cir. 2005).

28  ORDER DENYING VERISIGN'S MOTION TO DISMISS AND GRANTING DEFENDANTS' MOTIONS FOR JUDGMENT ON THE
    PLEADINGS
    C-05-4826 RMW
    DOH                                                     11

1   or by affidavits, further particularized allegations of fact deemed supportive of plaintiff's standing."

2   *Warth v. Seldin*, 422 U.S. 490, 501-02 (1975).

3           The complaint fails to identify a single member of CFIT.  *See* Comp. ¶ 7 (alleging only that

4   "[m]embers of CFIT include certain domain name registrars, registrants, back order service

5   providers, and other Internet stakeholders").  At least two cases suggest that this is fatal to CFIT's

6   attempt to plead associational standing.  First, in *American Immigration Lawyers Ass'n v. Reno*, 18

7   F. Supp. 2d 38 (D. D.C. 1998) several organizations challenged the Illegal Immigration Reform and

8   Immigrant Responsibility Act of 1996, which worked a sea change in adjudicating the claims of

9   aliens who arrive in the United States without proper documentation.  The plaintiffs included

10  refugee assistance associations and coalitions of immigration lawyers.  They contended that the

11  statute would harm their members by, *inter alia*, causing the erroneous removal of some immigrants.

12  *Id*. at 49-50.  The D.C. Circuit held that plaintiffs failed to allege a legally-cognizable injury-in-fact

13  because they did not pinpoint a specific individual who was likely to be deported:

14          Organizations are obligated to allege facts sufficient to establish that one or more
        of [their] members has suffered, or is threatened with, an injury.  *This obligation*
15      *extends to identifying the member or members of plaintiff organizations that have,*
        *or will suffer, harm.*  Here, plaintiffs either generally allege harm to all members
16      of all organizations or identify only vague categories of members that might
        suffer harm.  *They can point to no identifiable member or members for which the*
17      *Court can evaluate the harm.*  Nowhere in their pleadings do the plaintiffs
        identify one injured person by name, allege that the injured person is a member of
18      one of the plaintiff organizations (naming the specific organization), or allege
        facts sufficient to establish the harm to that member.
19
20  *Id*. at 51 (emphasis added) (internal citations and quotation marks omitted).

21          Similarly, in *Maine Ass'n of Indep. Neighborhoods Comm'r v. Maine Dep't of Human Servs.*,

22  747 F. Supp. 88 (D. Me. 1990), M.A.I.N., an organization, sought to strike down the "voluntarily

23  quit rule," a regulation that terminated food stamp assistance for "heads of household" when the

24  family's primary wage earner stopped working without good cause.  M.A.I.N.'s complaint alleged

25  that it "has members who are the head of a Food Stamp household but are not the primary wage

26  earners[.]"  *Id*. at 90.  Defendants moved to dismiss on standing grounds.  M.A.I.N.'s president

27  submitted an affidavit stating that "M.A.I.N. has at least one member who is a food stamp 'head of a

28  household,' is not the primary wage earner and who recently lost food stamps for the household

1    when the primary wage earner quit work without good cause." *Id*. at 91.  The court granted

2    defendants' motion, explaining that the complaint and the affidavit "do[ ] not identify the member

3    allegedly affected by the voluntary quit rule, nor . . . identify any of the factual circumstances

4    supporting her claim to be subject to the regulation." *Id*. at 92.

5           Like the defective complaints in *American Immigration Lawyers Ass'n* and *Maine Ass'n of*

6    *Indep. Neighborhoods*, which alleged "only vague categories of members that might suffer harm"

7    and "d[id] not identify the member allegedly affected," CFIT's complaint contains a single cryptic

8    sentence about its members' identities.  This is insufficient.  Regardless of whether there is a bright-

9    line rule mandating that organizations name at least one member in order to satisfy *Hunt*'s first

10   factor, at the very least *American Immigration Lawyers Ass'n* and *Maine Ass'n of Indep.*

11   *Neighborhoods* illuminate that courts may insist on such specificity.  This makes sense.  Although

12   Federal Rule of Civil Procedure 8(a)(2) only requires complaints to "give the defendant fair notice

13   of what the plaintiff's claim is and the grounds upon which it rests," *Conley v. Gibson*, 355 U.S. 41,

14   47 (1957), "fair notice" entitles defendants to some idea about who is seeking to haul them into

15   court.  Two additional considerations warrant such disclosure here.  For one, this is an antitrust

16   lawsuit.  Such cases are notoriously costly and protracted.  *See, e.g., DM Research, Inc. v. College of*

17   *Am. Pathologists*, 170 F.3d 53, 55 (1st Cir. 1999) (in antitrust litigation, "the price of entry, even to

18   discovery, is for the plaintiff to allege a factual predicate concrete enough to warrant further

19   proceedings").  In addition, defendants have faced similar claims before.  In 2004, several plaintiffs,

20   including R. Lee Chambers Company LLC, filed antitrust and state law claims against ICANN and

21   VeriSign in the Central District of California.  *See* ICANN's Request for Judicial Notice Ex. I at 2.

22   The court dismissed the antitrust claims and remanded the state law claims.  *See id*.  When CFIT

23   filed its TRO in this court, it included a declaration from Richard L. Chambers.  *See* Docket No. 6.

24   If this case involves res judicata or collateral estoppel issues — and the court expresses no view on

25   whether it does — defendants deserve to find out as early as possible.

26          CFIT relies on *Clark v. McDonald's Corp.*, 213 F.R.D. 198 (D. N.J. 2003).  In that case,

27   Robert Clark, a paraplegic, and Access Today, an organization to which Clark belonged, brought a

28

1    class action, claiming that "architectural barriers" at McDonald's restaurants violated Title III of the

2    Americans with Disabilities Act ("ADA").  The complaint alleged that "at least one member" of

3    Access Today had visited McDonald's franchises which Clark had not.  *Id.* at 203.  McDonald's

4    contested both Clark and Access Today's standing on a motion to dismiss.  The court first concluded

5    that, at a minimum, Clark had standing to assert claims for injunctive relief at restaurants he had

6    visited before filing the complaint.  *Id*. at 227-31.[6]  In addition, the court reasoned, Clark's Access

7    Today membership satisfied *Hunt*'s first prong and conferred associational standing upon the

8    organization.  *Id*. at 214.  Noting that Clark's standing was limited to obtaining equitable relief at

9    only certain restaurants, McDonald's then argued that the court should concomitantly restrict Access

10   Today's standing:

11               Access Today cannot advance the claims of its unidentified members, say the
             Defendants, because the amended complaint does not 'identify [such members],
12           allege which [members] have which disabilities, allege which [members] with which
             disabilities visited which store on which dates, identify what discriminatory conduct
13           was encountered, [and] which stores each unnamed member plans to visit (if any).'

14   *Id*. at 215 (alteration in original).  The court rejected this contention, calling it an "exaggerated

15   pleading standard."  *Id*. (internal quotation marks omitted).

16        *Clark* is distinguishable.  For one, unlike CFIT, whose membership remains shrouded in

17   mystery, Access Today did identify at least one member: Clark.  *See id.* ("[t]he short answer to

18   Defendants' present challenge, therefore, is that Clark's standing, albeit limited, enables Access

19   Today to satisfy the first prong of the *Hunt* test").  Moreover, *Clark* did not reject the same

20   arguments defendants make here.  Instead, that court found unpersuasive McDonald's novel theory

21   that Clark's standing shaped the contours of other Access Today members' standing.  *See id*.

22   (describing McDonald as contending that Access Today's standing should be "limited so as to be

23   coextensive with the standing Clark enjoys").  Accordingly, the court grants defendants' motions for

24   judgment on the pleadings without prejudice.

25

26

27        [6]      The court reserved ruling on whether Clark could challenge obstructions in
     restaurants he had not visited.  *See Clark*, 213 F.R.D. at 229-30.

28

ORDER DENYING VERISIGN'S MOTION TO DISMISS AND GRANTING DEFENDANTS' MOTIONS FOR JUDGMENT ON THE PLEADINGS
C-05-4826 RMW
DOH                                    14

1

### 3.     Antitrust Claims

2      Despite the fact that the court has dismissed CFIT's claims, it may be helpful at this point to

3 clarify several other pleading issues.

4      #### a.     Failure to Allege Relevant Product Markets

5      In general, a plaintiff must allege a relevant product and geographic market to state a claim

6 under sections 1 and 2 of the Sherman Act.  A market consists of all "commodities reasonably

7 interchangeable by consumers for the same purposes[.]"  *United States v. E.I. du Pont de Nemours &*

8 *Co.*, 351 U.S. 377, 395 (1956).  "In economists' terms, two products or services are reasonably

9 interchangeable where there is sufficient cross-elasticity of demand.  Cross-elasticity of demand

10 exists if consumers would respond to a slight increase in the price of one product by switching to

11 another product."  *Todd v. Exxon Corp.*, 275 F.3d 191, 201-02 (2d Cir. 2001).  "Congress prescribed

12 a pragmatic, factual approach to the definition of the relevant market and not a formal, legalistic

13 one."  *Brown Shoe Co. v. United States*, 370 U.S. 294, 336 (1962).

14      One market that CFIT alleges is the "[t]he market for services used by end users in the

15 purchase and sale of expiring domain name registrations ("the Expiring Names Registration Services

16 Market")."  Comp. ¶ 11.  VeriSign argues that *Weber v. Nat'l Football League*, 112 F. Supp. 2d 667

17 (N.D. Ohio 2000) and *Smith v. Network Solutions, Inc.*, 135 F. Supp. 2d 1159 (N.D. Ala. 2001) have

18 rejected this market definition as a matter of law.

19      In *Weber*, a professional domain name dealer registered "jets.com" and "dolphins.com" with

20 Network Solutions Incorporated ("NSI"), VeriSign's predecessor.  The National Football League

21 attempted to get NSI to transfer the domain names to the New York Jets and the Miami Dolphins.

22 NSI placed the names on hold and barred the plaintiff from selling them.  The plaintiff sued under

23 section 2 of the Sherman Act, describing the relevant product markets as "the demand for the

24 domain names 'jets.com' and 'dolphins.com.'"  *Weber*, 112 F. Supp. 2d at 673.  The court rejected

25 these definitions, reasoning that the infinite number of potential domain names made the proper

26 market "domain names in general":

27         The football defendants argue that the market should not be defined in terms of their
         specific marks, but rather in terms of domain names in general . . . .  The logic of the

28

1
2
3

football defendants' argument is sound . . . .  Although domain names are not a traditional commodity, for the purposes of a monopolization claim under the Sherman Act, the examination of the relevant market should be the same.  In this case, the market is defined in terms of domain names in general, not 'jets.com' and 'dolphins.com.'

4   *Id*. at 673-74.  Because the plaintiff did not allege that the defendants had monopolized this broader

5   market, the court dismissed his claim.  *Id*. at 674.

6        In *Smith*, a computer programmer sued NSI under the Sherman Act for refusing to permit

7   him to try to acquire expired domain names.  He defined the relevant product market as "expired

8   domain names."  *Smith*, 135 F. Supp. 2d at 1168.  Relying on *Weber*, the court reasoned that

9   plaintiff's failure to prove that NSI monopolized the market for "domain names generally" doomed

10  his claim:

11
12
13
14
15
16
17

[T]here is no inherent difference in character, for purposes of interchangeability and cross-elasticity of demand, between domain names that are 'expired' and held by NSI and those that are not.  It is true in a literal sense that each domain name is unique.  And one given individual domain name may be far more valuable on the open market than others.  But products need not be entirely fungible to be considered part of the same relevant market . . . .  [T]he *Weber* court did more than decide that the two names did not constitute the relevant market; the court reasoned that the relevant market was all domain names generally as a result of cross-elasticity of demand.  Because the number of domain names, unlike traditional commodities, is essentially unlimited, there will always be reasonable substitute names available for any given name kept out of circulation, whether by a registrar or by the registrant, regardless of whether we are talking about two names or a hundred and sixty thousand.

18  *Id*. at 1169-70.  Thus, the court granted summary judgment in NSI's favor.  *Id*. at 1170.

19       *Weber* and *Smith* provide an additional bar to CFIT's Sherman Act claims with respect to the

20  Expiring Names Registration Services Market.  Although CFIT alleges that "[r]ecognizable (and

21  hence usable) domain names are in limited supply" and "often have substantial commercial value,"

22  comp. ¶ 25, 64, no facts support these conclusory statements.  Nevertheless, the court declines

23  VeriSign's invitation to hold that CFIT's market definition necessarily fails as a matter of law.  At

24  bottom, both *Weber* and *Smith* rest on an empirical premise: that all domain names are fungible.

25  CFIT may have a colorable argument that this fact-specific issue is not amenable to a pleadings-

26
27
28

1  based challenge.  Indeed, unlike this court, *Smith* had the benefit of an evidentiary record.[7]

2  Although it may be unlikely, it is theoretically possible that CFIT's amended complaint may contain

3  detailed allegations tending to show that registered and unregistered domain names are not

4  reasonably interchangeable.[8]  A domain name cannot expire without first being registered; arguably,

5  the fact that some individual or entity has registered a domain name implies that it has a value that

6  an unregistered name does not.  VeriSign contends that bare allegations that some domain names

7  sell for high prices "is not at odds with . . . *Smith*," because it "acknowledged that 'one given

8  individual domain name may be far more valuable than others,' but 'products need not be entirely

9  fungible to be considered part of the same relevant market.'"  Rep. Supp. Mot. Jud. Plead. at 10:12-

10 15 (quoting *Smith*, 135 F. Supp. 2d at 1169).  At the same time, however, price disparities are

11 relevant for grouping commodities into relevant markets, *see E.I. du Pont de Nemours & Co.*, 351

12 U.S. at 404, and CFIT's new allegations could potentially differentiate the alleged Expiring Names

13 Registration Services Market from domain names in general.  The court thus dismisses this claim

14 with leave to amend.

15              **3.    Business and Professions Code Section 17200**

16         CFIT brings claims under California Business and Professions Code section 17200 ("UCL").

17 Compl. ¶¶ 129-33.  The UCL prohibits unfair competition, including "any unlawful, unfair or

18 fraudulent business act or practice."  Cal. Bus. & Prof. Code § 17200.  Until recently, "any person

19 acting for the interests of itself, its members, or the general public" could sue under the UCL.

20 *Feitelberg v. Credit Suisse First Boston, LLC*, 134 Cal. App. 4th 997, 1011 n.3 (2005).  The term

21 "person" includes associations.  *See* Cal. Bus. & Prof. Code § 17201 ("[a]s used in this chapter, the

22 _____

23         [7]      For example, the court bolstered its key determination that adequate alternative

24 domain names are always available by noting that "while the number of 'expired' names in NSI's
   database is undisputedly substantial in a raw sense, it represents approximately .05% of all domain
   names under registration."  *Smith*, 135 F. Supp. 2d at 1170.

25

26         [8]      Before the hearing on this matter, CFIT filed an amended complaint as an exhibit to a
   request for leave to amend.  The court expresses no view whatsoever on this complaint's legal
27 sufficiency.  In addition, pursuant to CFIT's request at oral argument, the court will not deem this
   proposed amended complaint controlling.  CFIT deserves an opportunity to amend after receiving
   this order and attending oral argument.

28

ORDER DENYING VERISIGN'S MOTION TO DISMISS AND GRANTING DEFENDANTS' MOTIONS FOR JUDGMENT ON THE
PLEADINGS
C-05-4826 RMW
DOH                                                    17

1   term person shall mean and include natural persons, corporations, firms, partnerships, joint stock

2   companies, associations and other organizations").  In November 2004, California voters approved

3   Proposition 64, which curtails private representative actions under the UCL.  The statute no longer

4   contains language about "any person acting for the interests of . . . its members" and now bestows

5   standing only on "any person who has suffered injury in fact and has lost money or property . . . ."

6   Cal. Bus. &  Prof. Code § 17204.  In addition, Proposition 64 amended section 17203, which

7   authorizes injunctive relief, to provide that "[a]ny person may pursue representative claims or relief

8   on behalf of others only if the claimant meets the standing requirements of [s]ection 17204 and

9   complies with [s]ection 382 of the Code of Civil Procedure."  Cal. Bus. & Prof. Code § 17203.[9]

10   Defendants contend that Proposition 64 abolished associational standing under the UCL.

11         The California Supreme Court has explained that a court construing a statute must start with

12   its plain meaning and only examine extrinsic sources if necessary to resolve an ambiguity:

> 13  [W]e first examine the words of the respective statutes: 'If there is no ambiguity in
> the language of the statute, then the Legislature is presumed to have meant what it
> said, and the plain meaning of the language governs.  Where the statute is clear,
> 14  courts will not interpret away clear language in favor of an ambiguity that does not
> exist.'  If, however, the terms of a statute provide no definitive answer, then courts
> 15  may resort to extrinsic sources, including the ostensible objects to be achieved and
> the legislative history.
> 16

17   *People v. Coronado*, 12 Cal. 4th 145, 151 (1995) (quoting *Lennane v. Franchise Tax Bd.*, 9 Cal. 4th

18   263, 268 (1994)).  At the same time, however, a court may disregard "[t]he literal meaning of the

19   words of a statute . . . to avoid absurd results . . . ."  *County of Sacramento v. Hickman,* 66 Cal. 2d

20   841, 849, n.6 (1967).

21         CFIT argues that Proposition 64 could not have eliminated associational standing under the

22   UCL because the explanation of the initiative that voters approved was comparatively narrow,

23   stating only that "[i]t is the intent of the California voters in enacting this act to prohibit private

24   attorneys from filing lawsuits for unfair competition where they have no client who has been injured

25   in fact under the standing requirements of the United States Constitution."  Cal. Bus. & Prof. Code §

26

27          [9]     California Code of Civil Procedure section 382 sets forth requirements for class
actions.

28

17203 (Historical and Statutory Notes).  But the statute's plain language effects a broader change.

CFIT cannot explain why Proposition 64 removed the section giving standing to "any person acting

for the interests of . . . its members" and replaced it with language requiring a plaintiff *personally* to

have suffered "injury in fact" and "lost money or property."  Cal. Bus.&  Prof. Code § 17204.

"[M]aterial changes in the phraseology of statutes normally demonstrate an intent by the lawmakers

to change the meaning."  *Barrett v. Dawson*, 61 Cal. App. 4th 1048, 1053 (1998) (holding that the

Legislature's deletion of words "entered into on or after the effective date of this section" from

statute forbidding restrictive covenants meant that all restrictive covenants, whenever formed, were

void).  The fact that the UCL now expressly limits "representative claims or relief on behalf of

others" to certain forms of class actions also belies CFIT's argument.  *See* Cal. Bus. & Prof. Code §

17203.[10]  Associational standing is a "representative claim": the organizational plaintiff has no claim

itself.  *See Warth*, 422 U.S. at 511 (referring to associational standing as "representational

standing").  Therefore, because the UCL no longer permits associational standing, and because CFIT

does not claim to have any other form of standing, the court dismisses its UCL cause of action

without leave to amend.

---

[10]    In *Bank of America, N.A. v. Miller*,  2005 WL 2086099 (E. D. Cal. 2005), the
plaintiff, Miller, founded Consumers Against Unfair Business Practices ("CAUBP").  CAUBP sued
Bank of America under the UCL.  In light of Proposition 64, however, CAUBP conceded that it was
an improper plaintiff because "the organization itself has no account with the Bank and therefore
cannot claim to have suffered an injury in fact."  *Id*. at *1.  CFIT correctly notes that CAUBP's
concession means that the court did not actually adjudicate the issue.  Although this is true in a
legalistic sense, CAUBP's concession also reinforces this court's sense that the plain meaning of the
UCL as amended does not permit associational standing.

1

**III.  ORDER**

2       For the foregoing reasons, the court

3       (1) denies VeriSign's motion to dismiss,

4       (2) grants defendants' motion for judgment on the pleadings with ten days leave to amend

5       except for CFIT's UCL claim,

6       (3) grants defendants' motions for judgment on the pleadings on CFIT's UCL claim with

7       prejudice,

8       (4) vacates the March 24 hearing date on CFIT's motion for leave to file an amended

9       complaint, and

10      (5) permits defendants twenty days from CFIT's amendment to file a response.

11

12

13  DATED:        2/28/06                              /s/ Ronald M. Whyte

14                                                     RONALD M. WHYTE
                                                       United States District Judge

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**Notice of this document has been electronically sent to:**

**Counsel for Plaintiff(s):**

| | |
|---|---|
| Jesse Markham | JMarkham@mofo.com |
| Cathleen Stadecker | cstadecker@mofo.com |
| Jennifer Lee Taylor | JLeeTaylor@mofo.com |
| Keith Butler | kbutler@mofo.com |
| Stuart C. Plunkett | splunkett@mofo.com |
| William Stern | wstern@mofo.com |

**Counsel for Defendant(s):**

| | |
|---|---|
| Laurence J. Hutt | laurence_hutt@aporter.com |
| James S. Blackburn | james_blackburn@aporter.com |
| Courtney Schaberg | cmschaberg@jonesday.com |
| Eric Patrick Enson | epenson@jonesday.com |
| Jason C. Murray | jcmurray@jonesday.com |
| Jeffrey A. LeVee | jlevee@jonesday.com |
| Sean William Jaquez | swjaquez@jonesday.com |

Counsel are responsible for distributing copies of this document to co-counsel that have not registered for e-filing under the court's CM/ECF program.

Dated:        2/28/06                              DOH
                                          **Chambers of Judge Whyte**