Jeffrey A. LeVee (State Bar No. 125863)
jlevee@jonesday.com
Jason C. Murray (State Bar No. 169806)
jcmurray@jonesday.com
JONES DAY
555 South Flower Street
Fiftieth Floor
Los Angeles, CA  90071-2300
Telephone:     (213) 489-3939
Facsimile:      (213) 243-2539

Attorneys for Defendant
INTERNET CORPORATION FOR ASSIGNED NAMES
AND NUMBERS

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **COALITION FOR ICANN TRANSPARENCY, INC.,**<br><br>       **Plaintiff,**<br><br>       v.<br><br>**VERISIGN, INC.; AND INTERNET CORPORATION FOR ASSIGNED NAMES AND NUMBERS,**<br><br>       **Defendants.** | **Case No. 05-4826 (RMW)**<br><br>**DEFENDANT ICANN'S NOTICE OF MOTION AND MOTION TO DISMISS CFIT'S FIRST AMENDED COMPLAINT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF**<br><br>**Rules 12(b)(1), 12(b)(6)**<br><br>**[Filed Concurrely with Request for Judicial Notice and [Proposed] Order]**<br><br><br>**Date:**      **June 9, 2006**<br>**Time:**      **9:00 a.m.**<br>**Location:**  **Courtroom 6**<br><br>**The Honorable Ronald M. Whyte** |

1

**TABLE OF CONTENTS**

2

**Page**

3

INTRODUCTION ........................................................................................................... 1

4

HISTORY OF THIS LITIGATION ............................................................................... 3

FACTUAL BACKGROUND ......................................................................................... 4

5

A.     ICANN'S FUNCTIONS ................................................................................... 4

6

B.     THE 2005 .NET AGREEMENT AND 2006 .COM EXTENSION ................. 5

7

C.     ICANN'S ROLE .............................................................................................. 7

ARGUMENT .................................................................................................................. 8

8

I.     STANDARD OF REVIEW ..................................................................................... 8

9

II.    CFIT HAS FAILED TO STATE A CLAIM UNDER THE ANTITRUST LAWS .......... 8

10

      A.     VERISIGN'S OPERATION OF THE .NET AND .COM TLDS IS NOT
           CONDUCT THAT HARMS COMPETITION ....................................................... 9

11

           1.     Neither the Exclusive Nature of the Contracts nor the Conditional
                Renewal Provisions Implicate the Antitrust Laws ...................................... 9

12

           2.     The Memorandum of Understanding Cannot Provide a Basis for
                Antitrust Liability ..................................................................................... 12

13

      B.     THE PRICE CAP IN THE 2005 .NET AGREEMENT AND 2006 .COM
           EXTENSION CANNOT VIOLATE THE ANTITRUST LAWS ........................ 13

14

      C.     VERISIGN'S ABILITY TO PROPOSE NEW SERVICES CANNOT
           VIOLATE THE ANTITRUST LAWS ................................................................. 14

15

      D.     CFIT HAS NOT AND CANNOT ALLEGE THAT ICANN ACTED
           WITH SPECIFIC INTENT TO MONOPOLIZE ................................................. 17

16

III.   CFIT HAS NOT AND CANNOT PLEAD FACTS NECESSARY FOR THIS
     COURT TO ASSERT JURISDICTION OVER THIS CASE ......................................... 20

17

      A.     CFIT'S ANTITRUST CLAIMS ARE NOT REVIEWABLE AT THIS
           TIME ................................................................................................................. 20

18

19

      B.     CFIT HAS FAILED TO ESTABLISH ASSOCIATIONAL STANDING .......... 22

20

CONCLUSION ............................................................................................................. 24

21

22

23

24

25

26

27

28

# TABLE OF AUTHORITIES

**Page**

## CASES

*Am. Ad Mgmt., Inc. v. Gen. Tel. Co. of Cal.*,
190 F.3d 1051 (9th Cir. 1999).................................................................................. 23

*Am. Immigration Lawyers Ass'n v. Reno*,
18 F. Supp. 2d 38 (D.D.C. 1998) ........................................................................... 24

*American-Arab Anti-Discrimination Comm'n v. Thornburgh*,
970 F.2d 501 (9th Cir. 1992)................................................................................... 24

*Associated Gen. Contractors of Cal. v. Cal. State Council of Carpenters*,
459 U.S. 519 (1983)................................................................................................ 23

*Atl. Richfield v. USA Petroleum Co.*,
495 U.S. 328 (1990)........................................................................................... 2, 13

*Brown Shoe Co. v. United States*,
370 U.S. 294 (1962)................................................................................................ 16

*Brulotte v. Thys Co.*,
379 U.S. 29 (1964).................................................................................................. 19

*Brunswick Corp. v. Pueblo Bowl-O-Mat*,
429 U.S. 477 (1977)................................................................................................ 23

*Brunswick Corp. v. Reigel Textile Corp.*,
752 F.2d 261 (7th Cir. 1984)................................................................................... 10

*Cal. Motor Transp. Co. v. Trucking Unlimited*,
404 U.S. 508 (1972)................................................................................................ 20

*Cargill v. Monfort of Colo., Inc.*,
479 U.S. 104 (1986)................................................................................................ 23

*Caribe BMW, Inc. v. Bayerische Motoren Werke Aktiengesellschaft*,
19 F.3d 745 (1st Cir. 1994)..................................................................................... 14

*Cascade Cabinet Co. v. W. Cabinet & Millwork, Inc.*,
710 F.2d 1366 (9th Cir. 1983)................................................................................. 16

*Christofferson Dairy, Inc. v. MMM Sales, Inc.*,
849 F.2d 1168 (9th Cir. 1988)................................................................................. 17

*City of Littleton v. Z.J. Gifts D-4 L.L.C.*,
541 U.S. 774 (2004)................................................................................................ 23

*Clinton v. Acequia, Inc.*,
94 F.3d 568 (9th Cir. 1996)..................................................................................... 21

*Columbia River People's Util. Dist. v. Portland Gen. Elec. Co.*,
217 F.3d 1187 (9th Cir. 2000)........................................................................ 3, 9, 10

*County of Tuolumne v. Sonora Cmty. Hosp.*,
236 F.3d 1148 (9th Cir. 2001)................................................................................... 9

*Destec Energy, Inc. v. S. Cal. Gas Co.*,
5 F. Supp. 2d 433 (S.D. Tex. 1997) ....................................................................... 21

*Dotster, Inc. v. Internet Corp. for Assigned Names and Numbers*,
296 F.Supp. 2d 1159 (C.D. Cal. 2003) ............................................................. 3, 14

**TABLE OF AUTHORITIES**
(continued)

Page

*Eastern R.R. Presidents Conference v. Noerr Motor Freight, Inc.*,
   365 U.S. 127 (1961)....................................................................................................... 20

*Empress LLC v. City & County of San Francisco*,
   419 F.3d 1052 (9th Cir. 2005)...................................................................................... 20

*Fischer v. NWA, Inc.*,
   883 F.2d 594 (8th Cir. 1989)........................................................................................ 10

*FW/PBS, Inc. v. City of Dallas*,
   493 U.S. 215 (1990)....................................................................................................... 23

*Genentech, Inc. v. Eli Lilly & Co.*,
   998 F.2d 931 (Fed. Cir. 1993),
   *abrogated on other grounds by Wilton v. Seven Falls Co.*, 515 U.S. 277 (1995) .............. 11, 19

*Gough v. Rossmoor Corp.*,
   585 F.2d 381 (9th Cir. 1978)........................................................................................ 16

*Great Escape, Inc. v. Union City Body Co., Inc.*,
   791 F.2d 532 (7th Cir. 1986)........................................................................................ 16

*Hartford-Empire Co. v. United States*,
   323 U.S. 386,
   *clarified*, 324 U.S. 570 (1945) .................................................................................... 19

*Hunt v. Wash. State Apple Adver. Comm'n*,
   432 U.S. 333 (1977)....................................................................................................... 22

*Hunt-Wesson Foods, Inc. v. Ragu Foods, Inc.*,
   627 F.2d 919 (9th Cir. 1980)........................................................................................... 8

*In re Independent Serv. Org. Antitrust Lit.*,
   203 F.3d 1322 (Fed. Cir. 2000)..................................................................................... 19

*In re Tamoxifen Citrate Antitrust Litig.*,
   429 F.3d 370 (2d Cir. 2005)........................................................................................... 20

*Klamath Water Users Protective Ass'n v. Patterson*,
   204 F.3d 1206 (9th Cir. 2000)................................................................................. 9, 13

*Kourtis v. Cameron*,
   419 F.3d 989 (9th Cir.  2005)......................................................................................... 8

*Lee v. City of Los Angeles*,
   250 F.3d 668 (9th Cir. 2001)........................................................................................... 8

*Les Shockley Racing, Inc. v. Nat'l Hot Rod Ass'n*,
   884 F.2d 504 (9th Cir. 1989)..................................................................................... 3, 16

*Long v. Salt River Valley Water Users' Ass'n*,
   820 F.2d 284 (9th Cir. 1987)........................................................................................ 13

*Lujan v. Nat'l Wildlife Fed'n*,
   497 U.S. 871 (1990)....................................................................................................... 21

*MacArthur v. San Juan County*,
   F. Supp. 2d, 2005 WL 3764933 (D. Utah June 13, 2005) ...................................... 21

*O'Shea v. Littleton*,
   414 U.S. 488 (1974)....................................................................................................... 21

1

**TABLE OF AUTHORITIES**
(continued)

2

Page

3

*Official Airline Guides, Inc. v. Federal Trade Comm'n,*
630 F.2d 920 (2d Cir. 1980) ................................................................................. 17

4

*Ohio Forestry Ass'n, Inc. v. Sierra Club,*
523 U.S. 726 (1998) ............................................................................................ 22

5

6

*Paladin Assocs., Inc. v. Montana Power Co.,*
328 F.3d 1145 (9th Cir. 2003) ........................................................................... 17

7

*Reid Brothers Logging Co. v. Ketchikan Pulp Co.,*
699 F.2d 1292 (9th Cir. 1983) .............................................................................. 9

8

*Rutman Wine Co. v. E & J Gallo Winery,*
829 F.2d 729 (9th Cir. 1987) ............................................................................. 16

9

*Seattle Totems Hockey Club, Inc. v. Nat'l Hockey League,*
783 F.2d 1347 (9th Cir. 1986) ........................................................................... 16

10

*Spectrum Sports, Inc. v. McQuillan,*
506 U.S. 447 (1993) ........................................................................................... 16

11

*Sprewell v. Golden State Warriors,*
266 F.3d 979 (9th Cir. 2001) ............................................................................... 8

12

*Standard Oil Co. v. United States,*
283 U.S. 163 (1931) ........................................................................................... 20

13

14

*Standfacts Credit Servs. v. Experian Info. Solutions, Inc.,*
405 F. Supp. 2d 1141 (C.D. Cal. 2005) ............................................................. 17

15

*State Oil Co. v. Khan,*
522 U.S. 3 (1997) ............................................................................................... 14

16

*Suburban Trails, Inc. v. N.J. Transit Corp.,*
800 F.2d 361 (3d Cir. 1986) .............................................................................. 21

17

*Sw. Suburban Bd. of Realtors, Inc. v. Beverly Area Planning Ass'n,*
830 F.2d 1374 (7th Cir. 1987) ........................................................................... 23

18

19

*Syufy Enters. v. Am. Multicinema, Inc.,*
793 F.2d 990 (9th Cir. 1986) ............................................................................. 17

20

*Tri-State Rubbish, Inc. v. Waste Mgmt., Inc.,*
998 F.2d 1073 (1st Cir. 1993) ............................................................................. 9

21

*UAW v. Brock,*
477 U.S. 274 (1986) ........................................................................................... 22

22

*United Mine Workers v. Pennington,*
381 U.S. 657 (1965) ........................................................................................... 20

23

24

*United States v. Westinghouse Electric Corp.,*
648 F.2d 642 (9th Cir. 1981) ............................................................................. 19

25

*Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP,*
540 U.S. 398 (2003) ..................................................................................... 2, 19

26

*Volvo N. Am. Corp. v. Men's Int. Prof. Tennis Council,*
857 F.2d 55 (2d Cir. 1988) ................................................................................ 22

27

28

1

**TABLE OF AUTHORITIES**
(continued)

2

Page

3
*W.L. Gore & Assocs. v. Carlisle Corp.*,
    529 F.2d 614 (3d Cir. 1976) ........................................................................................ 19

4
*Warth v. Seldin*,
    422 U.S. 490 (1975) ...................................................................................................... 23

5

6
*Wyler Summit P'ship v. Turner Broad. Sys., Inc.*,
    135 F.3d 658 (9th Cir. 1998) ........................................................................................ 8

7
**STATUTES**

8
15 U.S.C. § 1 (Supp. 2004) ................................................................................................ 9

15 U.S.C. § 26 (Supp. 2004) ............................................................................................ 21

9
**OTHER AUTHORITIES**

10

11
5C Chas. A. Wright & Arthur R. Miller,
    *Fed. Prac. & Proc. Civ. 3d* § 1363 (3d ed. 2004) ...................................................... 8

**RULES**

12

13
Fed. R. Civ. P. 12(b)(1) .............................................................................................. 4, 20

Fed. R. Civ. P. 12(b)(6) ................................................................................................ 4, 8

14
Fed. R. Civ. P. 12(c) ........................................................................................................ 4

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

## NOTICE OF MOTION AND MOTION TO DISMISS

PLEASE TAKE NOTICE that on June 9, at 9:00 a.m., or as soon thereafter as the matter may be heard, in Courtroom 6 of the above entitled Court, Defendant Internet Corporation for Assigned Names and Numbers ("ICANN") will and hereby does move this Court, pursuant to Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure, for dismissal of the Complaint in favor of ICANN and against Plaintiff.  The parties met and conferred and reached agreement on this hearing date.

## RELIEF SOUGHT

Plaintiff purports to assert claims against ICANN for:  (i) Conspiracy to Monopolize Under Section 2 of the Sherman Act; (ii) Conspiracy in Restraint of Trade Under Section 1 of the Sherman Act; and (iii) Conspiracy in Restraint of Trade Under the Cartwright Act.  This Motion is made on the grounds that none of these claims states a claim upon which relief may be granted, that plaintiff's claims are not ripe, and that plaintiff lacks standing to assert the claims.

This Motion is based on this Notice of Motion, Motion to Dismiss and the attached Memorandum of Points and Authorities; the concurrently filed Request for Judicial Notice; such further papers as ICANN may file in connection with the Motion; all other matters of which the Court may take judicial notice; such further evidence or argument as may be presented at or in connection with the hearing on the Motion; and all pleadings, files and records in this Action.

## STATEMENT OF ISSUES TO BE DECIDED

1.      Whether the Complaint states a claim against ICANN upon which relief can be granted.

2.      Whether Plaintiff's claims are ripe for review.

3.      Whether Plaintiff has the requisite associational standing to sue ICANN on behalf of its members.

## INTRODUCTION

ICANN coordinates various aspects of the Internet's Domain Name System ("DNS").  Among other things, ICANN designates the operator of the various domain name registries – essentially, databases that maintain Internet addresses.  (Am. Compl. ¶ 25)  There are 17 so-called "generic" domain name registries (called Top Level Domains or TLDs), and approximately 240

ICANN'S MOTION TO DISMISS FAC
No. 05-4826 (RMW)

1   more country code TLDs, which are assigned to entities (frequently governments or their

2   delegates) representing countries or other geographic areas.  As Plaintiff CFIT concedes (Am.

3   Compl. ¶ 35), each TLD can be operated by only one entity, and thus every such agreement

4   designating an operator of a particular domain name registry is necessarily a sole-source

5   agreement.

6          ICANN, a non-profit California corporation, is a private-sector organization.  Thus, when

7   it selects an operator for a TLD, it enters into an agreement with that entity setting forth various

8   obligations of both parties.  ICANN has recently entered into such an agreement with VeriSign,

9   Inc., the current operator of the largest TLD, .COM, to extend VeriSign's right to operate that

10  TLD for another 7 years.  CFIT does not like the terms of this Extension and asserts that

11  somehow the Extension violates the antitrust laws.  Exactly how this is so is not terribly clear,

12  even from CFIT's second attempt at a valid complaint, and none of the conduct alleged could

13  possibly be a violation of either Section 1 or Section 2 of the Sherman Act or of the Cartwright

14  Act.

15         VeriSign (or its predecessors) has been the sole operator of .COM since the

16  commercialization of the Internet over a decade ago.  VeriSign signed contracts with ICANN in

17  1999 and again in 2001, and CFIT does not challenge those contracts.  Indeed, CFIT describes the

18  results of those contracts as creating competitive conditions.  (Am. Compl. ¶¶ 2, 71-79, 83)  That

19  will not change as a result of this Extension.  And if the 2001 sole source contract does not violate

20  the antitrust laws, *Verizon Commc'ns Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398,

21  407 (2003), which CFIT concedes it does not (Am. Compl. ¶ 2), an extension of the existing sole

22  source contract cannot possibly be anticompetitive.

23         Under the 2001 .COM registry agreement, VeriSign is limited to a maximum price it can

24  charge for access to the .COM registry.  The Extension agreement maintains that feature, merely

25  raising the price cap by a relatively small amount.  If a price ceiling can be said to have any

26  competitive effect in this context, it is procompetitive, because it places an absolute limit on the

27  price for .COM access.  *See*, *e.g.*, *Atl. Richfield v. USA Petroleum Co.*, 495 U.S. 328, 344 n.13

28  (1990).  And again, if the 2001 agreement between ICANN and VeriSign is not anticompetitive,

1    an extension of that agreement – albeit with a small change in a price structure that is, as a matter

2    of law, pro-competitive – cannot violate the antitrust laws.

3           Under the 2001 .COM registry agreement, VeriSign has the right to seek permission from

4    ICANN to offer various services related to the operation of the .COM registry; the Extension

5    agreement maintains and clarifies that right.  Again, if the 2001 agreement itself does not violate

6    the antitrust laws, an extension of that agreement cannot be illegal.  CFIT does not admit this, but

7    there can be no doubt that its real fear is that VeriSign will, at some point in the future, gain

8    permission from ICANN to compete with CFIT members with respect to particular services.  But

9    the potential for increased competition at some undetermined point in the future (which is not ripe

10   as a claim in any event) cannot possibly violate the antitrust laws:  the antitrust laws protect

11   competition, not competitors, and cannot be used to foreclose potential new competition, as

12   courts addressing exactly this issue in the face of claims by registrars against ICANN already

13   have ruled.  *Dotster, Inc. v. Internet Corp. for Assigned Names and Numbers*, 296 F.Supp. 2d

14   1159, 1166 (C.D. Cal. 2003).  *See also Les Shockley Racing, Inc. v. Nat'l Hot Rod Ass'n*, 884

15   F.2d 504, 509 (9th Cir. 1989); *Columbia River People's Util. Dist. v. Portland Gen. Elec. Co.*,

16   217 F.3d 1187, 1190 (9th Cir. 2000).

17          Finally, even if CFIT did state a valid claim under the antitrust laws,[1] none of its claims

18   would be ripe because they allege only theoretical possibilities, which may or may not occur.

19   The Extension agreement itself cannot take effect without the approval of the United States

20   Department of Commerce, which has not occurred.  And the possible entry of VeriSign into

21   competition with CFIT members depends on a number of contingent events – beginning with

22   VeriSign formally proposing a new service to ICANN – none of which has occurred.

23                          **HISTORY OF THIS LITIGATION**

24          On November 28, 2005, CFIT filed its original complaint against VeriSign and ICANN

25   for antitrust violations, unfair competition, cybersquatting, and intentional interference with

26   prospective economic advantage.  On February 28, 2006, this Court granted defendants' judgment

27   ───────────────
             [1] CFIT's Amended Complaint fails to even mention the Clayton Act, the necessary
28   statutory basis for its private party antitrust claim.

1  on the pleadings under Fed. R. Civ. P. 12(c).  Finding that under California law an association

2  cannot pursue an unfair competition claim on behalf of its members, the Court dismissed this

3  claim with prejudice.  As to CFIT's other claims, this Court dismissed them without prejudice,

4  finding that CFIT failed to establish that it had associational standing and failed to define a

5  relevant product market.  CFIT filed an amended complaint on March 14, 2006, in which it

6  claims that it is a membership corporation (Am. Compl. ¶ 6), whose membership includes

7  "Internet domain name registrars, registrants, and back order service providers, including

8  Pool.com, Inc. ('Pool.com') and R. Lee Chambers Company, LLC." (*Id*. ¶ 7).  In its amended

9  complaint, CFIT asserts only federal and state antitrust violations.  ICANN now moves for

10  dismissal of these claims pursuant to Fed. R. Civ. P. 12(b)(1) and 12(b)(6).

11  <u>**FACTUAL BACKGROUND**</u>

12  **A.  ICANN'S FUNCTIONS**

13  ICANN, through a Memorandum of Understanding ("MOU") with the United States

14  Department of Commerce ("DOC"), administers certain aspects of the Internet's Domain Name

15  System.  (Am. Compl. ¶¶ 58-59)  Although it is a private, not for profit corporation, and not a

16  governmental entity, ICANN provides these functions pursuant to the MOU.  Thus, ICANN

17  distributes Internet Protocol ("IP") addresses through various intermediaries to every computer

18  connected directly to the Internet.  (*Id.* ¶¶ 4, 19)  An IP address is a unique and long numerical

19  address that identifies a computer and allows it to "communicate" with other computers.  (*Id.* ¶ 19)

20  To save users the trouble of remembering these strings of numbers, the "domain name" system

21  has been developed to correlate unique letters and/or words to specific IP addresses.  (*Id.* ¶ 24)

22  Persons or entities may acquire Internet "domain names," such as "cnn.COM" or "pbs.ORG,"

23  through companies known as "registrars."  (*Id.* ¶ 27)  ICANN established and operates the

24  accreditation system that has produced a highly competitive registrar marketplace, with several

25  hundred accredited registrars – including (apparently) some members of plaintiff CFIT.  (*Id.* ¶ 27)

26  Registrars acquire domain names from the sole registry operator for each TLD.  Some of the

27  "generic" TLDs are  .COM, .NET, .ORG, .BIZ, .INFO, and .TRAVEL.

28  ICANN also designates "registry operators," which occurs primarily via contracts between

1   ICANN and the designated entity.[2]  (*Id.* ¶ 62)  A registry is like a phone book that lists the

2   domain name addresses for each particular TLD.  (*Id.* ¶ 25)  Registry operators may also offer a

3   variety of services that, for example, permit consumers to check to see if a particular domain

4   name has already been registered and when the name is set to expire.  (*Id.*)

5          VeriSign is the registry operator for the .COM and .NET TLDs (Am. Compl. ¶ 25), and it

6   or its predecessors has been since they were first created.  Both ICANN's Board of Directors and

7   the DOC must approve renewals of the 2001 agreements.  (MOU Amend. 3, §§ I(1), II)  VeriSign

8   maintains the .COM registry and provides registry services pursuant to a 2001 agreement

9   approved both by ICANN's Board and the DOC ("2001 .COM Agreement").  VeriSign maintains

10  the .NET registry and provides .NET registry services pursuant to an agreement approved by

11  ICANN's Board and the DOC in 2005 ("2005 .NET Agreement").  (Am. Compl. ¶ 38)  ICANN's

12  Board approved an extension of the existing .COM agreement on February 28, 2006

13  ("2006 .COM Extension" or "Extension"), but that extension has not yet been approved by the

14  DOC and therefore is not yet effective.  *See* http://www.icann.org/

15  announcements/announcement-28feb06.htm (last visited Apr. 2, 2006); *see also* MOU, Amend. 3,

16  ¶ I(1).

17  **B.      THE 2005 .NET AGREEMENT AND 2006 .COM EXTENSION**

18         Because neither CFIT nor any of its named members has ever applied to become the

19  registry operator for either .NET or .COM (or any other registry), CFIT has to struggle to

20  construct an antitrust complaint resting on ICANN's decision to enter into either agreement.

21  Ultimately, CFIT's principal "concerns" relate to the renewal provisions in both the 2005 .NET

22  Agreement and the 2006 .COM Extension, and to the ability of VeriSign to increase the price of

23  these domain names and to propose new services for their registries.  (Am. Compl. ¶¶ 88, 94)

24  _____

25         [2] Since ICANN is a consensus building organization with no governmental power, its
    ability to designate registry operators depends entirely on the voluntary cooperation of multiple
26  private and governmental actors.  As a practical matter, ICANN is able to designate registry
    operators today only through a process that involves the United States Department of Commerce
27  and VeriSign.  The operators of all other root zone servers (the primary record-keepers for the
    DNS) have voluntarily accepted that process which is essential to the global interoperability of
28  the Internet.

LAI-2237724

ICANN'S MOTION TO DISMISS FAC
No. 05-4826 (RMW)

1        The facts, of which this Court may take judicial notice, are these.  Under both the

2  2005 .NET Agreement and the 2006 .COM Extension, renewal may take place <u>only</u> if VeriSign is

3  in full compliance with its agreement with ICANN.  VeriSign must cure any material breach

4  before any renewal could take place.  "[Thus, if] an arbitrator or court has determined that

5  [VeriSign] has been in fundamental and material breach of [its] obligations," the Agreement

6  cannot be renewed.  (2006 .COM Extension, Art. IV, § 4.2; 2005 .NET Agreement, Art. IV, § 4.2;

7  Am. Compl. ¶ 86)

8        Under the 2005 .NET Agreement, the price of .NET domain names is set at $4.25 through

9  December 31, 2006, after which any price increases are capped at no more than 10% a year.

10  (2005 .NET Agreement, Art. VII, § 7.3(a))  Under the proposed 2006 .COM Extension, the

11  maximum price for domain name registrations is $6.00 through December 31, 2006.  After that

12  time, annual price increases are allowed in no more than four of the remaining six years of the

13  contract, limited to "the smaller of the preceding year's Maximum Price or the highest price

14  charged during the previous year, multiplied by 1.07."  (2006 .COM Extension, Art. VII, § 7.3(d);

15  Am. Compl. ¶ 89)

16        With respect to new services, both the 2005 and 2006 Agreements create a "Process for

17  Consideration of Proposed Registry Services."  (Am. Compl. ¶ 93; 2006 .COM Extension,

18  Art. III, § 3.1(d)(iv); 2005 .NET Agreement Art. III, § 3.1(d)(iv))  Before beginning a new service,

19  VeriSign must first notify ICANN, which is required to review VeriSign's proposed service to

20  determine whether it raises issues of either competition, or for the security and stability of the

21  Internet.  (*Id.*)  If ICANN finds that any such issues exist, it must refer issues of competition to

22  "the appropriate governmental competition authority or authorities" and issues of security and

23  stability to a "Standing Panel of experts."  (*Id.*; *see also* Am. Compl. ¶ 98)  In addition, if the

24  proposed service raises issues of security and stability, it is subject to the public notification and

25  comment process set forth in the Extension.

26        CFIT claims that pursuant to this authority to propose new services, VeriSign "intends" to

27  offer a service called the "Central Listing Service" ("CLS") that will change the way some

28  expiring domain names are sold.  (Am. Compl. ¶ 95)  Today, expiring domain names are sought

1    after by registrars, who send literally billions of automated, rapid fire "add" commands to

2    VeriSign's registry database, requesting a particular domain name on behalf of a registrant.  (*Id.*

3    ¶ 48)  Because a registrar's odds of registering a popular expired domain name increase with the

4    number of "add" commands it sends, the current system functions, in essence, like a lottery.  (*See*

5    Order, Feb. 28, 2006, at 3:17-21)  As a result, back order service companies came into being in

6    order to pool the resources of several registrars.  When one of the registrars receives an order for

7    an expiring domain name, the back order service provider can arrange to have many registrars

8    send multiple "add" commands to increase the likelihood of obtaining the particular domain name.

9    (Am. Compl. ¶ 49)  The impact on the registry infrastructure is obvious.

10          CFIT alleges that VeriSign will replace the current system "as soon as possible" with the

11   CLS, an auction-based system.  (*Id.* ¶¶ 95, 110)  CFIT alleges that under this new system,

12   VeriSign will hold a five-day auction on expiring domain names.  (*Id.* ¶ 96)  If no bids are

13   received on a particular name, it can be registered under the current system.  (*Id.*)  Otherwise, the

14   registrar placing the highest bid will receive and pay for the domain name.  (*Id.*)  Ten percent of

15   the bid price will be paid to VeriSign; ninety percent will be paid to the registrar who released the

16   domain name.  (*Id.*)

17          CFIT does not allege that ICANN would benefit from the implementation of CLS and

18   ICANN, in fact, would not.  According to CFIT, the CLS, if implemented, would "displace the

19   competitive back order services market."  (*Id.* ¶ 94)  But VeriSign has not yet proposed

20   implementing the CLS to ICANN, and if it ever did, it would be required to go through the

21   entirety of the process established by the Extension for consideration of such services, including

22   (if appropriate) notification to the appropriate competition enforcement agency and review by the

23   Standing Committee of Experts, and in all cases by completing the process of public notification

24   and comment established by the Extension.

25   **C.     ICANN'S ROLE**

26          According to CFIT, ICANN "unlawfully shar[es] monopoly profits" by collecting "fees

27   borne by registrars and registrants for domain name registrations."  (*Id.* ¶¶ 99, 103)  The facts are

28   that both the 2005 .NET Agreement and the 2006 .COM Agreement provide for payment of fees

1   to ICANN, as did the 2001 .COM and .NET Agreements, as do all other registry agreements that

2   ICANN has entered with TLD operators.  ICANN is authorized by its bylaws to collect fees to

3   cover its cost of operation (*see* ICANN By-laws, Art. XVI, § 5), and doing so is fully consistent

4   with its MOU with the DOC.  (MOU, ¶ VI)  As a private sector entity with no public or

5   governmental funding, ICANN depends on fees collected from registrars and registries for its

6   operating budget.  As discussed below, the notion that the collection of operating fees can itself

7   support a claim of conspiring to violate the antitrust laws is nonsensical.

8                                    **ARGUMENT**

9   **I.      STANDARD OF REVIEW**

10          Under Fed. R. Civ. P. 12(b)(6), a complaint must be dismissed if it is clear that a plaintiff

11  can prove no facts that would entitle him to relief.  *Hunt-Wesson Foods, Inc. v. Ragu Foods, Inc.*,

12  627 F.2d 919, 924 (9th Cir. 1980).  While the allegations in the complaint generally must be

13  accepted as true, *Wyler Summit P'ship v. Turner Broad. Sys., Inc.*, 135 F.3d 658, 661 (9th Cir.

14  1998), a court is not required to accept as true "allegations that contradict matters properly subject

15  to judicial notice or by exhibit."  *Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir.

16  2001); 5C Chas. A. Wright & Arthur R. Miller, *Fed. Prac. & Proc. Civ. 3d* § 1363 (3d ed. 2004).

17  Thus, in ruling on a motion to dismiss, the court may consider "material which is properly

18  submitted as part of the complaint," *Lee v. City of Los Angeles*, 250 F.3d 668, 688 (9th Cir. 2001)

19  (internal quotation marks omitted), documents on which the complaint "necessarily relies" and

20  whose "authenticity is not contested," *id.* (internal quotation marks omitted), and court records

21  from related proceedings.  *Kourtis v. Cameron*, 419 F.3d 989, 994 n.2 (9th Cir.  2005).

22  **II.     CFIT HAS FAILED TO STATE A CLAIM UNDER THE ANTITRUST LAWS.**

23          CFIT's complaint must be dismissed because it fails to identify any conduct that is

24  actionable under federal or state antitrust laws.  CFIT does not like the 2005 .NET agreement or

25  the as-yet unratified (by the DOC) 2006 .COM Extension, both of which are renewals (of the

26  2001.NET and 2001.COM Agreements respectively).  But as much as it might want to, CFIT

27  cannot challenge these agreements directly, because CFIT is neither a party to nor a third-party

28  beneficiary of the agreements.  *See Klamath Water Users Protective Ass'n v. Patterson*, 204 F.3d

LAI-2237724

ICANN'S MOTION TO DISMISS FAC
No. 05-4826 (RMW)

1   1206, 1211-12 (9th Cir. 2000), 2001.COM Agreement, Art. II, § 32; 2001.NET Agreement, Art.

2   II, § 5:14, 2005.NET Agreement Art. VIII, § 8.7; 2006.COM Agreement, Art. VIII, § 8.5.

3          Instead, CFIT attempts to convert these Agreements into antitrust violations.  CFIT's main

4   argument appears to be that both Agreements contemplate that the current registry operator will

5   continue to operate those registries indefinitely unless certain circumstances arise.  But since

6   ICANN can designate registry operators – indeed, that is one of ICANN's main responsibilities

7   pursuant to its MOU (*see, e.g.*, MOU, Amend. 1, ¶ 2) – and since ICANN has done so in a

8   manner that CFIT concedes is competitive (Am. Compl ¶ 71-79, 83), the extension of its earlier

9   agreements cannot amount to a violation of the antitrust laws.  In essence, CFIT's complaint

10   alleges "no more" than lawful exclusive dealing contracts, and thus the complaint may be

11   dismissed for failure to state a claim.  *Tri-State Rubbish, Inc. v. Waste Mgmt., Inc.*, 998 F.2d 1073,

12   1080 (1st Cir. 1993).

    **A.    VERISIGN'S OPERATION OF THE .NET AND .COM TLDS IS NOT
            CONDUCT THAT HARMS COMPETITION.**

13
14          To state a claim for restraint of trade in violation of Section 1 of the Sherman Act, 15

15   U.S.C. § 1 (Supp. 2004), CFIT must allege facts that establish, *inter alia*, "an agreement . . .

16   which actually causes injury to competition."  *Reid Brothers Logging Co. v. Ketchikan Pulp Co.*,

17   699 F.2d 1292, 1296 (9th Cir. 1983).  Indeed, an "allegation that 'competition has been injured

18   rather than merely competitors' is essential to any § 1 Sherman Antitrust Act Claim."  *Columbia*

19   *River*, 217 F.3d at 1190 (internal citation omitted).  The potential loss of business by individual

20   competitors does not satisfy this requirement.  *Id.*  CFIT's claims under Section 1 of the Sherman

21   Act thus fail because it has not identified any restraint on trade that injures competition.[3]

22
            **1.    Neither the Exclusive Nature of the Contracts nor the Conditional
                    Renewal Provisions Implicate the Antitrust Laws.**

23
24          The theory CFIT puts forward in its Complaint is that, under the renewal provisions in the

25   2005 .NET Agreement and 2006 .COM Extension, VeriSign will continue in perpetuity as the

26

27          [3] The same analysis holds true for the Cartwright Act, "because the Cartwright Act . . . ,
    was modeled after the Sherman Act."  *County of Tuolumne v. Sonora Cmty. Hosp.*, 236 F.3d 1148,
    1160 (9th Cir. 2001).

28

1  sole operator of the .NET and .COM registries, thereby eliminating the potential for future

2  competitive bidding for these registries.  (Am. Compl. ¶¶ 1, 3, 38, 82, 83, 84, 87)  CFIT alleges

3  that under the 2001 .COM and .NET Agreements, a threat of competitive bidding for future

4  agreements constrains VeriSign to offer its services now on a competitive basis (*id.* ¶ 37), and if

5  this threat is eliminated, the price of .COM and .NET domain name registrations will increase

6  "significantly."  (*Id.* ¶ 88)

7          This is simply wrong.  Stripped of its rhetoric, CFIT's claim is nothing more than an

8  objection to the designation of VeriSign as operator of the .COM and .NET registries.  Setting to

9  one side for now that none of CFIT's members is or claims to seek to be a registry operator, that

10  CFIT has not pleaded any injury to the "market" for registry operations (assuming such a market

11  exists), and the significant ripeness problems with untethered speculation about future pricing and

12  registry operations decisions, *see infra* at III.A., this is not a claim that in any way implicates the

13  antitrust laws.

14          There is no dispute that ICANN has the ability pursuant to the MOU to designate registry

15  operators, and that only ICANN possesses this ability.  (*Id.* ¶ 62)  CFIT concedes that there can

16  be only one operator for each registry at any point in time.  (*Id.* ¶ 35, 68)  ICANN has designated

17  VeriSign to operate the .COM and .NET registries.  That designation cannot be an antitrust

18  violation because it is a "matter of indifference" to the antitrust laws which particular competitor

19  supplies a commodity where, as here, there can be only one supplier at a time.  *See, e.g.*, *Fischer*

20  *v. NWA, Inc.*, 883 F.2d 594, 600 (8th Cir. 1989) (rejecting commuter airline's antitrust claims

21  based on major carrier's exclusive regional contract with another commuter airline as "only one

22  was required"); *Brunswick Corp. v. Reigel Textile Corp.*, 752 F.2d 261, 264 (7th Cir. 1984)

23  (claim of rival for patent applicant obtained by defendant denied as claim not addressed by

24  antitrust laws); *Columbia River,* 217 F.3d at 1190 ("[Plaintiff] seeks to use the antitrust provisions

25  to replace PGE in the monopoly market that sells electric power to Boise Cascade.  This it cannot

26  do.").

27          In this way, ICANN's selection of VeriSign as the .NET and .COM TLD operator is no

28  different from a patent holder's grant of an exclusive license.  It is firmly established that a patent

1   holder's "right to select its licensees [and] the decision to grant exclusive or non-exclusive

2   licenses . . . are not of themselves acts in restraint of trade." *Genentech, Inc. v. Eli Lilly & Co.*,

3   998 F.2d 931, 949 (Fed. Cir. 1993), *abrogated on other grounds by Wilton v. Seven Falls Co.*,

4   515 U.S. 277 (1995). In the *Genentech* case, plaintiff Genentech alleged that patent holder

5   University of California conspired with Lilly to exclude Genentech from the market for the

6   patented human growth hormone. The Circuit Court rejected that claim, concluding that

7   "Genentech's pleading does not allege more substance than the University's grant of an exclusive

8   license to Lilly." *Genentech*, 998 F.2d at 949. So, too, here CFIT's pleading alleges no more

9   substance than ICANN's entering into an exclusive agreement with VeriSign. But contracting

10  with a company to provide registry services cannot possibly amount to an antitrust claim.

11      Nor does CFIT's inflammatory references to "a permanent monopoly" on the part of

12  VeriSign (Am. Compl. ¶ 1) and to VeriSign as the "permanent operator" (*id.* at ¶ 3) change this

13  conclusion. To begin with, those allegations are false, as the documents which CFIT itself

14  references and relies upon demonstrate. The 2005 and 2006 Agreements – by their explicit terms

15  – impose various conditions on the parties' ability to renew. In the 2006 .COM Extension, for

16  example, Section 4.2 requires that VeriSign have complied with the Agreement's terms, or have

17  cured any material breach of those terms, in order for renewal to occur. Thus, VeriSign must

18  comply with, *inter alia*, Section 7.3's limits on VeriSign's ability to raise prices or tie any offered

19  service to another, precisely the conduct that CFIT claims the agreements fail to address. (*See*

20  2006 .COM Extension, Art. IV, § 4.2)

21      Indeed, when the renewal provisions of the 2006 .COM Extension, which CFIT alleges

22  are anticompetitive, are viewed side-by-side with the renewal provisions under the 2001 .COM

23  Agreement, which CFIT concedes were competitive (Am. Compl. ¶¶ 38, 71-79, 83), it is clear

24  that whatever the changes in form, the new provisions create no change in substance (and

25  certainly none that would support an antitrust claim). While the terms are not identical, in both

26  agreements, material breach precludes renewal. (*Compare* 2001 .COM Agreement, Art. II,

27  § 25(B) *with* 2006 .COM Extension, Art. IV, § 4.2 *and* 2005 .NET Agreement, Art. IV, § 4.2; Am.

28  Compl. ¶ 86) The 2006 .COM Extension, like the 2005 .NET Agreement, defers to an arbitrator

1    or judge the determination of compliance with essential terms.  While the 2001 Agreements left

2    this determination to ICANN, surely the fact that an independent third party — rather than

3    ICANN itself — makes this judgment does not render the Agreements anticompetitive.

4           Under the old and new, what constitutes breach encompasses essentially the same conduct.

5    For example, under the 2001 .COM Agreement, breach is defined to include a failure to provide

6    "substantial service to the Internet community;" a lack of a "qualifi[cation] to operate the

7    Registry TLD during the renewal term;" and a proposal for an initial and renewal registration

8    price "[that] exceeds the price permitted under Section 22 of [the] Registry Agreement."  (*See*

9    2001 .COM Agreement Art. II, § 25(B).  Likewise, the 2006 .COM Extension speaks of breach in

10   terms of particular sections of the Agreement (Sections 3.1(a), (b), (c), (d) or (e), 5.2, or 7.3).

11   Those sections impose the same requirements on VeriSign that fall within the 2001 Agreement.

12   They require that VeriSign preserve Internet security and stability; comply with and implement

13   all Consensus Policies; handle all registry data as specified in the agreement; observe all registry

14   restrictions and specifications, and set the price for Registry Services at an amount "not to exceed

15   the Maximum Amount."  (*See* 2006 .COM Extension, Art. III, § 3.1(a), (b), (c), (d), (e); Art. V,

16   § 5.2; Art. VII, § 7.3; *see also* 2001 .COM Agreement, Art. II, §§ 3, 7(c), 9)

17          Thus, in all ways relevant and material, the 2001 .COM Agreement and 2006 .COM

18   Extension are effectively the same.  There has been no change in competitive conditions, and

19   there is no need for competition to be "restore[d]."  (Am. Compl. ¶ 2)

20                  2.      The Memorandum of Understanding Cannot Provide a Basis for
                            Antitrust Liability.

21          There is another, entirely separate reason why the Complaint fails to state a claim.  CFIT

22   attempts to create antitrust liability associated with alleged breaches by ICANN of its MOU with

23   the DOC, but the MOU does not establish prescriptive rules for competitive conduct, nor does it

24   establish standards that are enforceable by CFIT or anyone else.  Rather, the MOU is a policy

25   document whose stated "Purpose" is simply to set forth the "Principles" by which the DOC and

26   ICANN "will jointly design, develop, and test the mechanisms, methods, and procedures to carry

27   out . . . . DNS management functions . . . without disrupting the functional operation of the

28

LAI-2237724

ICANN'S MOTION TO DISMISS FAC
No. 05-4826 (RMW)

1    Internet."  (MOU, ¶ II.B).  It is a statement of mutual intentions – nothing more.

2           According to CFIT, the MOU "mandate[s] that ICANN support competition" and

3    therefore the MOU "requires" ICANN "to seek competitive bids" for future .NET and .COM

4    Agreements.  (Am. Compl. ¶ 70)  But the MOU contains no such mandate.  While, as CFIT

5    acknowledges, the MOU "promotes the management of the DNS in a manner that will permit

6    market mechanisms and support competition and consumer choice," (*id.* ¶ 60(C)(2)), the MOU

7    does not prescribe rules for ICANN or require that specific actions be taken to accomplish these

8    goals.  Indeed, the MOU, by its terms, was designed to leave to ICANN the day-to-day

9    operational decisions related to the management of the DNS, while allowing the DOC (which

10   asserts a historical claim to oversight of the DNS) to determine, over time, whether ICANN's

11   operation of these functions is consistent with the goals set forth in the MOU.  The MOU is

12   periodically renewable; by its terms it expires on September 30, 2006.  The DOC's ability to

13   decide what to do upon the expiration of the MOU is the only enforcement mechanism

14   contemplated in the MOU.

15          Even if there were some mandate in the MOU relating to renewal provisions, it would not

16   create a right enforceable by CFIT.  The MOU is an agreement between ICANN and the DOC,

17   and CFIT is neither a party to the contract nor a third-party beneficiary.  As such, CFIT lacks

18   standing to raise these claims.  *See Klamath Water Users Protective Ass'n*, 204 F.3d at 1211-12

19   (non-signatories to a contract with the federal government are "incidental beneficiaries," not

20   third-party beneficiaries, and thus cannot file suit under the contract); *Long v. Salt River Valley*

21   *Water Users' Ass'n*, 820 F.2d 284, 288-89 (9th Cir. 1987) (same).  The only party capable of

22   taking any action with respect to the MOU is the DOC.

23          **B.      THE PRICE CAP IN THE 2005 .NET AGREEMENT AND 2006 .COM**
                      **EXTENSION CANNOT VIOLATE THE ANTITRUST LAWS.**
24
            CFIT claims that the Extension as well as the .NET agreement allow VeriSign too much
25
     price flexibility, but nothing in the antitrust laws requires ICANN to put any price constraints on
26
     registry operators.  Thus, the fact that ICANN has chosen to limit the prices VeriSign can charge
27
     is, if anything, procompetitive.  *See, e.g.*, *Atl. Richfield*, 495 U.S. at 344 n.13 (noting vertical
28

1    maximum price restraints can have pro-competitive effects); *State Oil Co. v. Khan*, 522 U.S. 3, 15

2    (1997) (reversing *per se* rule of illegality maximum price fixing and noting, with approval, Judge

3    Posner's observation that "a supplier might . . . fix a maximum resale price in order to prevent

4    his dealers from exploiting a monopoly position.").  Indeed, again assuming *arguendo* that CFIT

5    is correct in asserting that .COM and .NET are monopolies in a relevant product market (an

6    assertion ICANN contests), where there is a single supplier, the "use of a maximum resale price

7    agreement [] protect[s] consumers from the exercise of a retailer's monopoly power."  *Caribe*

8    *BMW, Inc. v. Bayerische Motoren Werke Aktiengesellschaft*, 19 F.3d 745, 753 (1st Cir. 1994)

9    (Breyer, J.) (maximum price fixing has pro-competitive uses:  namely, "use of a *maximum* resale

10   price agreement that protects consumers from the exercise of a retailer's monopoly power.").  The

11   price limits in the 2005 and 2006 Agreements, therefore, cannot support CFIT's claims.

### C.    VERISIGN'S ABILITY TO PROPOSE NEW SERVICES CANNOT VIOLATE THE ANTITRUST LAWS.

13          Perhaps the most frivolous of CFIT's claims is that the Extension and the 2005 .NET

14   Agreement give VeriSign the authority to offer new services that would compete with those

15   offered by some of CFIT's members.  Even if this were true, it would not violate the antitrust

16   laws because creating the potential for new competition obviously is not anticompetitive.  *Dotster*,

17   296 F.Supp. 2d at 1166.  In fact, nothing in these agreements gives VeriSign the right to do

18   anything more than to seek ICANN's approval for new registry services.

19          CFIT alleges that, at some future date, VeriSign, pursuant to its right to propose new

20   services, will implement a new system for the registration of expiring domain names.  (Am.

21   Compl. ¶ 95)  Currently, when domain name registrations expire, the names can be purchased by

22   registrars who send rapid-fire "add" commands to registry databases to attempt to claim an

23   expiring domain name.  Sensing an opportunity, companies now known as back order service

24   providers (including CFIT member Pool.com) began "pooling resources" with multiple registrars

25   to maximize the number of "add" commands that they could send to a registry database.

26   According to CFIT, the services they provide have over time become less expensive.  (*Id.* ¶¶ 49,

27   50; Order, Feb. 28, 2006, at 3)  CFIT expresses concern that, under the new system that CFIT

28

LAI-2237724

ICANN'S MOTION TO DISMISS FAC
No. 05-4826 (RMW)

1    worries VeriSign may propose at some point in the future, expiring names will no longer be

2    acquired by chance, through this rapid-fire "add" scenario, but rather through a market-based

3    auction system.  (*Id.* ¶ 96)  Merely to state CFIT's allegation is to demonstrate that it cannot

4    possibly involve competition-reducing effects.

5         CFIT first alleges that this change in business model would result in "predictable adverse

6    price effects for consumers."  (*Id.* ¶ 111)  But CFIT has alleged no facts that could support this

7    claim.  Since no such system has yet been proposed, there are no details about the structure and

8    market mechanisms of such a program, and certainly none that would suggest any new service

9    offered by VeriSign would leave consumers worse off.

10        Second, CFIT complains that, by adopting a provision that gives VeriSign the right to

11   propose registry services, ICANN "swears off any attempt to review the competitive effect of any

12   proposed registry service."  (*Id.* ¶ 98)  But as noted, VeriSign has the "right" only to propose, not

13   to unilaterally implement, new registry services.  Under the Extension and the 2005 .NET

14   Agreement, as under the agreements that preceded them and all other registry agreements,

15   VeriSign is required to provide written notice in advance to ICANN if it "may make a change in a

16   Registry Service."  (2006 .COM Extension, Art. III, § 3.1(d)(iv); 2005 .NET Agreement, Art. III,

17   § 3.1(d)(iv))  Under the earlier agreements, ICANN itself was to decide whether the proposed

18   actions were anticompetitive.  The most recent agreements specify that, "[i]f ICANN

19   determines . . . that the Registry Service might raise significant competition issues," then

20   "ICANN *shall* refer the issue to the appropriate governmental competition authority or

21   authorities . . . ."  (Am. Compl. ¶ 93; 2006 .COM Extension, Art. III, §3.1(d)(iv)(E))  It is

22   inconceivable that an agreement requiring ICANN to determine if "significant competition

23   issues" are raised, and if so to refer them to antitrust enforcement agencies, can fairly be

24   characterized as ICANN "swearing off" review, much less provide the basis for antitrust liability.

25        What CFIT is really concerned about is that VeriSign will propose a new registry service

26   dealing with expiring domain names, that it will pass the competition and Internet stability and

27   security screens set forth in the Extension and the 2005 .NET Agreement, and, eventually, be

28   approved by ICANN.  If that point is reached, VeriSign could offer the service.  CFIT obviously

1   fears that VeriSign's service would be more attractive to consumers than what CFIT's members

2   are able to offer, which explains CFIT's concerns.  Thus, CFIT is essentially asking this Court to

3   protect one competitor from the potential of new competition — a request that is decidedly

4   inconsistent with both the letter and the spirit of the antitrust laws.

5           Indeed, the antitrust laws seek to avoid injury to the "characteristic or function of a

6   competitive market," not injury to particular competitors.  *Les Shockley Racing, Inc.*, 884 F.2d at

7   509; *Brown Shoe Co. v. United States*, 370 U.S. 294, 344 (1962) ("It is competition, not

8   competitors, which the [Sherman] Act protects."); *Rutman Wine Co. v. E & J Gallo Winery,* 829

9   F.2d 729, 734 (9th Cir. 1987) ("Indispensable to any section 1 claim is an allegation that

10  *competition* has been injured rather than merely competitors."); *Great Escape, Inc. v. Union City*

11  *Body Co., Inc.*, 791 F.2d 532, 540 (7th Cir. 1986) ("Competition means that some may be forced

12  out of business.  The antitrust laws are not designed to guarantee every competitor tenure in the

13  marketplace.").  That is because antitrust law is not based on "solicitude for private concerns but

14  out of concern for the public interest," and so it protects the markets themselves, not individual

15  companies making money in these markets.  *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447,

16  458 (1993).  *See Cascade Cabinet Co. v. W. Cabinet & Millwork, Inc.*, 710 F.2d 1366, 1373 (9th

17  Cir. 1983) ("Although Cascade complains of its business losses, economic injury to a competitor

18  does not equal injury to competition."); *Gough v. Rossmoor Corp.*, 585 F.2d 381, 386 (9th Cir.

19  1978) ("To amount to an unreasonable restraint of trade the anticompetitive conduct must have an

20  effect greater than its effect upon the plaintiff's business.").

21          Of course, what markets need – competitive conditions that foster the development of

22  cost-effective and high quality products – is not necessarily the same as what individual

23  businesses prefer.  Thus "[a] plaintiff has the burden to plead and prove that the defendant's

24  actions harmed competition, not that the actions harmed plaintiff in its capacity as a competitor."

25  *Seattle Totems Hockey Club, Inc. v. Nat'l Hockey League*, 783 F.2d 1347, 1350 (9th Cir. 1986).

26  All CFIT has alleged here is that at some undetermined point in the future, VeriSign may win the

27  ability to compete with existing registrars and back order suppliers, and that VeriSign's product

28  may be more attractive to consumers than plaintiff's existing product.  This does not state a claim

1  under the antitrust laws.

2  **D.   CFIT HAS NOT AND CANNOT ALLEGE THAT ICANN ACTED WITH SPECIFIC INTENT TO MONOPOLIZE.**

3

4  CFIT has not and cannot allege facts establishing that ICANN acted with the specific

5  intent to monopolize, as it is required to do to state a Sherman Act Section 2 conspiracy to

6  monopolize claim.  *See Paladin Assocs., Inc. v. Montana Power Co.*, 328 F.3d 1145, 1158 (9th

7  Cir. 2003); *Standfacts Credit Servs. v. Experian Info. Solutions, Inc.*, 405 F. Supp. 2d 1141, 1152-

8  53 (C.D. Cal. 2005) (must plead specific intent to monopolize the market).  A showing of specific

9  intent to monopolize requires proof that "more than one of the alleged co-conspirators had at least

10 some awareness that the underlying conduct was anticompetitive or monopolistic."  *See Syufy*

11 *Enters. v. Am. Multicinema, Inc.*, 793 F.2d 990, 1000-01 (9th Cir. 1986).  This proof can be

12 presented directly, or it can be inferred from the defendant's conduct.  *See Christofferson Dairy,*

13 *Inc. v. MMM Sales, Inc.*, 849 F.2d 1168, 1174 (9th Cir. 1988).  If a plaintiff relies on conduct to

14 supply an inference of intent, "[t]he conduct must [] amount to an unreasonable restraint of trade

15 under Sherman Act, section 1 standards."  *Id.*

16 Here, CFIT has alleged no facts from which specific intent can be inferred.  All CFIT has

17 alleged is that ICANN is doing its job, and this cannot support an inference of intent to

18 monopolize.  *Official Airline Guides, Inc. v. Federal Trade Comm'n*, 630 F.2d 920, 925 (2d Cir.

19 1980).  ICANN does not participate in the "markets" identified in CFIT's complaint, even

20 assuming they are accurate descriptions of relevant markets for antitrust purposes.  ICANN is

21 neither a registrar nor a registry operator, and indeed it cannot be either pursuant to its bylaws.

22 (Bylaws Art. II, § 2)

23 So all that CFIT has alleged is that ICANN will get a fee from VeriSign in return for

24 designating VeriSign as the registry operator.  CFIT tries to use this fact to argue that ICANN is

25 properly included in the claim for conspiracy to monopolize because it is acting out of a desire to

26 obtain from VeriSign a share of "monopoly profits."  (Am. Compl. ¶ 99, 103)  But since ICANN

27 previously received a fee from VeriSign under the 2001 agreements that CFIT has described as

28 "competitive," the mere fact of a fee obviously cannot support the necessary inference of intent.

LAI-2237724

ICANN'S MOTION TO DISMISS FAC
No. 05-4826 (RMW)

1   As best we can tell, CFIT is arguing that, because ICANN's fee is higher under the Extension and

2   2005 .NET Agreement than under the 2001 Agreements, this fact alone is sufficient to justify an

3   inference that ICANN intended to enter into a conspiracy to monopolize.

4         This flimsy argument falls of its own weight.  The fees that ICANN negotiated from

5   VeriSign with respect to the .NET agreement and the Extension are not identical; are both of them

6   "evidence" of the necessary intent to monopolize, or just the Extension?  If both, does that mean

7   that <u>any</u> increase in fees that ICANN negotiates with any registry operator is "evidence" of the

8   specific intent to monopolize, or just increased fees negotiated with VeriSign?  In either case, that

9   would mean that some or all of ICANN's existing fee structure is locked in perpetuity, regardless

10  of changed conditions, or else ICANN would be at risk of similar antitrust attacks whenever it

11  negotiated a higher fee.  Or maybe CFIT's argument is that a higher fee is only evidence of a

12  specific intent to monopolize when it is accompanied by an agreement by ICANN to change or

13  eliminate any fee cap that now exists in its registry agreements?  That is equally nonsensical,

14  since it would mean that ICANN was barred by the antitrust laws from entering into contracts that

15  allowed its designees (or licensees, to use the patent analogy) to charge a market price for the

16  services they offer.

17        ICANN is in the business of designating registry operators, among other things.  When it

18  does so, it charges a fee, which is negotiated with the designated operator.  That fee reflects many

19  things, including most importantly ICANN's predicted costs of operations and need for resources.

20  Such a fee, which is an ordinary and natural part of the ICANN designation process, provides

21  absolutely no basis for an inference that ICANN, which does not operate in the registry

22  marketplace and thus could never monopolize that market, however defined, intended to

23  participate in a conspiracy to monopolize what is and must be in any event a "monopoly" or sole

24  source designation for any particular registry.

25        Further, CFIT has not identified any conduct by anyone, and certainly not by ICANN, that

26  could even remotely be considered as monopolistic.  Accepting, solely for purposes of this

27  motion, the relevant market allegations put forth by CFIT – that .COM is a monopoly (Am.

28  Compl. ¶ 68) – it is settled law that it is not a violation of the antitrust laws for the holder of a

1   legitimate monopoly to merely charge a monopoly price.  *Verizon Commc'ns Inc.*, 540 U.S. at

2   407 ("The mere possession of monopoly power, and the concomitant charging of monopoly

3   prices, is not only not unlawful; it is an important element of the free market system").  Assuming

4   *arguendo* that the maximum prices established in the Extension and the 2005 .NET Agreement

5   are in fact monopoly prices, the fact that ICANN has agreed to a particular price cap, or even if it

6   had agreed to no price cap at all, cannot violate the antitrust laws.

7           Again, the patent analogy is useful here.  ICANN effectively stands in the same shoes as a

8   patent owner, which licenses its patented technology in return for a royalty payment.  A patent

9   holder can either choose to commercialize its discovery itself, and gain revenues directly from the

10  sale of patented materials or products, or it can license to one or more other entities the right to

11  commercialize, gaining in return a royalty stream or a fixed payment, or sometimes both, from

12  the licensee.  The patent holder has no antitrust duty to license, *Hartford-Empire Co. v. United*

13  *States*, 323 U.S. 386, 432-33, *clarified*, 324 U.S. 570 (1945) (patent owner "has no obligation

14  either to use it or to grant its use to others"); *In re Independent Serv. Org. Antitrust Lit.*, 203 F.3d

15  1322 (Fed. Cir. 2000) (in absence of fraud on the PTO, sham litigation, or tying, unilateral refusal

16  license is beyond the reach of the antitrust laws), and if it does license, it has no antitrust duty to

17  license more than one licensee.  *Genentech*, 998 F.2d at 949; *See also, United States v.*

18  *Westinghouse Electric Corp.*, 648 F.2d 642, 647 (9th Cir. 1981) (affirming directed verdict for

19  defendants on antitrust charges:  "The right to license that patent, exclusively or otherwise, or to

20  refuse license at all, is 'the untrammeled right' of the patentee.")  It can grant exclusive or non-

21  exclusive licenses, and it can charge for those licenses whatever the market will bear, *Brulotte v.*

22  *Thys Co.*, 379 U.S. 29, 33 (1964) ("A patent empowers the owner to exact royalties as high as he

23  can negotiate with the leverage of that monopoly."); *W.L. Gore & Assocs. v. Carlisle Corp.*, 529

24  F.2d 614, 623 (3d Cir. 1976) (same), without fear of antitrust liability.

25          CFIT concedes that there can only be one operator for each TLD registry, so here the

26  "license" is necessarily exclusive.  And ICANN is free to charge any fee it chooses (or can

27  negotiate) with its "licensee," the registry operator.  Most licensees, or in this analogy the registry

28  operator, would then be free to charge a market price for their products; here the Extension

LAI-2237724

ICANN'S MOTION TO DISMISS FAC
No. 05-4826 (RMW)

1    actually limits the price that VeriSign can charge, which if anything is procompetitive.  In any

2    event, it cannot provide a basis for attack under the antitrust laws.

3           Finally, the fact that ICANN and VeriSign negotiated the 2006 .COM Extension in

4    connection with a desire to settle litigation strongly contradicts any inference of specific intent to

5    monopolize.  Parties have "[t]he right of access to the courts," *Cal. Motor Transp. Co. v.*

6    *Trucking Unlimited*, 404 U.S. 508, 510-11 (1972) (citing *Eastern R.R. Presidents Conference v.*

7    *Noerr Motor Freight, Inc.*, 365 U.S. 127 (1961), and *United Mine Workers v. Pennington*, 381

8    U.S. 657 (1965)), and the fact a suit has been filed cannot be used as the basis of an antitrust

9    violation unless a party demonstrates that the suit was a mere "sham." *Empress LLC v. City &*

10   *County of San Francisco*, 419 F.3d 1052, 1057 (9th Cir. 2005).  CFIT has not alleged, much less

11   provided any evidentiary support, that ICANN has been involved in any such "sham" litigation.

12   And CFIT has provided no reason why an inference of intent to monopolize could possibly be

13   drawn from ICANN and VeriSign's natural desire to settle litigation.  "Where there are

14   legitimately conflicting claims or threatened interferences, a settlement by agreement, rather than

15   litigation, is not precluded by the [Sherman] Act." *Standard Oil Co. v. United States*, 283 U.S.

16   163, 171 (1931).  To the contrary, "the public has a strong interest in settlement" of antitrust

17   litigation.  *In re Tamoxifen Citrate Antitrust Litig.*, 429 F.3d 370, 386 (2d Cir. 2005) (internal

18   quotation omitted).

19          For all of these reasons, CFIT has failed to identify any conduct from which specific

20   intent to monopolize by ICANN can be inferred and its claim of conspiracy to monopolize fails.

21   **III.    CFIT HAS NOT AND CANNOT PLEAD FACTS NECESSARY FOR THIS
22           COURT TO ASSERT JURISDICTION OVER THIS CASE.**

23          Even if CFIT had been able to state a claim under the antitrust laws, dismissal would still

     be required under Fed. R. Civ. P. 12(b)(1), because CFIT cannot (and has not) allege facts that
24
     support this Court's exercise of jurisdiction.
25

26          **A.      CFIT'S ANTITRUST CLAIMS ARE NOT REVIEWABLE AT THIS TIME.**

            Adjudication of CFIT's challenges to the 2006 .COM Extension would be improper for
27
     two independent reasons.  First, by the terms of the MOU between ICANN and the DOC, the
28

1    Extension cannot go into effect without DOC approval, and thus there is no operable agreement

2    to review until and if that happens.  "Until an agency has completed its work by arriving at a

3    definitive decision, judicial review is premature."  *Suburban Trails, Inc. v. N.J. Transit Corp.*,

4    800 F.2d 361, 365 (3d Cir. 1986); *accord MacArthur v. San Juan County*, --- F. Supp. 2d -- ,

5    2005 WL 3764933, at *49-50 (D. Utah June 13, 2005) (because there was "no final

6    determination" on plaintiffs' hospital privileges his antitrust claim based on denial of privileges

7    was not ripe for review).

8         Second, even if DOC had approved the Extension, CFIT's claims would still not be ripe.

9    To present a case that is justiciable and fit for judicial review, plaintiff must allege a threat that is

10   "real and immediate," not "conjectural or hypothetical."  *O'Shea v. Littleton*, 414 U.S. 488, 494

11   (1974).  "[A] case is not ripe where the existence of the dispute itself hangs on future

12   contingencies that may or may not occur."  *Clinton v. Acequia, Inc.*, 94 F.3d 568, 572 (9th Cir.

13   1996).  Even where a plaintiff seeks injunctive relief against future harm, the harm alleged must

14   be immediately threatened, 15 U.S.C. § 26 (Supp. 2004), and require plaintiff to "adjust its

15   conduct immediately."  *See Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 891 (1990).  CFIT's

16   claims are not ripe for review because CFIT's claims rest solely and completely on mere

17   predictions of future events that may or may not occur.

18        The contract provisions of which CFIT complains — the price and new services

19   provisions — do not themselves require any change in VeriSign's conduct.  Instead, those

20   contract provisions merely create the possibility that VeriSign in the future may propose changes

21   in prices and services.  "Courts have held that challenges to an option are not ripe for resolution

22   before the option is exercised."  *Destec Energy, Inc. v. S. Cal. Gas Co.*, 5 F. Supp. 2d 433, 461

23   (S.D. Tex. 1997) (rejecting antitrust claim as unripe) (collecting cases).  Until VeriSign seeks to

24   and receives the necessary permission to change its operations, there is nothing but the mere

25   possibility of future action to review.  Grants of authority do not themselves "command anyone to

26   do anything or to refrain from doing anything; they do not grant, withhold, or modify any formal

27   legal license, power, or authority; they do not subject anyone to any civil or criminal liability;

28   they create no legal rights or obligations."  *Ohio Forestry Ass'n, Inc. v. Sierra Club*, 523 U.S. 726,

LAI-2237724

ICANN'S MOTION TO DISMISS FAC
No. 05-4826 (RMW)

- 21 -

1   733-36 (1998) (noting that where challenged plan made alleged injury only possible but did not in
2   fact authorize conduct leading to such injury, plaintiffs' claims were unripe).

3       In this way, CFIT's claims are exactly like the antitrust claims found to be unripe in *Volvo*
4   *N. Am. Corp. v. Men's Int. Prof. Tennis Council*, 857 F.2d 55 (2d Cir. 1988).   In *Volvo*, plaintiff
5   producers of professional sporting events challenged three rules for tennis events proposed by the
6   Men's International Professional Tennis Council.  The Court denied all but one of plaintiffs'
7   claims, finding that, for the claims dismissed as unripe, plaintiff presented insufficient evidence
8   that the proposed rules actually "burdened" their present-day business decisions.  *Id.* at 64-65.
9   These proposed rules, if enacted, granted the Tennis Council authority, at some point in the future,
10  to withhold its approval from certain events, and to prevent wildcard players from being invited
11  to certain events, for example.  The rule found ripe for review, by contrast would prohibit private
12  parties from promoting special events during specified times.  Just the prospect of its enactment,
13  the Court found, "inhibited and deterred parties from entering into contracts" to produce events
14  that it might be unable to promote later, and therefore imposed "considerable hardship."  *Id.* at 64.
15  In this case, CFIT presents no evidence that the authority granted by the 2005 .NET Agreement
16  and 2006 .COM Extension to raise prices and introduce new services have any present day impact,
17  and could not, since they do not.

18          **B.      CFIT HAS FAILED TO ESTABLISH ASSOCIATIONAL STANDING.**

19          CFIT continues to lack associational standing.  CFIT's original complaint in this action
20  was dismissed, with leave to amend, because the Court found CFIT had no standing to bring its
21  claims.  *See* Order, Feb. 28, 2006, at 14, 20.  Although CFIT amended its original complaint to
22  name two "CFIT Supporters," Pool.com and R. Lee Chambers Company LLC (Am. Compl. ¶ 7),
23  it still fails to satisfy constitutional standing requirements.

24          In order for CFIT to be able to maintain this suit, it must demonstrate, *inter alia*, that "'its
25  members would otherwise have standing to sue in their own right'" – that is, that its members
26  suffered the requisite injury in fact.  *UAW v. Brock*, 477 U.S. 274, 282 (1986) (quoting *Hunt v.*
27  *Wash. State Apple Adver. Comm'n*, 432 U.S. 333, 343 (1977)).  Significantly, "standing cannot be
28  inferred argumentatively from averments in the pleading, but rather must affirmatively appear in

LAI-2237724

ICANN'S MOTION TO DISMISS FAC
No. 05-4826 (RMW)

1    the record." *FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 231 (1990) (internal alterations,

2    quotation marks, and citations omitted) (*overruled on other grounds, City of Littleton v. Z.J. Gifts*

3    *D-4 L.L.C.*, 541 U.S. 774, 781 (2004)); *accord Warth v. Seldin*, 422 U.S. 490, 517-18 (1975)

4    (plaintiff must "clearly [] allege facts demonstrating that he is a proper party to invoke judicial

5    resolution of the dispute").

6         CFIT has presented almost no facts in its amended complaint regarding the businesses of

7    one of its two identified "Supporters" – Pool.com (Am. Compl. ¶¶ 7, 49, 50) – and <u>no</u> information

8    about the business of its second "Supporter" – R. Lee Chambers Co.  It is impossible to know,

9    therefore, how either of these "Supporters" might be harmed by the conduct they challenge.

10        But even if CFIT provided more information about these "Supporters," CFIT would still

11   lack standing.  As demonstrated above, *see supra* at II.A., none of the conduct that CFIT alleges

12   is actionable under antitrust law because CFIT has failed to allege an anticompetitive effect, as

13   opposed to harm to particular competitors.  It follows *a fortiori* that no one – and certainly neither

14   of CFIT's members – can have suffered or been threatened with any injuries cognizable under

15   antitrust law — that is, a threatened loss or damage "'of the type the antitrust laws were designed

16   to prevent and that flows from that which makes defendants' acts unlawful.'"  *Cargill v. Monfort*

17   *of Colo., Inc.*, 479 U.S. 104, 113 (1986) (quoting *Brunswick Corp. v. Pueblo Bowl-O-Mat*, 429

18   U.S. 477, 489 (1977)).  "Plaintiffs sometimes forget that the antitrust injury analysis must begin

19   with the identification of the defendant's specific unlawful conduct. . . .  Without a violation of

20   the antitrust laws, there can be no antitrust injury."  *Am. Ad Mgmt., Inc. v. Gen. Tel. Co. of Cal.*,

21   190 F.3d 1051, 1055-56 (9th Cir. 1999); *accord Associated Gen. Contractors of Cal. v. Cal. State*

22   *Council of Carpenters,* 459 U.S. 519, 539 & n.40 (1983).

23        CFIT therefore fails to meet the first prong of the *Hunt* requirements for associational

24   standing because no CFIT member could possibly have standing to sue in its own right for non-

25   existent antitrust violations and non-existent antitrust injuries.  *See Sw. Suburban Bd. of Realtors,*

26   *Inc. v. Beverly Area Planning Ass'n*, 830 F.2d 1374, 1381 (7th Cir. 1987) (noting that association

27   seeking standing under *Hunt* for alleged antitrust injuries must also show members suffered actual

28   "antitrust injury").

1       Moreover, to establish standing, a plaintiff must show that he will in fact be harmed by the

2   defendant, not that he imagines he might be harmed at some point in the future.  *American-Arab*

3   *Anti-Discrimination Comm'n v. Thornburgh*, 970 F.2d 501, 510 (9th Cir. 1992); *Am. Immigration*

4   *Lawyers Ass'n v. Reno*, 18 F. Supp. 2d 38, 50-52 (D.D.C. 1998).  Here, VeriSign has not yet

5   sought or received the approval necessary to offer expired domain name services of which CFIT

6   complains, and since the Extension is not yet effective, VeriSign could not have (and has not)

7   given the required six month advance notice of any change in price – and yet these are the alleged

8   harms on which CFIT attempts to establish standing.  Such events, which are far from coming to

9   pass, are plainly an insufficient basis for standing.

10                                    **CONCLUSION**

11      For all of the foregoing reasons, Plaintiffs' First Amended Complaint must be dismissed

12   with prejudice against defendant ICANN pursuant to Federal Rules of Civil Procedure 12(b)(1)

13   and 12(b)(6), for lack of standing and for a failure to state a claim.

14

15   Dated: April __, 2006                          Respectfully submitted,

    Jones Day

16

17                                                By: /s/ Jeffrey A. LeVee

18                                                    Jeffrey A. LeVee

19                                                Counsel for Defendant
                                                  INTERNET CORPORATION FOR
20                                                ASSIGNED NAMES AND NUMBERS

21

22

23

24

25

26

27

28