1

2

3

4                                                    **E-FILED on**   12/8/06

5

6

7

8                    IN THE UNITED STATES DISTRICT COURT

9                   FOR THE NORTHERN DISTRICT OF CALIFORNIA

10                              SAN JOSE DIVISION

11

12   COALITION FOR ICANN TRANSPARENCY        No. C-05-04826 RMW
     INC., a Delaware corporation,
13                                           ORDER GRANTING DEFENDANTS'
                 Plaintiff,                  MOTIONS TO DISMISS
14
           v.                                **[Re Docket Nos. 152, 160]**
15
     VERISIGN, INC., a Delaware corporation;
16   INTERNET CORPORATION FOR
     ASSIGNED NAMES AND NUMBERS, a
17   California corporation,

18               Defendants.

19

20          Defendant VeriSign, Inc. ("VeriSign") and defendant Internet Corporation for Assigned

21   Names and Numbers ("ICANN") both move to dismiss plaintiff's First Amended Complaint ("FAC")

22   for failure to state a claim.  Plaintiff Coalition For ICANN Transparency, Inc. ("CFIT") opposes

23   both motions.  The court has read the moving and responding papers and considered counsels'

24   arguments.  For the reasons set forth below, the court GRANTS defendants' motions to dismiss.

25   Plaintiff has twenty (20) days from the date of this order to amend its complaint or it may elect to

26   proceed on its proposed second amended complaint.

27

28

# I. BACKGROUND

This action involves two types of services related to Internet domain names. The factual allegations relevant to the present motions are set forth in this order. Additional factual background is set forth in the court's February 28, 2006 Order Denying Verisign's Motion to Dismiss and Granting Defendants' Motions for Judgment on the Pleadings ("Feb. 2006 Order").

## A.   The Parties

CFIT is a nonprofit membership organization whose members include certain Internet domain registrars, registrants, back order service providers, including Pool.com, Inc. and R. Lee Chambers Company, LLC. FAC ¶ 7. CFIT was formed for the purpose of challenging the allegedly anticompetitive agreements and activities of defendants as set forth in the FAC. *Id.*

ICANN is a private not-for-profit corporation that coordinates the Internet domain name system ("DNS") on behalf of the United States Department of Commerce ("DOC"). *Id.* ¶¶ 58-59. ICANN's bylaws provide that it shall "[i]ntroduc[e] and promot[e] competition in the registration of domain names where practicable and beneficial in the public interest." *Id.* ¶ 64. ICANN operates under a Memorandum of Understanding ("MOU") with the DOC. *Id.* ¶¶ 59-63. The MOU "is effectively ICANN's charter." *Id.* The MOU's purpose is to "promote[ ] the management of the DNS in a manner that will permit market mechanisms to support competition and consumer choice in the technical management of the DNS." *Id.* The MOU prohibits ICANN from "unjustifiably or arbitrarily" injuring "particular persons or entities or particular categories of persons or entities." *Id.* It requires ICANN to "act in a non-arbitrary and reasonable manner with respect to . . . any . . . activity related to a DNS project." *Id.* The original MOU was scheduled to expire in September 2000. *Id.* ICANN and the DOC have amended it six times. *Id.* The most recent amendment reiterates the DOC's "policy goal of privatizing the technical management of the DNS in a manner that promotes stability and security, competition, coordination, and representation." *Id.* In this amendment, ICANN also reaffirms its "commitment to maintaining security and stability in the technical management of DNS, and to perform as an organization founded on the principles of competition, bottom up coordination, and representation." *Id.*

**B.      The Internet Domain Name System**

Every computer connected to the Internet has a unique Internet Protocol ("IP") address.  *Id.* ¶ 19.  IP addresses are long strings of numbers, such as 64.233.161.147.  *Id.*  The Internet DNS provides an alphanumeric shorthand for IP addresses.  *Id.* ¶ 20.  The hierarchy of each domain name is divided by periods.  Thus, reading a domain name from right to left, the portion of the domain name to the right of the first period is the top-level domain ("TLD").  TLDs include .com, .gov, .net., and .biz.  *Id.* ¶ 21.  Each TLD is divided into second-level domains identified by the designation to the left of the first period, such as "example" in "example.com" or "example.net."  *Id.*  SLDs can be further divided in third-level domains, such as "another" in "another.example.com" and so on.  *Id.*  Each domain name is unique and thus can only be registered to one entity.  *Id.* ¶ 24.  CFIT alleges that the ".com" and ".net" TLDs have become the "definitive TLDs for all commercial and private TLD registrants."  *Id.* ¶ 13.  One reason is purportedly that other TLDs are either restricted as to accessibility (e.g., country code TLDs such as ".us") or restricted as to use or meaning (e.g., ".edu" or ".gov").  *Id.* ¶¶ 12-13.

A domain name is created when it is registered with the appropriate registry operator.  *Id.* ¶ 25.  A registry operator maintains the definitive database, or registry, that associates the registered domain names with the proper IP numbers for the respective domain name servers.  *Id.*  The domain name servers direct Internet queries to the related web resources.  *Id.*  A registrant can register a domain name only through companies that serve as registrars for second level domain names.  Registrars accept registrations for new or expiring domain names, connect to the appropriate registry operator's TLD servers to determine whether the name is available, and register available domain names on behalf of registrants.  *Id.* ¶ 48.  As such, registrars necessarily need access to the registry maintained by the registry operators.  When a domain name is expiring (and not renewed by the current registrant), the registry operator notifies the registrars.  To register an expired domain name, registrars send "add" commands to the registry database.  *Id.*  An "add" command is accepted (thereby registering the name) only if the name is available.  *Id.*  Therefore, to increase the chances of obtaining a popular expired domain name, a registrar may send a rapid series of "add" commands

1   for the expired name.  *See* Feb. 2006 Order at 3.  CFIT alleges that due to competition for

2   registration of expiring domain names, a registrant may use the services of "back order service

3   providers."  FAC ¶ 49.  Back order service providers further increase the chances of a registrant

4   obtaining a highly demanded expiring domain name by pooling the resources of several registrars.

5   In this way, the registrant's chances of an "add" command being accepted increases.  *See* Feb. 2006

6   Order at 3-4.

7        The majority of domain name registrations for commercial purposes utilize the .com TLD.

8   FAC ¶ 43.  CFIT alleges that demand for .com TLDs is not interchangeable with other TLDs and

9   consumers are willing to pay substantially more for .com domain name registrations.  *Id.* ¶ 40.  As

10   an example, CFIT alleges that no significant number of consumers switched from .com to .net as a

11   result of the more than thirty percent decrease in the registration fee for .net registrations in July

12   2005.  *Id.* ¶ 44.  Indeed, CFIT asserts that many .com domain name registrants consider the other

13   TLDs to be complements to, rather than substitutes for, the .com registration.  *Id.* ¶ 41.  Thus, a

14   registrant often seeks concurrent domain name registrations in a number of TLDs (e.g.,

15   verisign.com, verisign.net, verisign.info, verisign.biz).  *Id.*  On the other hand, .net domain names

16   have been the primary domain names used by registrants in the networking service, such as internet

17   service providers and e-mail service providers.  *Id.* ¶ 45.  CFIT contends that substitution among

18   TLDs is not feasible because many registrants' .com or .net domain names have become their

19   trademark or tradename, are associated with consumer goodwill, and represent their online brand

20   name and identity.  *Id.* ¶¶ 42, 45.

21        **C.      VeriSign and ICANN's Relationship**

22        In the past ICANN has selected the registry operator for the .com and .net TLDs through a

23   bidding process.  *Id.* ¶ 34.  Once a registry operator is selected, it serves as the sole registry operator

24   for the applicable TLD registry (.com or .net) until the expiration of the registry agreement.  *Id.* ¶ 35.

25   Currently, VeriSign is the registry operator for the .com and .net domains pursuant to written

26   registry agreements between ICANN and VeriSign.  *Id.* ¶¶ 16, 25.

27        In May 2001 VeriSign and ICANN entered into a .com registry agreement (the "2001 .com

28   Agreement") and a .net registry agreement (the "2001 .net Agreement") under which VeriSign was

designated the sole registry operator of the .com and .net TLD registries.  *Id.* ¶¶ 67-68.  The 2001

.com Agreement was to expire November 10, 2007.  *Id.* ¶ 69.  Under this agreement VeriSign was

permitted to make a written proposal sometime between November 10, 2005 and May 10, 2006 for a

four-year renewal term.  ¶ 69.  ICANN was then to consider the proposal and grant the extension

unless (1) ICANN determined that VeriSign was in material breach of the agreement, (2) the

proposal contained a maximum price that exceeded what was allowed under the existing 2001 .com

Agreement, or (3) "certain other conditions appl[ied]."  *Id.*

The 2001 .net Agreement was set to expire June 30, 2005.  Competitive bidding was solicited

prior to its expiration and VeriSign was again selected as the .net registry operator.  *Id.* ¶ 34.  Thus,

in 2005, VeriSign and ICANN entered into a .net registry agreement (the "2005 .net Agreement").

VeriSign and ICANN have negotiated and signed a proposed .com registry agreement (the

"2006 .com Agreement") that will replace the current 2001 .com Agreement.  *Id.* ¶ 71.  The 2006

.com Agreement effectively extends VeriSign's operation of the .com registry for an additional five

years beyond the original expiration date without any competitive bidding process.  *Id.* ¶ 84.  CFIT

alleges that by negotiating and agreeing to the 2006 .com Agreement ICANN and VeriSign are

"bypassing" the process in the 2001 .com Agreement that would trigger ICANN's solicitation of

competitive bids.  *Id.* ¶ 71.  Specifically, the proposed 2006 .com Agreement sets a maximum price

for domain name registrations which exceeds that allowed under the 2001 .com Agreement, which

CFIT contends would otherwise have triggered an obligation on ICANN's part to seek competitive

bids.  *Id.* ¶ 89.  According to ICANN, registry agreements, including renewals, must be approved by

ICANN's board of directors and by the DOC.  ICANN's RJN Ex. E (MOU Am. 3)[1]; *see also*

ICANN's Mot. at 5.  ICANN notes that the 2006 .com Agreement was approved by the ICANN

board of directors on February 28, 2006, but has not yet been approved by the DOC.

CFIT alleges that the contractual relationships between VeriSign and ICANN present several

problems.  First, pursuant to the 2001 .com Agreement ICANN has the right to seek competitive

---

[1]        Pursuant to ICANN's Request for Judicial Notice the court takes judicial notice of the
MOU and amendments available on ICANN's Internet site and to which several of CFIT's
allegations reference.  *See In re Silicon Graphics Securities Litigation*, 183 F.3d 970, 986 (9th Cir.
1999) (a court may consider documents referred to within a complaint on a motion to dismiss).

1  bids to replace VeriSign as registry operator upon the original expiration on November 10, 2007 (or

2  earlier because VeriSign has already allegedly breached the 2001 .com Agreement repeatedly). *Id.*

3  ¶ 70. CFIT suggests that ICANN is "required" to seek competitive bids because of the MOU's

4  mandate that ICANN support competition and ICANN has purportedly not sought such competitive

5  bids. *Id.* CFIT alleges that both the 2006 .com and 2005 .net Agreements include a renewal

6  provision that allows ICANN to solicit competitive bids upon expiration of the agreement "only if a

7  court or arbitrator issued a non-appealable final order finding VeriSign to be in breach of the

8  agreement, and VeriSign failed to cure the breach." *Id.* ¶ 38. CFIT asserts that this renewal

9  provision constitutes ICANN's "conspiratorial agreement to waive its right to impose competitive

10 bidding" for operation of the .com and .net registries. *Id.* ¶ 87. In comparison, the renewal

11 provisions in the 2001 .com and .net Agreements allowed ICANN to solicit competitive bids upon

12 expiration if ICANN deemed VeriSign to be in material breach. *Id.* ¶ 69.

13      Second, VeriSign has been freed from pricing constraints formerly in place in the 2001 .com

14 and .net Agreements. In particular, the maximum price in the 2006 .com Agreement excludes the

15 "registry-level transaction fee" (paid to ICANN), and the maximum price is set at $6.00 through

16 December 31, 2006 but can be increased seven percent in four of the following six years. CFIT

17 asserts this is excessive. *Id.* ¶ 89. Additionally, registrars and Internet stakeholders have no input

18 into prices as the fee increases are allegedly automatic pursuant to the contractual provision. *Id.*

19 ¶ 90. Similarly, the 2005 .net Agreement sets the maximum price at $4.25 until December 31, 2006

20 and then "[b]eginning in 2007, the price controls set forth in the 2005 .net Agreement will be

21 eliminated." *Id.* ¶ 91. CFIT contends that "VeriSign will be unconstrained in setting prices and will

22 charge the maximum cap allowed." *Id.* ¶ 88.

23      Third, CFIT alleges that under the 2006 .com Agreement ICANN may permit VeriSign to

24 provide additional registry services if ICANN determines that no competition concern exists. *Id.*

25 ¶ 93. CFIT concludes that VeriSign is therefore permitted to launch services, such as VeriSign's

26 proposed Central Listing Service ("CLS") and Wait List Service ("WLS"), that would "displace the

27 competitive back order services market . . . or similar services." *Id.* ¶ 94. Further, CFIT asserts that

28 because "nothing in the contracts or otherwise will prevent VeriSign from further increasing prices,"

1   consumers will pay more.  *Id.* ¶ 111  The 2005 .net Agreement and the 2006 .com Agreement also

2   allegedly abandon certain "Consensus Policies" representing the interests of Internet stakeholders

3   and certain provisions and obligations set forth in the 2001 .com and .net Agreements designed to

4   avoid unreasonable restraints on trade and to promote fair competition.  *Id.* ¶¶ 74-77, 80.

5           **C.**     **CFIT's Claims for Relief**

6        CFIT alleges claims for relief against (1) VeriSign in the .com and .net registration markets

7   for monopolization under section 2 of the Sherman Act, (2) VeriSign in the .com and .net

8   registration markets for attempted monopolization under section 2 of the Sherman Act, (3) VeriSign

9   in the expiring names registration services market under section 2 of the Sherman Act, (4) VeriSign

10   and ICANN in "all relevant markets" for conspiracy to monopolize under section 2 of the Sherman

11   Act, (5) VeriSign and ICANN in "all relevant markets" for conspiracy in restraint of trade under

12   section 1 of the Sherman Act and (6) VeriSign and ICANN in "all relevant markets" for conspiracy

13   in restraint of trade under the Cartwright Act.

14        The Feb. 2006 Order granted defendants' motions for judgment on the pleadings because

15   CFIT's complaint did not adequately allege facts supporting CFIT's associational standing to file the

16   present action.  Feb. 2006 Order at 14.  The Feb. 2006 Order also clarified certain pleading issues

17   with respect to CFIT's antitrust allegations.  In particular, the court noted that the amended

18   complaint should differentiate the alleged expiring names registration services market from domain

19   names in general and provide detailed allegations tending to show that registered and unregistered

20   domain names are not reasonably interchangeable.  Feb. 2006 Order at 17.

21                                       **II. ANALYSIS**

22           **A.**     **Legal Standard**

23        A Rule 12(b)(6) motion tests the legal sufficiency of the claims asserted in the complaint.

24   Dismissal can be based on the "lack of a cognizable legal theory" or "the absence of sufficient facts

25   alleged under a cognizable legal theory." *Balistreri v. Pacifica Police Dept.*, 901 F.2d 696, 699 (9th

26   Cir. 1988).  The issue is not whether the non-moving party will ultimately prevail but whether it is

27   entitled to offer evidence to support the claims asserted.  *Gilligan v. Jamco Dev. Corp.*, 108 F.3d

28   246, 249 (9th Cir. 1997).  The court's review is limited to the face of the complaint, documents

1   referenced in the complaint, and matters for which the court may take judicial notice.  *Levine v.*

2   *Diamanthuset, Inc.*, 950 F.2d 1478, 1483 (9th Cir. 1991).  When evaluating a Rule 12(b)(6) motion,

3   the court must accept all material allegations in the complaint as true and construe them in the light

4   most favorable to the non-moving party.  *Barron v. Reich*, 13 F.3d 1370, 1374 (9th Cir. 1994).  A

5   court must not dismiss a complaint for failure to state a claim unless "it appears beyond doubt that

6   the plaintiff can prove no set of facts in support of his claim which would entitle him to relief."

7   *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957); *see also United States v. Redwood City*, 640 F.2d 963,

8   966 (9th Cir. 1981).  However, the court is not required to accept conclusory legal allegations "cast

9   in the form of factual allegations if those conclusions cannot reasonably be drawn from the facts

10  alleged."  *Clegg v. Cult Awareness Network*, 18 F.3d 752, 754-55 (9th Cir. 1994).

11          **B.      Associational Standing**

12          VeriSign and ICANN argue that CFIT's amended complaint still fails to allege adequate facts

13  to support that CFIT has associational standing to file the present action.  An association may invoke

14  the doctrine of "associational standing" to bring a complaint "on behalf of its members."  *See New*

15  *York State Club Ass'n, Inc. v. City of New York*, 487 U.S. 1, 9 (1988).  It may do so if "(a) its

16  members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect

17  are germane to [its] purpose; and (c) neither the claim asserted nor the relief requested requires the

18  participation of individual members in the lawsuit."  *Hunt v. Wash. State Apple Adver. Comm'n*, 432

19  U.S. 333, 343 (1977).  When a defendant moves to dismiss on standing grounds, the court must

20  "accept as true all material allegations of the complaint, and . . . construe [it] in favor of the

21  complaining party."  *Pennell v. City of San Jose*, 485 U.S. 1, 7 (1988).  At the same time, however,

22  "[i]t is a long-settled principle that standing cannot be inferred argumentatively from averments in

23  the pleadings, but rather must affirmatively appear in the record."  *FW/PBS, Inc. v. City of Dallas*,

24  493 U.S. 215, 231 (1990) (plurality opinion) (citations and quotation marks omitted).  Therefore,

25  "[i]t is within the trial court's power to allow or to require the plaintiff to supply, by amendment to

26  the complaint or by affidavits, further particularized allegations of fact deemed supportive of

27  plaintiff's standing."  *Warth v. Seldin*, 422 U.S. 490, 501-02 (1975).

28

1    CFIT's initial complaint only alleged vague categories of members that might suffer harm.[2]

2    Thus, the court found that associational standing had not been alleged because CFIT failed to name

3    even one member.  As amended to support standing CFIT's complaint now alleges that its purpose is

4    "to promote the interests of its member businesses by seeking a competitive and fair market for

5    domain name registry services":

6        CFIT was formed for the purpose of challenging the anticompetitive agreements and
         activities of defendants alleged herein, including the 2006 .com Agreement.  CFIT's
7        members include Internet domain name registrars, registrants, and back order service
         providers, including but not limited to Pool.com, Inc. and R. Lee Chambers
8        Company, LLC.

9    FAC ¶ 7.[3]  CFIT alleges that Pool.com competes in the expiring names registration services market

10   and introduced the "pay-for-performance" business model whereby customers paid only if the back

11   order service provider obtained the domain name for the customer.  CFIT contends this model,

12   which has been largely adopted, encourages competition based on quality of service and price.  *Id.*

13   ¶¶ 49-50.  Elsewhere in the complaint CFIT contends that the 2006 .com Agreement includes a

14   provision that permits VeriSign to propose new services, including the CLS service, which CFIT

15   alleges would displace "the competitive back order services market." *Id.* ¶ 94.  Based on these

16   allegations, the court finds that the FAC adequately identifies at least one member (Pool.com) who

17   CFIT alleges will suffer threat of injury based on the 2005 .net and 2006 .com Agreements.  Thus,

18   the court finds these allegations sufficient to meet the first and second prongs of the requirements

19   under *Hunt*, at least as to the alleged expiring names registration services market.  *See Hunt*, 432

20   U.S. at 342 ("The association must allege that its members, *or any one of them*, are suffering

21   immediate or threatened injury as a result of the challenged action of the sort that would make out a

22   justiciable case had the members themselves brought suit.") (emphasis added).

23

24

25

---

26      [2]    ICANN argues that CFIT fails to establish that any member of CFIT could possibly
        have standing to sue in its own right because CFIT has failed to allege any antitrust violations or
27      antitrust injuries.  ICANN Mot. at 23.

28      [3]    Other than naming R. Lee Chambers Company, LLC as a member and supporter,
        CFIT make no allegations as to the identity of R. Lee Chambers Company, LLC.

## C.    Antitrust Standing

In addition to identifying at least one member, however, plaintiff must allege facts sufficient to establish that there is "immediate or threatened injury as a result of the challenged action[s]." *Id.* CFIT's allegations of improper monopoly are twofold.  First, ICANN and VeriSign's "agreements and understandings" have the effect of making VeriSign the permanent operator of the .com and .net registries.  CFIT alleges that this shields VeriSign from competitive pressures of a re-bidding process and is discordant with ICANN's obligation to maintain competition.  FAC ¶ 3.  Second, ICANN and VeriSign's "agreements and understandings" improperly permit VeriSign to extend its monopoly control to the downstream markets for back order and other services.  *Id.*  Moreover, CFIT contends these agreements between ICANN and VeriSign constitute a conspiracy to monopolize the operation of the .com and .net registries, to restrain trade in the downstream markets, and to share in the resulting "monopoly overcharges."

The court must make a determination of whether plaintiff has alleged antitrust standing not just the constitutional standing requirement of injury in fact:

> [T]he focus of the doctrine of "antitrust standing" is somewhat different from that of standing as a constitutional doctrine.  Harm to the antitrust plaintiff is sufficient to satisfy the constitutional standing requirement of injury in fact, but the court must make a further determination whether the plaintiff is a proper party to bring a private antitrust action.

*Assoc. Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 535 (1983).  "A plaintiff may only pursue an antitrust action if it can show 'antitrust injury, which is to say injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful.'"  *Am. Ad Mgmt., Inc. v. Gen. Tel. Co. of Cal.*, 190 F.3d 1051, 1055 (9th Cir. 1999) (quoting *Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 334 (1990)).  The Ninth Circuit has articulated four requirements for establishing antitrust injury:  "(1) unlawful conduct, (2) causing an injury to the plaintiff, (3) that flows from that which makes the conduct unlawful, and (4) that is of the type the antitrust laws were intended to prevent."  *Am. Ad Mgmt., Inc.*, 190 F.3d at 1055.

One way to demonstrate antitrust injury for a § 2 claim of unlawful monopoly is through direct evidence of the "injurious exercise of market power."  *Rebel Oil Co., Inc. v. Atl. Richfield Co.*,

1    51 F.3d 1421, 1434 (9th Cir. 1995).  Under this method, the plaintiff offers evidence of "restricted

2    output and supra[-]competitive prices that is direct proof of the injury to competition which a

3    competitor with market power may inflict" in the relevant market.  *Id.*  Accordingly, an act is

4    deemed anticompetitive under the Sherman Act only when it harms both allocative efficiency and

5    raises the prices of goods above competitive levels or diminishes their quality.  *Id.* at 1433.

6    Alternatively, unlawful market power and antitrust injury may be demonstrated circumstantially by:

7    (1) defining the relevant market, (2) showing that the defendant owns a dominant share of that

8    market, and (3) showing that there are significant barriers to entry and that existing competitors lack

9    the capacity to increase their output in the short run.  *Id.* at 1434.

10                       **1.      The Expiring Names Registration Services Market**

11             As the court noted in its Feb. 2006 Order, a plaintiff must allege a relevant product and

12   geographic market to state a claim under sections 1 and 2 of the Sherman Act.  A market consists of

13   all "commodities reasonably interchangeable by consumers for the same purposes[.]"  *United States*

14   *v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377, 395 (1956).  "If consumers view the products as

15   substitutes, the products are part of the same market."  *Rebel Oil Co.*, 51 F.3d at 1435.  "In

16   economists' terms, two products or services are reasonably interchangeable where there is sufficient

17   cross-elasticity of demand.  Cross-elasticity of demand exists if consumers would respond to a slight

18   increase in the price of one product by switching to another product."  *Todd v. Exxon Corp.*, 275

19   F.3d 191, 201-02 (2d Cir. 2001).  "Congress prescribed a pragmatic, factual approach to the

20   definition of the relevant market and not a formal, legalistic one."  *Brown Shoe Co. v. United States*,

21   370 U.S. 294, 336 (1962).

22             CFIT alleges that the market for back order services used by end users in the purchase and

23   sale of expiring domain name registrations (the "expiring domain names registration services

24   market") is a separate relevant market.  *Id.*  In the Feb. 2006 Order, the court noted that *Weber v.*

25   *Nat'l Football League*, 112 F. Supp. 2d 667 (N.D. Ohio 2000) and *Smith v. Network Solutions, Inc.*,

26   135 F. Supp. 2d 1159 (N.D. Ala. 2001) have rejected the market definition of expiring names

27   registration services as a matter of law.  Feb. 2006 Order at 16-17.  The *Weber* court reasoned that

28   the infinite number of potential domain names made the proper market "domain names in general."

1   112 F. Supp. 2d at 673-74.  Similarly, the *Smith* court held that domain names were reasonably

2   interchangeable whether expired or not:

3       [T]here is no inherent difference in character, for purposes of interchangeability
        and cross-elasticity of demand, between domain names that are 'expired' and held

4       by NSI and those that are not.  It is true in a literal sense that each domain name is
        unique.  And one given individual domain name may be far more valuable on the

5       open market than others.  But products need not be entirely fungible to be
        considered part of the same relevant market . . . .  [T]he *Weber* court did more

6       than decide that the two names did not constitute the relevant market; the court
        reasoned that the relevant market was all domain names generally as a result of

7       cross-elasticity of demand. Because the number of domain names, unlike
        traditional commodities, is essentially unlimited, there will always be reasonable

8       substitute names available for any given name kept out of circulation, whether by
        a registrar or by the registrant, regardless of whether we are talking about two

9       names or a hundred and sixty thousand.

10  135 F. Supp. 2d at 1169-70.  Nevertheless, in the Feb. 2006 Order the court declined to hold that

11  CFIT's market definition necessarily fails as a matter of law.  Feb. 2006 Order at 16-17.  Instead, the

12  court found that it was at least theoretically possible that CFIT could allege facts tending to show

13  that registered and unregistered domain names are not reasonably interchangeable, and granted leave

14  to amend.  *Id.*  On the one hand "products need not be entirely fungible to be considered part of the

15  same relevant market."  *Smith*, 135 F. Supp. 2d at 1169.  On the other hand, price disparities are

16  relevant for grouping commodities into relevant markets.  *See E.I. du Pont de Nemours & Co.*, 351

17  U.S. at 404.  CFIT's new allegations must be reviewed to see if they differentiate the alleged

18  expiring names registration services market from domain names in general and, thus properly allege

19  a relevant market.

20      VeriSign argues that CFIT has failed to allege a lack of interchangeability between expired

21  domain names and domain names of different statuses (i.e., never before registered or registered).

22  The court agrees.  While CFIT alleges that there exists a "competitive marketplace" for obtaining

23  expired domain names comprised of back order service providers competing on the basis of price

24  and service, these allegations do not give rise to an inference of a lack of interchangeability.  In

25  particular, CFIT alleges that back order service providers, of which Pool.com is one, provide

26  services assisting customers in the procurement of recently-expired domain names.  FAC ¶¶ 48-50.

27  CFIT alleges that at one time SnapNames, a back order service provider, charged $60 to a customer

28  seeking an expired domain name, whether or not it succeeded in obtaining the name.  *Id.* ¶ 49.  CFIT

1    also alleges that Pool.com introduced a pay-for-performance model where customer pay only if the

2    domain name is procured.  *Id.* ¶ 50.

3         These allegations, however, do not indicate that domain names are not reasonably

4    interchangeable by virtue of their "expired" status or otherwise raise an inference that the alleged

5    expiring domain names registration services market is a separate relevant market.  At most, these

6    allegations suggest that some expired domain names may be in greater demand than others such that

7    a registrant might be willing to pay an additional fee in order to increase its chances of procuring

8    that domain name.  Registration of a domain name, whether new or expired, are completed through

9    the same process with a registrar.  As CFIT alleges, "to register a new or expiring domain name, a

10   registrar sends an 'add' command to VeriSign's registry computer for that domain name." *Id.* ¶ 48.  It

11   appears that registrants register expired names with or without the use of a back order service

12   provider.  There is no indication that an expired domain name necessarily commands a higher price

13   or that there are any price differentials charged by the registrars for an expired domain name versus

14   a new domain name.  Even if "price disparities are relevant for grouping commodities into relevant

15   markets," *see* Feb. 2006 Order at 17 (citing *E.I. du Pont de Nemours & Co.*, 351 U.S. at 404), no

16   such disparity is alleged here.  Rather, similar to the *Smith* court's analysis, here, CFIT has not

17   alleged any "inherent difference in character, for purposes of interchangeability and cross-elasticity

18   of demand, between domain names that are 'expired' and held . . . and those that are not."[4]

19   Essentially, the only distinction alleged is that there is an additional service available for the

20   registration of expiring domain names, which customers may choose to use for some expired domain

21   names.  Therefore, CFIT has not alleged, for purposes of assessing alleged antitrust injury, that there

22   exists a relevant market for expiring domain names registration services separate from the market for

23   the registration of domain names in general.

24

25

---

26        [4]     CFIT does allege that the other TLDs are not substitutes for the .com and .net TLDs
     and that there is low demand cross-elasticities between the .com domain name and domain names
27   for TLDs such as .net, .biz, and .info.  FAC ¶¶ 39-45.  However, this does not give rise to an
     inference of low demand elasticity as between domain names of particular TLDs as would be
28   required to indicate that the expiring domain names registration services market constitutes a
     separate relevant market.

**2.      The Domain Name Registration Market**

CFIT also identifies the market for the purchase and sale of domain name registrations (the "domain name registration market") as a relevant market. FAC ¶ 11. It is unclear whether CFIT is alleging that the market is that of the .com and .net domain name registrations only or whether it is that of domain name registrations in general. CFIT defines the domain name registration market as comprised of the purchase and sale of domain name registrations in general, yet CFIT's allegations suggest the lack of demand cross-elasticity between the registration of .com and .net domain names on the one hand and the registration of domain names for all other TLDs on the other hand.[5] *See* FAC ¶¶ 39-47. Regardless, CFIT's allegations adequately show that at least the .com and .net domain name registrations constitute a relevant market.[6] It is not disputed that because there can only be one registry operator per registry, VeriSign, as the sole registry operator of the .com and .net registries, necessarily holds a monopoly in domain name registration for those registries during the term of the applicable registry agreement. *Id.* ¶ 35.[7]

**3.      Alleged Antitrust Injuries**

VeriSign and ICANN argue that CFIT cannot establish antitrust standing because the alleged injuries are not the type of injuries that antitrust laws are intended to prevent. Sherman Act § 2 states: "[e]very person who shall monopolize, or attempt to monopolize, or combine or conspire with any person or persons, to monopolize trade shall be guilty" of an antitrust violation. 15 U.S.C. § 2. To establish a § 2 violation for monopolization of trade, the plaintiff must show monopoly power

---

[5]      If CFIT contends the market consists of the domain name registrations regardless of TLD, then CFIT has failed to allege that VeriSign has any monopoly in that market.

[6]      Although the court finds that CFIT has sufficiently alleged associational standing insofar as it has alleged that a member is a back order service provider who purportedly suffered injury due to ICANN and VeriSign's alleged conduct, associational standing has not been properly alleged for a domain name registration market. CFIT has not alleged that its members include any competing registry operators or registrars.

[7]      This "monopoly" relates to the operation of registries but CFIT argues that VeriSign's sole access to the .com and .net traffic data combined with the proposed CLS service would necessarily result in CFIT being the sole "auctioneer" of expired domain names. Regardless, as discussed earlier, CFIT does not adequately allege there exists a relevant market of expiring names registration services.

1   and "the acquisition or perpetuation of this power by illegitimate 'predatory' practices." *Alaska*

2   *Airlines, Inc. v. United Airlines, Inc.*, 948 F.2d 536, 542 (9th Cir. 1991).  To establish a § 2 violation

3   for attempted monopolization, the plaintiff must show "specific intent to control prices or destroy

4   competition, predatory or anticompetitive conduct directed at accomplishing that purpose, dangerous

5   probability of achieving monopoly power, and causal antitrust injury." *McGlinchy v. Shell Chem.*

6   *Co.*, 845 F.2d 802, 811 (9th Cir.1988).  To properly allege a conspiracy to monopolize in violation

7   of § 2, a plaintiff must establish: "(1) the existence of a combination or conspiracy to monopolize;

8   (2) an overt act in furtherance of the conspiracy; (3) the specific intent to monopolize; and (4) causal

9   antitrust injury."  *Paladin Assocs., Inc. v. Montana Power Co.*, 328 F.3d 1145, 1158 (9th Cir. 2003)

10  (citing *United States v. Yellow Cab Co.*, 332 U.S. 218, 224-225 (1947)).  Finally, to establish a

11  conspiracy in restraint of trade under § 1 of the Sherman Act, there must be a showing of specific

12  intent or awareness as to one or more of the alleged co-conspirators.  *Syufy Enters. v. Am.*

13  *Multicinema, Inc.*, 793 F.2d 990, 1001 (9th Cir. 1986).  Under § 1, CFIT must plead facts

14  establishing injury to competition in the market for the registration of domain names in general.  15

15  U.S.C. § 1.  Here, CFIT's allegations of antitrust violations, attempted antitrust violations, and

16  conspiracy to monopolize and in restraint of trade stem from VeriSign and ICANN's agreement to

17  certain revisions to the 2005 .net and 2006 .com Agreements.

18      First, CFIT alleges that the renewal provisions in the Agreements permit VeriSign to serve as

19  the sole registry operator of the .net and .com registries "in perpetuity."  Opp. at 8.  The renewal

20  provision under both Agreements "virtually guarantee that VeriSign will not have to periodically bid

21  for control over the registries."  *Id.*  CFIT complains that by agreeing to replace the 2001 .com

22  Agreement with the proposed 2006 .com Agreement ICANN effectively waived its right to impose

23  competitive bidding with respect to operation of the .com registry.  FAC ¶ 87.  These allegations

24  merely show, however, that the proposed 2006 .com Agreement extends the term of VeriSign's

25  designation as the registry operator for the .com registry under the 2001 .com Agreement.  CFIT's

26  contention that the proposed 2006 .com Agreement results in VeriSign having a "perpetual"

27  monopoly of the .com registry is unpersuasive.  As in the 2001 .com Agreement, the proposed 2006

28  .com Agreement permits ICANN to terminate the agreement under certain circumstances including,

1   *inter alia*, VeriSign's breach of the maximum allowable prices and price increases.  *Id.*, Ex. 2 at 18

2   (Section VI.2).  The parties do not dispute that VeriSign was lawfully selected to be the registry

3   operator for the .com registry, and that there can only be one registry operator at a time.  Mere

4   extension of VeriSign's lawful appointment as the sole registry operator does not constitute an

5   antitrust violation.

6          Under the 2001 .com Agreement, VeriSign may propose a four year extension which ICANN

7   must consider "before deciding whether to call for competing proposals from potential successor

8   registry operators."  *Id.* ¶ 69.  ICANN must then consider the proposal and grant the extension unless

9   (1) ICANN determines that VeriSign is in material breach of the agreement, (2) the proposal

10  contains a maximum price that exceeds what is allowed under the existing 2001 .com Agreement, or

11  (3) "certain other conditions apply."  *Id.*  Under the proposed 2006 .com Agreement, ICANN may

12  solicit competitive bids upon expiration of the agreement "only if a court or arbitrator issued a non-

13  appealable final order finding VeriSign to be in breach of the agreement, and VeriSign failed to cure

14  the breach."  *Id.* ¶ 86.  Thus, under either the 2001 or 2006 versions, as alleged by CFIT, ICANN

15  may solicit competing bids upon expiration of the agreement.  The only difference is that under the

16  2001 provision ICANN makes the decision whether VeriSign is in material breach while under the

17  2006 provision ICANN defers the decision of whether VeriSign is in material breach (and thus

18  whether competitive bids could be solicited) to a court or arbitrator.[8]  The court fails to see how this

19  modified provision results in VeriSign as the registry operator of the .com and .net registries "in

20  perpetuity."  While the methodology differs, both provisions contemplate that competitive bids can

21  be solicited in the event VeriSign is deemed to be in material breach of the registry agreement.[9]

22  _____

23      [8]      Notably, under the 2001 .com Agreement VeriSign has the right to challenge a non-
    renewal under section 15 of the agreement, which provides for resolution of disputes in court or
24  through arbitration.  FAC, Ex. 1 ¶¶ 15, 25.

25      [9]      CFIT's suggestion that ICANN's deferral of the decision of whether a breach by
    VeriSign is material to the courts or to an arbitrator constitutes a waiver of ICANN's right to solicit
26  competitive bids is unpersuasive.  *See* FAC ¶ 87.  CFIT's suggestion necessarily assumes that
    ICANN would not pursue its contractual right to have VeriSign's conduct adjudicated as a material
27  breach, but CFIT's allegations do not support such an assumption.  Moreover, CFIT's contention that
    ICANN is in breach of the requirements of ICANN's MOU with the DOC is conclusory as CFIT has
28  alleged no facts to support that the DOC finds ICANN's proposed 2006 .com Agreement to be a
    violation of any MOU obligations.  In any event, the proposed 2006 .com Agreement is subject to

1    Second, CFIT contends that 2005 .net and 2006 .com Agreements increase the prices that

2    VeriSign may charge for registrations by increasing the maximum permissible price and permitting

3    significant price increases in future years.  Specifically, the 2005 .net Agreement removes price

4    controls after 2007 and the 2006 .com Agreement permits future price increases of up to seven

5    percent in four of the next six years.  "Antitrust injury does not arise . . . until a private party is

6    adversely affected by an anticompetitive aspect of the defendant's conduct; in the context of pricing

7    practices, only predatory pricing has the requisite anticompetitive effect."  *Atl. Richfield Co.*, 495

8    U.S. at 339 (internal citations omitted).  As VeriSign argues, increases in prices by a lawful

9    monopolist, without more, are not subject to antitrust scrutiny.  *See Alaska Airlines, Inc.*, 948 F.2d at

10   548-49.  As ICANN argues, the setting of maximum prices is not precluded by antitrust laws and has

11   been found to be pro-competitive in some instances.  *See, e.g., Atl. Richfield*, 495 U.S. at 344 n.13.

12   It also does not appear disputed that the revisions to the 2005 .net and 2006 .com set a maximum

13   price that VeriSign may charge registrars and that the new price ceilings may result in higher future

14   prices.  However, CFIT provides no argument to support why its allegations of the increases in price

15   caps or removal of price controls support, as a matter of law, a showing of predatory conduct or

16   anticompetitive effects causing its alleged injuries in violation of the antitrust laws.  Specifically,

17   CFIT has not alleged facts supporting that the future prices contemplated in the agreements will

18   serve as significant barriers to entry or are otherwise supra-competitive.[10]  Indeed, CFIT alleges that

19   the 2005 .net Agreement was the result of competitive bidding.  FAC ¶ 34.[11]

20

21   express review and approval by the DOC.

22   [10]    CFIT's assertion that the prices are supra-competitive is conclusory and does not
     represent a factual allegation giving rise to an inference of antitrust injury.  Moreover, since these
23   increases in price levels are "permissible" under the agreement, there can be no factual allegations at
     this juncture that the prices have created barriers to entry.  CFIT argues that the issue of whether the
24   price increases or removal of price controls constitute required price increases or permissive price
     increases is a question of fact not before the court on these motions.  However, CFIT has not
25   articulated sufficient facts to infer that these provisions are anything other than provisions that
     permit VeriSign the ability to raise prices.  *See* FAC ¶¶ 88-91.  CFIT's assertion that VeriSign *will*
26   impose these higher prices are conclusory and unsupported by factual allegations.  *Id.*

27   [11]    Specifically, CFIT alleges that pricing in the 2005 .net Agreement is wrongful and
     reflect "supra-competitive" pricing, yet elsewhere CFIT alleges that the 2005 .net Agreement was a
28   product of competitive bidding.  *See* Opp. at 14; FAC ¶ 34.  *See also* Opp. at 8 ("For example,
     because the 2001 .net Agreement did not have the renewal provisions that VeriSign now seeks for

CFIT appears to contend that these price increases are "monopoly overcharges" when viewed in light of its allegations that ICANN and VeriSign have negotiated VeriSign's allegedly perpetual monopoly in the operation of the .com registry.[12]  Notably, CFIT contends that the negotiation of a price increase above the maximum price permitted under the 2001 .com Agreement effectively bypasses ICANN's "obligation" under the 2001 .com Agreement to seek competitive bids before raising prices.  As CFIT's argument goes, ICANN and VeriSign conspired to implement the new agreement terms so they can unlawfully share in these monopoly overcharges.  However, the sharing of fees between ICANN and VeriSign is not new to the 2006 .com Agreement.  Under both the 2001 .com Agreement and the proposed 2006 .com Agreement, the registry operator must pay ICANN a "Registry-Level Fee" on a quarterly basis as "financial support of ICANN."  *Id.*, Ex. 1 at 9 (Section 7); *id.*, Ex. 2 at 20-22 (Section VII.2).  In addition, as noted above, the proposed 2006 .com Agreement does not represent an agreement to confer the monopoly of the .com registry to VeriSign in perpetuity.  CFIT's contention that VeriSign and ICANN colluded to avoid competitive bidding is likewise unpersuasive.  The 2001 .com Agreement does not obligate ICANN to seek competitive bidding.  Rather, ICANN "may" seek competitive bids in the event that, when the time came for renewal, VeriSign proposes prices higher than the maximum price set in the agreement.  *Id.*, Ex. 1 at 22 (Section 25).  Moreover, a request for competitive bids is not necessarily a prerequisite to an agreement between ICANN and VeriSign to increase prices under the 2001 .com Agreement:

> These prices [for registry services] shall be increased through an amendment to this Agreement as approved by ICANN and Registry Operator, such approval not to be unreasonably withheld, to reflect reasonably demonstrated increases in the net costs of providing Registry Services . . . to ensure that Registry Operator recovers such costs and a reasonable profit thereon.

*Id.*, Ex. 1 at 19 (Section 22.A).  Based on these terms, the proposal in the 2006 .com Agreement to increase prices above the current maximum price or to share fees with ICANN, without more, does not constitute a conspiracy to avoid an obligation to obtain competitive bidding or to impose supra-

---

the 2006 .com Agreement, VeriSign faced competitive bidding upon renewal of the 2001 .net Agreement, and had to lower its fees.") (citing FAC ¶¶ 69-70).

[12]     It remains unclear whether CFIT also contends that the conspiracy extends to the .net registry since the 2005 .net Agreement was the product of competitive bidding.  CFIT does allege that the 2005 .net Agreement removes price controls after 2007.

1   competitive prices.  In sum, CFIT has not adequately alleged predatory conduct or specific intent to

2   monopolize to support its section 2 claims.

3          Finally, CFIT asserts that VeriSign (and ICANN in collusion) has leveraged and threatens to

4   leverage its monopolies in the registry operator market (for .com and .net domain names,

5   presumably) to adjacent and downstream markets in restraint of trade.  CFIT alleges that the

6   unlawful conduct stems from VeriSign's intention to implement CLS which will eliminate the

7   current competitive marketplace for back order services.  *Id.* ¶¶ 108-112.  In particular, CFIT

8   contends that VeriSign's launch of such services would eliminate competition because of VeriSign's

9   exclusive access, as registry operator, to the traffic data of Internet users' attempts to visit

10  unregistered domain names.  *Id.* ¶ 94.  Currently, when a domain name expires, VeriSign releases

11  the name and customers may register the expired domain name through a registrar, with or without

12  the assistance of a back order service provider.  *See id.* ¶ 110.  With CLS, VeriSign will offer

13  expired domain names for auction.  Registrants may bid for the expired domain names through

14  registrars and the domain name goes to the highest bidder.  CFIT alleges "[r]egistrants will continue

15  to order domain names through registrars, but registrars must deal directly with VeriSign in order to

16  receive expiring names to offer to prospective clients."  *Id.*

17         VeriSign and ICANN both argue that CLS would be pro-competitive because it creates the

18  potential for new competition.  Further, VeriSign may only propose such new services to

19  ICANN—ICANN must still approve the services.  To the extent CFIT's allegations assumes that

20  CLS will be anticompetitive, it improperly presupposes that ICANN will abdicate its regulatory

21  obligation to review the competitive effects of proposed services.  ICANN's Mot. at 15.[13]

22  Defendants' arguments are well taken.  Even if the court assumes, as it must, that CLS will eliminate

23  the demand for back order services, the court need not assume as true that such elimination

24  constitutes predatory conduct actionable under antitrust laws.  "It is well established that the antitrust

25  laws are only intended to preserve competition for the benefit of consumers."  *Am. Ad Mgmt., Inc.*,

26

_____

27         [13]      In opposition, CFIT argues that whether CLS will be a competitive service is
    "irrelevant" and "the Complaint's allegations that CLS threatens to harm competition by eliminating
28  a highly competitive back order services pooling industry . . . and other adjacent markets, must be
    accepted as true."  Opp. at 15.

1   190 F.3d at 1055 (citing *Associated Gen.*, 459 U.S. 519, 538 (1983)).  "A plaintiff has the burden to

2   plead and prove that the defendant's actions harmed competition, not that the actions harmed

3   plaintiff in its capacity as a competitor."  *Seattle Totems Hockey Club, Inc. v. Nat'l Hockey League*,

4   783 F.2d 1347, 1350 (9th Cir. 1986).  At issue here is the market for the registration of .com and .net

5   domain names by registrants.  As ICANN notes, what is to be protected are the "competitive

6   conditions that foster the development of cost-effective and high quality products" to registrants.

7   Here, CFIT has alleged that the back order services market is highly competitive and participants

8   compete on the basis of price and service.  As alleged, currently expired domain names are made

9   available and registrars randomly send "add" commands in attempts to secure the domain name for a

10   registrant.  A registrant seeking to increase the number of "add" commands made on its behalf could

11   procure the services of a back order service provider to pool together resources of several registrars.

12   As alleged, VeriSign's CLS product proposes to notify participating registrars of expiring domain

13   names and hold a five-day auction for such names during which registrars may bid for the names on

14   behalf of registrants.  FAC ¶ 96.  The registration goes to the successful bidder and the proceeds are

15   divided ten percent to VeriSign (as registry operator) and ninety percent to the registrar.  *Id.*

16       Other than arguing that back order service providers will be displaced by CLS, CFIT does

17   not allege how consumers, namely the registrants, would be harmed by CLS.  CFIT makes no

18   allegations that CLS would result in higher prices or lower quality of service to registrants.  Indeed,

19   the inference is that an auction, open to all registrars and registrants, would result in the registration

20   of expired names at a price determined by market forces.  Moreover, the allegations give rise to an

21   inference that there might be increased competition among registrars under an auction system as

22   compared to the present lottery-like system.  CFIT's assertion that there will be "predictable adverse

23   price effects for consumers" is conclusory.  In any event, under the 2006 .com Agreement, ICANN

24   is to refer any proposed services that it believes raises significant competition issues to the

25   appropriate government authority.  *Id.* ¶ 93.  In sum, CFIT has failed to allege that VeriSign's rights

26   under the 2006 .com Agreement to propose new registry services for ICANN's approval violates

27   antitrust laws or constitutes specific intent to violate antitrust laws.

28

1    **D.      Leave to Amend**

2        Defendants argue that the FAC should be dismissed with prejudice.  Fed. R. Civ. P. 15(a)'s

3    edict that "leave shall be freely given when justice so requires" is "to be applied with extreme

4    liberality."  *Eminence Capital, LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1051 (9th Cir. 2003) (quoting

5    *Owens v. Kaiser Found. Health Plan, Inc.*, 244 F.3d 708, 712 (9th Cir. 2001) (citations omitted)).

6    However, "a district court need not grant leave to amend where the amendment: (1) prejudices the

7    opposing party; (2) is sought in bad faith; (3) produces an undue delay in litigation; or (4) is futile."

8    *AmerisourceBergen Corp. v. Dialysist West, Inc.*, 2006 WL 709199, *3 (9th Cir. 2006) (citations

9    omitted) (certified for publication); *see also Foman v. Davis*, 371 U.S. 178, 182 (1962).

10       Defendants argue that despite an opportunity to amend its initial complaint, plaintiff failed to

11   address the pleading deficiencies noted in the court's prior order dismissing plaintiff's complaint.

12   Defendants also note that both of the named members of CFIT, Pool.com and Chambers, have

13   previously brought similar actions without success.  The court agrees that plaintiff's FAC did not

14   adequately address the pleading deficiencies set forth in this court's February 2006 Order.

15   Nevertheless, the court will grant plaintiff leave to amend its complaint.

16                                      **III. ORDER**

17       For the foregoing reasons, the court GRANTS defendants' motions to dismiss.  Plaintiff has

18   twenty (20) days from the date of this order to amend its complaint.  The court recognizes that

19   plaintiff has already noticed a motion for leave to file a proposed second amended complaint in

20   response to the court's prior tentative ruling granting defendants' motions to dismiss the FAC.

21   Because the court grants plaintiff leave to amend, plaintiff's noticed motion is moot.  Accordingly,

22   the court VACATES the December 15, 2006 hearing date.  Plaintiff may either file the proposed

23   second amended complaint or another amended complaint no later than twenty (20) days from the

24   date of this order.

25

26   DATED:       12/8/06                          *Ronald M Whyte*
                                          _____
27                                        RONALD M. WHYTE
                                          United States District Judge
28

**Notice of this document has been electronically sent to:**

**Counsel for Plaintiff(s):**

Bret A. Fausett
Cathcart Collins & Kneafsey LLP
444 South Flower Street, 42nd Flr.
Los Angeles, CA 90071

Imani Gandy
Cathcart Collins & Kneafsey LLP
444 South Flower Street, 42nd Flr.
Los Angeles, CA 90071

**Counsel for Defendant(s):**

Laurence J. Hutt          laurence_hutt@aporter.com
James S. Blackburn        james_blackburn@aporter.com
Courtney Schaberg         cmschaberg@jonesday.com
Eric Patrick Enson        epenson@jonesday.com
Jason C. Murray           jcmurray@jonesday.com
Jeffrey A. LeVee          jlevee@jonesday.com
Sean William Jaquez       swjaquez@jonesday.com

Counsel are responsible for distributing copies of this document to co-counsel that have not registered for e-filing under the court's CM/ECF program.

**Dated:**          12/8/06                              SPT
                                              **Chambers of Judge Whyte**