1  PATRICK A. CATHCART (CA SBN 65413)
   BRET A. FAUSETT (CA SBN 139420)
2  IMANI GANDY (CA SBN 223084)
   CATHCART COLLINS & KNEAFSEY LLP
3  444 South Flower Street, 42nd Floor
   Los Angeles, California 90071
4  Telephone:    (213) 225-6600
   Facsimile:    (213) 225-6601
5  PCathcart@cckllp.com
   BFausett@cckllp.com
6
   Attorneys for Plaintiff
7  COALITION FOR ICANN TRANSPARENCY INC.

8

9                IN THE UNITED STATES DISTRICT COURT

10              FOR THE NORTHERN DISTRICT OF CALIFORNIA

11                        SAN JOSE DIVISION

12

13 COALITION FOR ICANN                Case No.  05-4826 (RMW) PVT
14 TRANSPARENCY INC., a Delaware
   Corporation,                       **PLAINTIFF'S MEMORANDUM OF**
15                                     **POINTS AND AUTHORITIES IN**
                    Plaintiff,         **OPPOSITION TO DEFENDANT'S**
16                                     **MOTION TO DISMISS CFIT'S SECOND**
          v.                           **AMENDED COMPLAINT**
17
   VERISIGN, INC., a Delaware
18 Corporation,                        **DATE:        March 9, 2007**
                                       **TIME:        9:00 A.M.**
19                  Defendant.         **Courtroom:   6**

20
                                       Honorable Ronald M. Whyte
21

22

23

24

25

26

27

28

Cathcart Collins & Kneafsey LLP
444 S. Flower St., 42nd Floor
Los Angeles, California 90071

# TABLE OF CONTENTS

                                                                                              Page

I.      INTRODUCTION AND OVERVIEW .................................................................................. 1

II.     ARGUMENT ......................................................................................................................... 1

        A.      All Factual Allegations In The Complaint Must Be Accepted As True ................. 1

        B.      New and Corrected Allegations Address the Court's Concerns ............................. 2

                1.      The Expiring Names Registration Services Market ..................................... 3

                        a.      Negative Effects on Competition ..................................................... 3

                        b.      The Nature And Value Of Expiring Domain Names ...................... 5

                        c.      Predatory Conduct by Verisign ....................................................... 6

                        d.      Harm Caused by Verisign ................................................................ 7

                2.      Domain Names Registration Market ............................................................ 9

                        a.      Competition for TLD Registries and the Elimination of
                                Competitive Bidding ........................................................................ 9

                        b.      Unlawful Prices and Harm to Consumers and Plaintiff ................ 12

        C.      SAC Resolves Issues Raised in December 8, 2006 Opinion ................................ 13

                1.      Interchangeability of Registration Types .................................................. 14

                2.      Contractual Differences ............................................................................. 14

                3.      Predatory Conduct and Supra-Competitive Prices .................................... 15

III.    CONCLUSION .................................................................................................................... 15

Cathcart Collins & Kneafsey LLP
444 S. Flower St., 42nd Floor
Los Angeles, California 90071

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Chandler v. McMinnville School Dist.*,
  978 F.2d 524 (9th Cir. 1992)......................................................................................... 2

*Church of Scientology of California v. Flynn*,
  744 F.2d 694 (9th Cir. 1984)......................................................................................... 2

*Conley v. Gibson*,
  355 U.S. 41 (1957)......................................................................................................... 1

*Experimental Engineering, Inc. v. United Technologies Corp.*,
  614 F.2d 1244 (9th Cir. 1980)....................................................................................... 2

*First Am. Title Ins. Co. v. Provident Savings Bank*,
  848 F.2d 969 (9th Cir. 1988)......................................................................................... 2

*Klarfeld v. United States*,
  944 F.2d 583 (9th Cir. 1990).......................................................................................... 1

*Shapley v. Wolff*,
  568 F.2d 1310 (9th Cir. 1978)....................................................................................... 2

**Statutes**

Federal of Civil Procedure 12(b)(6)................................................................................. 1

Cathcart Collins & Kneafsey LLP
444 S. Flower St., 42nd Floor
Los Angeles, California 90071

## I.    INTRODUCTION AND OVERVIEW

The present motion to dismiss follows a substantial revision of the Plaintiff's allegations, as set forth in its Second Amended Complaint ("SAC"). As detailed in this Opposition, the Coalition for ICANN Transparency's ("CFIT's") new and revised allegations, in its 386 numbered paragraphs, take account of the Court's prior rulings and cure the described deficiencies. A red-lined version of the SAC, highlighting the differences between the First Amended Complaint ("FAC") and the SAC is attached to this Opposition as Exhibit "A."

For its part, however, Defendant Verisign, Inc. ("Verisign") fails to acknowledge the new allegations and, hoping to find a way into the Court's prior rulings, pitches its arguments at the outdated complaint. Verisign also seeks to hold CFIT to a significantly higher standard of pleading than warranted under Rule 12 jurisprudence. As argued by Verisign, the present motion attacks the factual predicates on which the causes of action are based and the sufficiency of those facts to warrant judgment in favor of CFIT. Verisign's arguments ignore the procedural posture of the case and ask the Court to make inferences not warranted on the basis of the pleadings.

Verisign's motion to dismiss should be denied. The reasons are apparent in the new and revised SAC, and in this Opposition, CFIT will highlight the new allegations that frame the story that CFIT should be allowed to tell and prove at trial.

## II.    ARGUMENT

### A.    All Factual Allegations In The Complaint Must Be Accepted As True

The conditions that must be met before a motion may be granted under Federal of Civil Procedure 12(b)(6) are quite strict. "[A] complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." _Conley v. Gibson_, 355 U.S. 41, 45-46 (1957).

In applying this standard, the court must treat all of the allegations in the complaint as true. _Id._; _see also Klarfeld v. United States_, 944 F.2d 583, 585 (9th Cir. 1990) (holding that district court erred in granting motion to dismiss because whether plaintiff's fourth amendment rights were violated by the requirement that he walk several yards over a dirty floor was a

Cathcart Collins & Kneafsey LLP
444 S. Flower St., 42nd Floor
Los Angeles, California 90071

1   question of fact); *Chandler v. McMinnville School Dist.*, 978 F.2d 524, 527 (9th Cir. 1992)

2   (district court erred in granting motion to dismiss in freedom of expression case where factual

3   questions existed on what conduct at school could be deemed "inherently disruptive");

4   *Experimental Engineering, Inc. v. United Technologies Corp.*, 614 F.2d 1244 (9th Cir. 1980)

5   (district court erred in dismissing complaint when it could not be said that it appears beyond

6   doubt that appellant could prove no set of facts in support of his claim); *Shapley v. Wolff*, 568

7   F.2d 1310 (9th Cir. 1978) (holding that district court erred in dismissing complaint because it

8   could not be said that it appears beyond doubt that appellant could prove no set facts in support of

9   his claim); *First Am. Title Ins. Co. v. Provident Savings Bank*, 848 F.2d 969 (9th Cir. 1988)

10  (holding that district court erred in granting motion to dismiss in lien case claim because appellant

11  might have proven that it perfected its bank lien before government recorded its tax lien); *Church*

12  *of Scientology of California v. Flynn*, 744 F.2d 694 (9th Cir. 1984) (holding that district court

13  erred in granting motion to dismiss in defamation because whether statement was an "opinion"

14  was a question of fact).

15       As the following sections make clear, CFIT has alleged sufficient facts to state its claims.

16  Reviewing the well-pleaded facts described below against the arguments made by Verisign in its

17  motion to dismiss reveals that Verisign asks this Court to make unwarranted factual

18  determinations, interpret complex contractual provisions without the benefit of history or

19  extrinsic evidence, and ignore conduct that, as pleaded in the SAC, would injure consumers and

20  rival businesses, including Plaintiff's members here.

21       **B.    New and Corrected Allegations Address the Court's Concerns**

22       The Court's December 8, 2006 decision to dismiss the FAC, and allow CFIT leave to

23  amend and file the SAC, was based on the conclusion that CFIT had failed to plead sufficient

24  allegations to assert antitrust standing. *See*, Dec. 8, 2006 Opinion, at pp. 10-20. The Court

25  specifically reviewed whether CFIT had alleged adequate antitrust injury in the "Expiring Names

26  Registration Services Market" and the "Domain Name Registration Market." In its additions and

27  revisions in the SAC, CFIT not only took care to address the perceived deficiencies in the FAC

28  but also added allegations that clarify the legal theories on which CFIT bases its causes of action.

Cathcart Collins & Kneafsey LLP
444 S. Flower St., 42nd Floor
Los Angeles, California 90071

Cathcart Collins & Kneafsey LLP
444 S. Flower St., 42nd Floor
Los Angeles, California 90071

1. **The Expiring Names Registration Services Market**

CFIT believes and alleges that the markets for previously registered domain names and currently unregistered domain names are distinct. Because of the different attributes of domain names in each of the separate markets, domain names in the unregistered domain names market are not reasonably interchangeable with domain names in the expiring names registration market. The new and revised allegations are primarily in three sections of the SAC: "Competition In Registration Of Expiring Names" (¶¶109-130); "The Nature And Value Of Expiring Domain Names" (¶¶131-154); and "Harm Suffered By The Plaintiff And Its Members" (¶¶311-318). They will be discussed in turn here.

a. **Negative Effects on Competition**

As additional factual background for these new allegations, CFIT added a new section of the SAC that describes what is known in ICANN circles as "The Registry-Registrar Split" (¶¶47-52). The Registry-Registrar Split and its history are important because the "split" was designed to keep new services and innovation at the registrar-level of services, where competition flourishes, rather than at the single-source registry-level of services. The "split" was created by contract between ICANN and Verisign on or about November 10, 1999 in order to bring competition to the registration of domain names. SAC, ¶48. Verisign, by and through its predecessor in interest, Network Solutions, Inc. ("NSI"), was required to agree to the registry-registrar split by the United States government, under threat of antitrust prosecution and possible loss of its contract for services with the United States. SAC, ¶50. At the same time, NSI agreed to recognize ICANN. SAC, ¶186. Through these negotiations with ICANN and parallel negotiations with the United States, NSI agreed to split it business into a *registrar* business and a *registry* business, which it would maintain separately. NSI agreed to face competition at the registrar level, while maintaining its single position as the sole registry. SAC, ¶187.

Since 1999, the registry-registrar split has been the key to maintaining competition in the registration for domain names and the provisioning of related domain name services. SAC, ¶51. In effect, the registry-registrar split allows the "Registry" to act as a neutral services platform, while "Registrars" compete for customers on price and differentiation of services. SAC, ¶52.

1    The effectiveness of the split is nowhere more evident than in the expiring names

2    registration market.  Back-order service providers, acting at the registrar-level, compete on the

3    basis of price and on quality of service to obtain customers who are seeking recently-expired

4    domain names.  Under this model, price competition has been fierce. SAC, ¶114.  Because this

5    competitive marketplace for obtaining expired domain names exists at the *registrar* level, market

6    participants are able to compete on differentiated services and prices. SAC, ¶117.

7    New allegations in the SAC describe these various ways that registrars, acting as back-

8    order service providers, differentiate their services to consumers.  Some back order service

9    providers offer customers the opportunity to purchase an expiring name for a flat fee.  This flat

10   fee is affordable for most domain name registrants. SAC, ¶119. For some flat fee back order

11   service providers, customers are awarded a domain name based on the principle of "first come,

12   first served," whereby the first customer to request the expiring domain name becomes the only

13   registrar customer eligible to receive it.  For other flat fee back order service providers, customers

14   are given the opportunity to register an expiring domain name based on random selection. SAC,

15   ¶120.

16   Some back order service providers offer customers the ability to purchase chances to win

17   an expiring domain name. SAC, ¶121. Some back order service providers offer customers the

18   ability to subscribe to an expiring domain name, so that if the domain name becomes available

19   during the time-limited period of the subscription, it is registered to the subscribing customer.

20   SAC, ¶122.

21   Some back order service providers offer customers the opportunity to purchase an

22   expiring name at an auction price. SAC, ¶123. Some back order service providers offer customers

23   the opportunity to participate in membership clubs, which for a monthly subscription fee, domain

24   name registrants can attempt to register expiring domain names as they become available. SAC,

25   ¶124. Some back order service providers partner together to aggregate their connections to

26   Verisign's registry computers in order to increase the odds that their customers will obtain an

27   expiring domain name. SAC, ¶125.

28

Cathcart Collins & Kneafsey LLP
444 S. Flower St., 42nd Floor
Los Angeles, California 90071

1   The market place for expiring domain names is rich and varied. New allegations in the

2   SAC also describe why this competitive marketplace serves consumers, by driving down prices

3   (through, among other things, the differentiated pricing models discussed above) and increasing

4   the level of services. SAC, ¶127. Because of the benefits of competition, domain name registrants

5   currently can purchase expiring domain names at prices below what those prices would fetch at

6   auction (the sole availability model available when Verisign moves this service to the *registry*

7   level). SAC, ¶128.

8                        **b.      The Nature And Value Of Expiring Domain Names**

9   The expiring names market is distinct from the market for new registrations. Even

10  Verisign understands this to be true. SAC, ¶143. The nature of the two markets, how they differ,

11  and the reasons why one is not a substitute for the other are detailed in the SAC. Verisign

12  describes these new allegations as mere "tinkering." They are not.

13  Expired domain names become available for a variety of reasons. For example, as domain

14  name registrations age, the likelihood that a registrant dies or becomes uninterested in

15  maintaining an Internet presence increases. Over time, every individual who has registered a

16  domain name will die. Those domain names eventually will fall into the market for expiring

17  domain names. SAC, ¶132. For commercial registrations, most businesses started in the United

·18 States, and elsewhere, fail within a few years from the time they are created. Commercial

19  registrations from failed businesses are not renewed and eventually will fall into the market for

20  expiring domain names. SAC, ¶133. For those businesses that do not fail, many of them will

21  merge into other businesses or change their names over time. Oftentimes, the original domain

22  name of the merged or changed company will not be renewed and eventually will fall into the

23  market for expiring domain names. SAC, ¶134.

24  Many commercial registrations center on specific product lines or promotions.

25  Oftentimes, these products or promotions have a limited lifetime, and the domain name registrant

26  may decide not to renew the domain name once the immediate need for it has passed. Such

27  domain names eventually will fall into the market for expiring domain names. SAC, ¶135. Both

28  individuals and corporations commonly register domain names for time-specific events, such as

Cathcart Collins & Kneafsey LLP
444 S. Flower St., 42nd Floor
Los Angeles, California 90071

1   meetings, conferences, concerts, picnics, etc. Once the event has passed, the registrant may decide

2   not to renew the domain name. Such domain names eventually will fall into the market for

3   expiring domain names. SAC, ¶136.

4       Expiring domain names have *more value* than newly registered domain names in part

5   because they have been advertised by the previous registrant and/or because websites associated

6   with the domain name have been indexed by search engines. SAC, ¶137. This means that expiring

7   domain names typically have visitors to, links to, and traffic to the web sites and other Internet

8   services associated with the domain name. Such Internet traffic makes it easier for a new domain

9   name registrant to monetize the domain name registration by associating advertisements or other

10   services with the domain name. SAC, ¶138.

11      Expiring domain names also often have more value than newly registered domain names

12   because they were registered at a time when good, short domain names were less scarce. SAC,

13   ¶139. For example, every dictionary word in English was registered many years in the past.

14   Currently, the only way to register a common dictionary word in the .COM TLD is to buy it

15   directly from its current registrant or acquire the domain registration in the expiring domains

16   market. SAC, ¶140.

17      Expiring domain names command a premium price, far in excess of the average cost of a

18   new domain name registration. SAC, ¶141. The average cost of an expiring domain name is

19   multiples in excess of the average cost of a new domain name registration. SAC, ¶142.

20              **c.    Predatory Conduct by Verisign**

21      The SAC also details the ways in which Verisign has used its superior resources and

22   market power unlawfully to damage competition, injure consumers, and give itself an unfair

23   advantage in various markets. Through a pattern of both strong-arm conduct and deceptive acts

24   and practices, Verisign has undermined ICANN's legal authority and financial stability (SAC, ¶6)

25   and used this conduct to command unreasonable and unlawful terms in the contracts now at issue.

26      Since ICANN was founded in November, 1998, Verisign (both by itself and by and

27   through its predecessor NSI) has been relentless in its assault on ICANN's legitimacy and

28   credibility. SAC, ¶272.  Verisign (both by itself and by and through its predecessor NSI) has,

Cathcart Collins & Kneafsey LLP
444 S. Flower St., 42nd Floor
Los Angeles, California 90071

1    among other things: (a) lobbied against ICANN's authority in Washington, D.C. and in the

2    European Union: (b) attempted to control policy debates within ICANN by hiring people to

3    advocate its positions under the guise that they were independent of Verisign/NSI; (c) paid

4    bloggers to attack ICANN under false names and under the guise that they were independent of

5    Verisign/NSI; (d) planted news stories critical of ICANN with mainstream and online media; and

6    (e) contributed to various "think tanks" and non-profit organizations to enable those organizations

7    to criticize and undermine ICANN.  SAC, ¶273.  Verisign (both by itself and by and through its

8    predecessor NSI) has threatened to withhold funding from ICANN, jeopardizing the non-profit

9    corporation's stability and existence. SAC, ¶274.

10       The assault on ICANN by Verisign (both by itself and by and through its predecessor

11   NSI) has designed to, and had had the effect of, coercing and/or convincing ICANN to agree to

12   the conspiracy alleged in the Complaint. SAC, ¶273.  In fact, Verisign's continuous attacks on

13   ICANN have been so successful that ICANN found it necessary to seek a specific provision in the

14   new agreements expressly requiring Verisign to cease the attacks on ICANN's credibility and

15   legitimacy. SAC, ¶274.

16       Most recently, in order to consolidate its monopoly power over the .COM and .NET

17   markets, Verisign filed a spurious legal action against ICANN which taxed ICANN's financial

18   and personnel resources, placed its Directors and advisors *in personal financial jeopardy*, and

19   threatened the legal underpinnings on which ICANN has based. SAC, ¶7.  Using the unequal

20   financial resources between it and ICANN, Verisign's litigation coerced ICANN into signing

21   these new anti-competitive agreements for .COM and .NET that provide Verisign the ability to

22   exact monopoly prices from consumers and capture downstream and adjacent markets from rival

23   commercial players, including CFIT's member companies. SAC, ¶¶8, 269.

### d.    Harm Caused by Verisign

25       Prior to February, 2006, Verisign was not a provider of services to end-users in the

26   expiring domain names market. SAC, ¶144. Prior to February, 2006, Verisign did not earn any

27   fee or commission on the registration of expiring domain names above the annual fee for new

28   registrations. SAC, ¶145.

Cathcart Collins & Kneafsey LLP
444 S. Flower St., 42nd Floor
Los Angeles, California 90071

By using its superior financial resources through the conduct described in the previous section, Verisign coerced ICANN into signing an agreement that did away with the registry-registrar split on the provisioning of new services and allowed Verisign to take steps to destroy the market for expiring domain names and, using the registrars as resellers of Verisign's single undifferentiated service, become the sole provider of services to end-users for the registration of expiring domain names. SAC, ¶146.

By its actions, Verisign will replace the currently competitive back order service providers, offering differentiated services and varying competitive pricing models, with a uniform Verisign-mandated service. SAC, ¶147. Such actions completely dissolve the registry-registrar split. Verisign will receive a fee or commission on the registration of every expiring domain name above and in addition to the annual fee it receives for new registrations. SAC, ¶148. The actions taken by Verisign will increase the average cost of expiring domain names for consumers. SAC, ¶149. The actions taken by Verisign will place the cost of valuable expiring domain names beyond the reach of the average domain name registrant. SAC, ¶150. A significant percentage of the participants in the market for expiring domain names will be priced out of the market for such names completely. SAC, ¶151.

The actions taken by Verisign will put the back order service providers out of business. SAC, ¶152. The actions taken by Verisign will impair the business relationships that back order service providers have with their customers, who have come to rely on these providers for a suite of back ordering services. SAC, ¶153. By its actions, Verisign will leverage its control of the .COM registry and the permissions granted it by ICANN in the new 2006 .COM Registry Agreement to insert itself as the sole provider in a currently competitive market in which it does not currently participate, extracting fees which it does not currently receive for services that are less beneficial to consumers. SAC, ¶154.

Domain name registrants, including those members of the Plaintiff, will be harmed by the loss of competitive services for expiring domain names, which will displace some registrants, including members and supporters of CFIT, from the market for such services entirely and exact new and unnecessary costs from those who can afford to remain in the market. SAC, ¶313.

Cathcart Collins & Kneafsey LLP
444 S. Flower St., 42nd Floor
Los Angeles, California 90071

1   Domain name registrar and back order service providers, including those members of the

2   Plaintiff, will be harmed by (a) the displacement of the services they now offer to consumers at

3   the registrar level by the services that Verisign will mandate from the registry level, which will

4   drive such registrars and back order providers from the markets they now serve; (b) the attendant

5   impairment of customer relationships based on the loss of the ability to provide services

6   demanded by their customers; (c) the loss of revenue from the displaced services, which will be in

7   the hundreds of millions of dollars over the course of the current .COM and .NET Registry

8   Agreements. SAC, ¶317.

9   ## 2.   Domain Names Registration Market

10  CFIT believes and alleges that the Verisign has misused its market power and superior

11  financial resources to coerce ICANN into signing new agreements that permit Verisign *to exact*

12  *unlawful and anticompetitive fees* from captive market participants.  The new and revised

13  allegations describing Verisign's price gouging of .COM and .NET consumers are primarily in

14  the following sections of the SAC: "Competition for the TLD Registry Agreements" (¶¶58, 64-

15  71, 73); "Elimination of Competitive Bidding" (¶¶223-233, 236, 238-246); "Monopoly

16  Leveraging" (¶¶249-253); and "Harm Suffered By The Plaintiff And Its Members" (¶¶311-318)..

17  They will be discussed in turn here.

18  ### a.   Competition for TLD Registries and the Elimination of

19  ### Competitive Bidding

20  In its Motion to Dismiss, Verisign effectively asks this Court to interpret four contracts

21  (the 2001 .COM and .NET Registry Agreements, the 2005 .NET Agreement, and the 2006 .COM

22  Agreement) based purely on their written terms – without reference to their history, the parties'

23  custom and practice, or other extrinsic evidence – and make a determination that (a) the newer set

24  of contracts make no change in the competitive landscape; and (b) any more favorable terms in

25  the newer set of contracts were the result of negotiation, not Verisign's predatory and unlawful

26  conduct.  This is not a conclusion that can be drawn either from the facts or at this stage of the

27  litigation.

28

Cathcart Collins & Kneafsey LLP
444 S. Flower St., 42nd Floor
Los Angeles, California 90071

As described more fully in the SAC, one of the ways ICANN has sought to obtain the benefits of competition has been by putting TLD registry agreements out for bid, and by selecting a registry operator on the basis of the benefits to consumers in price and quality of service presented by each prospective registry operator. SAC, ¶58. To date, periodic bidding for the TLD registry agreements has yielded substantial benefits for consumers. SAC, ¶59.

Because there can be only one registry operator at a time for each TLD registry, no competition among prospective registry operators exists during the term of each registry agreement. The only time competition among prospective registry operators exists is at the end of a registry agreement, when the next registry operator must be selected. SAC, ¶61. A central competitive constraint on a TLD registry operator is the meaningful prospect that the operator will lose the registry in the next round of bidding on the basis of overcharging or poor performance during the current contract term. SAC, ¶62.

The threat of future competitive bidding not only constrains the TLD operator at the moment when it bids, but also during its operation of the registry. SAC, ¶63. A failure to act reasonably and provide service on competitive terms and conditions throughout the contract term poses a potential for the current operator to lose in future bidding competition for the TLD registry agreement. SAC, ¶64.

Although current technology favors having a single registry for a given TLD, the assignment of a contract to operate a TLD does not create a natural monopoly. SAC, ¶65. A registry operator that operates a TLD registry for a fixed period of time, knowing that the registry contract will be placed into a competitive bidding situation at the end of the fixed term, *faces competition from its potential successors*. SAC, ¶66. This competitive bidding, between incumbent operator and prospective successor operators, benefits consumers by keeping prices in check, by ensuring that the registry operator invests in sufficient infrastructure and staff to maintain a stable and secure registry, by maintaining solid and reliable performance of the registry, and by preventing the registry from undertaking abusive practices that would financially benefit the registry at the expense of the end-user's experience. SAC, ¶67.

1    Until June 2005, Verisign had operated both the .NET and the .COM registries under the

2    competitive threat of future competitive bidding. SAC, ¶68. When ICANN awarded the contract

3    for the .NET registry to Verisign in July 2005, however, ICANN and Verisign eliminated all

4    realistic prospects that Verisign would face competitive bidding for that registry in the future.

5    SAC, ¶69. Upon the award of the new .NET contract to Verisign in July, 2005, Verisign moved

6    into a monopoly position with regard to .NET, insulated from any realistic competition from a

7    successor registry for .NET. SAC, ¶70.

8    The new 2005 .NET Agreement included a renewal provision that allowed ICANN to

9    solicit competitive bids for the .NET registry only if a court or arbitrator issued a non-appealable

10   final order finding Verisign to be in breach of the agreement.  Even then, Verisign would not lose

11   the registry contract if it cured the breach. SAC, ¶71. Likewise, the proposed 2006 .COM

12   Agreement challenged in this action includes an identical provision, thereby eliminating all

13   realistic prospect that Verisign will face competitive bidding for the .COM registry in the future.

14   SAC, ¶72.

15   Verisign was able to extract these materially different terms from as a result of the

16   financial and litigation pressure applied by Verisign's vastly superior financial resources. SAC,

17   ¶223. The terms of the new agreements were not the same as those in the older ones. Although

18   the 2006 .COM Registry Agreement gives ICANN the titular ability to rebid the registry

19   agreement if Verisign is in breach, the provision is illusory. SAC, ¶224. The rebid provision only

20   applies if Verisign has been adjudged in material breach of the agreement by a final, non-

21   appealable judgment and Verisign has not cured the defect.  This is an event that never will be

22   triggered. SAC, ¶225. At the time they negotiated the rebid provision of the 2006 .COM Registry

23   Agreement, and at the time they executed the Agreement, both ICANN and Verisign understood

24   that it never would be triggered. SAC, ¶226. At the time they negotiated the rebid provision of the

25   2006 .COM Registry Agreement, and at the time they executed the Agreement, both ICANN and

26   Verisign understood that the rebid provision was illusory. SAC, ¶227. By contrast, the rebid

27   provisions of the previous agreement, which allowed a rebid for breach or because of a proposal

28

Cathcart Collins & Kneafsey LLP
444 S. Flower St., 42nd Floor
Los Angeles, California 90071

1    to price .COM domain names higher than $6.00 per year, already would have been triggered had

2    that provision remained in effect. SAC, ¶228.

3              b.    **Unlawful Prices and Harm to Consumers and Plaintiff**

4         The unlawful actions described in the SAC increase significantly the prices that Verisign

5    will charge for .COM and .NET domain name registrations. By eliminating periodic rivalry to run

6    the registry, Verisign will be unconstrained in setting prices and will charge the maximum cap

7    allowed by the terms of the conspiracy. SAC, ¶230.

8         The 2006 .COM Registry Agreement affects prices by not only redrafting the previous

9    provisions for maximum price, but also redefining which terms are included in the maximum

10   price. SAC, ¶231. In the 2006 .COM Registry Agreement Verisign and ICANN effectively fix the

11   price for .COM domain name registration at $6 through December 31, 2006, and further conspire

12   to permit Verisign to permanently raise the price of .COM registration 7% for four out of the next

13   six years. This price exceeds the historical rate of inflation and is greater than what a fair market

14   would otherwise bear. SAC, ¶232.

15        If .COM had been put out for a competitive bid, the costs of domain name registrations

16   would have fallen to at least as low as $3.00 per domain name, with at least the same level and

17   quality of services provided by Verisign. SAC, ¶233. Under the terms of the 2006 .COM Registry

18   Agreement, the increase in the registry-level transaction fee is an automatic process. The

19   Agreement makes no provision for registrars and Internet stakeholders to provide any input into

20   the process. SAC, ¶234.

21        Verisign and ICANN each believe that Verisign could raise prices to the maximum

22   permitted by the caps under .COM and to any price whatsoever under .NET without running afoul

23   of the antitrust laws. SAC, ¶236.

24        In addition, pursuant to the conspiracy, the 2005 .NET Agreement provides for higher

25   prices in the future for new or renewal domain name registrations in the .NET TLD. Until

26   December 31, 2006, the maximum price is set at $4.25, which includes a $0.75 Registry-Level

27   Transaction Fee that is paid to ICANN by the registrars. Beginning in 2007, the price controls set

28   forth in the 2005 .NET Registry Agreement will be eliminated. Without the constraint of

Cathcart Collins & Kneafsey LLP
444 S. Flower St., 42nd Floor
Los Angeles, California 90071

competitive bidding, Verisign will be free to impose, and will impose, monopoly pricing on .NET domain name registrations. SAC, ¶237

Verisign has stated its intention to raise prices under the 2006 .COM and 2005 .NET Agreements (SAC, ¶238), and Verisign will raise its prices under the .COM and .NET Agreements. SAC, ¶239. Verisign's stock has risen on the widespread expectation by financial analysts that Verisign will raise its prices under the .COM and .NET Agreements. SAC, ¶240.

The price increases, as described in the previous paragraphs, will be above the prices that Verisign could charge if the .COM and .NET registry contracts were subject to a competitive bidding process. SAC, ¶241. Under a competitive model for registry bidding, prices would have fallen, to at least as low as $3.00 per name for similar levels and quality of service. SAC, ¶243. The sale of new .COM registrations is highly competitive, with a number of high volume, low margin businesses pricing their domains just above or even at the price charged by the registry. SAC, ¶244. Lower .COM prices at the registry level would have been passed on to consumers by these high volume, low margin registrars. SAC, ¶245.

Domain name registrants, including those members of the Plaintiff, will be harmed by the actions and conspiracy detailed in this Complaint by, among other things, the unlawful increase in prices which Verisign will exact from registrants in the .COM TLD, which will damage Plaintiff's members by hundreds of thousands of dollars each year and extract hundreds of millions of dollars from all .COM registrants over the course of the 2006 .COM Registry Agreement's existence. SAC, ¶313.

C.     **SAC Resolves Issues Raised in December 8, 2006 Opinion**

CFIT's SAC cures the deficiencies raised by the Court in its December 8, 2006 opinion. In many instances, CFIT has added new allegations to directly address the Court's concerns. In other instances, however, CFIT has recast the allegations to clarify the legal theories it makes and the factual predicates for those theories. The key issues raised by the Court are discussed here.

///

///

Cathcart Collins & Kneafsey LLP
444 S. Flower St., 42nd Floor
Los Angeles, California 90071

### 1.   Interchangeability of Registration Types

In its December 8, 2006 ruling, this Court stated that CFIT had failed to allege facts "tending to show that registered and unregistered domain names are not reasonably interchangeable." Dec. 8, 2006 Opinion, at 12. It added that CFIT's allegations:

> do not indicate that domain names are not reasonably interchangeable by
> virtue of their 'expired' status or otherwise raise an inference that the
> alleged expiring domain names registration services market is a separate
> relevant market. At most, these allegations suggest that some expired
> domain names may be in greater demand than others such that a registrant
> might be willing to pay an additional fee in order to increase its chances of
> procuring that domain name.

*Id.*, at 13. The SAC addresses this concern head on. The new and revised allegations (specifically, SAC, at ¶¶131-154) make clear that expiring registrations are inherently different from new registrations. Among other things, expiring registration have established Internet traffic and history (SAC, ¶¶137-138), which a new registration can never have. The fact that expiring names have value in excess of new registrations is a *consequence* of the described differences, not the difference itself.

### 2.   Contractual Differences

One of the key areas of dispute between CFIT and Verisign is over whether the differences between the 2001 .COM and .NET Agreements and the new agreements at issue are meaningful. CFIT has alleged that the changed terms are substantial and, in both their language and as they will be applied, give Verisign new power to extract unlawful monopoly rents from domain name registrants.

In its December 8, 2006 Opinion, the Court devoted substantial attention to the language of the contracts, how they varied, and what new added rights, if any, Verisign would have as a result of the changes. See, Dec. 8, 2006 Opinion, at 15-18. The Court apparently concluded that CFIT complained of a "mere extension of Verisign's lawful appointment as the sole registry operator." Id., at 16. This is not the case.

Cathcart Collins & Kneafsey LLP
444 S. Flower St., 42nd Floor
Los Angeles, California 90071

1       As described in the SAC, Verisign used predatory and fraudulent conduct (¶¶273-274) to

2   coerce ICANN into an agreement that fundamentally changed the competitive landscape.  Among

3   other things, the new contract broke down the historic wall between registry services and registrar

4   services and it gave Verisign freedom to raise prices undeterred by competition from a successor

5   registry.  The contracts at issue are simply not susceptible to a single interpretation, at the

6   pleading stage, that they are materially the same vis-à-vis their effects on competition.

7           **3.**    **Predatory Conduct and Supra-Competitive Prices**

8       One aspect of the factual history that CFIT has attempted to highlight in the SAC is that

9   Verisign achieved its new contractual freedom by predatory and fraudulent conduct designed to

10  coerce its putative regulator, ICANN, into agreeing to the unlawful provisions of the agreements

11  at issue. SAC, at ¶¶ 273-274.  Moreover, CFIT has alleged, and can prove, that a competitive

12  bidding environment, such as what existed under the 2001 versions of the .COM and .NET

13  agreements, would have resulted in a price reduction to at least as low as $3.00 per name, half of

14  what Verisign now charges and an even lower percentage over what Verisign will charge when it

15  implements its planned price increases. SAC, ¶¶241-245. The delta between $3.00, which would

16  be established in a competitive market, and what Verisign now charges and will charge in the

17  future is the measure of the supra-competitive prices that the Court found lacking in the prior

18  Complaint.  Verisign calls these allegations "speculative," but CFIT can and will prove its

19  allegation that at least half of the revenue Verisign derives from operation of the .COM registry is

20  supra-competitive.  It should be allowed this opportunity at trial.

21

22  **III.**   **CONCLUSION**

23      In this Opposition, CFIT has chosen to highlight the new and revised well-pleaded facts

24  that address the Court's December 8, 2006 opinion.  The SAC tells the story of Verisign's

25  predatory conduct, its attempts to coerce its regulator into agreement to unlawful operational

26  terms, and the effects that these actions will have on registrars, acting as back-order services

27  providers, and registrants.  CFIT's member companies encompass both categories (also as

28  clarified in new and revised allegations).  This is a story that warrants more complete

Cathcart Collins & Kneafsey LLP
444 S. Flower St., 42nd Floor
Los Angeles, California 90071

1 | development through discovery and ultimately that should be placed before a trier of fact at trial.

2 | For these reasons, Verisign's motion should be denied.

3

4 | Respectfully submitted,

5 | Dated:      February 16, 2007           CATHCART COLLINS & KNEAFSEY LLP

6

7 | By:_____

8 |                                      Bret A. Fausett

9 | Attorneys for Plaintiff
    COALITION FOR ICANN TRANSPARENCY INC.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Cathcart Collins & Kneafsey LLP
444 S. Flower St., 42nd Floor
Los Angeles, California 90071

**PROOF OF SERVICE**

STATE OF CALIFORNIA, COUNTY OF LOS ANGELES:

I am employed in the aforesaid county, State of California; I am over the age of 18 years and not a party to the within action; my business address is 444 S. Flower Street, 42ⁿᵈ Floor, Los Angeles, California 90071.

On **February 16, 2007,** I served the foregoing: **PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS CFIT'S SECOND AMENDED COMPLAINT** on the interested parties in this action by placing a true copy thereof, enclosed in a sealed envelope, addressed as follows:

Ronald L. Johnston, Esq.
Laurence J. Hutt, Esq.
Brian K. Condon, Esq.
James S. Blackburn, Esq.
Angel L. Tang, Esq.
ARNOLD & PORTER
777 South Figueroa Street, 44ᵗʰ Floor
Los Angeles, California  90017
Tel.    (213) 243-4000
Fax.    (213) 243-4199

[X]    **(BY FACSIMILE)**  I transmitted such documents from our facsimile machine number (213) 225-6601 to the person(s) at the facsimile numbers listed on the attached service list. Said transmission was reported as complete and without error.

[X]    **(BY OVERNIGHT MAIL)** by placing the document listed above in a sealed envelope and affixing a pre-paid air bill, and causing the envelope to be delivered to a Overnite Express agent for delivery.

[X ]    **(FEDERAL)**  I declare under penalty of perjury that the foregoing is true and correct, and that I am employed in the office of a member of the bar of this Court at whose direction the service was made.

Executed on **February 16, 2007,** in Los Angeles, California.

_Liliana Hernandez_
Liliana R. Hernandez

Cathcart Collins & Kneafsey LLP
444 S. Flower St., 42ⁿᵈ Floor
Los Angeles, California 90071