# EXHIBIT A

PATRICK A. CATHCART (CA SBN 65413)
BRET A. FAUSETT (CA SBN 139420)
IMANI GANDY (CA SBN 223084)
CATHCART COLLINS & KNEAFSEY LLP
444 South Flower Street, 42nd Floor
Los Angeles, California 90071
Telephone: (213) 225-6600
Facsimile: (213) 225-6601
PCathcart@cckllp.com
BFausett@cckllp.com

Attorneys for Plaintiff
COALITION FOR ICANN TRANSPARENCY INC.

Author
Deleted:

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

COALITION FOR ICANN TRANSPARENCY INC., a Delaware Corporation,

Plaintiff,

v.

VERISIGN, INC., a Delaware Corporation,

Defendant.

Case No. 05-4826 (RMW) PVT

**SECOND AMENDED COMPLAINT FOR VIOLATION OF THE ANTITRUST LAWS AND DECLARATORY AND INJUNCTIVE RELIEF**

**TRIAL JURY DEMANDED**

Honorable Ronald M. Whyte

Author
Deleted: FIRST

Author
Formatted: Indent: Left: 0.18"

Author
Deleted: ; INTERNET CORPORATION FOR ASSIGNED NAMES AND NUMBERS, a California Corporation

Author
Deleted: s

Author
Formatted: Indent: Left: 0.18", First line: 0", Space After: 0 pt, Line spacing: single

Author
Deleted: FIRST

Cathcart Collins & Kneafsey LLP
444 S. Flower St., 42nd Floor
Los Angeles, California 90071

Plaintiff Coalition for ICANN Transparency Inc. ("CFIT") brings this action against Verisign, Inc. ("Verisign"), and alleges as follows:

## I. NATURE OF THE ACTION

1. This action is brought to (a) enjoin and prevent defendant Verisign, Inc. (hereafter "Verisign") from carrying out an unlawful scheme to establish a permanent monopoly over the relevant markets as alleged herein, for declaratory relief and damages; (b) enjoin and prevent defendant Verisign from furthering an unlawful agreement with the Internet Corporation for Assigned Names and Numbers (hereafter "ICANN").

2. The unlawful schemes and agreement described herein give Verisign a permanent monopoly over all the ".COM" and ".NET" domain name registrations, a monopoly for related consumer services that it does not currently enjoy, and permits Verisign to increase prices above the fair market price in a normally competitive market.

3. This action seeks to restore competitive conditions in markets for ".COM" and ".NET" Internet domain names, and to prevent Verisign from expanding its monopoly control over the .COM and .NET domain name registries into downstream and adjacent markets.

4. CFIT seeks an injunction against the defendant and its management personnel preventing them from taking further steps to implement their unlawful schemes and agreement, including without limitation preventing the implementation of certain terms of a new .COM Registry Agreement between ICANN and Verisign (the "2006 .COM Agreement") (attached, as approved by the United States Department of Commerce as Exhibit "A"); and, an injunction against Verisign's monopoly leveraging conduct as specified herein. Plaintiff also requests declaratory relief that the agreements and understandings between the defendant and ICANN, as reflected in the terms of the 2006 .COM Agreement and the 2005 .NET Agreement constitute violations of federal and state antitrust laws, and ordering appropriate relief to restore competitive conditions in affected markets.

5. CFIT seeks damages on behalf of its registrar and registrant members for injury to their respective interests.

Author
Deleted: Internet Corporation for Assigned Names and Numbers ("ICANN") and VeriSign…("V ... [1]

Author
Deleted: defendants ICANN and VeriSign…their agreement…and …and other …. The…gives VeriSign a permanent monopoly over all the ... [2]

Author
Formatted: Bullets and Numbering

Author
Deleted: ".net…VeriSign…permanently and indefinitely …natural rate of inflation and what a would otherwise bear. ... [3]

Author
Deleted: is an …com…net…VeriSign…co ... [4]

Author
Deleted: defendants and their respective …signing or …proposed .com…VeriSign…com…");…VeriSign's…; an injunction requiring ICANN to adhere to its governmental mandate to maintain competition and prevent discrimination in markets related to Internet domain names; and an injunction requiring VeriSign… to abide by…current .com agreement (the "2001 .com…") until it expires…requiring ICANN to entertain competing bids for the operation of the .com registry at that time. Plaintiff also requests declaratory relief that the agreements and understandings between the defendants, as reflected in the terms of the 2006 .com…, as well as the similar "2005 .net Agreement," ... [5]

Author
Formatted: Bullets and Numbering

Author
Deleted: ICANN has abrogated its government-mandated obligation to maintain competition and prevent discrimination in markets related to Internet domain names by acquiescing and colluding in VeriSign's strong-arm tactics to leverage its limited-duration contractual monopoly over the .com and .net Internet domain name registries into permanent monopolies over those registries and over adjacent and downstream markets for various domain name services. Specifically and without limitation, ICANN and VeriSign have agreed to terms that have the practical effect of installing VeriSign as the permanent operator of the .com and .net registries and shielding VeriSign from the competitive pressures of the periodic re-bidding process that ICANN typically imposes on registry operators. ICANN and VeriSign have

Author
Deleted: FIRST

Cathcart Collins & Kneafsey LLP
444 S. Flower St., 42nd Floor
Los Angeles, California 90071

6. Through a pattern of both strong-arm conduct and deceptive acts and practices, Verisign has undermined ICANN's legal authority and financial stability continually since the non-profit corporation was founded in 1998.

7. Most recently, in order to consolidate its monopoly power over the .COM and .NET markets, Verisign filed a spurious legal action against ICANN which taxed ICANN's financial and personnel resources, placed its Directors and advisors in personal financial jeopardy, and threatened the legal underpinnings on which ICANN has based.

8. Using the unequal financial resources between it and ICANN, Verisign's litigation coerced ICANN into signing new anti-competitive agreements for .COM and .NET that provide Verisign the ability to exact monopoly prices from consumers and capture downstream and adjacent markets from commercial players, including CFIT's member companies, in currently competitive markets.

9. Specifically and without limitation, Verisign has leveraged its superior financial resources to coerce agreements from ICANN that have the practical effect of installing Verisign as the permanent operator of the .COM and .NET registries and shielding Verisign from the competitive pressures of the periodic re-bidding process that make for competitive markets.

10. Verisign also has gained anti-competitive terms that permit it to extend its monopoly control to the downstream markets for back order services and other services, as described below.

11. The unlawful agreements and understandings between Verisign and ICANN have the effects of imposing supracompetitive prices on consumers, distributing the monopoly profits between ICANN and Verisign, and permanently excluding competition and rivals from the relevant markets.

## II. PARTIES

12. Verisign is a corporation, organized and existing under the laws of the State of Delaware, and having its principal place of business in Mountain View, California. Verisign currently acts under contract with ICANN as the registry for all .COM and .NET domain names.

Author
**Deleted:** agreed to
Author
**Deleted:** VeriSign
Author
**Deleted:** .
Author
**Formatted:** Bullets and Numbering
Author
**Deleted:** VeriSign
Author
**Deleted:** VeriSign
Author
**Deleted:** permanently.
Author
**Deleted:** <#>ICANN is a private not-for-profit corporation, organized and existing under the laws of the State of California, and having its principal place of business in Marina Del Rey, California. ICANN is responsible for providing technical coordination of the Internet domain name system. VeriSign
Author
**Formatted:** Bullets and Numbering
Author
**Deleted:** VeriSign
Author
**Deleted:** "
Author
**Deleted:** "
Author
**Deleted:** com
Author
**Deleted:** net
Author
**Deleted:** FIRST

Cathcart Collins & Kneafsey LLP
444 S. Flower St., 42nd Floor
Los Angeles, California 90071

13. CFIT is a not-for-profit membership corporation, organized and existing under the laws of the State of Delaware, and having its principal place of business in the District of Columbia.

## III. STANDING

14. CFIT brings this action for injunctive and declaratory relief and damages on behalf of its members.

15. CFIT's purpose, as stated in its Articles of Incorporation, is to "promote the interests of its member businesses by seeking a competitive and fair market for domain name registry services."

16. CFIT was formed for the purpose of challenging the anticompetitive agreements and activities of Verisign alleged herein, including the 2006 .COM Agreement.

17. CFIT's has received financial support for this litigation from Internet domain name registrars and back order service providers, including but not limited to Pool.com, Inc. ("Pool.com"), Momentous, Inc. ("Momentous"), and R. Lee Chambers Company, LLC (hereinafter referred to collectively as "CFIT's Supporters").

18. CFIT's list of members continues to evolve and grow, and the list of members has been produced to Verisign during discovery.

19. CFIT's list of members produced to Defendant Verisign includes the names of CFIT's financial supporters as well as the names of domain name registrants, including but not limited to the World Association of Domain Name Developers ("WADND") (hereinafter referred to collectively as "CFIT's Supporters") and other individuals and companies that, collectively, have registered tens of thousands of domain names in the .COM and .NET registries.

## IV. JURISDICTION AND VENUE

20. This Court has subject matter jurisdiction over this action under 28 U.S.C. §§ 1331 and 1337; the Declaratory Judgment Act, 28 U.S.C. § 2201; and principles of supplemental jurisdiction under 28 U.S.C. § 1367.

Author
Deleted: defendants
Author
Deleted: com
Author
Formatted: Bullets and Numbering
Author
Deleted: members include
Author
Deleted: , registrants,
Author
Deleted: ")
Author
Formatted: Bullets and Numbering
Author
Deleted: FIRST

Cathcart Collins & Kneafsey LLP
444 S. Flower St., 42nd Floor
Los Angeles, California 90071

21. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) and (c), in that defendant Verisign resides, transacts business, and is found in this district and defendant ICANN resides, transacts business, and is found in the State of California and in this district.

22. **Intradistrict Assignment**: A substantial part of the events giving rise to CFIT's claims occurred in Santa Clara County, California, where defendant Verisign has its principal place of business. Assignment to the San Jose division is therefore proper.

## V. RELEVANT MARKETS

23. The relevant markets for antitrust analysis in this action include the following:

a. The unique and separate market for .COM domain name registrations (the ".COM Registration Market").

b. The unique and separate market for .NET domain name registrations (the ".NET Registration Market").

c. As used in this Complaint, the ".COM Registration Market" and the ".NET Registration Market" may be referenced, from time to time, as the Domain Name Registration Markets.

d. The market for back order services used by end users in the purchase and sale of expiring domain name registrations (the "Expiring Names Registration Services Market" or the 'Expiring Domain Names Market"). The Expiring Names Registration Services Market includes various services that are bought by end users to register domain names when they expire on the .COM and .NET registries. The relevant services include, without limitation, "back order" services that assist registrars in acquiring expiring domain names for registration on behalf of clients (potential and actual registrants), and auctions through which expiring domain name registrations are released to the public for bidding.

24. The market for .COM domain name registrations is a distinct market for purposes of domain name registrations.

Cathcart Collins & Kneafsey LLP
444 S. Flower St., 42nd Floor
Los Angeles, California 90071

Author
**Deleted:** VeriSign

Author
**Deleted:** VeriSign

Author
**Deleted:** case

Author
**Formatted:** Bullets and Numbering

Author
**Deleted:** 1

Author
**Formatted:** List 1 Char

Author
**Deleted:** markets for the purchase

Author
**Formatted:** List 1 Char

Author
**Deleted:** sale of

Author
**Formatted:** List 1 Char

Author
**Formatted:** List 2, Indent: Left: 1.5"

Author
**Deleted:** Domain Name

Author
**Formatted:** List 1 Char

Author
**Deleted:** s"), which include:

Author
**Deleted:** (a)

Author
**Formatted:** List 1

Author
**Formatted:** List 1 Char

Author
**Formatted:** List 1 Char

Author
**Deleted:** com

Author
**Formatted:** List 1 Char

Author
**Deleted:** com Registration Market").
(b) The market for .net domain name registr ... [6]

Author
**Formatted:** List 1 Char

Author
**Deleted:** 2

Author
**Deleted:** com

Author
**Deleted:** net

Author
**Deleted:** FIRST

25. Although over 250 TLDs[1] exist, they are not equally accessible to businesses based in the United States. All country-code TLDs are operated and managed outside of the United States, and are therefore not subject to United States antitrust laws and statutes. Registration with ccTLDs requires a Registrant to leave the borders and protection of the United States. Therefore these ccTLDs cannot be counted as part of the relevant market for determining antitrust violations.

26. Many of the generic TLDs, or gTLDs, are restricted either in use or in meaning. Specifically, gTLDs such as ".EDU," ".MIL," ".GOV," ".AERO," and ".COOP" are reserved for specific types of institutions and are not available to businesses or private persons. Many gTLDs carry inherent meanings which cause confusion Registrants would want to avoid. The gTLD ".ORG" carries the connotation of a non-profit organization, and similarly ".TRAVEL" connotes a travel-related Registrant. As a result, ".COM" and ".NET" have become more than just the most used TLDs, they have become the definitive TLDs for all commercial and private Registrants within the United States who seek to avoid confusion with other types of associations.

27. No top-level domain is a substitute for the .COM top-level domain.

28. As between .COM and .NET, Verisign agrees that .COM is a distinct market.

29. As a matter of business practice and strategy, Verisign operates as though .COM is a distinct market, and it markets its registration services for the .COM TLD differently than it markets any other registration services.

30. The relevant geographic market as to each relevant product market is the world.

31. Verisign is a participant in each relevant market.

32. Verisign is the sole Registry for the .COM and .NET domains. As a result, any arrangements into which Verisign enters to control competition in the expired domain names market, to fix prices, or to introduce new consumer services at the registry level that also are available in a competitive market at the registrar level constitutes an unjustifiable use of monopoly power.

[1] TLDs or "top-level domains" are described more fully in section VII.B, paragraphs 16 through 19. ".COM" and ".NET" are examples of TLDs.

Cathcart Collins & Kneafsey LLP
444 S. Flower St., 42nd Floor
Los Angeles, California 90071

Author
Formatted: Bullets and Numbering
Author
Deleted: edu," ".mil," ".gov," ".aero
Author
Deleted: coop
Author
Deleted: org
Author
Deleted: travel
Author
Deleted: com
Author
Deleted: net
Author
Formatted: Bullets and Numbering
Author
Deleted: VeriSign
Author
Deleted: ICANN is a participant in each relevant market in that it collects fees that are either directly or ultimately borne by registrars and registrants for each registration.
Author
Deleted: VeriSign
Author
Deleted: com
Author
Deleted: net
Author
Deleted: into
Author
Deleted: or in the site finder market, or
Author
Deleted: com
Author
Deleted: net
Author
Deleted: FIRST

## VI. INTERSTATE COMMERCE

33. The conduct of defendant Verisign described in this Complaint will take place in and affect interstate trade and commerce of the United States in that the purchases and sales of services in the relevant markets are transacted across state lines.

34. The conduct of defendant Verisign complained of herein will directly, substantially, and foreseeably affect interstate trade and commerce in that defendant will obstruct free and open competition in the .COM and .NET Registration Markets and in the Expiring Names Registration Services Market.

Author
Deleted: defendants VeriSign and ICANN complained of herein

Author
Formatted: Bullets and Numbering

Author
Deleted: defendants VeriSign and ICANN

Author
Deleted: s

Author
Deleted: com

Author
Deleted: net

Author
Formatted: No bullets or numbering

## VII. BACKGROUND

### A. THE INTERNET DOMAIN NAME SYSTEM

35. The Internet is a network of interconnected computers and computer networks. Every computer connected directly to the Internet has a unique numerical address. These addresses, which are known as Internet Protocol ("IP") addresses, are necessary for computers to communicate with each other over the Internet. An example of an IP address is 64.233.161.147.

Author
Formatted: Bullets and Numbering

36. Because numerical IP addresses can be cumbersome and difficult for Internet users to remember or to use, the numerical IP address system has been overlaid with a more user-friendly system of domain names, the Domain Name System or DNS.

### B. DOMAIN NAME SYSTEM HIERARCHY

37. The DNS defines a hierarchical name space divided into zones, each of which has authority over the zones below it.

38. For purposes of the DNS, domain names are read from right to left. The top zone is divided into top-level domains, or "TLDs" such as ".COM" and ".NET." Each TLD is divided into second-level domains or "SLDs" such as "example.com" or "example.net." Second-level domains can be further divided into third-level domains, such as "another.example.com," and so on.

Author
Formatted: Bullets and Numbering

Author
Deleted: com

Author
Deleted: net

Author
Deleted: FIRST

Cathcart Collins & Kneafsey LLP
444 S. Flower St., 42nd Floor
Los Angeles, California 90071

39. A set of "root servers" provides a list of the registries responsible for maintaining each TLD. For example, at present, the root servers tell users looking for .COM or .NET domain names to find the location for that domain name on name servers operated by Verisign. For example, a user looking for google.COM would be directed to Verisign's .COM name server to find the entry for "google." The Verisign server, in turn, would tell the user that google could be found at the host identified by the address 64.233.161.147.

40. There are currently two different types of TLDs: seventeen generic TLDs ("gTLDs"): ".AERO," ".BIZ" ".COM," ".COOP," ".INFO," ".JOBS," ".MOBI," ".MUSEUM," ".NAME," ".NET," ".ORG," ".PRO," ".TRAVEL," ".GOV," ".EDU," ".MIL," and ".INT" and approximately 240 two-letter country code TLDs ("ccTLDs"), such as ".US," ".UK," ".JP," and ".KR."

41. Because domain names are essentially "addresses" that allow computers connected to the Internet to communicate with each other, each domain name must be unique, even if it differs from another domain name by only one character (*e.g.*, "uscourts.com" is different from "uscourt.com" or "us-courts.com").

42. A given domain name is typically registered to only one entity and can point to only one set of host computers.

**C. REGISTRIES, REGISTRARS, AND REGISTRANTS**

43. Verisign acts as the "Registry" for domain names registered in the .COM and .NET gTLDs in accordance with a written agreement with ICANN.

44. As the Registry for the .COM and .NET gTLDs, Verisign maintains the definitive database that associates registered domain names in these gTLDs with the corresponding IP numbers of their respective domain name servers. The domain name servers, in turn, direct Internet queries to resources such as websites and e-mail systems. This database is known as a "zone file." Oftentimes, the Registry is referred to as a "Registry operator" and the zone file is referred to as the "Registry."

Author
**Deleted:** .com
Author
**Deleted:** net
Author
**Deleted:** VeriSign.
Author
**Deleted:** com
Author
**Deleted:** VeriSign's .com
Author
**Deleted:** VeriSign
Author
**Deleted:** aero," ".biz" ".com," ".coop," ".info," ".jobs," ".mobi," ".museum," ".name," ".net," ".org," ".pro," ".travel," ".gov," ".edu," ".mil
Author
**Deleted:** int
Author
**Deleted:** us," ".uk," ".jp
Author
**Deleted:** kr
Author
**Formatted:** Bullets and Numbering
Author
**Deleted:** , therefore, can be
Author
**Deleted:** .
Author
**Deleted:** VeriSign
Author
**Deleted:** com
Author
**Deleted:** net
Author
**Formatted:** Bullets and Numbering
Author
**Deleted:** com
Author
**Deleted:** net
Author
**Deleted:** VeriSign
Author
**Deleted:** FIRST

Cathcart Collins & Kneafsey LLP
444 S. Flower St., 42nd Floor
Los Angeles, California 90071

45. A domain name is created by an individual or organization that registers the domain name and thereby includes it in the zone file. The individual or organization that registers a specific domain name is a "Registrant."

46. Internet users typically interact with the DNS through their Internet Service Providers ("ISP"). Specifically, when a user requests a Web site associated with a domain name, the user's computer searches its local cache for the IP address associated with that domain name. If the IP address is not found locally, the computer will query the ISP's name server. If the ISP's name server does not have the address for the domain name requested, it will query the appropriate Registry's name server (*i.e.*, its zone file), from which it will obtain the name and IP address of the name server associated with the domain name requested. It will then query the name server associated with the domain name, and pass the IP address back to the user's computer.

Author
Deleted: <#>Registrants do not have direct access to the VeriSign Registry and do not interact directly with the Registry in connection with domain name registrations. Instead, prospective registrants must register domain names through any one of over 130 private companies located in the United States and throughout the world that act as domain name "Registrars" for the second-level domain names in the .com and .net gTLDs.

**D. THE REGISTRY-REGISTRAR SPLIT**

47. Registrants do not have direct access to the Verisign Registry and do not interact directly with the Registry in connection with domain name registrations. Instead, prospective registrants must register domain names through any one of hundreds of private companies located in the United States and throughout the world that act as domain name "Registrars" for the second-level domain names in the .COM and .NET gTLDs.

48. The split between the .COM and .NET Registries and the Registrars was created by contract between ICANN and Verisign on or about November 10, 1999 in order to bring competition to the registration of domain names.

49. Prior to the creation of the registry-registrar split on November 10, 1999, Verisign, by and through its predecessor in interest, Network Solutions, Inc., was the sole provider of .COM and .NET registration services to consumers, either by itself or through a network of authorized resellers.

///

Author
Deleted: FIRST

Cathcart Collins & Kneafsey LLP
444 S. Flower St., 42nd Floor
Los Angeles, California 90071

50. Verisign, by and through its predecessor in interest, Network Solutions, Inc., was required to agree to the registry-registrar split by the United States government, under threat of antitrust prosecution and possible loss of its contract for services with the United States.

51. Since 1999, the registry-registrar split has been the key to maintaining competition in the registration for domain names and the provisioning of related domain name services.

52. In effect, the registry-registrar split described in the paragraph above allows the "Registry" to act as a neutral services platform, while the "Registrars" compete for customers on price and differentiation of services.

**E. COMPETITION FOR THE TLD REGISTRY AGREEMENTS**

53. One of the principal reasons ICANN was created was to enable competition in the registration of domain names.

54. As set forth more completely below, on July 1, 1997, as part of the Clinton Administration's Framework for Global Electronic Commerce, the President directed the Secretary of Commerce to privatize the domain name system (DNS) in a manner that increases competition and facilitates international participation in its management.

55. This Presidential directive resulted in a policy process that created ICANN. One of the principal statements of United States policy behind the creation of ICANN was a document released by the U.S. Department of Commerce on June 5, 1998, and titled "Management of Internet Names and Addresses," Docket Number: 980212036-8146-02. This document is often referenced by ICANN and the entities that are involved in ICANN as the "White Paper."

56. The "White Paper" specifically provided that the corporation which would become ICANN should seek to use "Where possible, market mechanisms that support competition and consumer choice." The United States believed that competition would "lower costs, promote innovation, encourage diversity, and enhance user choice and satisfaction."

57. This mandate to create competition is one of the core values currently written into ICANN's by-laws ("In performing its mission, the following core values should guide the

Author
**Formatted:** Bullets and Numbering

Author
**Deleted:** <#>Historically, ICANN has sought to obtain the benefits of competition by putting TLD registry agreements out for bid, and by selecting a registry operator on the basis of the benefits to consumers in price and quality of service presented by each prospective registry operator.
In fact, one

Author
**Formatted:** Bullets and Numbering

Author
**Deleted:** FIRST

Cathcart Collins & Kneafsey LLP
444 S. Flower St., 42nd Floor
Los Angeles, California 90071

decisions and actions of ICANN:....(6) Introducing and promoting competition in the registration of domain names where practicable and beneficial in the public interest.").

58. Historically, one of the ways ICANN has sought to obtain the benefits of competition has been by putting TLD registry agreements out for bid, and by selecting a registry operator on the basis of the benefits to consumers in price and quality of service presented by each prospective registry operator.

59. Periodic bidding for the TLD registry agreements has yielded substantial benefits for consumers.

60. Verisign and others recently bid competitively for the right to operate the .NET registry beginning in July 2005. Verisign's bid was selected as the winning bid, in part because Verisign promised immediately to *lower* .NET registration fees by more than thirty percent.

61. Because there can be only one registry operator at a time for each TLD registry, no competition among prospective registry operators exists during the term of each registry agreement. The only time competition among prospective registry operators exists is at the end of a registry agreement, when the next registry operator must be selected.

62. A central competitive constraint on a TLD registry operator is the meaningful prospect that the operator will lose the registry in the next round of bidding on the basis of overcharging or poor performance during the current contract term.

63. The threat of future competitive bidding not only constrains the TLD operator at the moment when it bids, but also during its operation of the registry. A failure to act reasonably and provide service on competitive terms and conditions throughout the contract term poses a potential for the current operator to lose in future bidding competition for the TLD registry agreement.

64. Although current technology favors having a single registry for a given TLD, the assignment of a contract to operate a TLD does not create a natural monopoly.

65. A registry operator that operates a TLD registry for a fixed period of time, knowing that the registry contract will be placed into a competitive bidding situation at the end of the fixed term, faces competition from its potential successors.

Author
**Deleted:** For example, VeriSign

Author
**Deleted:** net

Author
**Formatted:** Bullets and Numbering

Author
**Deleted:** VeriSign's

Author
**Deleted:** VeriSign

Author
**Deleted:** net

Author
**Deleted:** there is

Author
**Deleted:** there can be

Author
**Deleted:** The only

Author
**Deleted:** could

Author
**Deleted:** Until June 2005, VeriSign had operated both the .net and the .com registries under the competitive threat of future competitive bidding. When ICANN awarded the contract for the .net registry to VeriSign in July 2005, however, ICANN and VeriSign eliminated all realistic prospects that VeriSign would face competitive bidding for that registry in the future. The new 2005 .net Agreement included a renewal provision that allowed ICANN to solicit competitive bids for the .net registry only if a court or arbitrator issued a non-appealable final order finding VeriSign to be in breach of the agreement, and VeriSign failed to cure the breach.

Author
**Deleted:** FIRST

Cathcart Collins & Kneafsey LLP
444 S. Flower St., 42nd Floor
Los Angeles, California 90071

66. This competitive bidding, between incumbent operator and prospective successor operators, benefits consumers by keeping prices in check, by ensuring that the registry operator invests in sufficient infrastructure and staff to maintain a stable and secure registry, by maintaining solid and reliable performance of the registry, and by preventing the registry from undertaking abusive practices that would financially benefit the registry at the expense of the end-user's experience.

67. This competitive bidding, between incumbent operator and prospective successor operators, also benefits registrars, including registrars who act as back-end service providers (as defined *infra*), by ensuring that the registry operator invests in sufficient infrastructure and staff to maintain a stable and secure registry on which registrars can rely for their businesses, by maintaining solid and reliable performance of the registry on which registrars can rely for their businesses, and by preventing the registry from undertaking abusive practices that would allow the registry to cannibalize competitive registrar markets.

68. Until June 2005, Verisign had operated both the .NET and the .COM registries under the competitive threat of future competitive bidding.

69. When ICANN awarded the contract for the .NET registry to Verisign in July 2005, however, ICANN and Verisign eliminated all realistic prospects that Verisign would face competitive bidding for that registry in the future.

70. Upon the award of the new .NET contract to Verisign in July, 2005, Verisign moved into a monopoly position with regard to .NET, insulated from any realistic competition from a successor registry for .NET.

71. The new 2005 .NET Agreement included a renewal provision that allowed ICANN to solicit competitive bids for the .NET registry only if a court or arbitrator issued a non-appealable final order finding Verisign to be in breach of the agreement. Even then, Verisign would not lose the registry contract if it cured the breach.

72. The proposed 2006 .COM Agreement challenged in this action includes an identical provision, thereby eliminating all realistic prospect that Verisign will face competitive bidding for the .COM registry in the future.

Author
Deleted: com

Author
Formatted: Bullets and Numbering

Author
Deleted: VeriSign

Author
Deleted: com

Author
Deleted: FIRST

Cathcart Collins & Kneafsey LLP
444 S. Flower St., 42nd Floor
Los Angeles, California 90071

73. Upon the award of the new .COM contract to Verisign in 2006, Verisign moved into a monopoly position with regard to .COM, insulated from any realistic competition from a successor registry for .COM.

## F. OTHER TLDs ARE NOT SUBSTITUTES FOR .COM AND .NET

74. The .COM registry does not compete with other TLDs.

75. The .NET registry also does not compete with other TLDs.

76. The .COM and .NET registries cannot compete with each other for an additional, separate reason: Verisign controls both the .COM and the .NET registries.

77. Consumers do not regard .COM domain names as having reasonable substitutes in any other top-level domain name registries.

78. Demand cross-elasticities between .COM domain names, on the one hand, and domain names in other TLDs such as .NET, .INFO, .BIZ and in country code TLDs, are low.

79. Decreases in the price of domain name registrations in other TLDs (such as occurred on July 1, 2005 when .NET domain name registration prices were cut by more than thirty percent) do not result in price decreases for .COM domain name registrations.

80. As a promotional device, .INFO domain names were given away for free for a significant period when that registry first started to operate. During that time, there was no discernible number of registrants switching from .COM domain names to .INFO domain names.

81. The prices that consumers are willing to pay for .COM domain name registrations in auctions substantially exceed the prices they are willing to pay for domain name registrations in other TLDs when they are offered at auctions. For example, during the past year, nine .COM domain names sold for $600,000.00 or more, while the highest selling .BIZ domain name was $15,000.00.

82. Many .COM domain name registrants regard domain names in other TLDs as complements to, rather than substitutes for, .COM domain name registrations and seek similar domain name registrations in a number of TLDs.

Author
Formatted: Bullets and Numbering
Author
Deleted: com
Author
Deleted: net
Author
Formatted: Bullets and Numbering
Author
Deleted: com
Author
Deleted: net
Author
Deleted: VeriSign
Author
Deleted: com
Author
Deleted: net
Author
Deleted: com
Author
Deleted: com
Author
Deleted: net, .info, .biz
Author
Deleted: net
Author
Deleted: com
Author
Deleted: info
Author
Deleted: com
Author
Deleted: info
Author
Formatted: Bullets and Numbering
Author
Deleted: com
Author
Deleted: com
Author
Deleted: biz
Author
Deleted: com
Author
Deleted: com
Author
Deleted: FIRST

83. In fact, Verisign itself has registered not only "Verisign.com" but also "Verisign.net," "Verisign.info," and "Verisign.biz," among others.

84. Moreover, most .COM domain name registrants would experience overwhelming costs to switch from a .COM domain name registration to the complementary domain name in another TLD (for example, a switch from cook.COM to cook.NET or to cook.info), including potential lost traffic, e-mails, and goodwill, as well as slippage in search engine results and costs associated with revising letterhead, business cards, Internet listings, and websites.

85. As a result, registrants of .COM domain names would not regard domain names in other TLDs as reasonable substitutes for their existing domain names in the .COM TLD.

86. For all practical purposes, registrants of .COM domain names are locked in to the registration and use of their .COM domain name.

87. For many .COM domain name registrants, their .COM domain name has become their trademark or trade name, such as "Amazon.com" and "Pool.com." These registrants do not regard domain names in other TLDs, such as "Amazon.net," to be reasonable substitutes for their .COM domain name registrations.

88. For a company that has branded its online identity with a .COM domain name, the costs of changing that branding to a new TLD are enormous. For this reason, .COM registrants are locked into their use of the .COM registry.

89. .COM domain names are the primary commercial domain names and dominate the market for domain names registered for commercial purposes.

90. There are in excess of 60,000,000 .COM domain name registrations, which is approximately 75% of all domain names registered in generic TLDs (.COM, .NET, .ORG, .INFO, and .BIZ) and approximately 45% of all domain names registered in any TLD (including those registered in restricted TLDs such as .GOV or .MUSEUM, and the country code TLDs).

91. Consumers likewise do not regard .NET registrations as having reasonable substitutes in any other top level domain name registries.

///

Author
**Deleted:** VeriSign…verisign…verisign.net," "verisign…verisign ... [7]

Author
**Deleted:** com…com…com…net ... [8]

Author
**Formatted:** Bullets and Numbering

Author
**Deleted:** they …com ... [9]

Author
**Deleted:** For many .com domain name…, ... [10]

Author
**Deleted:** .com

Author
**Formatted:** Bullets and Numbering

Author
**Deleted:** com…com…com ... [11]

Author
**Deleted:** com

Author
**Formatted:** Bullets and Numbering

Author
**Deleted:** 46…com…76 percent…com, .net, .org, .info, and .biz) and roughly 46 percent…gov…museum ... [12]

Author
**Deleted:** net

Author
**Deleted:** FIRST

Cathcart Collins & Kneafsey LLP
444 S. Flower St., 42nd Floor
Los Angeles, California 90071

92. Demand cross-elasticity between domain names in the .NET TLD, on the one hand, and domain names in other TLDs such as .COM, .INFO, .BIZ and country code TLDs, are low.

93. The significant decrease in the registration fee for .NET domain names in July 2005 (more than thirty percent) did not result in significant numbers of consumers switching to .NET domain names from domain names in other TLDs.

94. When .INFO domain names were being given away for free when that registry first started to operate, there was no discernible number of registrants switching from .NET domain names to .INFO domain names.

95. The prices that consumers are willing to pay at auctions for .NET domain name registrations substantially exceed the prices they are willing to pay for domain names in all other TLDs when they are offered at auction, with the sole exception of .COM domain names.

96. For example, during the past year the highest selling .NET domain name was $150,000.00, which was more than double what anyone was willing to pay for a domain name in the other TLDs (other than the .COM TLD).

97. As with registrants of .COM domain names, many .NET domain name registrants use their .NET domain name as their trademark or trade name, such as "earthlink.net." They would be unwilling to incur the substantial switching costs involved in switching from their .NET domain name to a complementary domain name in another TLD (such as a switch from "att.net" to "att.info").

98. Moreover, because .NET domain names are the primary domain names used for networking purposes and dominate the market for such names, they are commonly used by Internet and e-mail service providers who could not easily substitute a domain name in an alternative TLD without potentially disrupting traffic for thousands if not millions of customers. Domain names in the .NET TLD exceed 6,500,000, comprising 11 percent of all domain names registered in unrestricted generic TLDs and roughly 7 percent of all registered domain names.

99. There are a limited number of generic TLDs.

Author Deleted: elasticities
Author Deleted: net
Author Deleted: com, .info, .biz
Author Deleted: net
Author Deleted: net
Author Deleted: info
Author Deleted: net
Author Deleted: info
Author Deleted: net
Author Deleted: com
Author Formatted: Bullets and Numbering
Author Deleted: net
Author Deleted: com
Author Deleted: com
Author Deleted: net
Author Deleted: net
Author Deleted: net
Author Formatted: Bullets and Numbering
Author Deleted: net
Author Deleted: net
Author Deleted: FIRST

Cathcart Collins & Kneafsey LLP
444 S. Flower St., 42nd Floor
Los Angeles, California 90071

100. A number of these generic TLDs, such as .MIL, .MUSEUM, and .TRAVEL, impose restrictions on who can register a domain name in the TLD and the purpose for which such a domain name can be used.

101. Other generic TLDs, such as .ORG and .EDU, are recognized by consumers as being used in connection with particular purposes, such as non-profit organizations and educational institutions.

102. None of the other generic TLDs compete with the .COM or .NET TLDs.

103. The country codes TLDs do not compete with either the .COM TLD or the .NET TLD.

104. Many ccTLDs impose nexus requirements between the prospective registrant and the host country for the ccTLD, preserving the idea that domain names in ccTLDs should be used by individuals and entities that have a nexus with the host country.

105. Some of these nexus requirements can be quite onerous, for example, limiting domain name registrations to entities formed or incorporated in the host country.

106. Even in those cases where there is no nexus requirement, a ccTLD is not viewed as a reasonable substitute for a .COM or .NET domain name for individuals and entities who have no nexus with the host country because it could lead to consumer confusion. For example, a company located in the United States would not view a domain name registered in the Mexican TLD as a substitute for a domain name registered in the .COM or .NET TLDs. Additionally, all country code TLDs are operated and managed outside of the United States, and are therefore not subject to United States antitrust laws and statutes.

107. Registration with ccTLDs requires a Registrant to leave the borders and protection of the United States.

108. ccTLDs cannot be counted as part of the relevant market for determining antitrust violations.

///

///

Cathcart Collins & Kneafsey LLP
444 S. Flower St., 42nd Floor
Los Angeles, California 90071

- Author Deleted: mil, .museum, and .travel
- Author Deleted: org
- Author Deleted: edu
- Author Deleted: net
- Author Formatted: Bullets and Numbering
- Author Deleted: these
- Author Deleted: com
- Author Deleted: com
- Author Deleted: net
- Author Deleted: com
- Author Deleted: net
- Author Deleted: com
- Author Deleted: net
- Author Deleted: Therefore, these
- Author Formatted: Bullets and Numbering
- Author Deleted: FIRST

**G. COMPETITION IN REGISTRATION OF EXPIRING NAMES**

109. Qualified registrars are granted a limited number of connections to Verisign's registry computers, which they use to register domain names on behalf of registrants.

110. To register a new or expiring domain name, a registrar sends an "add" command to Verisign's registry computer for that domain name; if the name is available, the "add" command is accepted, and the domain name is registered on behalf of a registrant.

111. A competitive marketplace for obtaining expired domain names currently exists.

112. This market for expired domain names is comprised of back order service providers, who compete to provide the lowest prices and highest quality service to customers seeking to register recently-expired domain names.

113. Many companies, such as SnapNames and Pool.com, compete in this Expiring Names Registration Services Market.

114. Back-order service providers compete on the basis of price and on quality of service to obtain customers who are seeking recently-expired domain names. Price competition has been fierce.

115. For example, at one time SnapNames charged approximately $60 to a customer seeking an expired domain name irrespective of whether SnapNames was ultimately successful in obtaining the domain name for the customer.

116. Pool.com introduced "pay-for-performance" as a competitive initiative, offering a back order service for which the customer paid only if it obtained the domain name for the customer. The competitive market has largely adopted "pay-for-performance."

117. This competitive marketplace for obtaining expired domain names exists at the registrar level.

118. At the registrar level, registrars, acting as back order service providers, compete for customers on both price and differentiation of services.

119. Some back order service providers offer customers the opportunity to purchase an expiring name for a flat fee. This flat fee is affordable for most domain name registrants.

Author
Formatted: Bullets and Numbering
Author
Deleted: VeriSign's
Author
Formatted: Bullets and Numbering
Author
Deleted: VeriSign's
Author
Deleted: There currently exists a
Author
Deleted: .
Author
Deleted: at times
Author
Formatted: Bullets and Numbering
Author
Deleted: FIRST

Cathcart Collins & Kneafsey LLP
444 S. Flower St., 42nd Floor
Los Angeles, California 90071

Cathcart Collins & Kneafsey LLP
444 S. Flower St., 42nd Floor
Los Angeles, California 90071

120. For some flat fee back order service providers, customers are awarded a domain name based on the principle of "first come, first served," whereby the first customer to request the expiring domain name becomes the only registrar customer eligible to receive it. For other flat fee back order service providers, customers are given the opportunity to register an expiring domain name based on random selection.

121. Some back order service providers offer customers the ability to purchase chances to win an expiring domain name.

122. Some back order service providers offer customers the ability to subscribe to an expiring domain name, so that if the domain name becomes available during the time-limited period of the subscription, it is registered to the subscribing customer.

123. Some back order service providers offer customers the opportunity to purchase an expiring name at an auction price.

124. Some back order service providers offer customers the opportunity to participate in membership clubs, which for a monthly subscription fee, domain name registrants can attempt to register expiring domain names as they become available.

125. Some back order service providers partner together to aggregate their connections to Verisign's registry computers in order to increase the odds that their customers will obtain an expiring domain name.

126. The market for expiring domain names, offered by back order service providers at the registrar level of services, is highly competitive.

127. This highly competitive market for expiring domain names benefits consumers because it drives down prices (through, among other things, the differentiated pricing models discussed above) and increases the level of services.

128. Because of the benefits of competition, domain name registrants currently can purchase expiring domain names at prices below what those prices would fetch at auction.

129. In order to attract customers, back order service providers have had to compete on quality of service. The more effective a back order service provider is in obtaining domain names, the more customers it attracts, resulting in more income.

Author
**Deleted:** FIRST

130. Consumers have benefited in both price and quality of service from competition in the Expiring Name Registration Services Market.

Author
Formatted: Tabs: 0.5", Left
Author
Formatted: Bullets and Numbering

**H. THE NATURE AND VALUE OF EXPIRING DOMAIN NAMES**

131. Expired domain names become available for a variety of reasons.

132. As domain name registrations age, the likelihood that a registrant dies or becomes uninterested in maintaining an Internet presence increases. Over time, every individual who has registered a domain name will die. Those domain names eventually will fall into the market for expiring domain names.

133. For commercial registrations, most businesses started in the United States, and elsewhere, fail with a few years from the time they are created. Commercial registrations from failed businesses are not renewed and eventually will fall into the market for expiring domain names.

134. For those businesses that do not fail, many of them will merge into other businesses or change their names over time. Oftentimes, the original domain name of the merged or changed company will not be renewed and eventually will fall into the market for expiring domain names.

135. Many commercial registrations center on specific product lines or promotions. Oftentimes, these products or promotions have a limited lifetime, and the domain name registrant may decide not to renew the domain name once the immediate need for it has passed. Such domain names eventually will fall into the market for expiring domain names.

136. Both individuals and corporations commonly register domain names for time-specific events, such as meetings, conferences, concerts, picnics, etc. Once the event has passed, the registrant may decide not to renew the domain name. Such domain names eventually will fall into the market for expiring domain names.

137. Expiring domain names have more value than newly registered domain names in part because they have been advertised by the previous registrant and/or because websites associated with the domain name have been indexed by search engines.

Author
Deleted: FIRST

Cathcart Collins & Kneafsey LLP
444 S. Flower St., 42nd Floor
Los Angeles, California 90071

138. This means that expiring domain names typically have visitors to, links to, and traffic to the web sites and other Internet services associated with the domain name. Such Internet traffic makes it easier for a new domain name registrant to monetize the domain name registration by associating advertisements or other services with the domain name.

139. Expiring domain names also often have more value than newly registered domain names because they were registered at a time when good, short domain names were less scarce.

140. For example, every dictionary word in English was registered many years in the past. Currently, the only way to register a common dictionary word in the .COM TLD is to buy it directly from its current registrant or acquire the domain registration in the expiring domains market.

141. Expiring domain names command a premium price, far in excess of the average cost of a new domain name registration.

142. The average cost of an expiring domain name is multiples in excess of the average cost of a new domain name registration.

143. Verisign understands and appreciates that the market for expiring domain names is a separate and distinct market from the market for new registrations.

144. Prior to February, 2006, Verisign was not a provider of services to end-users in the expiring domain names market.

145. Prior to February, 2006, Verisign did not earn any fee or commission on the registration of expiring domain names above the annual fee for new registrations.

146. By the actions described in this Complaint, Verisign has taken steps to destroy the market for expiring domain names and, using the registrars as resellers of a single undifferentiated service, become the sole provider of services to end-users for the registration of expiring domain names.

147. By its actions, Verisign will replace the currently competitive back order service providers, offering differentiated services and varying competitive pricing models, with a uniform Verisign-mandated service.

Author
Deleted: FIRST

Cathcart Collins & Kneafsey LLP
444 S. Flower St., 42nd Floor
Los Angeles, California 90071

148. By its actions, Verisign will receive a fee or commission on the registration of every expiring domain name above and in addition to the annual fee it receives for new registrations.

149. The actions taken by Verisign will increase the average cost of expiring domain names for consumers.

150. The actions taken by Verisign will place the cost of valuable expiring domain names beyond the reach of the average domain name registrant.

151. A significant percentage of the participants in the market for expiring domain names will be priced out of the market for such names completely.

152. The actions taken by Verisign will put the back order service providers out of business.

153. The actions taken by Verisign will impair the business relationships that back order service providers have with their customers, who have come to rely on these providers for a suite of back ordering services.

154. By its actions, Verisign will leverage its control of the .COM registry and the permissions granted it by ICANN in the new 2006 .COM Registry Agreement to insert itself as the sole provider in a currently competitive market in which it does not currently participate, extracting fees which it does not currently receive for services that are less beneficial to consumers.

## I. HISTORY OF gTLD DOMAIN NAME ADMINISTRATION

155. Today's Internet has its origin in a network called the ARPAnet which was launched by the Department of Defense ("DOD") in 1969. ARPAnet was later linked to other networks established by various government agencies, universities, and research facilities. In 1990, NSFnet, the network developed by the National Science Foundation superseded ARPAnet.

156. In 1992, Congress passed the Scientific and Advanced-Technology Act of 1992, 42 U.S.C. § 1862(g), which allowed commercial activity on NSFnet and permitted NSFnet to interconnect with commercial networks.

Author
**Formatted:** Bullets and Numbering

Author
**Deleted:** FIRST

Cathcart Collins & Kneafsey LLP
444 S. Flower St., 42nd Floor
Los Angeles, California 90071

157. In 1993, NSF signed a cooperative agreement with Network Solutions ("NSI"), Verisign's predecessor in interest, under which NSI became the exclusive registrar for second-level domains in .COM, .NET, .ORG, and .EDU, as well as the exclusive Registry operator for each of those top-level domains.

158. The NSF initially underwrote NSI's domain registration services, thereby allowing Internet users to register domain names free of charge.

159. On or about September 13, 1995, however, NSF and NSI entered into Amendment 4 of the cooperative agreement, which permitted NSI to charge Internet users $100 for a two-year registration of a second-level domain in the .COM, .NET, and .ORG domains. Thirty percent of the registration fees were to be paid into an NSF Infrastructure fund.

160. In April 1998, the portion of the fee allocated to the Infrastructure fund was held to constitute an unconstitutional tax, and the effective rate for domain registrations dropped to $35 per year.

161. On July 1, 1997, the Clinton administration issued a report on electronic commerce, "*A Framework for Global Electronic Commerce*." The report supported private efforts to address Internet governance and made the Department of Commerce ("DOC") the lead agency on this initiative. Accompanying the report was a presidential directive that called on the DOC to "support efforts to make the governance of the domain name system private and competitive and to create a contractually based self-regulatory regime that deals with potential conflicts between domain name usage and trademark laws on a global basis."

162. To carry out this mission, the DOC first issued a Request for Comment on DNS administration, and then on February 20, 1998, it published "*Proposal to Improve Technical Management of Internet Names and Addresses*" (commonly referred to as the "Green Paper").

163. After receiving more than 650 comments, the DOC ended the proposed rulemaking and instead published on June 10, 1998, a policy statement also known as the "White Paper."

///

Author
**Deleted:** ")

Author
**Deleted:** com, .net, .org

Author
**Deleted:** edu

Author
**Deleted:** However, on

Author
**Deleted:** com, .net

Author
**Deleted:** org

Author
**Formatted:** Bullets and Numbering

Author
**Formatted:** Bullets and Numbering

Author
**Deleted:** FIRST

Cathcart Collins & Kneafsey LLP
444 S. Flower St., 42nd Floor
Los Angeles, California 90071

164. The White Paper, reflecting the views of the overwhelming majority of comments, called upon the private sector to create a new, not-for-profit corporation to assume responsibility, over time, for the management of certain aspects of the DNS.

165. The White Paper identified four specific functions to be performed by this new corporation: (i) To set policy for and direct the allocation of Internet Protocol number blocks; (ii) To develop overall policy guidance and control of top-level domains and the Internet root server system; (iii) To develop policies for the addition, allocation, and management of gTLDs, and the establishment of domain name registries and domain name registrars and the terms, including licensing terms, applicable to new and existing gTLDs and registries under which registries, registrars, and gTLDs are permitted to operate; and (iv) To coordinate maintenance and dissemination of the protocol parameters for Internet addressing.

166. The White Paper also articulated the fundamental policies that would guide United States participation in the transfer of DNS management responsibility to the private sector: stability; competition; private, bottom-up coordination; and representation.

167. The White Paper listed a number of tasks to be undertaken on a priority basis, including, in particular, the creation and organization of a new, not-for-profit corporation ("NewCo") to manage the DNS and the rapid introduction of competition in the provision of domain name registration services. The Department of Commerce committed to enter into an agreement with NSI by which NSI would agree to take specific actions, including commitments as to pricing and equal access, designed to permit the development of competition in domain name registration.

168. In fulfillment of the commitment expressed in the White Paper, on October 7, 1998, the DOC and NSI entered Amendment 11 to the Cooperative Agreement. In Amendment 11, NSI agreed to recognize NewCo "when recognized by the [DOC] in accordance with the provisions of the Statement of Policy."

169. NSI further committed to enter into a contract with NewCo, and acknowledged "that NewCo will have the authority, consistent with the provisions of the Statement of Policy and the agreement between the [DOC] and NewCo, to carry out NewCo's Responsibilities."

Author
**Formatted:** Bullets and Numbering

Author
**Deleted:** FIRST

Cathcart Collins & Kneafsey LLP
444 S. Flower St., 42nd Floor
Los Angeles, California 90071

170. Under Amendment 11, "NewCo's Responsibilities" specifically include the establishment and implementation of DNS policy and the terms, including licensing terms, applicable to new and existing gTLDs and registries under which registries, registrars and gTLDs are permitted to operate."

171. Amendment 11 also provided for the development, deployment, and licensing by NSI (under a license agreement to be approved by the Department of Commerce) of a mechanism to allow multiple registrars to submit registrations for the gTLDs for which NSI acted as the Registry (the "Shared Registration System," or "SRS").

**J. ICANN'S ROLE IN THE INTERNET DOMAIN NAME SYSTEM**

172. In September 1998, Defendant Internet Corporation for Assigned Names and Numbers was formed. ICANN is a non-profit public benefit corporation.

173. In October 1998, ICANN transmitted to the Department of Commerce a copy of its Articles of Incorporation, and proposed Bylaws.

174. In November 1998, the DOC entered into a Memorandum of Understanding ("MOU") with ICANN that recognized ICANN as the new not-for-profit corporation for DNS management and specifically contemplated ultimate transition of management responsibility to ICANN.

175. The MOU expressly identified the promotion of competition in the DNS as one of its central principles.

176. In the MOU, ICANN expressly agreed to abide by principles of stability, competition, private, bottom-up coordination, and representation.

177. The MOU also obligated ICANN to "act in a non-arbitrary and reasonable manner with respect to design, development, and testing of the DNS Project and any other activity related to the DNS Project," and to refrain from acting "unjustifiably or arbitrarily to injure particular persons or entities or particular categories of persons or entities."

178. Under the MOU, ICANN exclusively awards the generic TLD registry agreements, including the registry agreements for the .COM and .NET TLDs.

Cathcart Collins & Kneafsey LLP
444 S. Flower St., 42nd Floor
Los Angeles, California 90071

Author
**Formatted:** Bullets and Numbering

Author
**Formatted:** Bullets and Numbering

Author
**Deleted:** organized without members pursuant to California Corporation Code § 5110 et. seq. According to its by-laws, the board of directors of ICANN controls it.

Author
**Deleted:** articles of incorporation

Author
**Deleted:** by-laws.

Author
**Deleted:** , now completely independent,

Author
**Formatted:** Bullets and Numbering

Author
**Formatted:** Body Text #

Author
**Deleted:** :
C. The Principles:
The parties will abide by the following principles:
1. Stability
This Agreement promotes the stability of the Internet and allows the Parties to plan for a deliberate move from the existing structure to a private-sector structure without disruption to the functioning of the DNS. The Agreement calls for the design, development, and testing of a new management system that will not harm current functional operations.
2. Competition
This Agreement promotes the management of the DNS in a manner that will permit market mechanisms to support competition and consumer choice in the technical management of the DNS. This competition will lower costs, promote innovation and enhance user choice and satisfaction.
3. Private, Bottom-Up Coordination
This Agreement is intended to result in the design, development, and testing of a private coordinating process that is flexible and able to move rapidly enough to meet the changing needs of the Internet and of Internet users. This Agreement is intended to foster the development of a private sector management system that, as far as possible, reflects a system of bottom-up management.
4. Representation.
This Agreement promotes the technical management of the DNS in a manner that reflects the global and functional diversity of Internet users and their needs. This Agreement is intended to promote the c ... [13]

Author
**Formatted:** Bullets and Numbering

Author
**Deleted:** and country code

Author
**Deleted:** com

Author
**Deleted:** net

Author
**Deleted:** FIRST

179. The original MOU was scheduled to terminate on September 30, 2000, and has been amended seven times.

180. The most recent amendment, in the form of a Joint Project Agreement ("JPA") was entered into on or around September 29, 2006.

181. In the September 29, 2006 JPA, the DOC reaffirmed its "continued support" for privatizing the technical management of the DNS in a manner that promotes stability and security, competition, coordination, and representation.

182. The new JPA reaffirmed ICANN's operational principles, including that ICANN foster and enable "competition."

183. ICANN's by-laws also explicitly recognize "core values," which "should guide the decisions and actions of ICANN," including: "Where feasible and appropriate, depending on market mechanisms to promote and sustain a competitive environment" and "Introducing and promoting competition in the registration of domain names where practicable and beneficial in the public interest."

184. The DOC has recognized that ICANN is subject to federal anti-trust laws.

## K. ICANN'S COURSE OF DEALING AND AGREEMENTS WITH VERISIGN

### 1. The 2001 .COM and .NET Agreements ("the 2001 Registry Agreements")

185. On or about November 10, 1999, NSI and ICANN entered into a written Registry Agreement (the "1999 Registry Agreement") with respect to NSI's operation of the Registry for the .COM and .NET gTLDs.

186. Through the negotiations that led to the 1999 Registry Agreement and by agreements with the United States negotiated at the same time, NSI agreed to recognize ICANN.

187. Through the negotiations that led to the 1999 Registry Agreement and by agreements with the United States negotiated at the same time, NSI agreed to split it business into a registrar business and a registry business, which it would maintain separately. NSI agreed to face competition at the registrar level, while maintaining its single position as the sole registry.

Author
Deleted: six
Author
Deleted: which
Author
Deleted: 17, 2003, is scheduled to terminate on September 30
Author
Deleted: this amendment
Author
Deleted: "
Author
Deleted: policy goal of
Author
Deleted: "
Author
Formatted: Bullets and Numbering
Author
Formatted: Body Text #
Author
Deleted: 1.
Author
Deleted: ." 2.
Author
Deleted: Within the mandate contained in the MOU, ICANN has had and continues to have very broad discretion over how it fulfills its obligations under the MOU. The DOC no longer has any control over the workings of ICANN, nor does it actively influence ICANN's decision-making procedures.
Author
Formatted: Bullets and Numbering
Author
Formatted: Bullets and Numbering
Author
Deleted: com
Author
Deleted: net
Author
Formatted: Bullets and Numbering
Author
Deleted: com
Author
Deleted: net
Author
Deleted: FIRST

Cathcart Collins & Kneafsey LLP
444 S. Flower St., 42nd Floor
Los Angeles, California 90071

188. On or about May 25, 2001, Verisign and ICANN entered into the 2001 .COM Agreement with respect to Verisign's operation of the .COM registry and the 2001 .NET Agreement with respect to Verisign's operation of the .NET registry.

189. The 2001 Registry Agreements superseded the 1999 Registry Agreement with NSI.

190. In accordance with the 2001 Registry Agreements, Verisign undertook to operate the .COM and .NET gTLD registry and to pay certain registry-level fees to ICANN.

191. Verisign is the sole registry for the .COM and .NET gTLDs and therefore maintains a monopoly over the .COM and .NET gTLDs.

192. The 2001 .COM Agreement had been set to expire on November 10, 2007, but provided that Verisign could submit a written proposal to extend the agreement.

193. Under this same agreement, ICANN was required to consider any extension proposal for a period not to exceed six (6) months "before deciding whether to call for competing proposals from potential successor registry operators." It further provided that Verisign "shall be awarded a four-year renewal term" unless ICANN determines that Verisign is in material breach of the 2001 .COM Agreement, or the proposal to extend the agreement contains a maximum price that exceeds the price allowed under Section 22 of the 2001 .COM Agreement or certain other conditions apply. This four-year renewal term, if granted, would have expired on November 10, 2011.

194. Verisign repeatedly breached the terms of the 2001 .COM Agreement, and ICANN sought to redress certain of Verisign's breaches in litigation against Verisign.

195. These breaches give ICANN the right to seek competitive bids to replace Verisign at the expiration of the current term, or even earlier.

196. Verisign and ICANN agreed to bypass this process by entering into a new .COM Registry Agreement.

197. In the new 2006 .COM Agreement, negotiated and agreed to by Verisign, Verisign is proposing to set a new maximum price for domain name registrations that exceeds the price allowed under Section 22 of the 2001 .COM Agreement.

Author
Deleted: VeriSign com…VeriSign's…com…net…VeriSign's. ... [14]

Author
Formatted: Bullets and Numbering

Author
Deleted: com…net ... [15]

Author
Formatted: Bullets and Numbering

Author
Deleted: com…net…com…net ... [16]

Author
Deleted: com…is…provides that VeriSign may… between November 10, 2005, and May 10, 2 ... [17]

Author
Formatted: Bullets and Numbering

Author
Deleted: is this…VeriSign…VeriSign…com…com…e ... [18]

Author
Deleted: VeriSign has…com…itself has VeriSign's…VeriSign. ... [19]

Author
Deleted: VeriSign…The MOU's mandate ... [20]

Author
Deleted: support competition requires it to exercise its right to seek competitive bids because of VeriSign's repeated breaches. VeriSign and ICANN have …com… that will replace the current .com Registry Agreement prior to its expiration. ... [21]

Author
Deleted: com…defendants, VeriSign…co ... [22]

Author
Deleted: FIRST

Cathcart Collins & Kneafsey LLP
444 S. Flower St., 42nd Floor
Los Angeles, California 90071

198. If Verisign had proposed this pricing change to ICANN as part of a written proposal to extend the 2001 .COM Agreement (as contemplated by that agreement), ICANN would have had the right, and (because of the MOU) the obligation, to seek competitive bids for the .COM registry.

199. The 2001 .NET Agreement also allowed for competitive bidding, which took place in advance of its expiration on June 30, 2005.

200. That agreement established a procedure by which ICANN was to select as a successor operator of the .NET registry "the eligible party that it reasonably determines is best qualified to perform the registry function . . . taking into account all factors relevant to the stability of the Internet, promotion of competition, and maximization of consumer choice . . . ."

201. Under both the 2001 .COM Agreement and the 2001 .NET Agreement, Verisign is required to provide "Registry Services" to ICANN-accredited registrars in a manner meeting the performance and functional specifications attached to the agreement. "Registry Services" are defined in the 2001 .COM Agreement as follows:

> "Registry Services" means services provided as an integral part of the Registry TLD, including all subdomains. These services include: receipt of data concerning registrations of domain names and nameservers from registrars; provision to registrars of status information relating to the Registry TLD zone servers, dissemination of TLD zone files, operation of the Registry zone servers, dissemination of contact and other information concerning domain name and nameserver registrations in the Registry TLD, and such other services required by ICANN through the establishment of Consensus Policies as set forth in Definition 1 of this Agreement.

The 2001 .NET Agreement contains a substantially similar definition of "Registry Services."

202. Under both the 2001 .COM Agreement and the 2001 .NET Agreement, Verisign is also obligated to comply with "Consensus Policies," which consist of specifications and policies established on the basis of a consensus among Internet stakeholders represented in the ICANN process, as demonstrated by compliance with detailed procedures prescribed in the agreement.

203. The 2001 .COM Registry Agreement defines "Consensus Policies" as consisting of those specifications and policies established on the basis of a consensus among Internet

Author
Deleted: VeriSign
Author
Formatted: Bullets and Numbering
Author
Deleted: com
Author
Deleted: com
Author
Deleted: net
Author
Formatted: Bullets and Numbering
Author
Deleted: net
Author
Deleted: com
Author
Deleted: net
Author
Deleted: VeriSign
Author
Deleted: com
Author
Formatted: Space After: 12 pt
Author
Deleted: net
Author
Deleted: com
Author
Deleted: net
Author
Deleted: VeriSign
Author
Formatted: Bullets and Numbering
Author
Deleted: The consensus policy limits VeriSign's ability to exact monopoly pricing or other monopoly terms.
Author
Deleted: com
Author
Deleted: FIRST

Cathcart Collins & Kneafsey LLP
444 S. Flower St., 42nd Floor
Los Angeles, California 90071

stakeholders represented in the ICANN process, as demonstrated by compliance with specific, detailed procedures prescribed in the agreement. Exh. A, section I.1.

204. The 2001 Registry Agreements set forth "General Obligations of Registry Operator [Verisign]."

205. Verisign generally is obligated to comply with Consensus Policies if, among other requirements, they are properly adopted by ICANN and consistent with ICANN's other contractual obligations, and (A) they "do not unreasonably restrain competition"; and (B) relate to "(1) issues for which uniform or coordinated resolution is reasonably necessary to facilitate interoperability, technical reliability, and/or stable operation of the Internet or DNS, (2) Registry policies reasonably necessary to implement Consensus Policies relating to registrars, or (3) resolution of disputes regarding the registration of domain names (as opposed to the use of such domain name)." Exh. A, section II.

206. In an effort avoid federal antitrust violations by Verisign, the 2001 .COM Registry Agreement further sets forth the following "General Obligations of ICANN." "With respect to all matters that impact the rights, obligations, or role of Registry Operator," the agreement explicitly provides that ICANN shall, among other obligations: (i) "exercise its responsibilities in an open and transparent manner," (ii) "not unreasonably restrain competition and, to the extent feasible, promote and encourage robust competition…." As discussed below, these goals were abandoned in the 2005 .NET and 2006 .COM Registry Agreements. Exh. A, section II.4.

207. Appendix G to both the 2001 .COM Agreement and the 2001 .NET Agreement sets forth the maximum prices Verisign can charge for specified services.

208. Among other things, Appendix G to both the 2001 .COM Agreement and the 2001 .NET Agreement set a maximum price of six dollars ($6.00) per year for registration of a domain name and six dollars ($6.00) per year for renewal or extension of the registration of a domain name. In addition, for each one-year domain name registration a "registry-level transaction fee" of $0.25 is charged and paid to ICANN. Under the 2001 .COM Agreement, a registrar currently pays $6.00 per year to register each domain name registered with Verisign. The registrar also pays $0.25 to ICANN for the registry-level transaction fee. Any amount above $6.25 that is

Author
Deleted: 1
Author
Deleted: VeriSign]." VeriSign
Author
Formatted: Bullets and Numbering
Author
Deleted: 1
Author
Deleted: VeriSign
Author
Deleted: com
Author
Deleted: net
Author
Deleted: com
Author
Deleted: 1
Author
Deleted: com
Author
Deleted: net
Author
Deleted: VeriSign
Author
Formatted: Bullets and Numbering
Author
Deleted: sets
Author
Deleted: com
Author
Deleted: VeriSign.
Author
Deleted: FIRST

Cathcart Collins & Kneafsey LLP
444 S. Flower St., 42nd Floor
Los Angeles, California 90071

charged to the registrant is kept by the registrar. On information and belief, Verisign has always charged the maximum price allowed under the 2001 .COM Agreement and 2001 .NET Agreement to register a .COM or .NET domain name. Thus, the maximum price has been more than a price cap; it has been the *de facto* price.

209. Appendix I to both the 2001 .COM Agreement and the 2001 .NET Agreement includes a Code of Conduct. Under the Code of Conduct, Verisign is obligated to "at all times strive to operate as a trusted and neutral third-party provider of Registry Services."

210. Among other obligations, the Code of Conduct to both the 2001 .COM Agreement and the 2001 .NET Agreement requires Verisign to treat all ICANN-accredited registrars equally and to give them equivalent access to the registry and prohibits Verisign from warehousing or registering domain names in its own right other than through an ICANN-accredited registrar.

**2. The Unlawful and Anticompetitive 2005, 2006 Registry Agreements**

211. Unrestrained by any competition, ICANN and Verisign have now abandoned their commitments to avoid unreasonable restraints of trade and promote fair competition in the "Covenants" or "General Obligations" to this effect.

212. Verisign is now using its monopoly power to raise prices above their natural level and permit Verisign to leverage its power into other markets. The antitrust and unfair competition laws were enacted to prohibit this very conduct.

213. Verisign and ICANN have agreed to eliminate the competitive constraints imposed by the competitive bidding process, the Consensus Policies and the Code of Conduct, and thereby to secure for Verisign an unlawful monopoly in each of the relevant markets.

214. Pursuant to the conspiracy, ICANN allowed Verisign to alter substantial terms of its bid for the 2005 .NET Agreement, after the bid was accepted by ICANN and after bidding was closed to other participants. The conspiracy led to the implementation of the monopolistic provisions in the 2005 .NET Agreement, and also includes an understanding between the conspirators as to the terms for the .COM Registry Agreement.

215. The objectives of the unlawful conspiracy are to replace the 2001 .COM and .NET Agreements with successor agreements that eliminate permanently all vestiges of competition in

Author Deleted: VeriSign
Author Deleted: com
Author Deleted: net
Author Deleted: com
Author Deleted: net
Author Deleted: com
Author Deleted: net
Author Deleted: VeriSign
Author Formatted: Bullets and Numbering
Author Deleted: VeriSign
Author Deleted: VeriSign
Author Formatted: Bullets and Numbering
Author Deleted: VeriSign
Author Deleted: Moreover, VeriSign
Author Deleted: VeriSign
Author Deleted: their
Author Deleted: Defendants
Author Deleted: VeriSign
Author Formatted: Bullets and Numbering
Author Deleted: VeriSign
Author Deleted: net
Author Deleted: net
Author Deleted: com
Author Deleted: com
Author Deleted: net
Author Deleted: FIRST

Cathcart Collins & Kneafsey LLP
444 S. Flower St., 42nd Floor
Los Angeles, California 90071

the operation of these two registries and in the Relevant Markets; to secure for Verisign free reign to impose supracompetitive prices for registrations of domain names in the .COM and .NET TLDs; to free Verisign from current limitations that prevent it from leveraging monopolies in downstream and adjacent markets; and to divide between Verisign and ICANN the monopoly profits achieved by operation of the conspiracy.

216. ICANN and Verisign have agreed (a) to extend the term of Verisign's control of the .COM registry for an additional five years beyond the termination date under the current 2001 .COM Agreement, in violation of its terms and without ever submitting the renewal to any sort of competitive bidding; (b) to eliminate any meaningful prospect that Verisign will ever have to compete to operate the .NET registry or the .COM registry or that there will be any competitive bidding to operate either of them; (c) to increase the overall prices to consumers of domain names in the .COM and .NET TLDs; (d) to assure that any contractual price caps will be identical to the actual prices by having eliminated any competitive constraint on Verisign in the relevant markets; (e) to free Verisign to launch preemptive services that, by virtue of its control of the .COM and .NET registries, will eliminate rivalry and permit Verisign to exploit a complete monopoly over traffic data and other resources it has never paid or competed for the right to exploit; and (f) to provide mechanisms by which ICANN shares in the resulting monopoly profits.

217. **Elimination of Competitive Bidding.** Under the terms of the conspiracy, ICANN has agreed to divest itself of any meaningful ability to require Verisign to bid for a renewal term against competing registry operators for the .COM TLD.

218. Under the 2001 .COM Agreement, ICANN had the right to require Verisign to bid for a renewal term to begin in November 2007.

219. Under the MOU between ICANN and the Department of Commerce, ICANN is required to avail itself of every available opportunity to harness competition for the benefit of consumers and the Internet.

220. The 2006 .COM Registry Agreement provides for the automatic renewal of the agreement, *inter alia*, as follows:

Renewal. This Agreement shall be renewed upon the expiration of

Author
Deleted: VeriSign…com…net…VeriSign…VeriSign ... [23]

Author
Deleted: VeriSign…VeriSign's…com…com…VeriSign…net…com…com…net…VeriSign…VeriSign…com…net…VeriSign ... [24]

Author
Deleted: VeriSign…com ... [25]

Author
Deleted: existing …com…has…VeriSign ... [26]

Author
Formatted: Bullets and Numbering

Author
Deleted: com

Author
Deleted: FIRST

Cathcart Collins & Kneafsey LLP
444 S. Flower St., 42nd Floor
Los Angeles, California 90071

> the term set forth in Section 4.1 above and each later term, unless the following has occurred : (i) following notice of breach to Registry Operator in accordance with Section 6.1 and failure to cure such breach within the time period prescribed in Section 6.1, an arbitrator or court has determined that Registry Operator has been in fundamental and material breach of Registry Operator's obligations set forth in Sections 3.1(a), (b), (d) or (e); Section 5.2 or Section 7.3 and (ii) following the final decision of such arbitrator or court, Registry Operator has failed to comply within ten days with the decision of the arbitrator or court, or within such other time period as may be prescribed by the arbitrator or court.
>
> Upon renewal, in the event that the terms of this Agreement are not similar to the terms generally in effect in the Registry Agreements of the 5 largest gTLDs (determined by the number of domain name registrations under management at the time of renewal), renewal shall be upon terms reasonably necessary to render the terms of this Agreement similar to such terms in the Registry Agreements for those other gTLDs. The preceding sentence, however, shall not apply to the terms of this Agreement regarding the price of Registry Services…Upon renewal, Registry-Level Transaction Fees may be reasonably modified so long as any increase in such fees shall not exceed the average of the percentage increase in Registry-Level Transaction Fees for the 5 largest gTLDs (determined as for the 5 largest gTLDs (determined as above), during the prior three-year period.

221. ICANN's conspiratorial agreement to waive its right to impose competitive bidding with respect to operation of the .COM registry, and to violate its contract with the federal government, is a keystone of the overall conspiracy with Verisign.

222. ICANN has similarly conspired with Verisign to eliminate future competitive bidding for operation of the .NET registry. In 2005, competitive bidding for the .NET registry yielded a reduction in the price for .NET domain name registrations that was in excess of thirty percent. ICANN's and Verisign's conspiracy eliminates this possibility in the future.

223. Verisign was able to extract from ICANN agreement to enter into this conspiracy as a result of the financial and litigation pressure applied to ICANN by Verisign's vastly superior financial resources.

224. Although the 2006 .COM Registry Agreement gives ICANN the titular ability to rebid the registry agreement if Verisign is in breach, the provision is illusory.

///

Author
**Deleted:** com

Author
**Deleted:** VeriSign.

Author
**Formatted:** Bullets and Numbering

Author
**Deleted:** VeriSign

Author
**Deleted:** net

Author
**Deleted:** net

Author
**Deleted:** net

Author
**Deleted:** VeriSign's

Author
**Deleted:** <#>**Increasing Prices.** The conspiracy increases significantly the prices that VeriSign will charge for .com and .net domain name registrations. The conspiracy also, in effect, raises the amounts that registrants ultimately bear for the registry level transaction fees paid to ICANN. By eliminating periodic rivalry to run the registry, VeriSign will be unconstrained in setting prices and will charge the maximum cap allowed by the terms of the conspiracy.
The 2006 .com Registry Agreement affects prices by not only redrafting the previous provisions for maximum price, but also redefining which terms are included in the maximum price. In the 2006 .com

Author
**Deleted:** FIRST

Cathcart Collins & Kneafsey LLP
444 S. Flower St., 42nd Floor
Los Angeles, California 90071

225. The rebid provision only applies if Verisign has been adjudged in material breach of the agreement by a final, non-appealable judgment and Verisign has not cured the defect. This is an event that never will be triggered.

226. At the time they negotiated the rebid provision of the 2006 .COM Registry Agreement, and at the time they executed the Agreement, both ICANN and Verisign understood that it never would be triggered.

227. At the time they negotiated the rebid provision of the 2006 .COM Registry Agreement, and at the time they executed the Agreement, both ICANN and Verisign understood that the rebid provision was illusory.

228. By contrast, the rebid provisions of the previous agreement, which allowed a rebid for breach or because of a proposal to price .COM domain names higher than $6.00 per year, already would have been triggered had that provision remained in effect.

229. **Increasing Prices.** The conspiracy increases significantly the prices that Verisign will charge for .COM and .NET domain name registrations.

230. The conspiracy also, in effect, raises the amounts that registrants ultimately bear for the registry level transaction fees paid to ICANN. By eliminating periodic rivalry to run the registry, Verisign will be unconstrained in setting prices and will charge the maximum cap allowed by the terms of the conspiracy.

231. The 2006 .COM Registry Agreement affects prices by not only redrafting the previous provisions for maximum price, but also redefining which terms are included in the maximum price.

232. In the 2006 .COM Registry Agreement Verisign and ICANN effectively fix the price for .COM domain name registration at $6 through December 31, 2006, and further conspire to permit Verisign to permanently raise the price of .COM registration 7% for four out of the next six years. This price exceeds the historical rate of inflation and is greater than what a fair market would otherwise bear.[2]

Author
Deleted: VeriSign
Author
Formatted: Bullets and Numbering
Author
Deleted: com
Author
Deleted: VeriSign
Author
Deleted: com
Author
Deleted: net
Author
Deleted: VeriSign
Author
Deleted: VeriSign's
Author
Deleted: Exh. 3
Author
Deleted: FIRST

[2] In the 2005 .NET Registry Agreement, entered into on June 29, 2005, ICANN and Verisign agree to set the price for new and renewed domain name registrations at $4.25. The Agreement then goes on to say that, effective January 1, 2007, the "controls on [Verisign's] pricing set forth in this Agreement shall be eliminated…." 2005 .NET Registry

Cathcart Collins & Kneafsey LLP
444 S. Flower St., 42nd Floor
Los Angeles, California 90071

233. If .COM had been put out for a competitive bid, the costs of domain name registrations would have fallen to at least as low as $3.00 per domain name, with at least the same level and quality of services provided by Verisign.

234. Furthermore, the 2006 .COM Registry Agreement specifically excludes the "registry-level transaction fee" from the definition of the maximum price. Therefore, the actual price is not simply $6.00 plus the ICANN sanctioned 7% increase in four of the next six years, but these two terms plus the registry-level transaction fee. Exh. A, section 7.3(d).

235. Under the terms of the 2006 .COM Registry Agreement, the increase in the registry-level transaction fee is an automatic process. The Agreement makes no provision for registrars and Internet stakeholders to provide any input into the process. *Id*.

236. Verisign and ICANN each believe that Verisign could raise prices to the maximum permitted by the caps under .COM and to any price whatsoever under .NET without running afoul of the antitrust laws.

237. In addition, pursuant to the conspiracy, the 2005 .NET Agreement provides for higher prices in the future for new or renewal domain name registrations in the .NET TLD. Until December 31, 2006, the maximum price is set at $4.25, which includes a $0.75 Registry-Level Transaction Fee that is paid to ICANN by the registrars. Beginning in 2007, the price controls set forth in the 2005 .NET Registry Agreement will be eliminated. Without the constraint of competitive bidding, Verisign will be free to impose, and will impose, monopoly pricing on .NET domain name registrations.

238. Verisign has stated its intention to raise prices under the 2006 .COM and 2005 .NET Agreements.

239. Verisign will raise its prices under the .COM and .NET Agreements.

240. Verisign's stock has risen on the widespread expectation by financial analysts that Verisign will raise its prices under the .COM and .NET Agreements.

---

Agreement, section 7.3. Virtually the only restriction the Agreement places on pricing is that all registrars be equally subject to the price Verisign sets and treated equally under any incentive programs Verisign offers. The unfettered ability to raise prices indefinitely demonstrates the collusive manipulation and control which ICANN and Verisign are perpetrating. Only with certain monopolistic control over the market could Verisign and ICANN create such an agreement.

Cathcart Collins & Kneafsey LLP
444 S. Flower St., 42nd Floor
Los Angeles, California 90071

Author — Deleted: com
Author — Deleted: 2
Author — Deleted: com
Author — Formatted: Bullets and Numbering
Author — Formatted: Bullets and Numbering
Author — Deleted: net
Author — Deleted: net
Author — Deleted: net
Author — Deleted: VeriSign
Author — Deleted: net domain name registrations. **Monopoly Leveraging.** The conspiracy also suspends the application of Consensus Policies, contractual restrictions and competitive constraints that otherwise could limit VeriSign's freedom to exact monopoly profits from the relevant markets that are downstream and adjacent to the relevant markets for .com and .net
Author — Formatted: Font color: Auto
Author — Deleted:
Author — Deleted: The
Author — Formatted: Font color: Auto
Author — Deleted: com
Author — Deleted: VeriSign
Author — Deleted: VeriSign
Author — Deleted: VeriSign
Author — Deleted: the two defendants
Author — Deleted: FIRST

241. The price increases, as described in the previous paragraphs, will be above the prices that Verisign could charge if the .COM and .NET registry contracts were subject to a competitive bidding process.

242. The unlawful price increases, as described in the previous paragraphs, will be passed to consumers.

243. Under a competitive model for registry bidding, prices would have fallen, to at least as low as $3.00 per name for similar levels and quality of service.

244. The sale of new .COM registrations is highly competitive, with a number of high volume, low margin businesses pricing their domains just above or even at the price charged by the registry.

245. Lower .COM prices at the registry level would have been passed on to consumers by these high volume, low margin registrars.

246. **Monopoly Leveraging.** The conspiracy also suspends the application of Consensus Policies, contractual restrictions and competitive constraints that otherwise could limit Verisign's freedom to exact monopoly profits from the relevant markets that are downstream and adjacent to the relevant markets for .COM and .NET domain name registrations.

247. The 2006 .COM Registry Agreement sets forth a "Process for Consideration of Proposed Registry Services" whereby ICANN makes a preliminary determination as to whether a Registry Service "(i) could raise significant Security or Stability issues; or (ii) could raise significant competition issues."

248. If ICANN determines that the proposed Registry Service raises significant competition issues, then it must refer the issue "to the appropriate governmental competition authority." If ICANN finds that no competition concerns exist, Verisign is permitted to provide the new Registry Service.

249. ICANN and Verisign agreed to the provisions referring competitive issues "to the appropriate governmental competition authority" without consulting such competition authorities about whether they would consider such issues.

Author
Deleted: VeriSign

Author
Deleted: FIRST

Cathcart Collins & Kneafsey LLP
444 S. Flower St., 42nd Floor
Los Angeles, California 90071

250. ICANN and Verisign understood that the provisions referring competitive issues "to the appropriate governmental competition authority" were vague, overbroad and without legal effect.

251. In a worldwide market, the "appropriate governmental competition authority" is without meaning.

252. Even assuming that a single "government competition authority" could be found, Verisign and ICANN understood that no response would be forthcoming from such authorities, because such a "government competition authority" had not been consulted in advance and was not a party to the agreements.

253. As a practical matter, the promise to refer competition issues to the "appropriate government competition authority" is an illusory promise.

254. Thus, Verisign will be free to launch the very services, among others, that ICANN and the Internet community have previously thwarted on competitive grounds, including services that would displace the competitive back order services market (such as Verisign's proposed Central Listing Service ("CLS") or Wait List Service ("WLS")) or similar services.

255. The conspiracy further allows Verisign to mine the economic value of all unregistered domain names by monitoring traffic data (which allows Verisign to see which unregistered names Internet users attempt to visit), eliminating all forms of competition for which competitive and fair access to this data is necessary.

256. The 2006 .COM Agreement permits Verisign to use its exclusive access to traffic data to the TLD servers for its own commercial benefit, including to promote the sale of domain names.

257. One of the services Verisign intends to re-launch under the conspiracy is a modified and expanded version of the Wait List Service, which it has renamed the Central Listing Service ("CLS") (hereafter, both the Waiting List Service and the Central Listing Service are identified as "CLS").

258. On information and belief, Verisign intends to launch CLS as soon as possible.

Author
Formatted: Bullets and Numbering

Author
Deleted: VeriSign

Author
Deleted: VeriSign's

Author
Deleted: VeriSign

Author
Deleted: VeriSign

Author
Deleted: com

Author
Deleted: VeriSign

Author
Deleted: this

Author
Formatted: Bullets and Numbering

Author
Deleted: VeriSign

Author
Deleted: ").

Author
Deleted: VeriSign

Author
Deleted: FIRST

Cathcart Collins & Kneafsey LLP
444 S. Flower St., 42nd Floor
Los Angeles, California 90071

259. The CLS service will affect the manner in which expired .COM domain names are released to the public.

260. Under the current system, when a .COM domain name is not renewed by the registrant, Verisign automatically renews it upon expiration and gives the registrar up to forty-five days to inform the registry that the domain name is to be deleted. Once the registrar confirms with the registry that the domain name is to be deleted, the domain name enters the redemption grace period. During this period, a registrant who failed to renew its domain name may do so upon payment of a fee above the standard registry fee. At the end of the redemption grace period, the domain name is added to the pending delete file and all of the registrars are notified that it is pending deletion. At that point, the registrars may use their back order service providers to try to register the domain name on behalf of their registrants.

261. Under the proposed CLS service, the pending delete period, as well as the daily release of deleted domain names, will be eliminated. Instead, Verisign will notify all registrars who have signed the CLS service agreement of the domain names to be deleted, and will hold a five-day auction for all of the domain names. If there are no bids on a particular domain name, it will be released by Verisign and can be registered as with any other previously unused domain name. If there is a successful bid for the domain name, Verisign will deduct the bid amount (plus the registry fee and any ICANN fees) from the successful registrar's account and the domain name will enter a ten-day grace period designed to permit the registrar to collect the bid amount from the successful registrant to complete the auction. Although a registrar has no ownership interest in a domain name, if the registrar that released the domain name has signed the CLS agreement, then the registrar will receive ninety percent of the auction bid. Verisign will receive the remaining ten percent.

262. The 2006 .COM Agreement would create a new definition of "Consensus Policies," including new limitations on what policies can be "Consensus Policies." The effect of the new limitations on "Consensus Policies" is to restrict the ability of Internet stakeholders other than Verisign to require Verisign to act in the interest of the entire Internet community and consistently with the pro-competitive mandate of the Department of Commerce MOU.

Author
Deleted: com

Author
Deleted: com

Author
Formatted: Bullets and Numbering

Author
Deleted: VeriSign

Author
Deleted: VeriSign

Author
Deleted: VeriSign

Author
Deleted: VeriSign

Author
Deleted: VeriSign

Author
Deleted: com

Author
Deleted: VeriSign

Author
Deleted: VeriSign

Author
Deleted: FIRST

Cathcart Collins & Kneafsey LLP
444 S. Flower St., 42nd Floor
Los Angeles, California 90071

263. In conspiring with Verisign to allow Verisign to leverage its monopoly, ICANN abdicated its responsibility under the MOU to support competition and to ensure that new proposed registry services are not anticompetitive.

264. As part of the 2006 .COM Agreement, ICANN swears off any attempt to review the competitive effect of any proposed registry service. As a result, anticompetitive services that ICANN previously resisted, and new services that ICANN should resist under the MOU's pro-competition mandate, would be approved under the 2006 .COM Agreement.

265. Under this agreement, if ICANN determines that the proposed registry service "might raise significant competition issues, ICANN shall refer the issue to the appropriate governmental competition authority." The agreement further provides that "[f]ollowing such referral, ICANN shall have no further responsibility, and [Verisign] shall have no further obligation to ICANN, with respect to any competition issues relating to" the proposed registry service.

266. **ICANN's Economic Motives to Conspire.** ICANN was motivated to enter into the conspiracy by economic factors.

267. First, the conspiracy provides for ICANN to share in the monopoly profits, including among other things, through the payment by Verisign to ICANN of a "registry level fee," beginning at $6 million dollars per year and increasing over the next two years to potentially in excess of $12 million dollars per year.

268. These monopoly profits are far above the fees paid to ICANN under prior agreements.

269. Second, Verisign has put ICANN in financial jeopardy through a stream of costly and aggressive litigation: Verisign brought claims in federal court that were dismissed without prejudice; filed similar claims again in federal court that were dismissed with prejudice; proceeded to file for a third time in state court; and has also proceeded in arbitration against ICANN.

///

Author
Deleted: VeriSign
Author
Deleted: VeriSign
Author
Deleted: intentionally
Author
Deleted: com
Author
Deleted: com
Author
Formatted: Bullets and Numbering
Author
Deleted: VeriSign
Author
Deleted: is
Author
Deleted: VeriSign
Author
Deleted: VeriSign
Author
Deleted: VeriSign
Author
Deleted: FIRST

Cathcart Collins & Kneafsey LLP
444 S. Flower St., 42nd Floor
Los Angeles, California 90071

270. ICANN has acquiesced to Verisign's pressure to conspire, and ICANN has further been lured by the share of monopoly profits that it will receive from Verisign's operations of the .NET and .COM registries.

271. Verisign used its oppressive and costly litigation, its threats to withhold funding to ICANN, and the promise of a financial bailout and windfall of $12,000,000 in order to coerce ICANN into the conspiracy.

272. Since ICANN was founded in November, 1998, Verisign (both by itself and by and through its predecessor NSI) has been relentless in its assault on ICANN's legitimacy and credibility.

273. Among other things, Verisign (both by itself and by and through its predecessor NSI) has, among other things: (a) lobbied against ICANN's authority in Washington, D.C. and in the European Union: (b) attempted to control policy debates within ICANN by hiring people to advocate its positions under the guise that they were independent of Verisign/NSI; (c) paid bloggers to attack ICANN under the guise that they were independent of Verisign/NSI; (d) planted news stories critical of ICANN with mainstream and online media; (e) contributed to various "think tanks" and non-profit organizations to enable those organizations to criticize and undermine ICANN; and (f) threatened ICANN, its Staff members, and its Board members with litigation, arbitration, government investigation and even personal financial liability.

274. Verisign (both by itself and by and through its predecessor NSI) has threatened to withhold funding from ICANN, jeopardizing its stability and existence.

275. The relentless assault on ICANN by Verisign (both by itself and by and through its predecessor NSI) has designed to, and had had the effect of, coercing and/or convincing ICANN to agree to the conspiracy alleged in this Complaint.

276. In the 2006 .COM Registry Agreement, Verisign expressly pledged to cease the attacks on ICANN's credibility and legitimacy in exchange for ICANN's agreement to the conspiracy detailed herein.

277. In addition, the 2005 .NET Agreement provides for a maximum price per year for each new or renewal domain name registration. Until December 31, 2006, the maximum price is

Author
Deleted: VeriSign's

Author
Deleted: VeriSign's

Author
Deleted: net

Author
Deleted: com

Author
Deleted:

Author
Deleted: net

Author
Formatted: Bullets and Numbering

Author
Deleted: FIRST

Cathcart Collins & Kneafsey LLP
444 S. Flower St., 42nd Floor
Los Angeles, California 90071

set at $4.25, which includes a $0.75 Registry-Level Transaction Fee that is paid to ICANN by the registrar. The increase in the "Registry-Level Transaction Fee" from $0.25 under the 2001 .NET Agreement to $0.75 under the 2005 .NET Agreement allows ICANN to share in the monopoly profit generated by Verisign's and ICANN's conspiracy.

278. The conspiracy hands Verisign an additional windfall by relieving it of its obligation under the 2001 .COM Agreement to expend a minimum of two hundred million dollars ($200,000,000) "for research, development, and infrastructure improvements to the .COM, .NET, and .org Registries" between May 25, 2001, and December 31, 2010.

279. The conspiracy also frees Verisign from the Code of Conduct in Appendix I to the 2001 .COM Agreement.

## VIII. ICANN'S AND VERISIGN'S ANTICOMPETITIVE, EXCLUSIONARY AND PREDATORY CONDUCT IN THE RELEVANT MARKETS

280. The history of ICANN's oversight of the Internet domain name system has seen an ever-expanding empire-building by Verisign, most recently with ICANN's capitulation to Verisign's litigation and financial threats.

281. Verisign has repeatedly taken steps to expand its limited-duration contractual monopoly over the registry itself into a permanent monopoly over that registry and over markets for various domain name services.

282. Verisign's misconduct has included outright breaches of its contracts with ICANN. Indeed, these breaches have led to litigation between Verisign and ICANN in which ICANN brought a counterclaim alleging that Verisign was in violation of material provisions of its contracts with ICANN.

### A. ANTICOMPETITIVE CONDUCT IN THE DOMAIN NAME REGISTRATION MARKET

283. Verisign's persistence in challenging ICANN's oversight authority has been rewarded with a steady erosion of competition under ICANN.

Author
Deleted: net
Author
Deleted: net
Author
Deleted: VeriSign's
Author
Deleted: VeriSign
Author
Deleted: com
Author
Deleted: com, .net
Author
Deleted: VeriSign
Author
Deleted: com
Author
Deleted: VeriSign
Author
Deleted: . VeriSign
Author
Deleted: VeriSign's
Author
Formatted: Bullets and Numbering
Author
Deleted: in several instances
Author
Deleted: VeriSign
Author
Deleted: VeriSign
Author
Deleted: However, ICANN's resistance to VeriSign's misconduct has all along been feeble, and now ICANN has capitulated entirely in return for a share of the monopoly profits its acquiescence will afford to VeriSign.
Author
Deleted: VeriSign's
Author
Deleted: FIRST

Cathcart Collins & Kneafsey LLP
444 S. Flower St., 42nd Floor
Los Angeles, California 90071

284. For example, in negotiating to take over operation of the .COM registry in 2001, Verisign deployed its substantial economic muscle to extract from ICANN a renewal term that would make it difficult for ICANN to reopen the registry contract to competitive bidding. Now, the conspiracy all but eliminates that potential for competition in all of the relevant markets, and virtually ensures Verisign's monopoly control over these markets.

285. Without the threat of future open bidding on its registry operation contracts, Verisign is free to increase the prices consumers are charged for registering domain names.

286. In just one manifestation of Verisign's monopoly control, the proposed .COM Registry Agreement calls for an increase in registration fees coupled with guaranteed annual additional increases (in four of the next six years) – and with the renewal provision for four of every six years, in perpetuity.

287. By contrast, because Verisign failed to secure similar favorable renewal terms in its initial 2001 contract to operate the .NET registry, Verisign faced competitive bidding when it sought to renew the .NET registry agreement in 2005. As a result, Verisign was forced to agree to lower registration fees by thirty percent in connection with that registry in order to win renewal of the contract.

288. The conspiracy frees Verisign from any reasonable prospect of competitive bidding for either registry in the future.

289. Verisign also used its litigation with ICANN and the confidential settlement negotiations attendant to that litigation to obtain an unfair competitive advantage in its 2005 bid to operate the .NET registry.

290. In its settlement negotiations for .COM, which preceded the submission of competitive bids for .NET, Verisign learned of material changes in ICANN's registry contractual terms, including the release of price caps and changes in the approval process for new registry services, that allowed Verisign to submit a more competitive bid for .NET than it could have had it been subject to the rules applicable to other bidders.

291. Verisign used its litigation with ICANN to obtain an unfair commercial advantage in the bidding for the .NET registry contract.

Author Deleted: com
Author Deleted: VeriSign
Author Deleted: VeriSign's
Author Deleted: VeriSign
Author Deleted: VeriSign's
Author Deleted: com
Author Deleted: VeriSign
Author Deleted: net
Author Deleted: VeriSign
Author Deleted: net
Author Deleted: VeriSign
Author Formatted: Bullets and Numbering
Author Deleted: VeriSign
Author Deleted: VeriSign
Author Deleted: net
Author Formatted: Bullets and Numbering
Author Deleted: com
Author Deleted: net, VeriSign
Author Deleted: VeriSign
Author Deleted: net
Author Deleted: VeriSign
Author Deleted: FIRST

Cathcart Collins & Kneafsey LLP
444 S. Flower St., 42nd Floor
Los Angeles, California 90071

292. Verisign, insulated from the threat of future competition, has engaged in monopolistic conduct that has disrupted the competitive balance of the Internet, and at times has included flagrant breaches of its obligations under the existing .COM and .NET registry agreements. For example, Verisign has taken impermissible steps, without obtaining required consent from ICANN, to introduce, *inter alia*, fee-based services, including "IDN" (international domain name) and "ConsoliDate," in each case undermining ICANN's ability to maintain competitive and nondiscriminatory balance in the markets for domain name services.

293. Verisign engaged in a predatory and exclusionary campaign that included depleting ICANN's resources while at the same time luring it with a share of monopoly profits, in order to exclude rivals from the relevant markets.

294. Through its own conduct, including its unlawful conspiracy with ICANN, Verisign has monopolized and will continue to monopolize the relevant markets for .COM domain name registrations, has imposed and will impose supracompetitive prices on consumers in those markets, and has eliminated and will continue to eliminate any economic pressure on itself to innovate or offer improvements in service including security and stability.

295. Through its own conduct, including its unlawful conspiracy with ICANN, Verisign has monopolized and will continue to monopolize the relevant markets for .NET domain name registrations, has imposed and will impose supracompetitive prices on consumers in those markets, and has eliminated and will continue to eliminate any economic pressure on itself to innovate or offer improvements in service including security and stability.

**B. ANTICOMPETITIVE CONDUCT IN THE EXPIRING NAMES REGISTRATION SERVICES MARKET**

296. Acting alone and also in collusion with ICANN, Verisign has leveraged, and threatens to leverage, contractual registry monopolies into monopolies over other adjacent and downstream markets and to destroy and completely transform a functioning and competitive marketplace for Internet domain names and related services.

Author
Formatted: Bullets and Numbering
Author
Deleted: com
Author
Deleted: net
Author
Deleted: VeriSign
Author
Deleted: VeriSign
Author
Deleted: VeriSign
Author
Deleted: the relevant markets for .com
Author
Deleted: .net
Author
Formatted: Bullets and Numbering
Author
Deleted: VeriSign
Author
Deleted: FIRST

Cathcart Collins & Kneafsey LLP
444 S. Flower St., 42nd Floor
Los Angeles, California 90071

297. The registry-registrar split, described *supra*, has been an important component for the maintenance of competition in domain name services markets.

298. As described above in more detail, there is strong competition within the Expiring Names Registration Services Market for the registration of expiring domain names.

299. The primary reason for the strong competition in the Expiring Names Registration Services Market is the existence of the registry-registrar split, which allows registrars to differentiate their services.

300. A number of back order service providers compete in this market, and their services have been well-received by consumers.

301. Verisign has conspired with ICANN to eliminate all competition for such services and share between themselves the monopoly profits that Verisign will take by excluding all other back order service providers.

302. Under the conspiracy, the provisioning of back order and deleting domain name services will move from the registrar-level, which offers differentiated services, to the registry level, where only a Verisign-controlled service will be allowed.

303. Under the conspiracy, Verisign will discontinue the existing competitive process through which it currently releases expiring domain names to the public.

304. Instead, Verisign will implement a Waiting List Service ("WLS") or a Central Listing Service ("CLS") whereby it will retain all expiring .COM and .NET domain names, and open them up for auction through a dedicated auction site.

305. The 2006 .COM Registry Agreement already has pre-approved the Waiting List Service.

306. Registrants will continue to order domain names through registrars, but registrars must deal directly with Verisign in order to receive expiring names to offer to prospective clients.

307. The conspiracy will immediately and permanently substitute a complete Verisign monopoly in place of the existing competition among back order service providers.

///

Author
**Deleted:**

Author
**Formatted:** Bullets and Numbering

Author
**Deleted:** and VeriSign have conspired

Author
**Deleted:** VeriSign

Author
**Deleted:**

Author
**Deleted:** VeriSign

Author
**Deleted:** VeriSign

Author
**Deleted:** the

Author
**Deleted:** com

Author
**Deleted:** net

Author
**Formatted:** Bullets and Numbering

Author
**Deleted:** VeriSign

Author
**Deleted:** VeriSign

Author
**Deleted:** , with predictable adverse price effects for consumers.

Author
**Deleted:** FIRST

Cathcart Collins & Kneafsey LLP
444 S. Flower St., 42nd Floor
Los Angeles, California 90071

308. As a consequence, domain name registrants will lose the choice of pricing models and services they currently enjoy, will face increased average prices for expiring domain names, and, in some instances, will be priced out of the market for expiring domain names.

309. At the outset, Verisign will skim ten percent off winning bids and nothing in the contracts or otherwise will prevent Verisign from further increasing prices.

310. Verisign's CLS auction monopoly entirely displaces the currently competitive market for back order services.

**IX. HARM SUFFERED BY THE PLAINTIFF AND ITS MEMBERS**

311. As noted, infra, CFIT was formed for the purpose of challenging the anticompetitive agreements and activities of Verisign alleged herein, including the 2006 .COM Agreement.

312. **CFIT's members include domain name registrants**, including but not limited to the World Association of Domain Name Developers ("WADND") (hereinafter referred to collectively as "CFIT's Supporters") and other individuals and companies that, collectively, have registered tens of thousands of domain names in the .COM and .NET registries.

313. Domain name registrants, including those members of the Plaintiff, will be harmed by the actions and conspiracy detailed in this Complaint by (a) the unlawful increase in prices which Verisign will exact from registrants in the .COM TLD, which will damage Plaintiff's members by hundreds of thousands of dollars each year and extract hundreds of millions of dollars from all .COM registrants over the course of the 2006 .COM Registry Agreement's existence; (b) the loss of competitive services for expiring domain names, which will displace some registrants, including members and supporters of CFIT, from the market for such services entirely and exact new and unnecessary costs from those who can afford to remain in the market; (c) the degradation in registry services that will come from allowing Verisign to abandon its $200,000,000 infrastructure commitment and operate unrestricted by the prior "Code of Conduct"; (d) the loss of policy influence of Internet users, including CFIT's members, by the

Author
**Deleted:** VeriSign, again with ICANN's blessing,

Author
**Formatted:** Bullets and Numbering

Author
**Deleted:** VeriSign

Author
**Deleted:** VeriSign's

Author
**Deleted:** FIRST

Cathcart Collins & Kneafsey LLP
444 S. Flower St., 42nd Floor
Los Angeles, California 90071

restrictions on the definition of "Consensus Policies" in the .COM and .NET Registry Agreements; and (e) such other injuries and harms as detailed throughout this Complaint.

314. None of the harms detailed in the paragraph above are conditional on any future acts or decisions of the parties. All of the harms are real and will occur if not enjoined by this Court.

315. **CFIT's financial supporters include Internet domain name registrars**, including but not limited to Pool.com, Inc. ("Pool.com"), Momentous, Inc. ("Momentous"), R. Lee Chambers Company, LLC.

316. **CFIT's financial supporters include Internet domain name back order service providers**, including but not limited to Pool.com, Inc. ("Pool.com"), Momentous, Inc. ("Momentous"), R. Lee Chambers Company, LLC.

317. Domain name registrar and back order service providers, including those members of the Plaintiff, will be harmed by the actions and conspiracy detailed in this Complaint by (a) the displacement of the services they now offer to consumers at the registrar level by the services that Verisign will mandate from the registry level, which will drive such registrars and back order providers from the markets they now serve; (b) the attendant impairment of customer relationships based on the loss of the ability to provide services demanded by their customers; (c) the loss of revenue from the displaced services, which will be in the hundreds of millions of dollars over the course of the current .COM and .NET Registry Agreements; (d) the degradation in registry services that will come from allowing Verisign to abandon its $200,000,000 infrastructure commitment and operate unrestricted by the prior "Code of Conduct"; (e) the loss of policy influence of registrars and back order providers, including CFIT's members, by the restrictions on the definition of "Consensus Policies" in the .COM and .NET Registry Agreements; and (f) such other injuries and harms as detailed throughout this Complaint.

318. None of the harms detailed in the paragraph above are conditional on any future acts or decisions of the parties. All of the harms are real and will occur if not enjoined by this Court.

Cathcart Collins & Kneafsey LLP
444 S. Flower St., 42nd Floor
Los Angeles, California 90071

Author
Deleted: FIRST

Cathcart Collins & Kneafsey LLP
444 S. Flower St., 42nd Floor
Los Angeles, California 90071

**X. NO ANTITRUST IMMUNITY FOR VERISIGN**

319. On or about November 30, 2006, the United States Department of Commerce approved the 2006 .COM Registry Agreement at issue in this Complaint, as modified by a new Amendment 30 to the Cooperative Agreement between Verisign and the United States.

320. This approval allows the 2006 .COM Registry Agreement to take effect immediately.

321. This approval did not address the issues in this Complaint or provide any immunity or safe harbor to Verisign.

322. The approval and the new Amendment 30 to the Cooperative Agreement between Verisign and the United States contains an express provision in Section 5 that reads: “*"This approval is not intended to confer federal antitrust immunity on Verisign with respect to the Registry Agreement."*

**CAUSES OF ACTION**

**FIRST CAUSE OF ACTION**

**Monopolization Under Section 2 of the Sherman Act**

**(COM and .NET Registration Markets)**

323. Plaintiff repeats and incorporates by reference the allegations set forth above as if fully set forth herein.

324. For purposes of this claim, the relevant product markets are the .COM and .NET Registration Markets.

325. The relevant geographic markets are global.

326. Verisign has a complete monopoly in the .COM and .NET Registration Markets, and exercises market power in those markets.

327. Verisign has a complete monopoly in the separate .COM Registration Market and exercises market power in that market.

328. Verisign has acted alone and in concert with ICANN unlawfully to maintain its monopoly indefinitely into the future in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

Author
**Deleted:** Against VeriSign–.com

Author
**Deleted:** net

Author
**Formatted:** Bullets and Numbering

Author
**Deleted:** com

Author
**Deleted:** net

Author
**Formatted:** Bullets and Numbering

Author
**Deleted:** VeriSign

Author
**Deleted:** com

Author
**Deleted:** net

Author
**Deleted:** VeriSign

Author
**Formatted:** Bullets and Numbering

Author
**Deleted:** FIRST

329. Verisign's monopoly control of the .COM and .NET Registration Markets has been maintained and extended through exclusionary and predatory conduct.

330. It is unnecessary and unreasonable for a single company to continue indefinitely to maintain monopoly control over the .COM and .NET registries.

331. Verisign has unlawfully abused its authority as the registry operator for .COM and .NET, its contractual relationship to ICANN, and its superior financial resources to ICANN, to extend and enhance its control over the .COM and .NET registries to allow it to dominate new markets and to price its services far above that which a competitive market otherwise would allow.

332. Verisign's unlawful conduct has caused and, unless enjoined by this Court, will continue to cause adverse and anticompetitive injury to consumers and to the business and property of Internet stakeholders and to CFIT's Members and Supporters, as described more fully in this Complaint.

**SECOND CAUSE OF ACTION**

**Attempted Monopolization Under Section 2 of the Sherman Act**

**(.COM and .NET Registration Markets)**

333. Plaintiff repeats and incorporates by reference the allegations set forth above as if fully set forth herein.

334. For purposes of this claim, the relevant product markets are the .COM and .NET Registration Markets.

335. The relevant geographic markets are global.

336. For purposes of this claim, CFIT alleges that .COM and .NET are separate markets and that Verisign has engaged in exclusionary and predatory conduct with respect to each of them separately and individually.

337. Verisign has a complete monopoly in the .COM and .NET Registration Markets, and each of them individually, and exercises market power in those markets.

Author
**Deleted:** VeriSign's
Author
**Deleted:** com
Author
**Deleted:** net
Author
**Deleted:** com
Author
**Deleted:** net
Author
**Deleted:** VeriSign's
Author
**Formatted:** Bullets and Numbering
Author
**Deleted:** including Pool.com and R. Lee Chambers Company LLC.
Author
**Deleted:** Against VeriSign - .com
Author
**Deleted:** net
Author
**Formatted:** Bullets and Numbering
Author
**Deleted:** com
Author
**Deleted:** net
Author
**Formatted:** Bullets and Numbering
Author
**Deleted:** VeriSign has a complete monopoly in the .com and .net
Author
**Formatted:** Bullets and Numbering
Author
**Deleted:** FIRST

Cathcart Collins & Kneafsey LLP
444 S. Flower St., 42nd Floor
Los Angeles, California 90071

338. Verisign has engaged in exclusionary and predatory conduct with the specific intent to extend and perpetuate its monopoly over these relevant markets in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

339. The acts done and threatened by Verisign are exclusionary insofar as they have prevented and threaten to further prevent in perpetuity any other entity from ever competing to operate the .COM and .NET registries such as by offering lower prices, superior service or innovation.

340. By virtue of Verisign's exclusionary scheme and unlawful conduct, there is a dangerous probability that Verisign will succeed in extending its monopoly control over the .COM and .NET Registration Markets in perpetuity in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

341. If not enjoined, there is a dangerous likelihood that Verisign's monopolization will continue, with the result that all other existing and potential competitors will be forever excluded from competition in the relevant .COM and .NET Registration Markets, and Verisign will continue to impose supra-competitive price increases.

342. If not enjoined by this Court, Verisign will continue to cause adverse and anticompetitive injury to consumers and to the business and property of Internet stakeholders and to CFIT's Supporters, including Pool.COM and R. Lee Chambers Company LLC.

**THIRD CAUSE OF ACTION**

**Attempted Monopolization Under Section 2 of the Sherman Act**

**(Expiring Names Registration Services Market)**

343. Plaintiff repeats and incorporates by reference the allegations set forth above as if fully set forth herein.

344. For purposes of this claim, the relevant product market is the Expiring Names Registration Services Market.

345. The relevant geographic market is the world.

Author
Deleted: VeriSign

Author
Deleted: VeriSign

Author
Deleted: com

Author
Deleted: net

Author
Deleted: VeriSign's

Author
Deleted: VeriSign

Author
Deleted: com

Author
Deleted: net

Author
Deleted: VeriSign's

Author
Deleted: com

Author
Deleted: net

Author
Deleted: VeriSign

Author
Deleted: VeriSign

Author
Deleted: com

Author
Formatted: Space After: 12 pt

Author
Deleted: Against VeriSign –

Author
Formatted: Bullets and Numbering

Author
Formatted: Bullets and Numbering

Author
Deleted: FIRST

Cathcart Collins & Kneafsey LLP
444 S. Flower St., 42nd Floor
Los Angeles, California 90071

346. Verisign has a complete monopoly in the .COM and .NET Registration Markets, and exercises market power in those markets.

347. The Expiring Names Registration Services Market is currently highly competitive.

348. Verisign has engaged in exclusionary and predatory conduct with the specific intent to acquire and maintain unlawfully a monopoly in each of the currently competitive relevant markets, including the Expiring Names Registration Services Market.

349. Verisign's unlawful monopoly, if not enjoined and restrained, will result in the elimination of competition from rival service providers, including CFIT's Supporters, as well as supra-competitive price increases.

350. The acts done and threatened by Verisign pursuant to the 2006 .COM Agreement, and the acts undertaken pursuant to the 2005 .NET Agreement, as well as the other acts taken by Verisign to implement this scheme, are exclusionary and predatory insofar as they preclude others from competing for the provision of registration services in the Expiring Names Registration Services Market.

351. By virtue of Verisign's exclusionary scheme and unlawful conduct, there is a dangerous probability that Verisign will succeed in gaining monopoly control over the currently competitive markets for registering expiring domain names, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

352. If not enjoined, there is a dangerous likelihood that Verisign's monopolization will continue, with the result that all other existing and potential competitors will be forever excluded from competition in the relevant Expiring Names Registration Services Market, and that Verisign will continue to impose supra-competitive price increases.

353. If not enjoined by this court, Verisign will continue to cause adverse and anticompetitive injury to consumers and to the business and property of Internet stakeholders and to CFIT's Members and Supporters.

///

///

Author
**Deleted:** VeriSign

Author
**Deleted:** com

Author
**Deleted:** net

Author
**Deleted:** VeriSign

Author
**Deleted:** VeriSign's

Author
**Deleted:** VeriSign

Author
**Deleted:** com

Author
**Deleted:** net

Author
**Deleted:** VeriSign

Author
**Deleted:** VeriSign's

Author
**Deleted:** VeriSign

Author
**Deleted:** VeriSign's

Author
**Deleted:** VeriSign

Author
**Deleted:** VeriSign

Author
**Deleted:** , including Pool.com and R. Lee Chambers Company LLC.

Author
**Deleted:** FIRST

Cathcart Collins & Kneafsey LLP
444 S. Flower St., 42nd Floor
Los Angeles, California 90071

**FOURTH CAUSE OF ACTION**

**Conspiracy to Monopolize Under Section 2 of the Sherman Act**

**(All Relevant Markets)**

354. Plaintiff repeats and incorporates by reference the allegations set forth above as if fully set forth herein.

355. For purposes of this claim, the relevant product markets are the .COM and .NET Registration Markets and the Expiring Names Registration Services Market.

356. The relevant geographic markets are global.

357. Verisign has a complete monopoly in the .COM and .NET Registration Markets, and exercises market power in those markets.

358. It is unnecessary and unreasonable for a single company to continue indefinitely to maintain monopoly control over the .COM and .NET registries.

359. Verisign has acted in concert with ICANN unlawfully to acquire and maintain Verisign's monopoly over these relevant markets indefinitely into the future in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2, and both have acted with the specific intent to confer upon Verisign unlawful monopoly power in these relevant markets.

360. The Expiring Names Registration Services Market is currently highly competitive. Verisign and ICANN have combined and conspired to act together to obtain monopoly power for Verisign in each of the relevant markets.

361. In furtherance of their conspiracy, Verisign and ICANN negotiated and entered into agreements and profit-sharing arrangements whereby Verisign and ICANN will in various ways share the monopoly overcharges that the conspiracy will impose on consumers in the relevant markets.

362. Verisign's conspiracy to monopolize the relevant markets has been in violation of § 2 of the Sherman Act.

363. Verisign's unlawful conspiracy has caused and, unless enjoined by this Court, will continue to cause adverse and anticompetitive injury to consumers and to the business and property of Internet stakeholders and to CFIT's Supporters.

Author
Deleted: Against VeriSign and ICANN –
Author
Formatted: Bullets and Numbering
Author
Deleted: com
Author
Deleted: net
Author
Formatted: Bullets and Numbering
Author
Deleted: VeriSign
Author
Deleted: com
Author
Deleted: net
Author
Formatted: Bullets and Numbering
Author
Deleted: com
Author
Deleted: net
Author
Deleted: VeriSign
Author
Deleted: VeriSign's
Author
Deleted: VeriSign
Author
Deleted: VeriSign
Author
Deleted: VeriSign
Author
Formatted: Bullets and Numbering
Author
Deleted: VeriSign
Author
Deleted: VeriSign
Author
Deleted: Defendants'
Author
Deleted: Defendants'
Author
Deleted: , including Pool.com and R. Lee Chambers Company LLC.
Author
Deleted: FIRST

Cathcart Collins & Kneafsey LLP
444 S. Flower St., 42nd Floor
Los Angeles, California 90071

364. If not enjoined, Verisign's conspiracy and restraint on trade will continue.

**FIFTH CAUSE OF ACTION**

**Conspiracy in Restraint of Trade Under Section 1 of the Sherman Act**

**(All Relevant Markets)**

365. Plaintiff repeats and incorporates by reference the allegations set forth above as if fully set forth herein.

366. For purposes of this claim, the relevant product markets are the .COM and .NET Registration Markets and the Expiring Names Registration Services Market.

367. The relevant geographic markets are global.

368. For purposes of this claim, CFIT alleges that .COM and .NET are separate markets and that Verisign has engaged in exclusionary and predatory conduct with respect to each of them separately and individually.

369. Verisign has a complete monopoly over the relevant .COM and .NET Registration Markets, and each of them individually, and exercises market power in those markets. It is unnecessary and unreasonable for a single company to continue indefinitely to maintain monopoly control over the .COM and .NET registries.

370. Verisign has acted in concert with ICANN unlawfully to secure monopoly power and to restrain and eliminate competition in the relevant .COM and .NET Registration Markets indefinitely into the future in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

371. The Expiring Names Registration Services Market is currently highly competitive.

372. Verisign and ICANN have conspired to act together to restrain trade and competition in each of these relevant markets in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

373. Verisign's conspiracy to restrain trade in the relevant markets has had, and unless enjoined will continue to have, the effect of harming the competitive process in interstate commerce.

Author Deleted: defendants'

Author Deleted: Against VeriSign and ICANN –

Author Formatted: Bullets and Numbering

Author Deleted: com

Author Deleted: net

Author Formatted: Bullets and Numbering

Author Deleted: VeriSign has a complete monopoly over the relevant .com and .net

Author Formatted: Bullets and Numbering

Author Deleted: com

Author Deleted: net

Author Deleted: VeriSign

Author Deleted: com

Author Deleted: net

Author Deleted: VeriSign

Author Deleted: Defendants'

Author Deleted: FIRST

Cathcart Collins & Kneafsey LLP
444 S. Flower St., 42nd Floor
Los Angeles, California 90071

374. If not enjoined, Verisign's restraint on trade will continue, with the result that all other existing and potential competitors will be excluded from competing in the relevant markets and consumers will be forced to pay, and continue to pay in perpetuity, supra-competitive prices for the registration of .COM and .NET domain names.

375. Verisign's conspiracy has caused, and unless enjoined will continue to cause, injury to consumers and to the business and property of Verisign's existing and potential competitors and Internet stakeholders and to CFIT's Supporters.

**SIXTH CAUSE OF ACTION**

**Conspiracy in Restraint of Trade Under the Cartwright Act**

**(All Relevant Markets)**

376. Plaintiff repeats and incorporates by reference the allegations set forth above as if fully set forth herein.

377. For purposes of this claim, the relevant product markets are the .COM and .NET Registration Markets and the Expiring Names Registration Services Market.

378. The relevant geographic markets are global, including California.

379. Verisign has a complete monopoly over the relevant .COM and .NET Registration Markets, and exercises market power in those markets.

380. It is unnecessary and unreasonable for a single company to continue indefinitely to maintain monopoly control over the .COM and .NET registries.

381. Verisign has acted in concert with ICANN unlawfully to restrain and eliminate competition in the relevant .COM and .NET Registration Markets indefinitely into the future in violation of the Cartwright Act, California Business & Professions Code sections 16720 *et seq*.

382. The Expiring Names Registration Services Market is currently highly competitive.

383. Verisign and ICANN have conspired to act together to restrain trade and competition in each of these relevant markets in violation of the Cartwright Act California Business & Professions Code sections 16720 *et seq*.

Author Deleted: defendants'
Author Deleted: com
Author Deleted: net
Author Deleted: Defendants'
Author Deleted: VeriSign's
Author Deleted: , including Pool.com and R. Lee Chambers Company LLC.
Author Deleted: Against VeriSign and ICANN –
Author Formatted: Bullets and Numbering
Author Deleted: com
Author Deleted: net
Author Formatted: Bullets and Numbering
Author Deleted: VeriSign
Author Deleted: com
Author Deleted: net
Author Formatted: Bullets and Numbering
Author Deleted: com
Author Deleted: net
Author Deleted: VeriSign
Author Deleted: com
Author Deleted: net
Author Deleted: VeriSign
Author Deleted: FIRST

Cathcart Collins & Kneafsey LLP
444 S. Flower St., 42nd Floor
Los Angeles, California 90071

384. Verisign's conspiracy to restrain trade in the relevant markets has had, and unless enjoined will continue to have, the effect of harming the competitive process in California.

385. If not enjoined, Verisign's restraint on trade will continue, with the result that all other existing and potential competitors will be excluded from competing in the relevant markets in California and consumers will be forced to pay, and continue to pay in perpetuity, supra-competitive prices for the registration of .COM and .NET domain names.

386. Verisign's conspiracy has caused, and unless enjoined will continue to cause, injury to consumers and to the business and property of Verisign's existing and potential competitors and Internet stakeholders and to CFIT's Supporters.

**PRAYER**

WHEREFORE, CFIT prays for judgment as follows:

1. For a declaration that the 2005 .NET Agreement and the new 2006 .COM Registry Agreement are unlawful and in violation of Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2; and the Cartwright Act, California Business & Professions Code sections 16720 *et seq*;

2. For a declaration that Section 3.1(b)(v) (the limitations on Consensus Policies), Section 3.1(d) (the definition of Registry Services), Section 4.2 ("Renewal"), and Appendix 9 (explicitly authorizing the provision of specified new services) of the 2005 .NET Agreement are unlawful in violation of Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2; and the Cartwright Act, California Business & Professions Code sections 16720 *et seq*.;

3. That the Court adjudge and decree that Verisign has monopolized interstate trade and commerce in the relevant markets in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2;

4. That the Court adjudge and decree that Verisign has attempted to monopolize interstate trade and commerce in the relevant markets in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2;

5. That the Court adjudge and decree that Verisign, through its superior financial resources and unlawful and predatory acts, has coerced ICANN into a combination and

Author
**Deleted:** Defendants'

Author
**Deleted:** defendants'

Author
**Deleted:** com

Author
**Deleted:** net

Author
**Deleted:** Defendants'

Author
**Deleted:** VeriSign's

Author
**Deleted:** , including Pool.com and R. Lee Chambers Company LLC.

Author
**Deleted:** net

Author
**Deleted:** proposed

Author
**Deleted:** com

Author
**Deleted:** net

Author
**Deleted:** VeriSign

Author
**Deleted:** VeriSign

Author
**Deleted:** ICANN

Author
**Deleted:** VeriSign have

Author
**Deleted:** FIRST

Cathcart Collins & Kneafsey LLP
444 S. Flower St., 42nd Floor
Los Angeles, California 90071

conspiracy to monopolize interstate trade and commerce in the relevant markets in violation of Section 1 and 2 of the Sherman Act and in violation of the Cartwright Act, California Business & Professions Code §§ 16720 *et seq*.;

6. That the Court adjudge and decree that Verisign has combined and conspired with ICANN to monopolize interstate trade and commerce in the relevant markets in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2;

7. That the Court adjudge and decree that Verisign has combined and conspired with ICANN to restrain interstate trade and commerce in the relevant markets in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1;

8. That the Court adjudge and decree that Verisign has combined and conspired with ICANN to restrain trade, and to have formed a trust, in violation of the Cartwright Act, California Business & Professions Code §§ 16720 *et seq*.;

9. That Verisign and all persons, firms, and corporations acting on its behalf and under its direction or control be permanently enjoined from engaging in, carrying out, renewing or attempting to engage, carry out, or renew, any contracts, agreements, practices, or understandings in violation of the Sherman Act, the Lanham Act, the Cartwright Act, or the Unfair Competition Act, and specifically including, without limitation, the renewal provisions of the 2006 .COM registry agreement and Section 2.4 "Renewal" of the 2005 .NET Agreement;

10. That Verisign be enjoined and prohibited from engaging in any "Registry Services" except for services that are defined as "Registry Services" in the 2001 .COM Agreement;

11. That Verisign be ordered to divest promptly and in any event within 90 days the registry business and all assets used or reasonably necessary to its operation to a separate company that will be prohibited from engaging in any business except for services that are defined as "Registry Services" in the 2001 .COM Agreement;

12. That Verisign be prohibited from seeking approval from ICANN for any service for the .COM or .NET registries where the effect may be to tend to create a monopoly, to substantially harm competition, or to restrain trade and competition in any line of commerce;

Author
**Formatted:** Bullets and Numbering

Author
**Deleted:** ICANN and VeriSign have

Author
**Deleted:** ICANN and VeriSign have

Author
**Deleted:** Defendants

Author
**Deleted:** their

Author
**Deleted:** their

Author
**Deleted:** proposed .com

Author
**Deleted:** net

Author
**Deleted:** VeriSign

Author
**Deleted:** com

Author
**Deleted:** VeriSign

Author
**Deleted:** com

Author
**Deleted:** ICANN

Author
**Deleted:** approving

Author
**Deleted:** offered by VeriSign, its divestee,

Author
**Deleted:** any future party operating the .com or .net

Author
**Deleted:** FIRST

Cathcart Collins & Kneafsey LLP
444 S. Flower St., 42nd Floor
Los Angeles, California 90071

13. That CFIT and other third parties who shall have been or might be injured in their business or property as a result of any violation by Verisign of any of the provisions of the Court's order, including CFIT's Supporters, be specifically authorized to enforce the provisions of thereof in this Court, including without limitation pursuant to the antitrust laws of the United States as well as any applicable state antitrust or unfair competition laws;

14. That the 2006 .COM Registry Agreement be judged and decreed an unlawful agreement in violation of Sections 1 and 2 of the Sherman Act and the Cartwright Act, California Business & Professions Code §§ 16720 *et seq*.;

15. That Verisign be ordered to abide by the terms of the 2001 .COM Agreement until it expires on November 10, 2007;

16. That Verisign be ordered and required to comply with the price provisions of Appendix G of the 2001 .COM Agreement, and the Code of Conduct provisions of Appendix I of the 2001 .COM Agreement and 2001 .NET Agreement;

17. That Verisign be ordered and required to comply with the research and development provisions of Appendix W of the 2001 .COM Agreement and make public the required annual reports thereunder;

18. That Plaintiff be awarded its damages from Verisign's unlawful conduct, including its costs of bring this action;

19. That Plaintiff have such other relief as the Court may consider necessary or appropriate to restore competitive conditions in the markets affected by Verisign's unlawful conduct;

20. That plaintiff recover the costs of this action and its attorneys' fees.

Dated: December 28, 2006 CATHCART COLLINS & KNEAFSEY LLP

By:________________________________
Patrick A. Cathcart

Attorneys for Plaintiff
COALITION FOR ICANN TRANSPARENCY INC.

Author — Deleted: ICANN or

Author — Deleted:

Author — Deleted: <#>That VeriSign and ICANN be ordered to abide by the terms of the 2001 .com Agreement until it expires on November 10, 2007, and that ICANN be ordered to entertain competing bids for the operation of the .com registry by that time;
That VeriSign and ICANN

Author — Formatted: Bullets and Numbering

Author — Deleted: com

Author — Deleted: com

Author — Deleted: net

Author — Deleted: VeriSign and ICANN

Author — Deleted: com

Author — Deleted: plaintiff

Author — Formatted: Bullets and Numbering

Author — Deleted: defendants'

Author — Deleted: and

Author — Deleted:

Author — Deleted:

Author — Formatted: Date, Indent: Left: 0", Line spacing: exactly 24 pt

Author — Deleted: March 14

Author — Deleted:

Author — Deleted: FIRST

Cathcart Collins & Kneafsey LLP
444 S. Flower St., 42nd Floor
Los Angeles, California 90071