**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| COALITION FOR ICANN TRANSPARENCY, INC., a Delaware corporation, | No. 07-16151 |
| *Plaintiff-Appellant,* | D.C. No. CV-05-04826-RMW |
| v. | ORDER AND AMENDED OPINION |
| VERISIGN, INC., a Delaware corporation, | |
| *Defendant-Appellee.* | |

Appeal from the United States District Court
for the Northern District of California
Ronald M. Whyte, District Judge, Presiding

Argued and Submitted
December 8, 2008—San Francisco, California

Filed June 5, 2009
Amended July 9, 2010

Before: Mary M. Schroeder, A. Wallace Tashima and
William A. Fletcher, Circuit Judges.

Opinion by Judge Schroeder

9857

**COUNSEL**

Bret A. Fausett, Los Angeles, California, for the plaintiff-appellant.

Ronald L. Johnston, Los Angeles, California, for defendant-appellee.

Dennis M. Hart, Washington, DC, for *amicus curiae* Internet Commerce Association.

**ORDER**

The opinion filed on June 5, 2009 is hereby amended.

The petitions for rehearing and rehearing en banc are otherwise DENIED, and no further petitions for rehearing will be accepted.

**OPINION**

SCHROEDER, Circuit Judge:

This appeal is about whether the plaintiff, Coalition for ICANN Transparency, Inc., using antitrust statutes drafted in the late 19th century, has successfully stated claims in con-

nection with the administration of the Internet domain name system, so essential to the operation of our sophisticated 21st century communications network. The district court ruled that the plaintiff failed. With the benefit of extensive briefing, collegial discussions and amicus participation on appeal from other players in the domain name system, we hold that the plaintiff has stated claims under both Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1-2. We reverse and remand for further proceedings.

## I.  Overview

Plaintiff Coalition for ICANN Transparency ("CFIT") is an organization composed of participants in the Internet domain name system ("DNS"), including website owners. The heart of the IT industry is located in the Silicon Valley, which lies within the Northern District of California. CFIT filed its complaint in 2005 in the Northern District against defendant VeriSign, the corporation that acts as the sole operator of the ".com" and ".net" domain name registries.

VeriSign operates each registry pursuant to a contract with the Internet Corporation for Assigned Names and Numbers ("ICANN"), a non-profit oversight body that coordinates the DNS on behalf of the United States Department of Commerce. Pursuant to these contracts, VeriSign receives a certain price for registering each domain name. It is not disputed that there can only be one operator for each domain name registry at any one time. Therefore, the only viable competition can take place in connection with obtaining a new contract after expiration of the old one. The .com agreement entered into by ICANN and VeriSign in 2006, after no competitive bidding, provides that the price of domain names can increase by seven percent over four of the six succeeding years. The .net agreement, which was entered into as a result of competitive bidding, contained price caps that were set to expire on December 31, 2006, leaving no limitation on the price that

could be charged for .net names. Each contract has a presumptive renewal provision.

CFIT's complaint endeavored to state claims against VeriSign under Section 1 of the Sherman Act and under California's counterpart, the Cartwright Act, for conspiracy in restraint of trade in connection with the terms of the .com and .net contracts' pricing and renewal provisions. In essence, CFIT sought to show that the prices were artificially high and that the renewal provisions wrongfully restrained competition for successor contracts.

The complaint also endeavored to state claims under Section 2 of the Sherman Act, alleging that VeriSign's conduct in obtaining the anti-competitive provisions constituted monopolization or attempted monopolization of the .com and .net registration markets. In addition, the complaint sought an injunction against VeriSign's proposed service for registration of expiring domain names, on the ground it constituted an attempted monopolization of that allegedly separate market.

The district court, after some discovery and several opportunities for CFIT to amend the complaint, dismissed the action with prejudice for failure to state claims under state or federal law in connection with either the .com or the .net contract. It held that CFIT had not sufficiently alleged that either the terms of the contracts or VeriSign's conduct in obtaining the contracts amounted to antitrust violations. The court also held that CFIT failed sufficiently to allege that a market for expiring domain names existed separate and apart from the market for newly registered domain names.

In this appeal, CFIT contends that the district court failed to appreciate the seriousness of the allegations of anti-competitive conduct and that, in rejecting the existence of a separate market for expiring domain names, the district court improperly relied on already outdated authority from earlier in this young century. We now agree with CFIT, at least with

respect to the claims challenging the terms and award of the .com contract and asserting the existence of a separate market for expiring domain names. We therefore reverse.

## II. The Players

Plaintiff CFIT is a non-profit corporation composed of DNS stakeholders, including domain name registrars and owners of domain names (registrants). CFIT alleges that its members, including both registrars and registrants, have an interest in ensuring that conditions in the domain name registration market remain fair and competitive.

ICANN is a nonprofit corporation that was created in 1998, in response to a policy directive of the Department of Commerce, to administer the domain name system on the Department's behalf. ICANN is charged by the Department of Commerce with selecting and entering into agreements with registry operators such as VeriSign. ICANN was named as a defendant in CFIT's original complaint and in its First Amended Complaint, but CFIT dropped ICANN as a defendant in the Second Amended Complaint, from which this appeal arises. It seeks to maintain claims only against VeriSign.

Defendant VeriSign is a corporation that, through its contractual relationship with ICANN, acts as the sole operator of the .com and .net domain name registries. This means that VeriSign manages the definitive databases of registered .com and .net domain names. VeriSign has held this position since 2001, prior to which its predecessor-in-interest, Network Solutions, Inc. ("NSI"), managed the databases.

## III. Nature and Terms of the Agreements

VeriSign has been the sole operator of the .com and .net registries since 2001, when it entered into two separate agreements with ICANN (the "2001 .com Agreement" and the

"2001 .net Agreement," respectively). Those agreements supercede ICANN's previous agreements with NSI. The 2001 Agreements imposed on VeriSign a price cap of $6 per year for registration, renewal, or extension of any domain name. Each of the 2001 Agreements contained a renewal provision that allowed ICANN to place the contract up for competitive bidding upon its expiration.

When the 2001 .net Agreement expired in 2005, there was a competitive bidding process that resulted in the selection of VeriSign's bid. VeriSign entered into a new agreement with ICANN (the "2005 .net Agreement"). Before the 2001 .com Agreement was due to expire in 2007, however, VeriSign and ICANN agreed to extend it with a new contract (the "2006 .com Agreement"). Both the 2006 .com Agreement and the 2005 .net Agreement provide for automatic renewal upon expiration unless a court or arbitrator issues a final order finding VeriSign to be in breach of the Agreement, and VeriSign fails to cure the breach. The 2006 .com Agreement also increases the maximum price VeriSign can charge for domain name registrations. The previous contract's $6 cap was maintained until December 31, 2006, but the new contract provides that cap may be increased seven percent per year in four of the following six years. The 2005 .net Agreement does not contain an express price increase provision. Its price cap of $4.25 per domain name expired on December 31, 2006, leaving no cap in its place.

## IV.  CFIT's Claims

CFIT's complaint included claims under Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 & 2. CFIT sought to state a Section 1 claim, for conspiracy in restraint of trade, in connection with the pricing and renewal provisions of both the 2005 .net Agreement and the 2006 .com Agreement. CFIT claimed that VeriSign and ICANN conspired to restrain trade by setting prices for VeriSign's registry services that were substantially above the prices that would result from a com-

petitive market. Moreover, CFIT alleged that VeriSign and ICANN violated Section 1 by imposing a presumptive renewal provision in both the 2006 .com and 2005 .net Agreements, all but ensuring VeriSign's continued market dominance by reducing or eliminating competition for successor contracts.

CFIT's first claim under Section 2 was for monopolization and attempted monopolization of the .com and .net markets. CFIT alleged that VeriSign engaged in improper and predatory conduct, including financial pressure, vexatious litigation, and negative press coverage, in order to induce ICANN to enter into agreements with terms that unlawfully favored VeriSign. CFIT claimed that VeriSign eventually settled its allegedly vexatious suit against ICANN by offering to pay ICANN a multi-million dollar fee in exchange for favorable terms in the 2006 .com and 2005 .net Agreements, thus doing away with any competition for the next contract.

CFIT's second claim under Section 2 concerned the existence of a separate market for expiring domain names. Expiring domain names are names that have fallen back, or are about to fall back into the registry database as a result of non-renewal by their current owners. CFIT alleged that expiring domain names are sufficiently distinct from other types of domain names as to constitute a separate market for antitrust purposes.

CFIT further alleged that VeriSign planned to "leverage" its monopoly in the .com and .net markets into the market for expiring names. According to CFIT's complaint, pursuant to a term in the 2006 .com Agreement permitting VeriSign to launch new registry-related services, VeriSign planned to launch a Central Listing Service ("CLS") to replace the current system for registration of expiring domain names. CFIT alleged that VeriSign's proposed CLS system will allow it to leverage its existing monopoly in the .com and .net registra-

tion markets to achieve a monopoly of the market for expiring domain names.

## V. Legal Analysis

We review de novo a dismissal for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). *William O. Gilley Enters., Inc. v. Atl. Richfield Co.*, 588 F.3d 659, 662 (9th Cir. 2009) (per curiam). All allegations of material fact are taken as true and are construed in the light most favorable to CFIT. *Id.* "On a motion to dismiss in an antitrust case, a court must determine whether an antitrust claim is 'plausible' in light of basic economic principles." *Id.* (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007)). CFIT must plead "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570.

### A. CFIT's Claims Under Section 1 of the Sherman Act

**[1]** Section 1 of the Sherman Act prohibits "contract[s], combination[s] in the form of trust or otherwise, or conspirac-[ies], in restraint of trade or commerce." 15 U.S.C. § 1. To state a claim under Section 1, a plaintiff must allege facts that, if true, will prove: (1) the existence of a conspiracy, (2) intention on the part of the co-conspirators to restrain trade, and (3) actual injury to competition. *Kendall v. Visa U.S.A., Inc.*, 518 F.3d 1042, 1047 (9th Cir. 2008) (citing *Les Shockley Racing Inc. v. Nat'l Hot Rod Ass'n*, 884 F.2d 504, 507 (9th Cir. 1989)).

CFIT sought to state a Section 1 claim in connection with the pricing and renewal provisions of the 2006 .com Agreement and the 2005 .net Agreement. CFIT alleged that ICANN and VeriSign conspired to set artificially high prices for Veri-Sign's services and to ensure that VeriSign would receive successor contracts with ICANN without having to go through a competitive bidding process. We conclude that

CFIT adequately alleged a Section 1 violation with respect to the 2006 .com Agreement.

### 1.  Renewal

CFIT challenged the renewal term in both the .com and .net contracts providing that VeriSign will receive automatic renewal upon expiration of each contract unless a court or arbitrator issues a final order finding VeriSign to be in breach of the Agreement, and VeriSign fails to cure the breach. CFIT alleged the renewal term unlawfully restrains competition because the provision that would trigger a competitive re-bid for the contract is "illusory," and that "at the time they executed the Agreement[s], both ICANN and VeriSign understood that [the provision] never would be triggered." CFIT alleged that the threat of losing each contract in a competitive re-bid is essential to protect competition in that it "benefits consumers by keeping prices in check, . . . by maintaining solid and reliable performance of the registry, and by preventing the registry from undertaking abusive practices that would financially benefit the registry at the expense of the end-user's experience." The district court found that CFIT's complaint was insufficient to state a challenge to the renewal provision, concluding that CFIT's allegation regarding the illusory nature of the re-bid provision was "conclusory and speculative," and insufficient to allege a violation of antitrust law.

[2] We have expressly held, however, that concerted action between co-conspirators to eliminate competitive bidding for a contract is an actionable harm to competition. *Harkins Amusement Enters., Inc. v. Gen. Cinema Corp.*, 850 F.2d 477, 487 (9th Cir. 1988). In *Harkins*, the defendants were distributors and exhibitors of films who "rigged" a bidding process in order to ensure that the exhibitors would obtain licenses to display films released by the distributors, thus excluding from competition the plaintiff, a rival film exhibitor. *Id.* at 487-88. We found a Section 1 violation for injury to competition even though the only entity harmed, in the particular circumstances

of that case, was the plaintiff. *Id.* at 488. The allegation in this case regarding the elimination of competitive bidding at the expiration of each successive registry agreement means that any other potential registry operator is excluded from competition, making the alleged harm to competition in this case even more severe than that at issue in *Harkins*.

**[3]** CFIT's complaint is not limited to alleging that the renewal provision harms individual competitors in the DNS. Rather, CFIT alleged that competition itself has been eliminated as a result of VeriSign and ICANN's conspiratorial conduct. This is precisely the type of allegation required to state an injury to competition. *Austin v. McNamara*, 979 F.2d 728, 738 (9th Cir. 1992) (to state injury to competition, plaintiff must allege conduct that "actually causes injury to competition, beyond the impact on the claimant"). CFIT has also alleged that consumers are harmed by this anti-competitive restraint, in the form of higher prices for registration of domain names, and potentially lower-quality services. In combination with the allegations regarding the existence of the conspiracy between VeriSign and ICANN as well as the intent to restrain competition, these allegations of harm to competition are sufficient to state a claim under Section 1. *Kendall*, 518 F.3d at 1047.

**[4]** Because restraint of trade claims under Section 1 do require the showing of a conspiracy whose members intended to restrain trade, *see id.*, we conclude that CFIT's allegations regarding the renewal provision in the contracts is made out only with respect to the .com contract. CFIT has adequately pled the existence of a conspiracy between VeriSign and ICANN, and that VeriSign had the intent to restrain trade when it entered into the .com contract. Beyond ICANN's decision not to use competitive bidding to reach the .com agreement, CFIT has also alleged that ICANN was economically motivated to conspire with VeriSign because VeriSign agreed to share its monopoly profits with ICANN and to cease its predatory behavior, which had put ICANN in financial

jeopardy. However, the .net contract was reached after a competitive bidding process. CFIT has not adequately alleged that conspiratorial conduct to restrain trade was involved in the making of the .net agreement. CFIT has not alleged, with sufficient specificity, that the bidding process used to reach the 2005 .net Agreement was in any way rigged. *Harkins*, 850 F.2d at 484. CFIT's allegations concerning ICANN and VeriSign's adoption of the presumptive renewal provision are therefore sufficient to make out a Section 1 claim for restraint of trade with respect to the 2006 .com Agreement alone.

In so holding, we observe that competitive bidding is not required before entering into an exclusive licensing agreement, but its presence or absence is a factor to be considered in determining the applicability of the antitrust laws. *See Nat'l Soc'y of Prof'l Eng'rs v. United States*, 435 U.S. 679, 692-96 (1978); *Harkins*, 850 F.2d at 487. So long as the agreement is the result of independent business judgment, is not the result of an intention to restrain trade, or does not actually injure competition, it is immaterial whether it was secured through a competitive bidding process. *See Kendall*, 518 F.3d at 1047.

## 2. Pricing

CFIT further alleged in its complaint that the seven-percent-per-year increase in the allowable fee under the 2006 .com Agreement exceeds the rate competitive market conditions would produce. CFIT's complaint stated that if the .com Agreement had been put out for competitive bidding, "the costs of domain name registrations would have fallen to at least as low as $3.00 per domain name, with at least the same level and quality of services provided by VeriSign." Counsel for CFIT stated at oral argument before the district court that potential competitors of VeriSign had stated publicly that, if awarded the .com contract, they could and would offer registry services at or below $3 per domain name.

The district court held that CFIT had not stated a cognizable claim regarding the pricing provisions in the 2006 .com Agreement, finding that an increase in the price of services, standing alone, did not give rise to antitrust liability. The district court relied primarily on *Alaska Airlines, Inc. v. United Airlines, Inc.*, 948 F.2d 536 (9th Cir. 1991), in which this court held that a high price alone is not an antitrust violation. We stated in *Alaska Airlines* that while "setting a high price may be a use of monopoly power, . . . it is not in itself anti-competitive." *Id.* at 549 (quoting *Berkey Photo, Inc. v. Eastman Kodak Co.*, 603 F.2d 263, 294 (2d Cir. 1979)).

**[5]** The district court's reliance on *Alaska Airlines* was misplaced, however, because the pricing claims at issue in that case were monopolization claims arising solely under Section 2 of the Sherman Act. *See id.* at 541 n.8. In this case, by contrast, CFIT's allegation is that the pricing provision in VeriSign and ICANN's 2006 .com Agreement unlawfully restrains trade, in violation of Section 1. *Alaska Airlines* itself distinguishes between the proper inquiries the court should undertake in the Section 1 and Section 2 contexts: "While concerted conduct is subject to sanction [under Section 1] if it merely restrains trade, unilateral conduct is subject to sanction [under Section 2] only if it either actually monopolizes or threatens monopolization." *Id.* at 541 (citing *Copperweld Corp. v. Indep. Tube Corp.*, 467 U.S. 752, 767-69 (1984)). In other words, an entity cannot be held liable for antitrust violations if it simply unilaterally increases its prices, absent a showing that it either conspired with another entity in order to restrain trade, or acted in a market in which it holds or is attempting to hold a monopoly. *See Copperweld*, 467 U.S. at 768-69 ("Congress treated concerted behavior more strictly than unilateral behavior . . . . [because] [c]oncerted activity inherently is fraught with anticompetitive risk.").

**[6]** In this case, CFIT's allegation is not that VeriSign took unilateral action to increase the price of its services, but that VeriSign and ICANN undertook concerted action to restrain

trade by imposing prices higher than market rate and under conditions hostile to competition. Applying the correct inquiry for Section 1 violations, we conclude that CFIT has adequately alleged that the pricing provision in VeriSign and ICANN's 2006 .com Agreement unlawfully restrains trade. CFIT has alleged the existence of a conspiracy, and that Veri-Sign and ICANN had the intent to impose terms for pricing and price increases that restrained trade. CFIT's allegations concerning the prices alternative registry operators would offer, were they able to compete with VeriSign for successor contracts, are adequate to state a claim of actual injury to competition, in that potential competitors are allegedly unable to bid for operation of the .com registry, and that consumers are allegedly unable to benefit from the positive effects of that competition. Harm to consumers in the form of higher prices resulting from competitive restraints has long been held to constitute an actual injury to competition in the Section 1 context, *see Am. Ad Mgmt., Inc. v. GTE Corp.*, 92 F.3d 781, 791 (9th Cir. 1996) ("[I]t is difficult to image a more typical example of anti-competitive effect than higher prices . . . ."), and CFIT's complaint adequately alleges that such injury has occurred and is still occurring. CFIT's complaint is therefore sufficient to state a claim under Section 1 in connection with the pricing provisions of the 2006 .com Agreement.

[7] CFIT also attempted to allege a Section 1 violation in connection with the pricing terms in the 2005 .net Agreement. The .net contract imposed an initial price cap of $4.25 per domain name registration, but provided that this cap would expire on December 31, 2006, leaving no price limitation in place. Although this claim involved terms comparable to those in the .com contract, CFIT has not made out a Section 1 violation for the .net pricing agreement. The .net contract was reached as a result of competitive bidding, not conspiratorial action. CFIT's assertion that some terms of the agreement changed after VeriSign's bid was accepted, without allegations of materiality, does not suffice to state a claim for

existence of a conspiracy and the intent to restrain trade. *See id.*

## B.   CFIT's Claims Under Section 2 of the Sherman Act

CFIT also asserted claims under Section 2 of the Sherman Act, alleging first that VeriSign's predatory conduct in obtaining the anti-competitive provisions described above constituted monopolization or attempted monopolization of the .com and .net registration markets. CFIT's second Section 2 claim alleged the existence of a separate market for expiring domain names, and attempted monopolization of that market. With respect to the latter claim, the district court held that CFIT failed to state a claim because it failed to allege that expiring names are sufficiently distinct from other types of names. With respect to the former, the district court held that CFIT also failed to state a claim for predatory conduct. The district court, apparently construing CFIT's claim as pertaining solely to VeriSign's initiation of litigation against ICANN, held that CFIT failed to state a claim because it alleged only that VeriSign's allegedly vexatious litigation against ICANN was "oppressive and costly," not that it was "baseless." In making this determination, the court relied on the doctrine that litigation activity is immune from antitrust liability unless it is "a mere sham." *See Prof'l Real Estate Investors, Inc. v. Columbia Pictures Indus., Inc.*, 508 U.S. 49, 56 (1993) (quoting *E.R.R. Presidents Conf. v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 144 (1961)); *see also United Mine Workers v. Pennington*, 381 U.S. 657, 670 (1965).

### 1.   Predatory Conduct

CFIT alleged that the 2006 .com Agreement and the 2005 .net Agreement were reached through improper conduct by VeriSign, including financial pressure and vexatious litigation against ICANN. CFIT alleged that in order to get ICANN to agree to the terms VeriSign desired, VeriSign paid lobbyists to support its position, "stacked" ICANN's public meetings

with VeriSign supporters, hired purportedly independent organizations and individuals to advocate VeriSign's position, paid bloggers to attack ICANN's reputation, planted news stories critical of ICANN in mainstream media, threatened ICANN with litigation, arbitration, and government investigation, and indeed eventually brought suit against ICANN in federal and state court. VeriSign's suit against ICANN was settled, allegedly as a result of VeriSign's offer to pay ICANN a fee of between $6 and $12 million in exchange for the favorable terms in the agreements. VeriSign and ICANN's Settlement Agreement expressly provided that VeriSign "will not participate in, contribute monies for, encourage or provide other support for any activities by or for third parties that seek to undermine ICANN's role [as 'the appropriate technical coordination body for the DNS'], and it will immediately cease any such ongoing activities." *Settlement Agreement between ICANN and VeriSign*, http://www.icann.org/en/tlds/agreements/verisign/ICANN-VRSN-settlement-agreement-2005.pdf, at 1.

In concluding that CFIT failed to state a claim for predatory conduct, the district court erroneously construed the allegation in the complaint as pertaining solely to VeriSign's litigation against ICANN, rather than to the predatory and harassing activities that accompanied that litigation. The district court's reliance on the *Noerr-Pennington* immunity doctrine therefore was misplaced, because Noerr-Pennington immunizes only litigation activity, not other forms of threats or harassment.

**[8]** We have long held that Section 2 claims may be premised upon predatory conduct that is aimed at achieving or maintaining a monopoly in a given market. We have explained that a claim for monopolization of trade has two elements: "the possession of monopoly power in the relevant market and . . . . the acquisition or perpetuation of this power by illegitimate 'predatory' practices." *Alaska Airlines*, 948 F.3d at 541-42 (citing *Aspen Skiing Co. v. Aspen Highlands Skiing Co.*, 472 U.S. 585, 596 n.19 (1985); *Catlin v. Wash.*

*Energy Co.*, 791 F.2d 1343, 1348 (9th Cir. 1986)). Similarly, to state a claim for attempted monopolization, the plaintiff must allege facts that, if true, will prove: "(1) that the defendant has engaged in predatory or anticompetitive conduct with (2) a specific intent to monopolize and (3) a dangerous probability of achieving monopoly power." *Cascade Health Solutions v. PeaceHealth*, 515 F.3d 883, 893 (9th Cir. 2008) (quoting *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 456 (1993)).

   **[9]** CFIT has alleged that VeriSign's predatory litigation activity was aimed at coercing ICANN to perpetuate VeriSign's role as exclusive regulator of the .com domain name market by awarding VeriSign the 2006 .com Agreement without any competitive bidding, and by agreeing to the terms that favored VeriSign. These allegations meet the requirements articulated in *Cascade Health Solutions* for stating an attempted monopolization claim. 515 F.3d at 893.

   **[10]** Moreover, the Supreme Court has held that an entity may be prosecuted for an antitrust violation on the basis of improper coercion of a standards-setting body. In *Allied Tube & Conduit Corp. v. Indian Head, Inc.*, 486 U.S. 492, 495-97 (1988), the Court imposed antitrust liability on the defendant, a manufacturer of steel electrical conduits. This liability was for predatory actions undertaken to coerce the National Fire Protection Association ("NFPA"), a body that published product standards and building codes, to publish standards barring the use of plastic conduits, a rival product which the plaintiff manufactured. The activities undertaken by the defendant in *Allied Tube* included such conduct as packing NFPA meetings with paid supporters of the defendant who would advocate for the banning of plastic pipes. *Id.* at 496. The Court noted that even such "unethical and deceptive practices" are protected from antitrust liability where they are either directly aimed at or " 'incidental' to a valid effort to influence government action." *Id.* at 499 (citing *Noerr*, 365 U.S. at 140-41). However, the Court explained that predatory activities aimed at

private standards-setting bodies, like NFPA, do not enjoy such categorical protection from liability. The Court pointed to the "procompetitive advantages" of private standards-setting organizations whose decisions are insulated from "being biased by members with interests in stifling product competition." *Id.* at 501. In concluding that the defendant's predatory activities subjected it to liability, the Court emphasized the fact that the NFPA, the body the defendant sought to coerce, was a private organization without any accountability to the public. *Id.* at 502.

**[11]** CFIT has essentially alleged that ICANN is a private standards-setting body akin to the NFPA. ICANN administers the DNS and is responsible for entering into agreements with registry operators like VeriSign. According to the complaint, ICANN's mission includes a commitment to promoting competition for the contracts. CFIT's allegations further state that ICANN, like the NFPA, is a private body with no public accountability. These allegations are consistent with the view held by commentators on the subject, who have, indeed, identified *Allied Tube* as providing the strongest argument in favor of imposing antitrust liability on those who seek to coerce ICANN. *See* Michael Froomkin & Mark A. Lemley, *ICANN and Antitrust*, 2003 U. Ill. L. Rev. 1, 72-73 (2003) (noting that "given ICANN's private status, VeriSign will face antitrust liability for persuading a private company in a position of power to grant it control over a market," and naming *Allied Tube* as the "closest analogue"). We hold, therefore, that pursuant to The Supreme Court's holding in *Allied Tube*, CFIT has adequately alleged that VeriSign's improper coercion of ICANN and attempts to control ICANN's operations in its own favor violated Section 2.

**[12]** CFIT also attempted to state a claim of predatory conduct in the .net registration market. The complaint's allegations did not reflect any assertion that VeriSign's predatory activities had any bearing on the competitive bidding process that resulted in the 2005 .net Agreement. Accordingly, we

hold that CFIT's claim of predatory conduct is made out with respect to the 2006 .com Agreement only.

## 2. Expiring Domain Names Market

The issue presented with respect to the claim of attempted monopolization of expiring domain names is whether the existence of a separate market was adequately pled. CFIT alleged that expiring domain names are more valuable than other names because, in all likelihood, they have already been advertised by the previous owner and already have web traffic. CFIT alleged that expiring domain names are in higher demand and command higher prices due to their unique features. In other words, expiring names differ from, and are more valuable than, names not previously used.

**[13]** A relevant market, for antitrust purposes, "can be broadly characterized in terms of the 'cross-elasticity of demand' for or 'reasonable interchangeability' of a given set of products or services." *M.A.P. Oil Co., Inc. v. Texaco Inc.*, 691 F.2d 1303, 1306 (9th Cir. 1982) (quoting *United States v. E.I. duPont de Nemours & Co.*, 351 U.S. 377, 395 (1956)). We consider whether "the product and its substitutes are reasonably interchangeable by consumers for the same purpose," as well as "industry or public recognition of the submarket as a separate economic entity, the product's peculiar characteristics and uses, unique production facilities, distinct customers, distinct prices, sensitivity to price changes, and specialized vendors." *Id.* (citations omitted).

The district court relied on two out-of-circuit, district court cases to conclude that the complaint failed adequately to allege that the market for expiring domain names is separate from the market for other types of domain names. *See Weber v. Nat'l Football League*, 112 F. Supp. 2d 667 (N.D. Ohio 2000); *Smith v. Network Solutions, Inc.*, 135 F. Supp. 2d 1159 (N.D. Ala. 2001). In *Weber*, the plaintiff brought a Section 2 claim against two professional football teams, the New York

Jets and the Miami Dolphins, who sought to prevent the plaintiff from registering the domain names "jets.com" and "dolphins.com." 112 F. Supp. 2d at 673. The plaintiff alleged that the market "should be defined by the demand for the domain names 'jets.com' and 'dolphins.com.' " *Id.* The court rejected the plaintiff's claim that the relevant market for antitrust purposes should be circumscribed to the market for a particular name, holding instead that the market should be "defined very broadly, in terms of domain names in general." *Id.* at 673-74.

**[14]** *Weber* is similar to this case only insofar as it also involved antitrust claims defining a market for domain names. We agree with that court that a market should not be defined in terms of a single domain name. CFIT's complaint, however, does not define the relevant market so narrowly. Rather, it alleges that expiring domain names, as a group, are sufficiently distinguishable from other domain names so as to constitute a separate market. *Weber* did not deal with an alleged market for expiring domain names.

The second case, *Smith v. Network Solutions*, did address the question of whether a separate market for expiring domain names was adequately alleged. In *Smith*, the court considered a claim that the defendant, VeriSign's predecessor-in-interest, maintained an unlawful monopoly by failing expeditiously to release newly expired domain names for re-registration. 135 F. Supp. 2d at 1166-67. The plaintiff alleged that the particular expiring domain names it wished to acquire constituted a separate market for antitrust purposes. *Id.* at 1168. The court rejected this proposed market definition, finding no appreciable difference between those particular expiring names and other types of names.

The court broadly observed that "there is no inherent difference in character, for purposes of interchangeability and cross-elasticity of demand, between domain names that are 'expired' . . . and those that are not." *Id.* at 1169. It did so, however, because it viewed the proposed market of some par-

ticular expiring domain names as too small. Thus, the deci-
sion in *Smith*, like *Weber*, was premised upon the court's
reluctance to approve an overly narrow market definition con-
sisting of one or a few domain names. *See Smith*, 135 F. Supp.
2d at 1169 ("Taken to its logical conclusion, Plaintiff's argu-
ment implies that each individual domain name is a relevant
market unto itself for antitrust purposes, subject the entity
'controlling' the name at a particular time . . . to a charge of
monopolization.").

CFIT's claims are not so narrowly drawn. Its complaint
relates to all expiring domain names, not just those a particu-
lar plaintiff wishes to acquire. Moreover, to the extent that the
*Smith* court may have viewed expiring domain names as inter-
changeable with other names, it may well be that expiring
domain names did not have a significant enough presence in
2001 for the court to consider a possible claim that, in the
aggregate, they amounted to a separate market. According to
the complaint, that is no longer the case. Moreover, amicus in
this case, the Internet Commerce Association ("ICA"), points
out that when *Smith* and *Weber* were decided, "the present
expired domain name market barely existed," and that today's
conditions were "unanticipated only a few years ago."

**[15]** Here CFIT's complaint alleges that every word in the
English language is already registered as a domain name, and
that desirable domain names can be difficult to come by. On
appeal, our understanding of the distinct role and value of
expiring domain names has also been significantly aided by
the explanation provided by the ICA. As cogently explained
by ICA, expiring domain names often carry with them a his-
tory of established web traffic and advertising support; when
such names do expire, they "still maintain much of [their]
prior inbound traffic," making them more valuable than
domain names that have never before been registered. The
district court, of course, did not have the benefit of briefing
by amicus. With the benefit of this aid to our understanding,
we are not prepared to affirm the district court's ruling that no

separate market exists. We therefore reverse and remand for further proceedings.

## C. Claims Concerning the .Net Market

[16] Although we conclude that CFIT has adequately stated facts sufficient to nudge its Section 1 and 2 claims "across the line from conceivable to plausible" with regard to VeriSign's activities in the .com registration market, *Twombly*, 550 U.S. at 570, we cannot reach the same conclusion for the allegations about the .net market. All of the specific allegations of the complaint concerning predatory conduct leading to the pricing and renewal provisions of a contract relate to the 2006 .com Agreement. The complaint, in its present form, contains no allegation that predatory or conspiratorial conduct was involved in the process of reaching the 2005 .net Agreement. CFIT may have viable claims with respect to the .net market, but the district court will be in a better position to determine whether it does if CFIT is given an opportunity to amend its conclusory allegations to allege more specific conduct or anti-competitive effect. We therefore remand the .net claims so that CFIT may be afforded that opportunity. In considering any possible amendments, the district court is directed to take into account the pleading requirements of the Supreme Court decisions in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 554 (2007), and *Ashcroft v. Iqbal*, 129 S. Ct. 1937 (2009).

Finally, we observe that our review in this appeal is limited to whether the facts alleged in the complaint state plausible causes of action for violations of the Sherman Act. Although the complaint alleges that the Department of Commerce approved the 2006 .com Agreement, the role of the Department in developing that agreement or overseeing its administration has not been developed. We therefore do not consider the effect that government supervision may have in displacing the utility of antitrust supervision. *See, e.g., Gordon v. N.Y. Stock Exch., Inc.*, 422 U.S. 659 (1975). We acknowledge, however, that while CFIT stated plausible Section 1 and 2

claims with respect to the .com market, proving actual injury to competition under Section 1 or dangerous probability of achieving monopoly power under Section 2 may be difficult in light of the amendments made by the Department of Commerce to its Cooperative Agreement with VeriSign and the Department's asserted commitment to "fulfill its stewardship responsibilities in connection with VeriSign's provision of .com registry services." *Amendment 30 to the Cooperative Agreement between the Department of Commerce and VeriSign* (Nov. 29, 2006), http://www.ntia.doc.gov/ntiahome/ domainname/agreements/amend30_11292006.pdf, at 3.

## VI. Conclusion

We REVERSE the district court's grant of VeriSign's motion to dismiss CFIT's complaint for failure to state a claim, and REMAND to the district court for further proceedings consistent with this opinion.