PATRICK A. CATHCART (CA Bar No. 65413)
pcathcart@AlvaradoSmith.com
BRET A. FAUSETT (CA Bar No. 139420)
bfausett@AlvaradoSmith.com
REGINALD ROBERTS, JR. (CA Bar No. 216249)
rroberts@AlvaradoSmith.com
IMANI GANDY (CA Bar No. 223084)
igandy@AlvaradoSmith.com
ALVARADOSMITH
A Professional Corporation
633 W. Fifth Street, Suite 1100
Los Angeles, CA 90071
Tel.    (213) 229-2400
Fax.    (213) 229-2499

Attorneys for Plaintiff
COALITION FOR ICANN TRANSPARENCY INC.

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## SAN JOSE DIVISION

| | |
|---|---|
| COALITION FOR ICANN TRANSPARENCY INC., a Delaware Corporation,<br><br>Plaintiff,<br><br>v.<br><br>VERISIGN, INC., a Delaware Corporation,<br><br>Defendant. | Case No. 05-4826 (RMW) PVT<br><br>Honorable Ronald M. Whyte<br><br>**FOURTH AMENDED COMPLAINT FOR VIOLATION OF THE ANTITRUST LAWS AND DECLARATORY AND INJUNCTIVE RELIEF**<br><br>**TRIAL JURY DEMANDED**<br><br>DISC. CUT-OFF:    June 24, 2011<br>TRIAL DATE:       December 5, 2011 |

Plaintiff Coalition for ICANN Transparency Inc. ("CFIT") brings this action against Verisign, Inc. ("Verisign"), and alleges as follows:

## I.  NATURE OF THE ACTION

1.      This action is brought to (a) enjoin and prevent defendant Verisign, Inc. (hereafter "Verisign") from carrying out an unlawful scheme to establish a permanent monopoly over the

ALVARADOSMITH
A PROFESSIONAL CORPORATION
LOS ANGELES

relevant markets as alleged herein, for declaratory relief and damages; (b) enjoin and prevent defendant Verisign from furthering an unlawful agreement with the Internet Corporation for Assigned Names and Numbers (hereafter "ICANN").

2.      The unlawful schemes and agreement described herein give Verisign a permanent monopoly over all the ".COM" and ".NET" domain name registrations and permits Verisign to increase prices above the fair market price in a normally competitive market.[1]

3.      This action seeks to restore competitive conditions in markets for ".COM" and ".NET" Internet domain names.

4.      CFIT seeks an injunction against the defendant and its management personnel preventing them from taking further steps to implement their unlawful schemes and agreement, including without limitation preventing the implementation of certain terms of a new .COM Registry Agreement between ICANN and Verisign (the "2006 .COM Agreement") (available on the ICANN website at http://www.icann.org/en/registries/agreements.htm).  Plaintiff also requests declaratory relief that the agreements and understandings between the defendant and ICANN, as reflected in the terms of the 2006 .COM Agreement and the 2005 .NET Agreement constitute violations of federal and state antitrust laws, and ordering appropriate relief, including disgorgement of Verisign's ill-gotten gains, to restore competitive conditions in affected markets.[2]

5.      Through a pattern of both strong-arm conduct and deceptive acts and practices, Verisign has undermined ICANN's legal authority and financial stability continually since the non-profit corporation was founded in 1998.

6.      Most recently, in order to consolidate its monopoly power over the .COM and .NET markets, Verisign filed a spurious legal action against ICANN which taxed ICANN's financial and personnel resources, placed its Directors and advisors in personal financial jeopardy, and threatened the legal underpinnings on which ICANN has based.

---

[1]    On Friday, February 11th, the Court dismissed CFIT's .NET allegations. CFIT believes the allegations dismissed stated valid claims for relief but, without discovery, CFIT cannot provide more detailed factual allegations. CFIT intends to appeal the dismissal of its causes of action based on .NET.

[2]    On Friday, February 11th, the Court dismissed CFIT's disgorgement prayer for relief.  CFIT intends to appeal the dismissal of its disgorgement remedy.

FOURTH AMENDED COMPLAINT                                    Case No. 5:05-CV-04826-RMW
2076472.1

7. Using the unequal financial resources between it and ICANN, Verisign's litigation coerced ICANN into signing new anti-competitive agreements for .COM and .NET that provide Verisign the ability to exact monopoly prices from consumers and capture downstream and adjacent markets from commercial players, including CFIT's member companies, in currently competitive markets.

8. Specifically and without limitation, Verisign has leveraged its superior financial resources to coerce agreements from ICANN that have the practical effect of installing Verisign as the permanent operator of the .COM and .NET registries and shielding Verisign from the competitive pressures of the periodic re-bidding process that make for competitive markets.

9. Verisign also has gained anti-competitive terms that permit it to extend its monopoly control to the downstream markets for back order services and other services, as described below.

10. The unlawful agreements and understandings between Verisign and ICANN have the effects of imposing supracompetitive prices on consumers, distributing the monopoly profits between ICANN and Verisign, and permanently excluding competition and rivals from the relevant markets.

## II. **PARTIES**

11. Verisign is a corporation, organized and existing under the laws of the State of Delaware, and having its principal place of business in Mountain View, California.  Verisign currently acts under contract with ICANN as the registry for all .COM and .NET domain names.

12. CFIT is a not-for-profit membership corporation, organized and existing under the laws of the State of Delaware, and having its principal place of business in the State of Delaware.

## III. **STANDING**

13. CFIT brings this action on behalf of its members.

14. CFIT's purpose, as stated in its Articles of Incorporation, is to "promote the interests of its member businesses by seeking a competitive and fair market for domain name registry services."

15. CFIT was formed for the purpose of challenging the anticompetitive agreements and activities of Verisign alleged herein, including the 2006 .COM Agreement.

FOURTH AMENDED COMPLAINT
2076472.1

Case No. 5:05-CV-04826-RMW

1      16.     CFIT was incorporated in 2005 by three founding supporters, Trammel & Co.,

2  Pool.com and Momentous.ca. Each of the founding members was a registrant of a .COM domain

3  name. In addition, Momentous.ca was the parent company of a family of domain name services

4  companies, including domain name registrars and back-order services providers (including fellow-

5  CFIT member Pool.com).

6      17.     On the same day that the present litigation was filed, the World Association of

7  Domain Name Developers, Inc. ("WADND") also filed suit in this same court seeking substantially

8  similar relief as sought be CFIT here. After learning of the present litigation, WADND voluntarily

9  dismissed its separate litigation without prejudice and joined CFIT as a Supporter. WADND is the

10  registrant of numerous .COM domain names. On or about the time that WADND joined CFIT,

11  Targeted Traffic Domains, Inc., a domain name holding company also joined. Targeted Traffic

12  Domains, Inc. owns thousands of .COM domain names.

13      18.     In or about January, 2006, Name Administration, Inc. and iRegistry Corp joined CFIT

14  as Supporters. Name Administration, Inc. is the registrant of hundreds of thousands of .COM domain

15  names. iRegistry is a domain name registrar.

16      19.     In or about October, 2010, Linkz Internet Services Corp. joined CFIT as a Supporter.

17  Linkz Internet Services Corp. is the registrant of tens of thousands of .COM domain names.

18      20.     The current supporters of CFIT are the World Association of Domain Name

19  Developers, Inc., Targeted Traffic Domains, Inc., Name Administration, Inc., iRegistry Corp., and

20  Linkz Internet Services Corp.

21      21.     The current supporters of CFIT have approximately 375,000 .COM domain names

22  under registration.

23      22.     CFIT receives ongoing financial supports from its supporters, including for the

24  support for the present litigation.

25      23.     CFIT maintains a website at CFIT.ORG where it actively solicits new members. As

26  CFIT's list of members continues to evolve and grow, the list of members will be produced to

27  Verisign during discovery.

28

ALVARADOSMITH
A PROFESSIONAL CORPORATION
LOS ANGELES

FOURTH AMENDED COMPLAINT
2076472.1

Case No. 5:05-CV-04826-RMW

## IV.  JURISDICTION AND VENUE

24.     This Court has subject matter jurisdiction over this action under 28 U.S.C. §§ 1331 and 1337; the Declaratory Judgment Act, 28 U.S.C. § 2201; and principles of supplemental jurisdiction under 28 U.S.C. § 1367.

25.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) and (c), in that defendant Verisign resides, transacts business, and is found in this district and defendant ICANN resides, transacts business, and is found in the State of California and in this district.

26.     **Intradistrict Assignment**:  A substantial part of the events giving rise to CFIT's claims occurred in Santa Clara County, California, where defendant Verisign has its principal place of business.  Assignment to the San Jose division is therefore proper.

## V.  RELEVANT MARKETS

27.     The relevant markets for antitrust analysis in this action include the following:

    a.     The unique and separate market for .COM domain name registrations (the ".COM Registration Market").

    b.     The unique and separate market for .NET domain name registrations (the ".NET Registration Market").

    c.     As used in this Complaint, the ".COM Registration Market" and the ".NET Registration Market" may be referenced, from time to time, as the Domain Name Registration Markets.

28.     The market for .COM domain name registrations is a distinct market for purposes of domain name registrations.

29.     Although over 250 TLDs[3] exist, they are not equally accessible to businesses based in the United States.  All country-code TLDs are operated and managed outside of the United States, and are therefore not subject to United States antitrust laws and statutes.  Registration with ccTLDs requires a Registrant to leave the borders and protection of the United States.  Therefore these ccTLDs cannot be counted as part of the relevant market for determining antitrust violations.

---

[3]    TLDs or "top-level domains" are described more fully in section VII.B, paragraphs 16 through 19.  ".COM" and ".NET" are examples of TLDs.

ALVARADOSMITH
A PROFESSIONAL CORPORATION
LOS ANGELES

30.     Many of the generic TLDs, or gTLDs, are restricted either in use or in meaning. Specifically, gTLDs such as ".EDU," ".MIL," ".GOV," ".AERO," and ".COOP" are reserved for specific types of institutions and are not available to businesses or private persons.  Many gTLDs carry inherent meanings which cause confusion Registrants would want to avoid.  The gTLD ".ORG" carries the connotation of a non-profit organization, and similarly ".TRAVEL" connotes a travel-related Registrant.  As a result, ".COM" and ".NET" have become more than just the most used TLDs, they have become the definitive TLDs for all commercial and private Registrants within the United States who seek to avoid confusion with other types of associations.

31.     No top-level domain is a substitute for the .COM top-level domain.

32.     As between .COM and .NET, Verisign agrees that .COM is a distinct market.

33.     As a matter of business practice and strategy, Verisign operates as though .COM is a distinct market, and it markets its registration services for the .COM TLD differently than it markets any other registration services.

34.     The relevant geographic market as to each relevant product market is the world.

35.     Verisign is a participant in each relevant market.

36.     Verisign is the sole Registry for the .COM and .NET domains.  As a result, any arrangements into which Verisign enters to control competition in the expired domain names market, to fix prices, or to introduce new consumer services at the registry level that also are available in a competitive market at the registrar level constitutes an unjustifiable use of monopoly power.

## VI.  INTERSTATE COMMERCE

37.     The conduct of defendant Verisign described in this Complaint will take place in and affect interstate trade and commerce of the United States in that the purchases and sales of services in the relevant markets are transacted across state lines.

38.     The conduct of defendant Verisign complained of herein will directly, substantially, and foreseeably affect interstate trade and commerce in that defendant will obstruct free and open competition in the .COM and .NET Registration Markets and in the Expiring Names Registration Services Market.

///

FOURTH AMENDED COMPLAINT
2076472.1

Case No. 5:05-CV-04826-RMW

# VII.  BACKGROUND

## A.    THE INTERNET DOMAIN NAME SYSTEM

39.    The Internet is a network of interconnected computers and computer networks.  Every computer connected directly to the Internet has a unique numerical address.  These addresses, which are known as Internet Protocol ("IP") addresses, are necessary for computers to communicate with each other over the Internet.  An example of an IP address is 64.233.161.147.

40.    Because numerical IP addresses can be cumbersome and difficult for Internet users to remember or to use, the numerical IP address system has been overlaid with a more user-friendly system of domain names, the Domain Name System or DNS.

## B.    DOMAIN NAME SYSTEM HIERARCHY

41.    The DNS defines a hierarchical name space divided into zones, each of which has authority over the zones below it.

42.    For purposes of the DNS, domain names are read from right to left.  The top zone is divided into top-level domains, or "TLDs" such as ".COM" and ".NET."  Each TLD is divided into second-level domains or "SLDs" such as "example.com" or "example.net."  Second-level domains can be further divided into third-level domains, such as "another.example.com," and so on.

43.    A set of "root servers" provides a list of the registries responsible for maintaining each TLD.  For example, at present, the root servers tell users looking for .COM or .NET domain names to find the location for that domain name on name servers operated by Verisign.  For example, a user looking for google.COM would be directed to Verisign's .COM name server to find the entry for "google."   The Verisign server, in turn, would tell the user that google could be found at the host identified by the address 64.233.161.147.

44.    There are currently two different types of TLDs:  generic TLDs ("gTLDs"), such as ".AERO," ".BIZ" ".COM," ".COOP," ".INFO," ".JOBS," ".MOBI," ".MUSEUM," ".NAME," ".NET," ".ORG," ".PRO,"  ".TRAVEL," ".GOV," ".EDU," ".MIL," and ".INT", and approximately 240 two-letter country code TLDs ("ccTLDs"), such as ".US," ".UK," ".JP," and ".KR."

45.    Because domain names are essentially "addresses" that allow computers connected to the Internet to communicate with each other, each domain name must be unique, even if it differs

ALVARADOSMITH
A PROFESSIONAL CORPORATION
LOS ANGELES

1  from another domain name by only one character (*e.g.*, "uscourts.com" is different from

2  "uscourt.com" or "us-courts.com").

3       46.    A given domain name is typically registered to only one entity and can point to only

4  one set of host computers.

5  **C.    REGISTRIES, REGISTRARS, AND REGISTRANTS**

6       47.    Verisign acts as the "Registry" for domain names registered in the .COM and .NET

7  gTLDs in accordance with a written agreement with ICANN.

8       48.    As the Registry for the .COM and .NET gTLDs, Verisign maintains the definitive

9  database that associates registered domain names in these gTLDs with the corresponding IP numbers

10  of their respective domain name servers.  The domain name servers, in turn, direct Internet queries to

11  resources such as websites and e-mail systems.  This database is known as a "zone file."  Oftentimes,

12  the Registry is referred to as a "Registry operator" and the zone file is referred to as the "Registry."

13       49.    A domain name is created by an individual or organization that registers the domain

14  name and thereby includes it in the zone file.  The individual or organization that registers a specific

15  domain name is a "Registrant."

16       50.    Internet users typically interact with the DNS through their Internet Service Providers

17  ("ISP").  Specifically, when a user requests a Web site associated with a domain name, the user's

18  computer searches its local cache for the IP address associated with that domain name.  If the IP

19  address is not found locally, the computer will query the ISP's name server.  If the ISP's name server

20  does not have the address for the domain name requested, it will query the appropriate Registry's

21  name server (*i.e.*, its zone file), from which it will obtain the name and IP address of the name server

22  associated with the domain name requested.  It will then query the name server associated with the

23  domain name, and pass the IP address back to the user's computer.

24  **D.    THE REGISTRY-REGISTRAR SPLIT**

25       51.    Registrants do not have direct access to the Verisign Registry and do not interact

26  directly with the Registry in connection with domain name registrations.  Instead, prospective

27  registrants must register domain names through any one of hundreds of private companies located in

28

ALVARADOSMITH
A PROFESSIONAL CORPORATION
LOS ANGELES

          

the United States and throughout the world that act as domain name "Registrars" for the second-level domain names in the .COM and .NET gTLDs.

52.     The split between the .COM and .NET Registries and the Registrars was created by contract between ICANN and Verisign on or about November 10, 1999 in order to bring competition to the registration of domain names.

53.     Prior to the creation of the registry-registrar split on November 10, 1999, Verisign, by and through its predecessor in interest, Network Solutions, Inc., was the sole provider of .COM and .NET registration services to consumers, either by itself or through a network of authorized resellers.

54.     Verisign, by and through its predecessor in interest, Network Solutions, Inc., was required to agree to the registry-registrar split by the United States government, under threat of antitrust prosecution and possible loss of its contract for services with the United States.

55.     Since 1999, the registry-registrar split has been the key to maintaining competition in the registration for domain names and the provisioning of related domain name services.

56.     In effect, the registry-registrar split described in the paragraph above allows the "Registry" to act as a neutral services platform, while the "Registrars" compete for customers on price and differentiation of services.

**E.      COMPETITION FOR THE TLD REGISTRY AGREEMENTS**

57.     One of the principal reasons ICANN was created was to enable competition in the registration of domain names.

58.     As set forth more completely below, on July 1, 1997, as part of the Clinton Administration's Framework for Global Electronic Commerce, the President directed the Secretary of Commerce to privatize the domain name system (DNS) in a manner that increases competition and facilitates international participation in its management.

59.     This Presidential directive resulted in a policy process that created ICANN.  One of the principal statements of United States policy behind the creation of ICANN was a document released by the U.S. Department of Commerce on June 5, 1998, and titled "Management of Internet Names and Addresses," Docket Number: 980212036-8146-02.  This document is often referenced by ICANN and the entities that are involved in ICANN as the "White Paper."

FOURTH AMENDED COMPLAINT
2076472.1

Case No. 5:05-CV-04826-RMW

60.     The "White Paper" specifically provided that the corporation which would become ICANN should seek to use "Where possible, market mechanisms that support competition and consumer choice."  The United States believed that competition would "lower costs, promote innovation, encourage diversity, and enhance user choice and satisfaction."

61.      This mandate to create competition is one of the core values currently written into ICANN's by-laws ("In performing its mission, the following core values should guide the decisions and actions of ICANN:....(6) Introducing and promoting competition in the registration of domain names where practicable and beneficial in the public interest.").

62.     Historically, one of the ways ICANN has sought to obtain the benefits of competition has been by putting TLD registry agreements out for bid, and by selecting a registry operator on the basis of the benefits to consumers in price and quality of service presented by each prospective registry operator.

63.     Periodic bidding for the TLD registry agreements has yielded substantial benefits for consumers.

64.     Verisign and others recently bid competitively for the right to operate the .NET registry beginning in July 2005.  Verisign's bid was selected as the winning bid, in part because Verisign promised immediately to *lower* .NET registration fees by more than thirty percent.

65.     Because there can be only one registry operator at a time for each TLD registry, no competition among prospective registry operators exists during the term of each registry agreement. The only time competition among prospective registry operators exists is at the end of a registry agreement, when the next registry operator must be selected.

66.     A central competitive constraint on a TLD registry operator is the meaningful prospect that the operator will lose the registry in the next round of bidding on the basis of overcharging or poor performance during the current contract term.

67.     The threat of future competitive bidding not only constrains the TLD operator at the moment when it bids, but also during its operation of the registry.  A failure to act reasonably and provide service on competitive terms and conditions throughout the contract term poses a potential for the current operator to lose in future bidding competition for the TLD registry agreement.

68.     Although current technology favors having a single registry for a given TLD, the assignment of a contract to operate a TLD does not create a natural monopoly.

69.     A registry operator that operates a TLD registry for a fixed period of time, knowing that the registry contract will be placed into a competitive bidding situation at the end of the fixed term, faces competition from its potential successors.

70.     This competitive bidding, between incumbent operator and prospective successor operators, benefits consumers by keeping prices in check, by ensuring that the registry operator invests in sufficient infrastructure and staff to maintain a stable and secure registry, by maintaining solid and reliable performance of the registry, and by preventing the registry from undertaking abusive practices that would financially benefit the registry at the expense of the end-user's experience.

71.     This competitive bidding, between incumbent operator and prospective successor operators, also benefits registrars, including registrars who act as back-end service providers (as defined *infra*), by ensuring that the registry operator invests in sufficient infrastructure and staff to maintain a stable and secure registry on which registrars can rely for their businesses, by maintaining solid and reliable performance of the registry on which registrars can rely for their businesses, and by preventing the registry from undertaking abusive practices that would allow the registry to cannibalize competitive registrar markets.

72.     Until June 2005, Verisign had operated both the .NET and the .COM registries under the competitive threat of future competitive bidding.

73.     When ICANN awarded the contract for the .NET registry to Verisign in July 2005, however, ICANN and Verisign eliminated all realistic prospects that Verisign would face competitive bidding for that registry in the future.

74.     Upon the award of the new .NET contract to Verisign in July, 2005, Verisign moved into a monopoly position with regard to .NET, insulated from any realistic competition from a successor registry for .NET.

75.     The new 2005 .NET Agreement included a renewal provision that allowed ICANN to solicit competitive bids for the .NET registry only if a court or arbitrator issued a non-appealable

1   final order finding Verisign to be in breach of the agreement.  Even then, Verisign would not lose the

2   registry contract if it cured the breach.

3        76.    The proposed 2006 .COM Agreement challenged in this action includes an identical

4   provision, thereby eliminating all realistic prospect that Verisign will face competitive bidding for

5   the .COM registry in the future.

6        77.    Upon the award of the new .COM contract to Verisign in 2006, Verisign moved into

7   a monopoly position with regard to .COM, insulated from any realistic competition from a successor

8   registry for .COM.

9   **F.    OTHER TLDs ARE NOT SUBSTITUTES FOR .COM AND .NET**

10        78.    The .COM registry does not compete with other TLDs.

11        79.    The ..NET registry also does not compete with other TLDs.

12        80.    The .COM and .NET registries cannot compete with each other for an additional,

13   separate reason:  Verisign controls both the .COM and the .NET registries.

14        81.    Consumers do not regard .COM domain names as having reasonable substitutes in

15   any other top-level domain name registries.

16        82.    Demand cross-elasticities between .COM domain names, on the one hand, and

17   domain names in other TLDs such as .NET, .INFO, .BIZ and in country code TLDs, are low.

18        83.    Decreases in the price of domain name registrations in other TLDs (such as occurred

19   on July 1, 2005 when .NET domain name registration prices were cut by more than thirty percent)

20   do not result in price decreases for .COM domain name registrations.

21        84.    As a promotional device, .INFO domain names were given away for free for a

22   significant period when that registry first started to operate.  During that time, there was no

23   discernible number of registrants switching from .COM domain names to .INFO domain names.

24        85.    The prices that consumers are willing to pay for .COM domain name registrations in

25   auctions substantially exceed the prices they are willing to pay for domain name registrations in

26   other TLDs when they are offered at auctions.  For example, during the past year, nine .COM

27   domain names sold for $600,000.00 or more, while the highest selling .BIZ domain name was

28   $15,000.00.

ALVARADOSMITH
A PROFESSIONAL CORPORATION
LOS ANGELES

86.     Many .COM domain name registrants regard domain names in other TLDs as complements to, rather than substitutes for, .COM domain name registrations and seek similar domain name registrations in a number of TLDs.

87.     In fact, Verisign itself has registered not only "Verisign.com" but also "Verisign.net," "Verisign.info," and "Verisign.biz," among others.

88.     Moreover, most .COM domain name registrants would experience overwhelming costs to switch from a .COM domain name registration to the complementary domain name in another TLD (for example, a switch from cook.COM to cook.NET or to cook.info), including potential lost traffic, e-mails, and goodwill, as well as slippage in search engine results and costs associated with revising letterhead, business cards, Internet listings, and websites.

89.     As a result, registrants of .COM domain names would not regard domain names in other TLDs as reasonable substitutes for their existing domain names in the .COM TLD.

90.     For all practical purposes, registrants of .COM domain names are locked in to the registration and use of their .COM domain name.

91.     For many .COM domain name registrants, their .COM domain name has become their trademark or trade name, such as "Amazon.com." These registrants do not regard domain names in other TLDs, such as "Amazon.net," to be reasonable substitutes for their .COM domain name registrations.

92.     For a company that has branded its online identity with a .COM domain name, the costs of changing that branding to a new TLD are enormous.  For this reason, .COM registrants are locked into their use of the .COM registry.

93.     .COM domain names are the primary commercial domain names and dominate the market for domain names registered for commercial purposes.

94.     There are in excess of 60,000,000 .COM domain name registrations, which is approximately 75% of all domain names registered in generic TLDs (.COM, .NET, .ORG, .INFO, and .BIZ) and approximately 45% of all domain names registered in any TLD (including those registered in restricted TLDs such as .GOV or .MUSEUM, and the country code TLDs).

ALVARADOSMITH
A PROFESSIONAL CORPORATION
LOS ANGELES

95.     Consumers likewise do not regard .NET registrations as having reasonable substitutes in any other top level domain name registries.

96.     Demand cross-elasticity between domain names in the .NET TLD, on the one hand, and domain names in other TLDs such as .COM, .INFO, .BIZ and country code TLDs, are low.

97.     The significant decrease in the registration fee for .NET domain names in July 2005 (more than thirty percent) did not result in significant numbers of consumers switching to .NET domain names from domain names in other TLDs.

98.     When .INFO domain names were being given away for free when that registry first started to operate, there was no discernible number of registrants switching from .NET domain names to .INFO domain names.

99.     The prices that consumers are willing to pay at auctions for .NET domain name registrations substantially exceed the prices they are willing to pay for domain names in all other TLDs when they are offered at auction, with the sole exception of .COM domain names.

100.    For example, during one recent year the highest selling .NET domain name was $150,000.00, which was more than double what anyone was willing to pay for a domain name in the other TLDs (other than the .COM TLD).

101.    As with registrants of .COM domain names, many .NET domain name registrants use their .NET domain name as their trademark or trade name, such as "earthlink.net."  They would be unwilling to incur the substantial switching costs involved in switching from their .NET domain name to a complementary domain name in another TLD (such as a switch from "att.net" to "att.info").

102.    Moreover, because .NET domain names are the primary domain names used for networking purposes and dominate the market for such names, they are commonly used by Internet and e-mail service providers who could not easily substitute a domain name in an alternative TLD without potentially disrupting traffic for thousands if not millions of customers.

103.    There are a limited number of generic TLDs.

///

///

FOURTH AMENDED COMPLAINT
2076472.1

Case No. 5:05-CV-04826-RMW

104.    A number of these generic TLDs, such as .MIL, .MUSEUM, and .TRAVEL, impose restrictions on who can register a domain name in the TLD and the purpose for which such a domain name can be used.

105.    Other generic TLDs, such as .ORG and .EDU, are recognized by consumers as being used in connection with particular purposes, such as non-profit organizations and educational institutions.

106.    None of the other generic TLDs compete with the .COM or .NET TLDs.

107.    The country codes TLDs do not compete with either the .COM TLD or the .NET TLD.

108.    Many ccTLDs impose nexus requirements between the prospective registrant and the host country for the ccTLD, preserving the idea that domain names in ccTLDs should be used by individuals and entities that have a nexus with the host country.

109.    Some of these nexus requirements can be quite onerous, for example, limiting domain name registrations to entities formed or incorporated in the host country.

110.    Even in those cases where there is no nexus requirement, a ccTLD is not viewed as a reasonable substitute for a .COM or .NET domain name for individuals and entities who have no nexus with the host country because it could lead to consumer confusion.  For example, a company located in the United States would not view a domain name registered in the Mexican TLD as a substitute for a domain name registered in the .COM or .NET TLDs.  Additionally, all country code TLDs are operated and managed outside of the United States, and are therefore not subject to United States antitrust laws and statutes.

111.    Registration with ccTLDs requires a Registrant to leave the borders and protection of the United States.

112.    ccTLDs cannot be counted as part of the relevant market for determining antitrust violations.

## G.    HISTORY OF gTLD DOMAIN NAME ADMINISTRATION

113.    Today's Internet has its origin in a network called the ARPAnet which was launched by the Department of Defense ("DOD") in 1969.  ARPAnet was later linked to other networks

ALVARADOSMITH
A PROFESSIONAL CORPORATION
LOS ANGELES

established by various government agencies, universities, and research facilities.  In 1990, NSFnet, the network developed by the National Science Foundation superseded ARPAnet.

114.    In 1992, Congress passed the Scientific and Advanced-Technology Act of 1992, 42 U.S.C. § 1862(g), which allowed commercial activity on NSFnet and permitted NSFnet to interconnect with commercial networks.

115.    In 1993, NSF signed a cooperative agreement with Network Solutions ("NSI"), Verisign's predecessor in interest, under which NSI became the exclusive registrar for second-level domains in .COM, .NET, .ORG, and .EDU, as well as the exclusive Registry operator for each of those top-level domains.

116.    The NSF initially underwrote NSI's domain registration services, thereby allowing Internet users to register domain names free of charge.

117.    On or about September 13, 1995, however, NSF and NSI entered into Amendment 4 of the cooperative agreement, which permitted NSI to charge Internet users $100 for a two-year registration of a second-level domain in the .COM, .NET, and .ORG domains.  Thirty percent of the registration fees were to be paid into an NSF Infrastructure fund.

118.    In April 1998, the portion of the fee allocated to the Infrastructure fund was held to constitute an unconstitutional tax, and the effective rate for domain registrations dropped to $35 per year.

119.    On July 1, 1997, the Clinton administration issued a report on electronic commerce, "*A Framework for Global Electronic Commerce*."  The report supported private efforts to address Internet governance and made the Department of Commerce ("DOC") the lead agency on this initiative.  Accompanying the report was a presidential directive that called on the DOC to "support efforts to make the governance of the domain name system private and competitive and to create a contractually based self-regulatory regime that deals with potential conflicts between domain name usage and trademark laws on a global basis."

120.    To carry out this mission, the DOC first issued a Request for Comment on DNS administration, and then on February 20, 1998, it published "*Proposal to Improve Technical Management of Internet Names and Addresses*" (commonly referred to as the "Green Paper").

16

121.    After receiving more than 650 comments, the DOC ended the proposed rulemaking and instead published on June 10, 1998, a policy statement also known as the "White Paper."

122.    The White Paper, reflecting the views of the overwhelming majority of comments, called upon the private sector to create a new, not-for-profit corporation to assume responsibility, over time, for the management of certain aspects of the DNS.

123.    The White Paper identified four specific functions to be performed by this new corporation: (i) To set policy for and direct the allocation of Internet Protocol number blocks; (ii) To develop overall policy guidance and control of top-level domains and the Internet root server system; (iii) To develop policies for the addition, allocation, and management of gTLDs, and the establishment of domain name registries and domain name registrars and the terms, including licensing terms, applicable to new and existing gTLDs and registries under which registries, registrars, and gTLDs are permitted to operate; and (iv) To coordinate maintenance and dissemination of the protocol parameters for Internet addressing.

124.    The White Paper also articulated the fundamental policies that would guide United States participation in the transfer of DNS management responsibility to the private sector: stability; competition; private, bottom-up coordination; and representation.

125.    The White Paper listed a number of tasks to be undertaken on a priority basis, including, in particular, the creation and organization of a new, not-for-profit corporation ("NewCo") to manage the DNS and the rapid introduction of competition in the provision of domain name registration services. The Department of Commerce committed to enter into an agreement with NSI by which NSI would agree to take specific actions, including commitments as to pricing and equal access, designed to permit the development of competition in domain name registration.

126.    In fulfillment of the commitment expressed in the White Paper, on October 7, 1998, the DOC and NSI entered Amendment 11 to the Cooperative Agreement.  In Amendment 11, NSI agreed to recognize NewCo "when recognized by the [DOC] in accordance with the provisions of the Statement of Policy."

///

///

17

FOURTH AMENDED COMPLAINT
2076472.1

Case No. 5:05-CV-04826-RMW

127.     NSI further committed to enter into a contract with NewCo, and acknowledged "that NewCo will have the authority, consistent with the provisions of the Statement of Policy and the agreement between the [DOC] and NewCo, to carry out NewCo's Responsibilities."

128.     Under Amendment 11, "NewCo's Responsibilities" specifically include the establishment and implementation of DNS policy and the terms, including licensing terms, applicable to new and existing gTLDs and registries under which registries, registrars and gTLDs are permitted to operate."

129.     Amendment 11 also provided for the development, deployment, and licensing by NSI (under a license agreement to be approved by the Department of Commerce) of a mechanism to allow multiple registrars to submit registrations for the gTLDs for which NSI acted as the Registry (the "Shared Registration System," or "SRS").

## H.     ICANN'S ROLE IN THE INTERNET DOMAIN NAME SYSTEM

130.     In September 1998, Defendant Internet Corporation for Assigned Names and Numbers was formed.  ICANN is a non-profit public benefit corporation.

131.     In October 1998, ICANN transmitted to the Department of Commerce a copy of its Articles of Incorporation, and proposed Bylaws.

132.     In November 1998, the DOC entered into a Memorandum of Understanding ("MOU") with ICANN that recognized ICANN as the new not-for-profit corporation for DNS management and specifically contemplated ultimate transition of management responsibility to ICANN.

133.     The MOU expressly identified the promotion of competition in the DNS as one of its central principles.

134.     In the MOU, ICANN expressly agreed to abide by principles of stability, competition, private, bottom-up coordination, and representation.

135.     The MOU also obligated ICANN to "act in a non-arbitrary and reasonable manner with respect to design, development, and testing of the DNS Project and any other activity related to the DNS Project," and to refrain from acting "unjustifiably or arbitrarily to injure particular persons or entities or particular categories of persons or entities."

ALVARADOSMITH
A PROFESSIONAL CORPORATION
LOS ANGELES

136.    Under the MOU, ICANN exclusively awards the generic TLD registry agreements, including the registry agreements for the .COM and .NET TLDs.

137.    The original MOU was scheduled to terminate on September 30, 2000, and has been amended seven times.

138.    The most recent amendment, in the form of a Joint Project Agreement  ("JPA") was entered into on or around September 29, 2006.

139.    In the September 29, 2006 JPA, the DOC reaffirmed its "continued support" for privatizing the technical management of the DNS in a manner that promotes stability and security, competition, coordination, and representation.

140.    The new JPA reaffirmed ICANN's operational principles, including that ICANN foster and enable "competition."

141.    ICANN's by-laws also explicitly recognize "core values," which "should guide the decisions and actions of ICANN," including: "Where feasible and appropriate, depending on market mechanisms to promote and sustain a competitive environment" and "Introducing and promoting competition in the registration of domain names where practicable and beneficial in the public interest."

142.    The DOC has recognized that ICANN is subject to federal anti-trust laws.

I.    **ICANN'S COURSE OF DEALING AND AGREEMENTS WITH VERISIGN**

1.    **The 2001 .COM and .NET Agreements ("the 2001 Registry Agreements")**

143.    On or about November 10, 1999, NSI and ICANN entered into a written Registry Agreement (the "1999 Registry Agreement") with respect to NSI's operation of the Registry for the .COM and .NET gTLDs.

144.    Through the negotiations that led to the 1999 Registry Agreement and by agreements with the United States negotiated at the same time, NSI agreed to recognize ICANN.

145.    Through the negotiations that led to the 1999 Registry Agreement and by agreements with the United States negotiated at the same time, NSI agreed to split it business into a registrar business and a registry business, which it would maintain separately.  NSI agreed to face competition at the registrar level, while maintaining its single position as the sole registry.

ALVARADOSMITH
A PROFESSIONAL CORPORATION
LOS ANGELES

146.     On or about May 25, 2001, Verisign and ICANN entered into the 2001 .COM Agreement with respect to Verisign's operation of the .COM registry and the 2001 .NET Agreement with respect to Verisign's operation of the .NET registry.

147.     The 2001 Registry Agreements superseded the 1999 Registry Agreement with NSI.

148.     In accordance with the 2001 Registry Agreements, Verisign undertook to operate the .COM and .NET gTLD registry and to pay certain registry-level fees to ICANN.

149.     Verisign is the sole registry for the .COM and .NET gTLDs and therefore maintains a monopoly over the .COM and .NET gTLDs.

150.     The 2001 .COM Agreement had been set to expire on November 10, 2007, but provided that Verisign could submit a written proposal to extend the agreement.

151.     Under this same agreement, ICANN was required to consider any extension proposal for a period not to exceed six (6) months "before deciding whether to call for competing proposals from potential successor registry operators."  It further provided that Verisign "shall be awarded a four-year renewal term" unless ICANN determines that Verisign is in material breach of the 2001 .COM Agreement, or the proposal to extend the agreement contains a maximum price that exceeds the price allowed under Section 22 of the 2001 .COM Agreement or certain other conditions apply. This four-year renewal term, if granted, would have expired on November 10, 2011.

152.     Verisign repeatedly breached the terms of the 2001 .COM Agreement, and ICANN sought to redress certain of Verisign's breaches in litigation against Verisign.

153.     These breaches give ICANN the right to seek competitive bids to replace Verisign at the expiration of the current term, or even earlier.

154.     Verisign and ICANN agreed to bypass this process by entering into a new .COM Registry Agreement.

155.     In the new 2006 .COM Agreement, negotiated and agreed to by Verisign, Verisign is proposing to set a new maximum price for domain name registrations that exceeds the price allowed under Section 22 of the 2001 .COM Agreement.

///

///

156.    If Verisign had proposed this pricing change to ICANN as part of a written proposal to extend the 2001 .COM Agreement (as contemplated by that agreement), ICANN would have had the right, and (because of the MOU) the obligation, to seek competitive bids for the .COM registry.

157.    The 2001 .NET Agreement also allowed for competitive bidding, which took place in advance of its expiration on June 30, 2005.

158.    That agreement established a procedure by which ICANN was to select as a successor operator of the .NET registry "the eligible party that it reasonably determines is best qualified to perform the registry function . . . taking into account all factors relevant to the stability of the Internet, promotion of competition, and maximization of consumer choice . . . ."

159.    Under both the 2001 .COM Agreement and the 2001 .NET Agreement, Verisign is required to provide "Registry Services" to ICANN-accredited registrars in a manner meeting the performance and functional specifications attached to the agreement.  "Registry Services" are defined in the 2001 .COM Agreement as follows:

> "Registry Services" means services provided as an integral part of the Registry TLD, including all subdomains.  These services include: receipt of data concerning registrations of domain names and nameservers from registrars; provision to registrars of status information relating to the Registry TLD zone servers, dissemination of TLD zone files, operation of the Registry zone servers, dissemination of contact and other information concerning domain name and nameserver registrations in the Registry TLD, and such other services required by ICANN through the establishment of Consensus Policies as set forth in Definition 1 of this Agreement.

The 2001 .NET Agreement contains a substantially similar definition of "Registry Services."

160.    Under both the 2001 .COM Agreement and the 2001 .NET Agreement, Verisign is also obligated to comply with "Consensus Policies," which consist of specifications and policies established on the basis of a consensus among Internet stakeholders represented in the ICANN process, as demonstrated by compliance with detailed procedures prescribed in the agreement.

161.    The 2001 .COM Registry Agreement defines "Consensus Policies" as consisting of those specifications and policies established on the basis of a consensus among Internet stakeholders represented in the ICANN process, as demonstrated by compliance with specific, detailed procedures prescribed in the agreement.

ALVARADOSMITH
A PROFESSIONAL CORPORATION
LOS ANGELES

162.    The 2001 Registry Agreements set forth "General Obligations of Registry Operator [Verisign]."

163.    Verisign generally is obligated to comply with Consensus Policies if, among other requirements, they are properly adopted by ICANN and consistent with ICANN's other contractual obligations, and (A) they "do not unreasonably restrain competition"; and (B) relate to "(1) issues for which uniform or coordinated resolution is reasonably necessary to facilitate interoperability, technical reliability, and/or stable operation of the Internet or DNS, (2) Registry policies reasonably necessary to implement Consensus Policies relating to registrars, or (3) resolution of disputes regarding the registration of domain names (as opposed to the use of such domain name)."

164.    In an effort avoid federal antitrust violations by Verisign, the 2001 .COM Registry Agreement further sets forth the following "General Obligations of ICANN."  "With respect to all matters that impact the rights, obligations, or role of Registry Operator," the agreement explicitly provides that ICANN shall, among other obligations: (i) "exercise its responsibilities in an open and transparent manner," (ii) "not unreasonably restrain competition and, to the extent feasible, promote and encourage robust competition…."   As discussed below, these goals were abandoned in the 2005 .NET and 2006 .COM Registry Agreements.

165.    Appendix G to both the 2001 .COM Agreement and the 2001 .NET Agreement sets forth the maximum prices Verisign can charge for specified services.

166.    Among other things, Appendix G to both the 2001 .COM Agreement and the 2001 .NET Agreement set a maximum price of six dollars ($6.00) per year for registration of a domain name and six dollars ($6.00) per year for renewal or extension of the registration of a domain name. In addition, for each one-year domain name registration a "registry-level transaction fee" of $0.25 is charged and paid to ICANN.  Under the 2001 .COM Agreement, a registrar currently pays $6.00 per year to register each domain name registered with Verisign.  The registrar also pays $0.25 to ICANN for the registry-level transaction fee.  Any amount above $6.25 that is charged to the registrant is kept by the registrar.  On information and belief, Verisign has always charged the maximum price allowed under the 2001 .COM Agreement and 2001 .NET Agreement to register a .COM or .NET

ALVARADOSMITH
A PROFESSIONAL CORPORATION
LOS ANGELES

1  domain name.  Thus, the maximum price has been more than a price cap; it has been the *de facto*

2  price.

3      167.    Appendix I to both the 2001 .COM Agreement and the 2001 .NET Agreement

4  includes a Code of Conduct.  Under the Code of Conduct, Verisign is obligated to "at all times strive

5  to operate as a trusted and neutral third-party provider of Registry Services."

6      168.    Among other obligations, the Code of Conduct to both the 2001 .COM Agreement

7  and the 2001 .NET Agreement requires Verisign to treat all ICANN-accredited registrars equally and

8  to give them equivalent access to the registry and prohibits Verisign from warehousing or registering

9  domain names in its own right other than through an ICANN-accredited registrar.

10      **2.**      **The Unlawful and Anticompetitive 2005, 2006 Registry Agreements**

11      169.    Unrestrained by any competition, ICANN and Verisign have now abandoned their

12  commitments to avoid unreasonable restraints of trade and promote fair competition in the

13  "Covenants" or "General Obligations" to this effect.

14      170.    Verisign is now using its monopoly power to raise prices above their natural level and

15  permit Verisign to leverage its power into other markets.  The antitrust and unfair competition laws

16  were enacted to prohibit this very conduct.

17      171.    Verisign and ICANN have agreed to eliminate the competitive constraints imposed

18  by the competitive bidding process, the Consensus Policies and the Code of Conduct, and thereby to

19  secure for Verisign an unlawful monopoly in each of the relevant markets.

20      172.    Pursuant to the conspiracy, ICANN allowed Verisign to alter substantial terms of its

21  bid for the 2005 .NET Agreement, after the bid was accepted by ICANN and after bidding was

22  closed to other participants.  The conspiracy led to the implementation of the monopolistic

23  provisions in the 2005 .NET Agreement, and also includes an understanding between the

24  conspirators as to the terms for the .COM Registry Agreement.

25      173.    The objectives of the unlawful conspiracy are to replace the 2001 .COM and .NET

26  Agreements with successor agreements that eliminate permanently all vestiges of competition in the

27  operation of these two registries and in the Relevant Markets; to secure for Verisign free reign to

28  impose supracompetitive prices for registrations of domain names in the .COM and .NET TLDs; to

ALVARADOSMITH
A PROFESSIONAL CORPORATION
LOS ANGELES

free Verisign from current limitations that prevent it from leveraging monopolies in downstream and adjacent markets; and to divide between Verisign and ICANN the monopoly profits achieved by operation of the conspiracy.

174.    ICANN and Verisign have agreed (a) to extend the term of Verisign's control of the .COM registry for an additional five years beyond the termination date under the current 2001 .COM Agreement, in violation of its terms and without ever submitting the renewal to any sort of competitive bidding; (b) to eliminate any meaningful prospect that Verisign will ever have to compete to operate the .NET registry or the .COM registry or that there will be any competitive bidding to operate either of them; (c) to increase the overall prices to consumers of domain names in the .COM and .NET TLDs; (d) to assure that any contractual price caps will be identical to the actual prices by having eliminated any competitive constraint on Verisign in the relevant markets; (e) to free Verisign to launch preemptive services that, by virtue of its control of the .COM and .NET registries, will eliminate rivalry and permit Verisign to exploit a complete monopoly over traffic data and other resources it has never paid or competed for the right to exploit; and (f) to provide mechanisms by which ICANN shares in the resulting monopoly profits.

175.    **Elimination of Competitive Bidding.**  Under the terms of the conspiracy, ICANN has agreed to divest itself of any meaningful ability to require Verisign to bid for a renewal term against competing registry operators for the .COM TLD.

176.    Under the 2001 .COM Agreement, ICANN had the right to require Verisign to bid for a renewal term to begin in November 2007.

177.    Under the MOU between ICANN and the Department of Commerce, ICANN is required to avail itself of every available opportunity to harness competition for the benefit of consumers and the Internet.

178.    The 2006 .COM Registry Agreement provides for the automatic renewal of the agreement, *inter alia*, as follows:

> Renewal. This Agreement shall be renewed upon the expiration of the term set forth in Section 4.1 above and each later term, unless the following has occurred : (i) following notice of breach to Registry Operator in accordance with Section 6.1 and failure to cure such breach within the time period prescribed in Section 6.1, an arbitrator or

ALVARADoSMITH
A PROFESSIONAL CORPORATION
LOS ANGELES

court has determined that Registry Operator has been in fundamental and material breach of Registry Operator's obligations set forth in Sections 3.1(a), (b), (d) or (e); Section 5.2 or Section 7.3 and (ii) following the final decision of such arbitrator or court, Registry Operator has failed to comply within ten days with the decision of the arbitrator or court, or within such other time period as may be prescribed by the arbitrator or court.

Upon renewal, in the event that the terms of this Agreement are not similar to the terms generally in effect in the Registry Agreements of the 5 largest gTLDs (determined by the number of domain name registrations under management at the time of renewal), renewal shall be upon terms reasonably necessary to render the terms of this Agreement similar to such terms in the Registry Agreements for those other gTLDs. The preceding sentence, however, shall not apply to the terms of this Agreement regarding the price of Registry Services…Upon renewal, Registry-Level Transaction Fees may be reasonably modified so long as any increase in such fees shall not exceed the average of the percentage increase in Registry-Level Transaction Fees for the 5 largest gTLDs (determined as for the 5 largest gTLDs (determined as above), during the prior three-year period.

179.    ICANN's conspiratorial agreement to waive its right to impose competitive bidding with respect to operation of the .COM registry, and to violate its contract with the federal government, is a keystone of the overall conspiracy with Verisign.

180.    ICANN has similarly conspired with Verisign to eliminate future competitive bidding for operation of the .NET registry.  In 2005, competitive bidding for the .NET registry yielded a reduction in the price for .NET domain name registrations that was in excess of thirty percent. ICANN's and Verisign's conspiracy eliminates this possibility in the future.

181.    Verisign was able to extract from ICANN agreement to enter into this conspiracy as a result of the financial and litigation pressure applied to ICANN by Verisign's vastly superior financial resources.

182.    Although the 2006 .COM Registry Agreement gives ICANN the titular ability to rebid the registry agreement if Verisign is in breach, the provision is illusory.

183.    The rebid provision only applies if Verisign has been adjudged in material breach of the agreement by a final, non-appealable judgment and Verisign has not cured the defect.  This is an event that never will be triggered.

///

ALVARADOSMITH
A PROFESSIONAL CORPORATION
LOS ANGELES

184. At the time they negotiated the rebid provision of the 2006 .COM Registry Agreement, and at the time they executed the Agreement, both ICANN and Verisign understood that it never would be triggered.

185. At the time they negotiated the rebid provision of the 2006 .COM Registry Agreement, and at the time they executed the Agreement, both ICANN and Verisign understood that the rebid provision was illusory.

186. By contrast, the rebid provisions of the previous agreement, which allowed a rebid for breach or because of a proposal to price .COM domain names higher than $6.00 per year, already would have been triggered had that provision remained in effect.

187. **Increasing Prices.** The conspiracy increases significantly the prices that Verisign will charge for .COM and .NET domain name registrations.

188. The conspiracy also, in effect, raises the amounts that registrants ultimately bear for the registry level transaction fees paid to ICANN. By eliminating periodic rivalry to run the registry, Verisign will be unconstrained in setting prices and will charge the maximum cap allowed by the terms of the conspiracy.

189. The 2006 .COM Registry Agreement affects prices by not only redrafting the previous provisions for maximum price, but also redefining which terms are included in the maximum price.

190. In the 2006 .COM Registry Agreement Verisign and ICANN effectively fix the price for .COM domain name registration at $6 through December 31, 2006, and further conspire to permit Verisign to permanently raise the price of .COM registration 7% for four out of the next six years. This price exceeds the historical rate of inflation and is greater than what a fair market would otherwise bear.[4]

---

[4] In the 2005 .NET Registry Agreement, entered into on June 29, 2005, ICANN and Verisign agree to set the price for new and renewed domain name registrations at $4.25. The Agreement then goes on to say that, effective January 1, 2007, the "controls on [Verisign's] pricing set forth in this Agreement shall be eliminated…." 2005 .NET Registry Agreement, section 7.3. Virtually the only restriction the Agreement places on pricing is that all registrars be equally subject to the price Verisign sets and treated equally under any incentive programs Verisign offers. The unfettered ability to raise prices indefinitely demonstrates the collusive manipulation and control which ICANN

26

ALVARADOSMITH
A PROFESSIONAL CORPORATION
LOS ANGELES

191.    If .COM had been put out for a competitive bid, the costs of domain name registrations would have fallen to at least as low as $3.00 per domain name, with at least the same level and quality of services provided by Verisign.

192.    Furthermore, the 2006 .COM Registry Agreement specifically excludes the "registry-level transaction fee" from the definition of the maximum price.  Therefore, the actual price is not simply $6.00 plus the ICANN sanctioned 7% increase in four of the next six years, but these two terms plus the registry-level transaction fee.

193.    Under the terms of the 2006 .COM Registry Agreement, the increase in the registry-level transaction fee is an automatic process. The Agreement makes no provision for registrars and Internet stakeholders to provide any input into the process.  *Id*.

194.    Verisign and ICANN each believe that Verisign could raise prices to the maximum permitted by the caps under .COM and to any price whatsoever under .NET without running afoul of the antitrust laws.

195.    In addition, pursuant to the conspiracy, the 2005 .NET Agreement provides for higher prices in the future for new or renewal domain name registrations in the .NET TLD.  Until December 31, 2006, the maximum price is set at $4.25, which includes a $0.75 Registry-Level Transaction Fee that is paid to ICANN by the registrars.  Beginning in 2007, the price controls set forth in the 2005 .NET Registry Agreement will be eliminated.  Without the constraint of competitive bidding, Verisign will be free to impose, and will impose, monopoly pricing on .NET domain name registrations.

196.    Verisign has stated its intention to raise prices under the 2006 .COM and 2005 .NET Agreements.

197.    Verisign will raise its prices under the .COM and .NET Agreements.

198.    Verisign's stock has risen on the widespread expectation by financial analysts that Verisign will raise its prices under the .COM and .NET Agreements.

---

and Verisign are perpetrating.  Only with certain monopolistic control over the market could Verisign and ICANN create such an agreement.

FOURTH AMENDED COMPLAINT
2076472.1

Case No. 5:05-CV-04826-RMW

ALVARADOSMITH
A PROFESSIONAL CORPORATION
LOS ANGELES

199.    The price increases, as described in the previous paragraphs, will be above the prices that Verisign could charge if the .COM and .NET registry contracts were subject to a competitive bidding process.

200.    The unlawful price increases, as described in the previous paragraphs, will be passed to consumers.

201.    Under a competitive model for registry bidding, prices would have fallen, to at least as low as $3.00 per name for similar levels and quality of service.

202.    The sale of new .COM registrations is highly competitive, with a number of high volume, low margin businesses pricing their domains just above or even at the price charged by the registry.

203.    Lower .COM prices at the registry level would have been passed on to consumers by these high volume, low margin registrars.

204.    **ICANN's Economic Motives to Conspire.**  ICANN was motivated to enter into the conspiracy by economic factors.

205.    First, the conspiracy provides for ICANN to share in the monopoly profits, including among other things, through the payment by Verisign to ICANN of a "registry level fee," beginning at $6 million dollars per year and increasing over the next two years to potentially in excess of $12 million dollars per year.

206.    These monopoly profits are far above the fees paid to ICANN under prior agreements.

207.    Second, Verisign has put ICANN in financial jeopardy through a stream of costly and aggressive litigation:  Verisign brought claims in federal court that were dismissed without prejudice; filed similar claims again in federal court that were dismissed with prejudice; proceeded to file for a third time in state court; and has also proceeded in arbitration against ICANN.

208.    ICANN has acquiesced to Verisign's pressure to conspire, and ICANN has further been lured by the share of monopoly profits that it will receive from Verisign's operations of the .NET and .COM registries.

ALVARADOSMITH
A PROFESSIONAL CORPORATION
LOS ANGELES

209.     Verisign used its oppressive and costly litigation, its threats to withhold funding to ICANN, and the promise of a financial bailout and windfall of $12,000,000 in order to coerce ICANN into the conspiracy.

210.     Since ICANN was founded in November, 1998, Verisign (both by itself and by and through its predecessor NSI) has been relentless in its assault on ICANN's legitimacy and credibility.

211.     Among other things, Verisign (both by itself and by and through its predecessor NSI) has, among other things: (a) lobbied against ICANN's authority in Washington, D.C. and in the European Union: (b) attempted to control policy debates within ICANN by hiring people to advocate its positions under the guise that they were independent of Verisign/NSI; (c) paid bloggers to attack ICANN under the guise that they were independent of Verisign/NSI; (d) planted news stories critical of ICANN with mainstream and online media; (e) contributed to various "think tanks" and non-profit organizations to enable those organizations to criticize and undermine ICANN; and (f) threatened ICANN, its Staff members, and its Board members with litigation, arbitration, government investigation and even personal financial liability.

212.     Verisign (both by itself and by and through its predecessor NSI) has threatened to withhold funding from ICANN, jeopardizing its stability and existence.

213.     The relentless assault on ICANN by Verisign (both by itself and by and through its predecessor NSI) has designed to, and had had the effect of, coercing and/or convincing ICANN to agree to the conspiracy alleged in this Complaint.

214.     In the 2006 .COM Registry Agreement, Verisign expressly pledged to cease the attacks on ICANN's credibility and legitimacy in exchange for ICANN's agreement to the conspiracy detailed herein.

215.     In addition, the 2005 .NET Agreement provides for a maximum price per year for each new or renewal domain name registration.  Until December 31, 2006, the maximum price is set at $4.25, which includes a $0.75 Registry-Level Transaction Fee that is paid to ICANN by the registrar.  The increase in the "Registry-Level Transaction Fee" from $0.25 under the 2001 .NET Agreement to $0.75 under the 2005 .NET Agreement allows ICANN to share in the monopoly profit generated by Verisign's and ICANN's conspiracy.

ALVARADOSMITH
A PROFESSIONAL CORPORATION
LOS ANGELES

216. The conspiracy hands Verisign an additional windfall by relieving it of its obligation under the 2001 .COM Agreement to expend a minimum of two hundred million dollars ($200,000,000) "for research, development, and infrastructure improvements to the .COM, .NET, and .org Registries" between May 25, 2001, and December 31, 2010.

217. The conspiracy also frees Verisign from the Code of Conduct in Appendix I to the 2001 .COM Agreement.

## VIII.  ICANN'S AND VERISIGN'S ANTICOMPETITIVE, EXCLUSIONARY AND PREDATORY CONDUCT IN THE RELEVANT MARKETS

218. The history of ICANN's oversight of the Internet domain name system has seen an ever-expanding empire-building by Verisign, most recently with ICANN's capitulation to Verisign's litigation and financial threats.

219. Verisign has repeatedly taken steps to expand its limited-duration contractual monopoly over the registry itself into a permanent monopoly over that registry and over markets for various domain name services.

220. Verisign's misconduct has included outright breaches of its contracts with ICANN. Indeed, these breaches have led to litigation between Verisign and ICANN in which ICANN brought a counterclaim alleging that Verisign was in violation of material provisions of its contracts with ICANN.

## A.    ANTICOMPETITIVE CONDUCT IN THE DOMAIN NAME REGISTRATION MARKET

221. Verisign's persistence in challenging ICANN's oversight authority has been rewarded with a steady erosion of competition under ICANN.

222. For example, in negotiating to take over operation of the .COM registry in 2001, Verisign deployed its substantial economic muscle to extract from ICANN a renewal term that would make it difficult for ICANN to reopen the registry contract to competitive bidding.  Now, the conspiracy all but eliminates that potential for competition in all of the relevant markets, and virtually ensures Verisign's monopoly control over these markets.

FOURTH AMENDED COMPLAINT
2076472.1

Case No. 5:05-CV-04826-RMW

223.    Without the threat of future open bidding on its registry operation contracts, Verisign is free to increase the prices consumers are charged for registering domain names.

224.    In just one manifestation of Verisign's monopoly control, the proposed .COM Registry Agreement calls for an increase in registration fees coupled with guaranteed annual additional increases (in four of the next six years) – and with the renewal provision for four of every six years, in perpetuity.

225.    By contrast, because Verisign failed to secure similar favorable renewal terms in its initial 2001 contract to operate the .NET registry, Verisign faced competitive bidding when it sought to renew the .NET registry agreement in 2005.  As a result, Verisign was forced to agree to lower registration fees by thirty percent in connection with that registry in order to win renewal of the contract.

226.    The conspiracy frees Verisign from any reasonable prospect of competitive bidding for either registry in the future.

227.    Verisign also used its litigation with ICANN and the confidential settlement negotiations attendant to that litigation to obtain an unfair competitive advantage in its 2005 bid to operate the .NET registry.

228.    In its settlement negotiations for .COM, which preceded the submission of competitive bids for .NET, Verisign learned of material changes in ICANN's registry contractual terms, including the release of price caps and changes in the approval process for new registry services, that allowed Verisign to submit a more competitive bid for .NET than it could have had it been subject to the rules applicable to other bidders.

229.    Verisign used its leverage over ICANN to obtain an unfair commercial advantage in the bidding for the .NET registry contract. Verisign coerced ICANN into creating a bidding process for .NET that Verisign was certain to win.  ICANN and Verisign thus conspired to provide Verisign undue and unfair advantage in the .NET rebid process. ICANN specifically added judging criteria requested by VeriSign by which Verisign alone would measure favorably. ICANN altered and downplayed evaluation criteria requested by the public by which Verisign would have measured

ALVARADOSMITH
A PROFESSIONAL CORPORATION
LOS ANGELES

unfavorably.  ICANN specifically rejected evaluation criteria detrimental to VeriSign despite requests by the public to do so on legitimate public policy grounds.

230.    To further ensure that Verisign was awarded the .NET contract, ICANN selected as a supposedly "independent" evaluator, Telcordia Technologies, Inc. ("Telcordia"). At the time of Telcordia's selection, Telcordia was a wholly owned subsidiary of Science Applications International Corporation ("SAIC"), a predecessor in interest to Verisign and which, just a few years earlier, had been a major shareholder in Verisign. At the time of the "independent" evaluation, a Corporate Executive Vice President for Telcordia's parent company, SAIC, was a sitting director of VeriSign.

231.    The stacked evaluation criteria coupled with an evaluator with extensive ties to Verisign ensured that Verisign would win the .NET rebid. Verisign was not the qualified bidder with the lowest price bid (based on proposed per domain name registration costs), and a more fair evaluation process untarnished by Verisign's unlawful influence would have resulted in an award of .NET to a different bidder, with lower overall .NET registration costs to consumers.

232.    Verisign, insulated from the threat of future competition, has engaged in monopolistic conduct that has disrupted the competitive balance of the Internet, and at times has included flagrant breaches of its obligations under the existing .COM and .NET registry agreements.

233.    Verisign engaged in a predatory and exclusionary campaign that included depleting ICANN's resources while at the same time luring it with a share of monopoly profits, in order to exclude rivals from the relevant markets.

234.    Through its own conduct, including its unlawful conspiracy with ICANN, Verisign has monopolized and will continue to monopolize the relevant markets for .COM domain name registrations, has imposed and will impose supracompetitive prices on consumers in those markets, and has eliminated and will continue to eliminate any economic pressure on itself to innovate or offer improvements in service including security and stability.

235.    Through its own conduct, including its unlawful conspiracy with ICANN, Verisign has monopolized and will continue to monopolize the relevant markets for .NET domain name registrations, has imposed and will impose supracompetitive prices on consumers in those markets,

ALVARADOSMITH
A PROFESSIONAL CORPORATION
LOS ANGELES

1   and has eliminated and will continue to eliminate any economic pressure on itself to innovate or

2   offer improvements in service including security and stability.

3   ### IX.  HARM SUFFERED BY THE PLAINTIFF AND ITS MEMBERS

4   236.    As noted, infra, CFIT was formed for the purpose of challenging the anticompetitive

5   agreements and activities of Verisign alleged herein, including the 2006 .COM Agreement.

6   237.    **CFIT's members include domain name registrants and registrars** that,

7   collectively, have registered hundreds of thousands of domain names in the .COM and .NET

8   registries.

9   238.    Domain name registrants, including those members of the Plaintiff, will be harmed by

10  the actions and conspiracy detailed in this Complaint by (a) the unlawful increase in prices which

11  Verisign will exact from registrants in the .COM TLD, which will damage Plaintiff's members by

12  hundreds of thousands of dollars each year and extract hundreds of millions of dollars from all

13  .COM registrants over the course of the 2006 .COM Registry Agreement's existence; (b) the loss of

14  competitive services for expiring domain names, which will displace some registrants, including

15  members and supporters of CFIT, from the market for such services entirely and exact new and

16  unnecessary costs from those who can afford to remain in the market; (c) the degradation in registry

17  services that will come from allowing Verisign to abandon its $200,000,000 infrastructure

18  commitment and operate unrestricted by the prior "Code of Conduct"; (d) the loss of policy influence

19  of Internet users, including CFIT's members, by the restrictions on the definition of "Consensus

20  Policies" in the .COM and .NET Registry Agreements; and (e) such other injuries and harms as

21  detailed throughout this Complaint.

22  239.    None of the harms detailed in the paragraph above are conditional on any future acts

23  or decisions of the parties.  All of the harms are real and will occur if not enjoined by this Court.

24  ### X.  NO ANTITRUST IMMUNITY FOR VERISIGN

25  240.    On or about November 30, 2006, the United States Department of Commerce

26  approved the 2006 .COM Registry Agreement at issue in this Complaint, as modified by a new

27  Amendment 30 to the Cooperative Agreement between Verisign and the United States.

28  241.    This approval allows the 2006 .COM Registry Agreement to take effect immediately.

ALVARADOSMITH
A PROFESSIONAL CORPORATION
LOS ANGELES

33

242.    This approval did not address the issues in this Complaint or provide any immunity or safe harbor to Verisign.

243.    The approval and the new Amendment 30 to the Cooperative Agreement between Verisign and the United States contains an express provision in Section 5 that reads: "*This approval is not intended to confer federal antitrust immunity on Verisign with respect to the Registry Agreement.*"

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION
### Monopolization Under Section 2 of the Sherman Act

### (COM and .NET Registration Markets)

244.    Plaintiff repeats and incorporates by reference the allegations set forth above as if fully set forth herein.

245.    For purposes of this claim, the relevant product markets are the .COM and .NET Registration Markets.

246.    The relevant geographic markets are global.

247.    Verisign has a complete monopoly in the .COM and .NET Registration Markets, and exercises market power in those markets.

248.    Verisign has a complete monopoly in the separate .COM Registration Market and exercises market power in that market.

249.    Verisign has acted alone and in concert with ICANN unlawfully to maintain its monopoly indefinitely into the future in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

250.    Verisign's monopoly control of the .COM and .NET Registration Markets has been maintained and extended through exclusionary and predatory conduct.

251.    It is unnecessary and unreasonable for a single company to continue indefinitely to maintain monopoly control over the .COM and .NET registries.

252.    Verisign has unlawfully abused its authority as the registry operator for .COM and .NET, its contractual relationship to ICANN, and its superior financial resources to ICANN, to

ALVARADOSMITH
A PROFESSIONAL CORPORATION
LOS ANGELES

extend and enhance its control over the .COM and .NET registries to allow it to dominate new markets and to price its services far above that which a competitive market otherwise would allow.

253.    Verisign's unlawful conduct has caused and, unless enjoined by this Court, will continue to cause adverse and anticompetitive injury to consumers and to the business and property of Internet stakeholders and to CFIT's Members and Supporters, as described more fully in this Complaint.

### SECOND CAUSE OF ACTION
### Attempted Monopolization Under Section 2 of the Sherman Act

### (.COM and .NET Registration Markets)

254.    Plaintiff repeats and incorporates by reference the allegations set forth above as if fully set forth herein.

255.    For purposes of this claim, the relevant product markets are the .COM and .NET Registration Markets.

256.    The relevant geographic markets are global.

257.    For purposes of this claim, CFIT alleges that .COM and .NET are separate markets and that Verisign has engaged in exclusionary and predatory conduct with respect to each of them separately and individually.

258.    Verisign has a complete monopoly in the .COM and .NET Registration Markets, and each of them individually, and exercises market power in those markets.

259.    Verisign has engaged in exclusionary and predatory conduct with the specific intent to extend and perpetuate its monopoly over these relevant markets in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

260.    The acts done and threatened by Verisign are exclusionary insofar as they have prevented and threaten to further prevent in perpetuity any other entity from ever competing to operate the .COM and .NET registries such as by offering lower prices, superior service or innovation.

261.    By virtue of Verisign's exclusionary scheme and unlawful conduct, there is a dangerous probability that Verisign will succeed in extending its monopoly control over the .COM

ALVARADOSMITH
A PROFESSIONAL CORPORATION
LOS ANGELES

1    and .NET Registration Markets in perpetuity in violation of Section 2 of the Sherman Act, 15 U.S.C.

2    § 2.

3         262.    If not enjoined, there is a dangerous likelihood that Verisign's monopolization will

4    continue, with the result that all other existing and potential competitors will be forever excluded

5    from competition in the relevant .COM and .NET Registration Markets, and Verisign will continue

6    to impose supra-competitive price increases.

7         263.    If not enjoined by this Court, Verisign will continue to cause adverse and

8    anticompetitive injury to consumers and to the business and property of Internet stakeholders and to

9    CFIT's Supporters.

10

11                              **THIRD CAUSE OF ACTION**
                   **Conspiracy to Monopolize Under Section 2 of the Sherman Act**

12                              **(All Relevant Markets)**

13        264.    Plaintiff repeats and incorporates by reference the allegations set forth above as if

14   fully set forth herein.

15        265.    For purposes of this claim, the relevant product markets are the .COM and .NET

16   Registration Markets and the Expiring Names Registration Services Market.

17        266.    The relevant geographic markets are global.

18        267.    Verisign has a complete monopoly in the .COM and .NET Registration Markets, and

19   exercises market power in those markets.

20        268.    It is unnecessary and unreasonable for a single company to continue indefinitely to

21   maintain monopoly control over the .COM and .NET registries.

22        269.    Verisign has acted in concert with ICANN unlawfully to acquire and maintain

23   Verisign's monopoly over these relevant markets indefinitely into the future in violation of Section 2

24   of the Sherman Act, 15 U.S.C. § 2, and both have acted with the specific intent to confer upon

25   Verisign unlawful monopoly power in these relevant markets.

26        270.    In furtherance of their conspiracy, Verisign and ICANN negotiated and entered into

27   agreements and profit-sharing arrangements whereby Verisign and ICANN will in various ways share

28   the monopoly overcharges that the conspiracy will impose on consumers in the relevant markets.

ALVARADOSMITH
A PROFESSIONAL CORPORATION
LOS ANGELES

271.    Verisign's conspiracy to monopolize the relevant markets has been in violation of § 2 of the Sherman Act.

272.    Verisign's unlawful conspiracy has caused and, unless enjoined by this Court, will continue to cause adverse and anticompetitive injury to consumers and to the business and property of Internet stakeholders and to CFIT's Supporters.

273.    If not enjoined, Verisign's conspiracy and restraint on trade will continue.

### FOURTH CAUSE OF ACTION
### Conspiracy in Restraint of Trade Under Section 1 of the Sherman Act

### (All Relevant Markets)

274.    Plaintiff repeats and incorporates by reference the allegations set forth above as if fully set forth herein.

275.    For purposes of this claim, the relevant product markets are the .COM and .NET Registration Markets and the Expiring Names Registration Services Market.

276.    The relevant geographic markets are global.

277.    For purposes of this claim, CFIT alleges that .COM and .NET are separate markets and that Verisign has engaged in exclusionary and predatory conduct with respect to each of them separately and individually.

278.    Verisign has a complete monopoly over the relevant .COM and .NET Registration Markets, and each of them individually, and exercises market power in those markets.  It is unnecessary and unreasonable for a single company to continue indefinitely to maintain monopoly control over the .COM and .NET registries.

279.    Verisign has acted in concert with ICANN unlawfully to secure monopoly power and to restrain and eliminate competition in the relevant .COM and .NET Registration Markets indefinitely into the future in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

280.    The Expiring Names Registration Services Market is currently highly competitive.

281.    Verisign and ICANN have conspired to act together to restrain trade and competition in each of these relevant markets in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

ALVARADOSMITH
A PROFESSIONAL CORPORATION
LOS ANGELES

282.    Verisign's conspiracy to restrain trade in the relevant markets has had, and unless enjoined will continue to have, the effect of harming the competitive process in interstate commerce.

283.    If not enjoined, Verisign's restraint on trade will continue, with the result that all other existing and potential competitors will be excluded from competing in the relevant markets and consumers will be forced to pay, and continue to pay in perpetuity, supra-competitive prices for the registration of .COM and .NET domain names.

284.    Verisign's conspiracy has caused, and unless enjoined will continue to cause, injury to consumers and to the business and property of Verisign's existing and potential competitors and Internet stakeholders and to CFIT's Supporters.

## FIFTH CAUSE OF ACTION
### Conspiracy in Restraint of Trade Under the Cartwright Act

### (All Relevant Markets)

285.    Plaintiff repeats and incorporates by reference the allegations set forth above as if fully set forth herein.

286.    For purposes of this claim, the relevant product markets are the .COM and .NET Registration Markets and the Expiring Names Registration Services Market.

287.    The relevant geographic markets are global, including California.

288.    Verisign has a complete monopoly over the relevant .COM and .NET Registration Markets, and exercises market power in those markets.

289.    It is unnecessary and unreasonable for a single company to continue indefinitely to maintain monopoly control over the .COM and .NET registries.

290.    Verisign has acted in concert with ICANN unlawfully to restrain and eliminate competition in the relevant .COM and .NET Registration Markets indefinitely into the future in violation of the Cartwright Act, California Business & Professions Code sections 16720 *et seq.*

291.    The Expiring Names Registration Services Market is currently highly competitive.

292.    Verisign and ICANN have conspired to act together to restrain trade and competition in each of these relevant markets in violation of the Cartwright Act California Business & Professions Code sections 16720 *et seq.*

293.    Verisign's conspiracy to restrain trade in the relevant markets has had, and unless enjoined will continue to have, the effect of harming the competitive process in California.

294.    If not enjoined, Verisign's restraint on trade will continue, with the result that all other existing and potential competitors will be excluded from competing in the relevant markets in California and consumers will be forced to pay, and continue to pay in perpetuity, supra-competitive prices for the registration of .COM and .NET domain names.

295.    Verisign's conspiracy has caused, and unless enjoined will continue to cause, injury to consumers and to the business and property of Verisign's existing and potential competitors and Internet stakeholders and to CFIT's Supporters.

## PRAYER

WHEREFORE, CFIT prays for judgment as follows:

1.    For a declaration that the 2005 .NET Agreement and the new 2006 .COM Registry Agreement are unlawful and in violation of Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2; and the Cartwright Act, California Business & Professions Code sections 16720 *et seq*;

2.    For a declaration that Section 3.1(b)(v) (the limitations on Consensus Policies), Section 3.1(d) (the definition of Registry Services), Section 4.2 ("Renewal"), and Appendix 9 (explicitly authorizing the provision of specified new services) of the 2005 .NET Agreement are unlawful in violation of Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2; and the Cartwright Act, California Business & Professions Code sections 16720 *et seq*.;

3.    That the Court adjudge and decree that Verisign has monopolized interstate trade and commerce in the relevant markets in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2;

4.    That the Court adjudge and decree that Verisign has attempted to monopolize interstate trade and commerce in the relevant markets in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2;

5.    That the Court adjudge and decree that Verisign, through its superior financial resources and unlawful and predatory acts, has coerced ICANN into a combination and conspiracy to monopolize interstate trade and commerce in the relevant markets in violation of Section 1 and 2

ALVARADOSMITH
A PROFESSIONAL CORPORATION
LOS ANGELES

39

of the Sherman Act and in violation of the Cartwright Act, California Business & Professions Code §§ 16720 *et seq.*;

6.    That the Court adjudge and decree that Verisign has combined and conspired with ICANN to monopolize interstate trade and commerce in the relevant markets in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2;

7.    That the Court adjudge and decree that Verisign has combined and conspired with ICANN to restrain interstate trade and commerce in the relevant markets in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1;

8.    That the Court adjudge and decree that Verisign has combined and conspired with ICANN to restrain trade, and to have formed a trust, in violation of the Cartwright Act, California Business & Professions Code §§ 16720 *et seq.*;

9.    That Verisign and all persons, firms, and corporations acting on its behalf and under its direction or control be permanently enjoined from engaging in, carrying out, renewing or attempting to engage, carry out, or renew, any contracts, agreements, practices, or understandings in violation of the Sherman Act, the Lanham Act, the Cartwright Act, or the Unfair Competition Act, and specifically including, without limitation, the renewal provisions of the 2006 .COM registry agreement and Section 2.4 "Renewal" of the 2005 .NET Agreement;

10.    That Verisign be ordered to divest promptly and in any event within 90 days the registry business and all assets used or reasonably necessary to its operation to a separate company that will be prohibited from engaging in any business except for services that are defined as "Registry Services" in the 2001 .COM Agreement;

11.    That Verisign be prohibited from seeking approval from ICANN for any service for the .COM or .NET registries where the effect may be to tend to create a monopoly, to substantially harm competition, or to restrain trade and competition in any line of commerce;

///

///

///

///

FOURTH AMENDED COMPLAINT
2076472.1

Case No. 5:05-CV-04826-RMW

1   12.     That CFIT and other third parties who shall have been or might be injured in their

2   business or property as a result of any violation by Verisign of any of the provisions of the Court's

3   order, including CFIT's Supporters, be specifically authorized to enforce the provisions of thereof in

4   this Court, including without limitation pursuant to the antitrust laws of the United States as well as

5   any applicable state antitrust or unfair competition laws;

6   13.     That the 2006 .COM Registry Agreement be judged and decreed an unlawful

7   agreement in violation of Sections 1 and 2 of the Sherman Act and the Cartwright Act, California

8   Business & Professions Code §§ 16720 *et seq*.;

9   14.     That Verisign be ordered to abide by the terms of the 2001 .COM  Agreement;

10   15.     That the 2005 .NET Agreement be adjudged to have been procured through a

11   fraudulent bidding process;

12   16.     That Verisign be ordered and required to comply with the price provisions of

13   Appendix G of the 2001 .COM Agreement, and the Code of Conduct provisions of Appendix I of

14   the 2001 .COM Agreement and 2001 .NET Agreement;

15   17.     That Verisign be ordered and required to comply with the research and development

16   provisions of Appendix W of the 2001 .COM Agreement and make public the required annual

17   reports thereunder;

18   18.     That Defendant be ordered to disgorge all of its unlawful profits, including but not

19   limited to, all per domain name fees it has collected on .COM domain name sales in excess of $6.00

20   per name (the maximum price permitted under the terms of the 2001 .COM Agreement) and all per

21   domain name fees it has collected on .NET domain names in excess of what the lowest bidder in the

22   2005 .NET auction would have charged;

23   ///

24   ///

25   ///

26   ///

27   ///

28   ///

ALVARADOSMITH
A PROFESSIONAL CORPORATION
LOS ANGELES

1    19.    That Plaintiff have such other relief as the Court may consider necessary or

2 appropriate to restore competitive conditions in the markets affected by Verisign's unlawful conduct;

3    20.    That plaintiff recover the costs of this action and its attorneys' fees.

4

5 DATED:  February 22, 2011                    ALVARADOSMITH
                                              A Professional Corporation
6

7
                                    By:  _____/s/ Bret A. Fausett_____
8                                            PATRICK A. CATHCART
                                             BRET A. FAUSETT
9                                            REGINALD ROBERTS, JR.
                                             IMANI GANDY
10
                                             Attorneys for Plaintiff
11                                           COALITION FOR ICANN TRANSPARENCY INC.

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

FOURTH AMENDED COMPLAINT                                     Case No. 5:05-CV-04826-RMW
2076472.1